# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| INTERNATIONAL GARDEN PRODUCTS, INC., et al.,[1] | Case No. 10-_____ (___) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF JAMES H. HULBERT, III IN SUPPORT OF FIRST DAY RELIEF

I, James H. "Jay" Hulbert, III, hereby declare as follows:

1.    I am a resident of Clackamas County, Oregon. I am over the age of eighteen and am competent to testify to the matters set forth herein.

2.    I am the Chief Executive Officer of International Garden Products, Inc. ("IGP"), and as such I have personal knowledge of the matters set forth herein. I hold a Bachelor of Arts degree from the University of Washington.

3.    I have substantial experience in agribusiness and in the horticultural growing industry. Prior to joining IGP, I was a senior Vice President with Seminis, Inc. where my responsibilities included worldwide seed production, quality assurance, operations, information technology and strategic planning as well as North American sales and marketing. Prior to that time, I served as an Officer in the United States Marine Corps and helped operate a family farm in the State of Washington.

4.    Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge, materials provided by members of the Debtors' management team, information provided by retained professionals of the Debtors, or information obtained from my review of relevant documents. Additionally, the opinions asserted in this declaration are based upon my experience and knowledge of the Debtors' operations, financial condition and liquidity.

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers): International Garden Products, Inc. (5711), Weeks Wholesale Rose Grower (9716), California Nursery Supply (6835), Iseli Nursery, Inc. (6206), and Old Skagit, Inc. (2996).

If called upon to testify, I would competently testify to the facts set forth herein. I am authorized to submit this declaration on behalf of each of the Debtors.

## I.     FACTUAL BACKGROUND.

5.     On October 4, 2010 (the "Petition Date"), each of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

### A.     Background and Corporate Structure of the Debtors.

6.     International Garden Products, Inc. ("IGP") is a holding company and the ultimate parent of each of the other Debtors—Iseli Nursery, Inc. ("Iseli"), California Nursery Supply ("CNS"), Weeks Wholesale Rose Grower ("Weeks"), and Old Skagit, Inc. ("Old Skagit"). IGP was incorporated in 1996 and during the following two years acquired CNS, Weeks, Old Skagit and a company known as Langeveld International, Inc. ("Langeveld"). IGP sold its interest in Langeveld in 2005 and sold substantially all of the tangible assets of Old Skagit in June 2008. Old Skagit remains an inactive corporate entity with no ongoing business operations. CNS likewise has no current business operations, other than owning Weeks as an intermediate holding company.

7.     Iseli and Weeks are the Debtors' principal operating entities, and they are engaged primarily in the business of growing horticultural products for nationwide sale to independent garden centers, landscape suppliers, landscapers and similar parties. Iseli's business is focused on growing and selling dwarf conifers, Japanese maples and other woody ornamentals. Weeks grows and sells premium rose bushes.

8.     Iseli participates in a very fragmented marketplace of conifer growers. Its primary strategic advantage is that it produces unique, high-quality products. Iseli's products have received national recognition for their premium quality, and Iseli continues to maintain the enviable position of high brand recognition in its market niche with garden centers and discerning consumers.

9.     Weeks is one of two nationally recognized premium rose bush growers in the United States.  Virtually all premium rose bushes are grown in California, where Weeks operates and where the climate is conducive to growing a very high quality rose.  Although some companies also grow roses in Arizona, such roses tend to be lower quality, commodity-type roses that are typically sold to the "big box" retailers such as Home Depot and Wal-Mart.  The lawn and garden centers that are Weeks' core customers demand a higher quality product to support the higher prices that they command for roses; Weeks meets this need.  The rose bush market should not be confused with production of roses for cut flowers, which is a separate and distinct industry with almost no crossover.

10.     As is typical for companies that deal in horticultural products, the Debtors' primary selling season is December through June.  The Company's products are primarily sold directly to independent garden centers through a network of independent sales representatives.

**B.     Pre-Petition Indebtedness.**

11.     Prior to the Petition Date, the Debtors funded their operations with senior secured bank financing comprised of a revolving credit facility, letters of credit and a term loan facility (the "Pre-Petition Secured Debt").  The Debtors are borrowers under that certain Fifth Amended and Restated Credit Agreement dated as of December 22, 2005 (as amended, restated or modified from time to time, the "Pre-Petition Credit Agreement"), with Harris N.A., as Administrative Agent, and certain other financial institutions as additional lenders (the "Pre-Petition Secured Parties").  All obligations under the Pre-Prepetition Credit Agreement are owed jointly and severally by the Debtors other than Old Skagit, but are also guaranteed by Old Skagit.  As of the Petition Date, the Debtors were indebted under the Pre-Petition Credit Agreement for, among other things:  (i) revolving loans in the approximate principal amount of $30,669,990.16 and term loans in the approximate principal amount of $13,000,000.00; and (ii) other financial accommodations or services (including, without limitation, obligations

relating to cash management, depository, investments, hedging arrangements and other banking and financial services provided by the Pre-Petition Secured Parties or their affiliates), accrued interest, costs, fees, and professional fees and expenses (including attorneys fees and legal expenses), and all other "Obligations," "Hedging Liability," and "Funds Transfer and Deposit Account Liability" (each as defined in the Pre-Petition Credit Agreement) (collectively, hereinafter the "Pre-Petition Liabilities").

12.     The Pre-Petition Liabilities are secured by perfected, first-priority security interests in and liens on virtually all of the assets of the Debtors in favor of the Pre-Petition Secured Parties.

## C.     Events Leading to Chapter 11 Filings.

13.     In the last several months, the Debtors' finances have been negatively affected by a number of issues unrelated to their own operations. For example, the recent chapter 11 filing of one of the Debtors' competitors, Jackson & Perkins Wholesale, Inc. ("J&P"), has caused substantial financial hardships for the Debtors. As is common in the rose industry, Weeks entered into a growing agreement with J&P in 2007 for delivery of a rose crop in December of 2009 for J&P's spring 2010 selling season.[2] Although Weeks performed its obligations under the agreement, J&P was unable to take delivery of such roses due to its own financial problems, resulting in a $1.7 million negative impact on Weeks' sales and liquidity.

14.     Certain legacy liabilities have also negatively impacted IGP. In 2001 and 2002, IGP guaranteed two leases on behalf of Langeveld, IGP's largest business unit at the time. When IGP divested Langeveld in 2005 in a sale to Oryx Capital, Langeveld's landlords declined to release IGP from its obligations in connection with the leases. Langeveld ceased business

---

[2] Note that it takes approximately 30 months to grow a rose crop before the crop is commercially saleable. At the time Weeks entered into the growing agreement with J&P, J&P appeared to be financially viable.

operations in 2008, as did Oryx Capital, and stopped making payments in connection with the leases. Both landlords subsequently sought to enforce their rights with respect to the leases against IGP, adding significantly to IGP's financial hardship with no related benefit to IGP's value.

15.     In addition, current market conditions in the Debtors' industry have caused financial distress for the Debtors. The Debtors' businesses are directly tied to home gardening and landscaping, and thus to the residential housing market in general. As a result of the recent recession, the Debtors' businesses have seen a negative impact on their sales, which has led to significant losses and severe liquidity constraints. In fiscal 2008, Iseli had gross revenues of approximately $23.2 million, compared with gross revenues of approximately $17.6 million in fiscal 2009. Iseli estimates its gross revenues were approximately $15.0 million in fiscal 2010 (which ended June 30, 2010). Weeks' gross revenues were approximately $14.6 million in 2008, compared with approximately $11.5 million in fiscal 2009. Weeks estimates its gross revenues were approximately $13.3 million in fiscal 2010.

## II.     FIRST-DAY MOTIONS.

16.     In furtherance of the objective of operating and preserving the value of the Debtors' business during the pendency of these chapter 11 cases, the Debtors have filed the following motions (the "First-Day Motions"):

A.     Debtors' Motion for an Order Directing Joint Administration of Their Related Chapter 11 Cases.

B.     Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 341 and 28 U.S.C. § 156(c) Authorizing the Debtors to (i) File (a) Consolidated List of Creditors and (b) Consolidated List of Debtors' Top Thirty Creditors and (ii) Provide Notices, Including Notices of Commencement of Cases and Section 341 Meeting.

C.     Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 521, Fed. R. Bankr. P. 1007(c) and 9006(b) and Del. Bankr. L.R. 1007-1 Granting the Debtors

an Extension of Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs.

D.   Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 345(b) and 503(b)(1) and Del. Bankr. L.R. 2015-2 (i) Authorizing the Continued Use of Existing Cash Management System, (ii) Authorizing the Continued Use of Existing Bank Accounts and Business Forms, (iii) Waiving the Requirements of 11 U.S.C. § 345(b), and (iv) Authorizing the Continuation of Certain Intercompany Transactions.

E.   Debtors' Motion for an Order (i) Authorizing: (a) Payment of Pre-Petition Obligations to Employees, Including Wages, Salaries, Commissions, and Expense Reimbursements; (b) the Continuance of Pre-Petition Employee Benefit Plans, Programs, and Policies in the Ordinary Course of Business; and (c) Payment of Taxes and Other Obligations Associated With Obligations to Employees; and (ii) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Checks and Transfers Drawn on the Debtors' Accounts Associated With the Foregoing.

F.   Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366 (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (ii) Deeming Utility Companies Adequately Assured of Future Performance, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment.

G.   Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A) and 327 and Fed. R. Bankr. P. 2014 Authorizing the Debtors to Retain and Employ Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the Petition Date.

H.   Debtors' Motion Pursuant to Sections 105(a) and 362 of the Bankruptcy Code for an Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Equity Interests in the Debtors' Estates.

I.   Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (i) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Secured Indebtedness and With Administrative Superpriority, (ii) Granting Liens, (iii) Authorizing Use of Cash Collateral By the Debtors Pursuant to 11 U.S.C. § 363 and Providing for Adequate Protection, (iv) Modifying the Automatic Stay and (v) Scheduling a Final Hearing.

J.   Debtors' Motion for Entry of an Administrative Order Pursuant to 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016 and Del. Bankr. L.R. 2016-2 Establishing

Procedures for Interim Compensation of Fees and Reimbursement of Expenses of Professionals and Official Committee Members.

K.   Debtors' Application for an Order Authorizing the Retention and Employment of the Garden City Group, Inc. as Notice, Claims and Balloting Agent for the Debtors and Appointing the Garden City Group, Inc. as Notice, Claims and Balloting Agent of the Court.

L.   Application for an Order Authorizing the Employment and Retention of Bryan Cave LLP as Attorneys for the Debtors and Debtors-in-Possession Pursuant to 11 U.S.C. §§ 327(a) and 1107, *Nunc Pro Tunc* to the Petition Date.

M.   Application of Debtors for Entry of an Order, Pursuant to 11 U.S.C. §§ 327(a) and 1107(b), Fed. R. Bankr. P. 2014 and 2016, and Del. Bankr. L.R. 2014-1 and 2016-1, Authorizing Retention and Employment of Morris, Nichols, Arsht & Tunnell LLP as Delaware Co-Counsel to the Debtors, *Nunc Pro Tunc* to the Petition Date.

N.   Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing and Approving the Employment and Retention of FTI Consulting, Inc. to Provide Restructuring Services to the Debtors, *Nunc Pro Tunc* to the Petition Date.

17.   I have reviewed each of the First-Day Motions (including the exhibits attached thereto) and can attest to the truth of the facts set forth therein. I believe the relief sought in each of the First-Day Motions (a) is necessary to preserve the value and productivity of the Debtors' operations, (b) is integral to the successful reorganization of the Debtors, and (c) serves the best interests of the Debtors, and the Debtors' estates and creditors.

A.   **Debtors' Motion for an Order Directing Joint Administration of Their Related Chapter 11 Cases.**

18.   The Debtors are requesting that these chapter 11 cases be jointly administered for procedural purposes only. IGP is the ultimate parent of the other Debtors, and it owns 100% of Iseli, CNS and Old Skagit. Debtor CNS owns 100% of Weeks. Accordingly, all of the Debtors are "affiliates" within the meaning of that term in section 101(2) of the Bankruptcy Code.

19.   I believe joint administration of the Debtors' chapter 11 cases is warranted because the Debtors have many common creditors and overlapping business operations. I anticipate that the notices, applications, motions, other pleadings, hearings, and orders in these cases will affect each of the Debtors. Thus, I believe that the joint administration of these cases

will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. I also believe that such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk of the Court with voluminous filings. Finally, I believe that the use of a simplified caption for the jointly administered cases will enable parties-in-interest in each of these cases to be apprised of the various matters before the Court.

**B.** **Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 341 and 28 U.S.C. § 156(c) Authorizing the Debtors to (i) File (a) Consolidated List of Creditors and (b) Consolidated List of Debtors' Top Thirty Creditors and (ii) Provide Notices, Including Notices of Commencement of Cases and Section 341 Meeting.**

20. The Debtors are requesting authorization to file a consolidated list of creditors holding the 30 largest unsecured claims in the format or formats currently maintained by the Debtors. The Debtors have a number of common creditors, and I understand that notice of certain proceedings in these chapter 11 cases (collectively, the "Notices") must be provided to these creditors. The Debtors presently maintain various computerized lists of the names and addresses of their creditors that are entitled to receive the Notices and other documents in these cases. I believe the information, as maintained in these computer files, may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents.

21. The Debtors also propose that the notice and claims agent undertake all mailings directed by the Court, the United States Trustee or as required by the Bankruptcy Code. The notice and claims agents' assistance with mailing and preparation of creditor lists and notices will ease administrative burdens that otherwise would fall upon the Court and the United States Trustee.

**C. Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 521, Fed. R. Bankr. P. 1007(c) and 9006(b) and Del. Bankr. L.R. 1007-1 Granting the Debtors an Extension of Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs.**

22.     The Debtors are requesting additional time to file their schedules of assets and liability and statements of financial affairs (collectively, the "Schedules and Statements"). Prior to the Petition Date, the Debtors were highly focused on implementing certain strategic initiatives and formulating a strategic framework for these chapter 11 cases. These efforts will continue to be integral to the Debtors in the weeks following the Petition Date. The total number of creditors in these jointly administered cases exceeds 200 creditors. The Debtors' management and employees, together with their outside legal and financial advisors, have been working diligently to compile the information necessary for the Schedules and Statements. Given the size and complexity of the Debtors' business, completing the Schedules and Statements is a significant and time-consuming undertaking, particularly when taken together with the considerable stresses of preparing for the filing of these chapter 11 cases, the anticipated burdens of preparing the Debtors' transition into chapter 11, and the ongoing burdens of operating the Debtors' business.

23.     I am advised that a debtor is required to file Schedules and Statements to permit, among other things, parties-in-interest to understand and assess a debtor's assets and liabilities. I am further advised that section 521 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007(c) would ordinarily require the Debtors to file their Schedules and Statements within fourteen (14) days after the Petition Date. In addition, Rule 1007-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") provides an automatic sixteen-day (16) extension of that deadline if the debtor has more than two hundred creditors and the petition is accompanied by a creditor list. I am advised that because the Debtors filed a consolidated list of creditors on the Petition Date and have more than two hundred creditors, the Debtors are required to file the Schedules and Statements within thirty (30) days after the Petition Date. The work required to compile the

Schedules and Statements is extensive, and considering the additional stresses under which the Debtors and their employees are working in connection with the reorganization and the preparation of these Chapter 11 cases while still attempting to operate their businesses, an extension of the deadline set forth in the Federal Rules of Bankruptcy Procedures and the Local Rules for filing the Schedules and Statements is warranted.

24. For the foregoing reasons, I believe that an extension of the time for the Debtors to file their Schedules and Statements for 30 additional days (for a total of 60 days) would provide sufficient time to prepare the Schedules and Statements without diverting critical resources in the early stages of these chapter 11 cases.

D. **Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 345(b) and 503(b)(1) and Del. Bankr. L.R. 2015-2 (i) Authorizing the Continued Use of Existing Cash Management System, (ii) Authorizing the Continued Use of Existing Bank Accounts and Business Forms, (iii) Waiving the Requirements of 11 U.S.C. § 345(b), and (iv) Authorizing the Continuation of Certain Intercompany Transactions.**

25. The Debtors are requesting (a) authority to use their existing cash management system, (b) authority to use their existing bank accounts and business forms, (c) a waiver of the requirements of 11 U.S.C. § 345(b) with respect to the Debtors' deposit and investment practices, and (d) authority to continue certain intercompany transactions by and among the Debtors on a post-petition basis with administrative expense status for related intercompany claims. Before the commencement of these chapter 11 cases, the Debtors, in the ordinary course of business, used a simple cash management system to collect funds from their operations and to pay operating and administrative expenses (the "Cash Management System"). It is my understanding that the Cash Management System is similar to the centralized cash management systems used by other large, diversified companies to collect, transfer and disburse funds generated by numerous operating units in a cost-effective and efficient manner.

26. **Cash Management System**. In the ordinary course of their business and operations, the Debtors use (a) approximately eight[3] bank accounts at Harris Trust and Savings Bank ("Harris") for most of their banking transactions and (b) two local bank accounts -- one at KeyBank N.A. ("KeyBank") for Iseli, and one at Wells Fargo Bank, N.A. ("Wells Fargo") for Weeks - for manual payroll checks and miscellaneous transactions (collectively, the "Bank Accounts"). The Bank Accounts comprise a simple cash management system through which the Debtors collect funds from their operations and fund operating and administrative expenses.

27. Although the Debtors utilize numerous Bank Accounts as part of their Cash Management System, they carefully account for all payments and receipts of each individual Debtor entity. All transactions between and among the Debtors are recorded as intercompany payments and loans so that the amounts owing to and from each individual entity can be accurately traced and determined at all times. The Debtors have accounting protocols in place to ensure that all transactions are properly recorded in the Debtors' books and records. The Debtors' accounting procedures and use of the Bank Accounts as part of the Cash Management System have been audited on a yearly basis by Moss Adams, LLP.

28. Iseli and Weeks have separate lockboxes at Harris where receipts are collected and then transferred to individual lockbox accounts. The lockbox accounts are zero-balance accounts. Prior to the Petition Date, the lockbox accounts were swept on a daily basis and applied to the Debtors' pre-petition secured loan with Harris, and Harris re-advanced funds to separate operating accounts for each Debtor to fund daily operations and expenses pursuant to the Debtors' secured financing facility with Harris. Some funds were also advanced by Harris to a controlled disbursement account in the name of IGP, as necessary.

29. In addition, Harris maintained a separate cash collateral account on behalf of Weeks that was intended to address any potential liabilities for chargebacks related to checks received from Weeks' customers in its lockbox account. Prior to the Petition Date, the Debtors

---

[3] The Debtors discontinued use of two of the eight accounts several weeks prior to the Petition Date, and those accounts remain inactive.

were required to maintain not less than a $50,000 balance in this cash collateral account in connection with the Debtors' pre-petition financing facility.

30.    The operating accounts of IGP, Iseli, and Weeks are used to fund payroll disbursements via ACH transactions to Automatic Data Processing, Inc. (the Debtors' payroll processor) for employees' net paychecks and payroll taxes, 401(k) savings plan contributions, health and dental insurance premiums, and other miscellaneous vendor payments that are made by ACH transactions or wire transfers. The controlled disbursement account is used by the Debtors to pay vendor obligations via check.

31.    The Debtors are seeking authority to continue using the Cash Management System on a post-petition basis as described above. The Debtors believe, and I agree, that it is critical that that the Debtors remain able to manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate their large and complex business operations. Disrupting the Debtors' current Cash Management System would impair the Debtors' ability to preserve and enhance their respective going concern value and to successfully reorganize during these chapter 11 cases.

32.    I understand that the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases. I believe that under the circumstances, a waiver of the United States Trustee's requirement that the Bank Accounts be closed and that new post-petition bank accounts be opened is warranted. If enforced in these cases, I believe that such requirements would cause significant and unnecessary disruption in the Debtors' businesses, thereby impairing their efforts to reorganize and pursue other alternative to maximize the value of their estates.

33.    **Business Forms**. In the ordinary course of business, the Debtors use numerous business forms including, but not limited to, letterhead, purchase orders, invoices, contracts and checks (collectively, the "Business Forms"). I believe it would be unnecessarily costly and burdensome for the Debtors to obtain new check stock and other business forms that bear the designation "debtor-in-possession." In addition, I believe the "debtor-in-possession" notation on

the post-petition checks drawn by the Debtors would impair the Debtors' efforts to maintain relations with their vendors.

34. To alleviate any potential confusion from the Debtors' continued use of the Bank Accounts and related checks, the Debtors have identified for Harris, KeyBank, and Wells Fargo the numbers of the pre-petition checks that were written from the Bank Accounts. The Debtors will leave a gap of at least 100 check numbers between the last pre-petition check and the first post-petition check so that pre-petition and post-petition obligations will be easily identifiable for the Debtors and the banks. In addition, the Debtors will specifically identify for Harris, KeyBank, and Wells Fargo any pre-petition checks or other payments that this Court may authorize to be honored. I believe with these safeguards in place, the Debtors' continued use of pre-petition business forms and checks will not prejudice any party, and will allow the Debtors to transition more easily into chapter 11.

35. **Waiver of Investment and Deposit Requirements**. I am advised and understand that section 345 of the Bankruptcy Code establishes certain investment and deposit restrictions. On a pre-petition basis, the Debtors' cash-management strategy was to keep a very small amount of cash on hand at any particular time, and to pay down their pre-petition secured financing facility on a daily basis. Given the Debtors' current financial state, they also do not anticipate having a large amount of cash on hand at any one time on a post-petition basis. The Debtors believe, and I agree, that it is in the best interests of their estates and creditors to follow their current policies with respect to deposits.

36. Although Harris is not an approved depository institutions in this District, it is a large and well-known national banking institution. There will be very little, if any, risk to the Debtors' estates in allowing the Debtors to continue depositing and holding their small amounts of cash with Harris. I believe that the Debtors' use of the Bank Accounts substantially conforms with what I understand to be the intent of the approved investment practices identified in section 345 of the Bankruptcy Code, and that all deposits and investments into the Bank Accounts are safe, prudent and designed to yield the maximum reasonable net return on the funds invested. I

believe that all of the Bank Accounts, whether located within or outside the District of Delaware, are held at financially-stable banking institutions.

37. **Intercompany Transactions.** In the normal course of their business operations, the Debtors engage in various intercompany transactions. As a result, on any given date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany payments made in the ordinary course between and among the Debtors (the "Intercompany Transactions"). These Intercompany Transactions include, but are not limited to vendor payments made by check and the allocation and payment of corporate expenses.

38. The Debtors maintain detailed records of all Intercompany Transactions and can trace and account for all Intercompany Transactions between and among the Debtors at all times. To ensure that no individual Debtor will fund, at the expense of its creditors, the operations of any other Debtor, the Debtors are requesting that all Intercompany Claims against a Debtor by another Debtor arising after the Petition Date as a result of an Intercompany Transaction be accorded administrative priority expense status. If all Intercompany Claims are accorded administrative priority expense status, each Debtor will continue to bear ultimate repayment responsibility for its own ordinary course transactions.

39. The Intercompany Transactions reduce the administrative costs incurred by the Debtors. By contrast, if the Debtors discontinued the Intercompany Transactions, the discontinuation would disrupt the Cash Management System and related administrative controls to the detriment of the Debtors and their estates. Therefore, the Debtors believe, and I agree, that the continuation of the Intercompany Transactions is in the best interests of the Debtors' respective estates and creditors.

**E.** **Debtors' Motion for an Order (i) Authorizing: (a) Payment of Pre-Petition Obligations to Employees, Including Wages, Salaries, Commissions, and Expense Reimbursements; (b) the Continuance of Pre-Petition Employee Benefit Plans, Programs, and Policies in the Ordinary Course of Business; and (c) Payment of Taxes and Other Obligations Associated With Obligations to Employees; and (ii) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Checks and Transfers Drawn on the Debtors' Accounts Associated With the Foregoing (the "*Employee Benefits Motion*").**

40. The Debtors are requesting authority, in accordance with their current policies, to: (a) pay all pre-petition obligations to employees, sales agents, and related parties that remain owing, including obligations for compensation, benefits, commissions and expense reimbursements; (b) to honor, and take all necessary actions to continue until further notice (but not to assume), all existing pre-petition programs, policies, and plans with respect to employees, including obligations customarily associated with the delivery of employee benefits; (c) to make all normal and customary deductions and withholdings, and pay all taxes and other obligations, associated with the payment of such employee obligations (collectively, the "Employee Obligations"); and (d) to direct applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' bank accounts to make all payments associated with the foregoing.

41. The Debtors currently employ approximately 294 active employees (the "Employees"), of whom approximately 246 are hourly Employees and 48 are salaried Employees. By Debtor, approximately 4 Employees work for IGP, approximately 99 Employees work for Weeks, and approximately 191 Employees work for Iseli. Debtors CNS and Old Skagit are not operating entities and do not have any current employees. None of the Debtors' Employees are covered by collective bargaining agreements. In addition, the Debtors use approximately 11 sales agents (the "Sales Agents"), some of which are not technically Employees of the Debtors, but rather are independent contractors.

42. The Debtors believe, and I agree, that the Employees' and Sales Agents' unique skills, knowledge, and experience are among the Debtors' most valuable assets. Their continued service and hard work are absolutely critical to the Debtors' ability to reorganize in these chapter

11 cases. The Debtors believe, and I agree, that the Debtors must take great care to minimize any personal disruptions or hardships that may befall the Employees and Sales Agents because of the Debtors' bankruptcy filings.

43.     The Debtors pay their Employees either an hourly wage or a salary (collectively, the "Payroll Obligations") for their services, depending on each particular Employee's position and job duties. IGP's Employees are paid on a semi-monthly basis, on the 15th and last day of each month, and the Payroll Obligations are paid on a current basis, through the date of payment. Weeks' hourly Employees are paid every Friday for hours worked through the previous Sunday. Weeks' salaried Employees are paid bi-weekly on Fridays for work completed through the previous Sunday. Iseli's Employees are paid on a bi-weekly basis as well, on every other Thursday, for work through the previous Friday. The average monthly gross compensation for the Debtors' Employees, including wages and salaries, is approximately $48,000 for IGP, $524,000 for Weeks, and $325,000 for Iseli, for total monthly Payroll Obligations of approximately $897,000.

44.     Iseli also utilizes independent Sales Agents who are not technically Employees. Weeks uses Sales Agents who are Employees that receive a base wage in addition to commissions on sales. The Sales Agents are paid commissions (the "Commissions") that become payable only when the Debtors receive payment from customers on the Sale Agents' sales. Commissions are payable to the Sales Agents in the month following receipt of the applicable customer payment and are generally made about 30 days following the Debtors' receipt of payment for the sales giving rise to the Commissions. The monthly amount of Commissions for Iseli's Sales Agents historically has ranged from about $250,000 to $300,000, and the average monthly amount of Commissions for Weeks' Sales Agents has been approximately $5,500.

45.     As of the Petition Date, both Iseli and Weeks were substantially current on their obligations to Sales Agents with respect to Commissions. However, because the last date Sales Agents were paid for Commissions was September 29, 2010, it is possible that the Debtors have

received subsequent payments from customers that would give rise to pre-petition Commission obligations. Although the Debtors believe, and I agree, that these amounts are de minimis, the Debtors nevertheless are requesting authority to pay any such Commissions that may be outstanding as of or after the Petition Date.

46.     The Debtors utilize the services of Automatic Data Processing, Inc. ("ADP") to coordinate the accounting and payment of all of their Payroll Obligations. The day prior to each applicable pay date, ADP drafts the necessary amount of net pay and tax payments from the respective Debtor's operating account via ACH transfer. Each of the Debtors last paid its Payroll Obligations to Employees through ADP on September 30, 2010. Because the Petition Date occurred in the middle of a normal payroll cycle and because Employees are paid in arrears, some of the Debtors' Employees had not been paid the full amount of the Payroll Obligations that they had earned as of the Petition Date.

47.     The Commissions of Sales Agents are not paid through ADP, but rather are made via check or ACH transfer from the Debtors' main disbursement account when the Commissions are due. The Debtors last sent checks or ACH transfers for Commissions to Sales Agents on September 29, 2010. As with the Payroll Obligations, certain Commissions may have remained outstanding to Sales Agents as of the Petition Date.

48.     In addition, certain of the Debtors' Employees or Sales Agents may not have presented their pre-petition checks for payment with respect to Payroll Obligations and Commissions, or such checks may not have cleared the banking system, as of the Petition Date. Because the checks for Payroll Obligations are drawn on ADP's accounts, rather than the Debtors' accounts, the Debtors do not anticipate significant issues with Employees' paychecks being honored.

49.     I estimate that approximately $182,250 in gross Payroll Obligations and Commissions of less than $10,000 were owing as of the Petition Date. I further believe that no Employee was owed more than $11,725 in pre-petition Payroll Obligations. I do not believe that any Sales Agents were owed in excess of $11,725 for pre-petition Commissions as of the Petition

Date, but to the extent any pre-petition Commissions remain owing, I believe that payment of such Commissions is justified under the circumstances due to the unique and critical nature of the Sales Agents' services and their relationships with the Debtors' customers.

50. The Debtors also provide their employees with certain other benefits, including the following: (a) health and welfare benefits, including plans related to medical, dental, life and disability insurance, accidental death and dismemberment, workers' compensation insurance, health savings accounts and paid time off; (b) a 401(k) plan administered by Northwest Plan Services, Inc.; and (c) certain business expense reimbursements. These benefits are described in greater detail in the Debtors' Employee Benefits Motion. The Debtors estimate that the total pre-petition amount owing but unpaid as of the Petition Date for benefits was approximately $34,850, and for business expense reimbursements was less than $10,000.

51. The Debtors also required to pay certain payroll taxes and make certain other withholdings from Employees' paychecks. The Debtors estimate that they owed approximately $25,500 in employer payroll taxes and $7,500 for Oregon TriMet tax obligations as of the Petition Date. In addition, the Debtors had deducted, but not yet remitted to the applicable third parties, approximately $2,000 in garnishments from Employees' checks.

52. If the Debtors fail to pay the Employee Obligations, I believe the Debtors will lose valuable, skilled employees whose knowledge of and familiarity with the Debtors' businesses and operations are essential to the continued functioning of the Debtors. Failure to honor outstanding commitments to employees would have an immediate and material adverse impact on the Debtors' ability to continue to operate, severely limiting the prospects for the Debtors' reorganization and reducing potential payments to creditors. The amount of the Employee Obligations is small when compared to the size of the Debtors' overall business, assets, and liabilities. The immediate payment of the Employee Obligations is crucial to the continued operation of the Debtors' businesses, and will aid the Debtors in preserving their going-concern value. As such, I believe the payment of the Employee Obligations will provide an ongoing benefit for creditors generally. The Debtors believe, and I agree, that failure to meet

the Employee Obligations to the employees, sales agents and related parties will lead to immediate and irreparable harm to the Debtors' businesses, which cannot survive without the continued help and support of these critical parties.

F. **Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366 (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (ii) Deeming Utility Companies Adequately Assured of Future Performance, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment (the "*Utilities Motion*").**

53.     The Debtors are seeking authority to: (a) prohibit the Utility Companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors; (b) deem the Utility Companies to be adequately assured of future payment; and (c) establish a procedure whereby the Utility Companies may request additional assurance.

54.     In the ordinary course of their business, the Debtors obtain electricity, natural gas, water, sewer, telephone and related telecommunications services, garbage collection and/or other similar services (collectively, the "Utility Services") from various utility companies (the "Utility Companies") where the Debtors operate. On an average monthly basis, the Debtors pay approximately $100,000 for Utility Services. The Debtors' business is highly seasonal, so their expenses for Utility Services fluctuate widely from month to month.

55.     The Debtors are proposing to provide the Utility Companies with "adequate assurance" of future payment by agreeing to maintain a deposit equal to 50% of the Debtors' estimated monthly cost of the Utility Services, adjusted monthly based on the Debtors' expenditures for Utility Services during the same calendar month of the preceding year, into an interest-bearing, newly-created, segregated account (the "Adequate Assurance Account"), within 20 days of the Petition Date until a final hearing on the Utilities Motion. Thereafter, the Debtors propose to adjust the amount in the Adequate Assurance Account to reflect the following factors: (a) the termination of Utility Services by the Debtors regardless of any additional requests for adequate assurance, (b) other agreements with the Utility Companies, including deposits already

held by certain Utility Companies, and (c) the monthly fluctuations in Utility Services attendant to the seasonality of the Debtors' business. The Debtors will timely pay any balances due on post-petition, undisputed invoices from the Utility Companies. The Utility Companies will have an opportunity to object and request additional assurance.

56.     Uninterrupted Utility Services are crucial to the Debtors' operations and the viability of their reorganization prospects. A disruption of the Utility Services at any of the Debtors' facilities would be costly to the Debtors and harmful to their businesses, forcing the Debtors from the outset of these chapter 11 cases to focus on finding replacement providers for utilities, rather than the operation and restructuring of their businesses. Moreover, the business disruption that would likely result from interruption of the Utility Services would seriously damage the Debtors' customer relationships, revenues and profits, and would significantly impair the Debtors' restructuring efforts, harming not only the Debtors' estates, but also creditors and employees. The Debtors believe, and I agree, that it is critical that Utility Services to the Debtors continue uninterrupted and that any interruption would lead to imminent and irreparable harm to the Debtors' businesses.

G.     **Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A) and 327 and Fed. R. Bankr. P. 2014 Authorizing the Debtors to Retain and Employ Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the Petition Date.**

57.     The Debtors are seeking to authorize the Debtors' retention, employment, compensation and reimbursement of expenses for certain professionals used in the ordinary course of the Debtors' business. The Debtors require professional services in connection with various business transactions and their general business operations. Prior to the Petition Date, the Debtors employed various professionals, including accountants, attorneys and consultants, in the ordinary course of business to render services relating to, among other things, corporate governance, labor, tax, auditing, and non-bankruptcy legal issues (collectively, the "Ordinary Course Professionals").

58.     In light of the costs associated with the preparation of employment applications for professionals who will receive relatively small fees, I believe it would be impractical, inefficient, and unnecessarily costly for the Debtors to submit individual applications and proposed retention orders for each professional.  Accordingly, the Debtors are requesting that this Court dispense with the requirement of individual employment applications, retention orders, and fee applications with respect to each Ordinary Course Professional, and that the Court authorize the Debtors to employ additional Ordinary Course Professionals, as the need arises in the day-to-day operation of their businesses, without the necessity of retention pleadings for each such retention or expansion of the scope of services.

59.     Although certain of the Ordinary Course Professionals may hold unsecured claims against the Debtors in respect of pre-petition services rendered to the Debtors, I do not believe that any of the Ordinary Course Professionals has an interest materially adverse to the Debtors, their creditors, or other parties-in-interest.  Each Ordinary Course Professional will be required to file a verified statement made pursuant to Federal Rule of Bankruptcy Procedure 2014 stating that such professional does not represent or hold any interest adverse to the Debtors or their estates with respect to the matters on which such professional is to be employed (the "Rule 2014 Statement").  The Debtors will not make any payment to any Ordinary Course Professional until such professional has filed a Rule 2014 Statement.

60.     The Debtors propose that they be permitted to pay each Ordinary Course Professional, without formal application to the Court by any Ordinary Course Professional, 100% of the fees and disbursements owed to such Ordinary Course Professional, upon the submission to and approval by the Debtors of an appropriate invoice setting forth in reasonable detail the nature of the services rendered and disbursements actually incurred; provided, however, that if any Ordinary Course Professional's fees and disbursements exceed $25,000 in a particular month at any time during the pendency of the chapter 11 cases, then the payment to such Ordinary Course Professional for any amount in excess of $25,000 per month shall be subject to the prior approval of the Court.

61.     Any delay in the retention and payment of Ordinary Course Professionals could seriously interfere with the Debtors' ability to respond to the numerous legal, financial, and other issues to which the Debtors' Ordinary Course Professionals must respond on a daily basis.  I believe it is essential that the employment of the Ordinary Course Professionals, who are already familiar with the Debtors' affairs, be continued on an ongoing basis to enable the Debtors to conduct, without disruption, their ordinary business affairs.

**H.      Debtors' Motion Pursuant to Sections 105(a) and 362 of the Bankruptcy Code for an Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Equity Interests in the Debtors' Estates. (the "_Equity Trading Motion_").**

62.     The Debtors are seeking authority to establish procedures to restrict the transfers of equity interests in the Debtors' estates, to protect the value of the Debtors' consolidated net operating tax loss carryforwards and certain other tax attributes.  The Debtors have, as of the date hereof, consolidated net operating losses ("NOLs") for U.S. federal income tax purposes estimated to be in excess of $14 million and general business tax credits in excess of $800,000 that can be carried forward and used to reduce taxable income and/or income taxes payable.

63.     Under sections 382 and 383 of title 26 of the United States Code (the "Tax Code"), the Debtors' ability to use their NOLs and other tax attributes (collectively with the NOLs, the "Tax Attributes") could be severely limited were the Debtors to undergo an ownership change (an "Ownership Change") within the meaning of those sections before emergence from chapter 11.  In these circumstances, the value of significant assets of the Debtors' estates could be dramatically reduced.  While the severity of an Ownership Change on the Debtors' ability to utilize their NOLs and other Tax Attributes might be mitigated by other provisions of section 382 and 383 of the Tax Code, I understand that both the law and the facts are unclear in this regard.  Given this uncertainty, the Debtors believe, and I believe, that it is necessary to avoid an Ownership Change in order to protect a valuable asset of the Debtors' estates.

64. In general, an Ownership Change of the Debtors would occur if and when a change in more then fifty (50) percentage points in the stock ownership of the Debtors occurs (ignoring trading among less than five percent (5%) shareholders) measured over any three-year testing period. The Debtors have been monitoring changes in stock ownership of the Debtors for purposes of section 382 of the Tax Code and, based on the data available to me, I believe that the Debtors have not already experienced an Ownership Change. However, there is a real risk that further transactions involving five percent (5%) shareholders could trigger an Ownership Change. I believe the proposed procedures outlined in the Equity Trading Motion are necessary to guard against that risk, and will serve to protect valuable assets of the Debtors' estates for the benefit of their creditors..

I.  **Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (i) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Secured Indebtedness and With Administrative Superpriority, (ii) Granting Liens, (iii) Authorizing Use of Cash Collateral By the Debtors Pursuant to 11 U.S.C. § 363 and Providing for Adequate Protection, (iv) Modifying the Automatic Stay and (v) Scheduling a Final Hearing (the "*DIP Financing Motion*").**

65. The Debtors are seeking authority to (a) enter into a debtor-in-possession financing facility with Harris N.A. and certain other financial institutions party thereto; (b) grant liens, including priming liens, and superpriority administrative expense status in connection with the debtor-in-possession financing facility pursuant to 11 U.S.C. § 364; (c) use cash collateral pursuant to 11 U.S.C. § 363; (iv) grant adequate protection to the Pre-Petition Secured Parties pursuant to 11 U.S.C. §§ 363 and 364; (v) vacate and modify the automatic stay imposed by 11 U.S.C. § 362; and (vi) schedule a final hearing pursuant to Federal Rule of Bankruptcy Procedure 4001. The Debtors have negotiated and reached an agreement to enter into, subject to approval of the Court, a $7,500,000 superpriority senior secured credit facility (the "DIP Facility"). The DIP Facility will provide the Debtors with much needed liquidity to fund their operating, working capital and capital expenditure needs throughout these chapter 11 cases.

66.     The Debtors, in consultation with their advisors, have determined that the DIP Facility is competitive, addresses the Debtors' working capital and liquidity needs, presents the best option available given the circumstances and current market conditions, and will enable the Debtors to effectuate an expeditious emergence from chapter 11 while preserving their value as a going concern.  The Debtors require immediate access to $4,750,000 in post-petition financing to satisfy their operating expenses and working capital needs.  The Debtors are, therefore, seeking entry of an interim order (the "Interim Order") at the first day hearing and entry of a final order at a final hearing.  The Debtors are also seeking authorization to use cash collateral on an interim basis, which, together with the DIP Facility, will be used by the Debtors to support their working capital requirements and other general corporate purposes.

67.     Prior to initiating their pursuit of debtor-in-possession ("DIP") financing, the Debtors, with the assistance of their advisors, thoroughly reviewed and analyzed their potential options for out-of-court refinancing of the outstanding obligations to the Pre-Petition Secured Parties.  Early in the process, it became readily apparent that the Debtors would not be able to secure alternative out-of-court financing in the current lending market in the time period available to the Debtors, particularly in light of their liquidity position and the Pre-Petition Secured Parties' significant leverage and unwillingness to permit additional indebtedness that would be senior to the Pre-Petition Secured Debt.  The Debtors therefore decided to pursue the DIP Facility in connection with the filing of these chapter 11 cases.

68.     Moreover, the Debtors recognized that the universe of lenders who could meet their post-petition financing requirements likely would be limited for several reasons.  For example, the requested DIP Facility is fairly large.  In addition, because any debtor-in-possession facility likely would require the priming of the Pre-Petition Secured Parties' liens and security interests in connection with the Pre-Petition Secured Debt, the Debtors realized that they likely would need the Pre-Petition Secured Parties' consent to effect any potential post-petition financing arrangement.

69.     Consequently, the Debtors determined that the DIP Facility offered the best option – and indeed the only available, viable option – for post-petition financing. The DIP Facility will be provided pursuant to that certain Credit Agreement (as amended, modified or supplemented in accordance with the terms of the Interim Order, the "DIP Credit Agreement"), by and among IGP, Iseli and Weeks (collectively, the "Borrowers"), CNS and Old Skagit, as guarantors, Harris N.A., as DIP agent (the "DIP Agent"), and the DIP lenders party thereto (the "DIP Lenders", collectively with the DIP Agent, the "DIP Secured Parties").

70.     While the Debtors were in the process of negotiating the terms of the DIP Facility, the Debtors also attempted to identify other sources of post-petition financing to determine whether they could obtain debtor-in-possession financing on better terms. Based on current conditions in the capital markets and discussions with potential lenders, the Debtors determined that post-petition financing on an unsecured basis or on a junior priority basis to Pre-Petition Secured Parties would be unobtainable.

71.     The Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available. In both the Debtors' business judgment and my own, the proposed terms of the DIP Facility are fair, reasonable and adequate given the severe credit crisis that exists in today's market. Likewise, the various fees and charges and other terms required by the DIP Lenders under the DIP Facility were necessary to secure their agreement to provide the financing notwithstanding the volatility that exists in today's capital markets. The terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's length. Given the Debtors' circumstances and the volatile conditions and lack of liquidity in the capital markets, it is the Debtors' judgment and my own that the terms of the DIP Facility are fair, reasonable and adequate.

72.     It is vital to the success of the Debtors' reorganization efforts that the Debtors immediately obtain access to sufficient post-petition financing and access to cash collateral. The preservation of the Debtors' business and the Debtors' ability to reorganize successfully depend heavily on the expeditious approval of the DIP Financing Motion. Absent the Court's approval

of the interim relief sought through the DIP Financing Motion, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

73.     I believe that a denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates, and will also have a detrimental effect on the Debtors' collateral.  Absent access to the DIP Facility and the use of the cash collateral, the Debtors will have no ability to meet their ongoing obligations to suppliers, vendors, employees and other creditors.  I believe that if the Debtors are unable to pay their ongoing obligations, they will not be able to operate.  In contrast, the Debtors' access to the DIP Facility and continued use of cash collateral will ensure that the "going concern" value of their assets are preserved, a value substantially greater than the value which would be realized from a piecemeal liquidation of those assets if the Debtors were forced to cease operations immediately.

**J.      Debtors' Motion for Entry of an Administrative Order Pursuant to 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016 and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation of Fees and Reimbursement of Expenses of Professionals and Official Committee Members ("_Interim Compensation Motion_").**

74.     The Debtors are seeking an orderly and regular process for allowance of compensation and reimbursement of expenses of attorneys and other professionals approved by the Court in these cases (collectively, the "Estate Professionals").  I understand the Debtors are filing applications to retain Bryan Cave LLP and Morris, Nichols, Arsht & Tunnell LLP as their bankruptcy counsel.  The Debtors anticipate that they may also retain other professionals in these chapter 11 cases as the need arises.  In addition, I am informed that an official unsecured creditors committee may be formed and may retain various professionals (the "Committee Professionals" and, together with the Estate Professionals, the "Professionals").

75.     I believe that the establishment of an orderly and regular process for allowance of compensation and reimbursement of expenses of the Professionals will streamline the professional compensation process and enable the Court and all other parties to monitor the

professional fees incurred in these cases more effectively. I further believe that the proposed procedures set forth in the Interim Compensation Motion would accomplish this purpose and is fair and appropriate.

**K. Debtors' Application for an Order Authorizing the Retention and Employment of the Garden City Group, Inc. as Notice, Claims and Balloting Agent for the Debtors and Appointing the Garden City Group, Inc. as Notice, Claims and Balloting Agent of the Court.**

76. The Debtors are seeking to retain The Garden City Group, Inc. ("GCG") as notice, claims and balloting agent. I believe that by retaining GCG in these chapter 11 cases, the Debtors' estates, and particularly their creditors, will benefit from GCG's service. GCG has developed efficient and cost-effective methods in the area of chapter 11 administration. It is my understanding that GCG is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in these chapter 11 cases.

**L. Application for an Order Authorizing the Employment and Retention of Bryan Cave LLP as Attorneys for the Debtors and Debtors-in-Possession Pursuant to 11 U.S.C. §§ 327(a) and 1107, *Nunc Pro Tunc* to the Petition Date.**

77. The Debtors are seeking to retain and employ Bryan Cave LLP ("Bryan Cave") as their attorneys. Bryan Cave has an extensive corporate restructuring practice and extensive experience in handling chapter 11 cases, as well as expertise in numerous other areas of practice that will be important to the Debtors' cases. In preparing for these chapter 11 cases, Bryan Cave has become familiar with the Debtors' business and the legal issues that may arise in these case. I believe that Bryan Cave is well qualified and uniquely able to represent the Debtors in these chapter 11 cases.

**M. Application of Debtors for Entry of an Order, Pursuant to 11 U.S.C. §§ 327(a) and 1107(b), Fed. R. Bankr. P. 2014 and 2016, and Del. Bankr. L.R. 2014-1 and 2016-1, Authorizing Retention and Employment of Morris, Nichols, Arsht & Tunnell LLP as Delaware Co-Counsel to the Debtors, *Nunc Pro Tunc* to the Petition Date.**

78. The Debtors are seeking to retain and employ Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols") as their attorneys. Morris Nichols has an extensive corporate

restructuring practice and extensive experience in handling chapter 11 cases, as well as expertise in numerous other areas of practice that will be important to the Debtors' cases. In preparing for these chapter 11 cases, Morris Nichols has become familiar with the Debtors' business and the legal issues that may arise in these case. I believe that Morris Nichols is well qualified and uniquely able to represent the Debtors in these chapter 11 cases.

N. **Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing and Approving the Employment and Retention of FTI Consulting, Inc. to Provide Restructuring Services to the Debtors,** *Nunc Pro Tunc* **to the Petition Date.**

79. The Debtors are seeking to retain FTI Consulting, Inc. ("FTI") to, among other things, among other things: (a) manage and conduct the Debtors' businesses, (b) manage and conduct the chapter 11 bankruptcy process, including the process for a restructuring of the Debtors' businesses and assets, (c) assist in management of the Debtors' cash flow, (d) manage compliance with the chapter 11 and other Bankruptcy Code reporting requirements, and (e) interface and negotiate with any official committee appointed in these cases, the professionals to such committee, the Debtors' creditors, and other parties-in-interest in the Debtors' chapter 11 cases. FTI has been providing the Debtors with restructuring advisory services since November 3, 2009 and has led operational preparations for these chapter 11 cases. I believe that FTI is well qualified to address the complex issues that the Debtors are likely to confront during these chapter 11 cases. The Debtors believe, and I agree, that the employment and retention of FTI to provide restructuring services reflect an exercise of the Debtors' sound business judgment.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  If called to testify, I would testify as I have stated in this declaration.

DATED:   October 4, 2010.

James H. Hulbert, III