SENIOR SECURED, SUPER-PRIORITY POST-PETITION CREDIT AGREEMENT

DATED AS OF OCTOBER 4, 2010,

AMONG

INTERNATIONAL GARDEN PRODUCTS, INC., ISELI NURSERY, INC., AND WEEKS WHOLESALE ROSE GROWER, EACH AS DEBTOR AND DEBTOR-IN-POSSESSION,

THE GUARANTORS PARTY HERETO, EACH AS DEBTOR AND DEBTOR-IN-POSSESSION,

THE DIP LENDERS FROM TIME TO TIME PARTIES HERETO,

AND

HARRIS N.A.,
as DIP Agent

# TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|

SECTION 1.    THE CREDIT FACILITIES ....................................................................1

Section 1.1.    DIP Revolving Credit Commitments ...................................1
Section 1.2.    Letters of Credit ...............................................................2
Section 1.3.    Interest ..............................................................................4
Section 1.4.    Minimum Borrowing Amounts ...........................................5
Section 1.5.    Manner of Borrowing DIP Loans ......................................6
Section 1.6.    Maturity of DIP Loans ......................................................7
Section 1.7.    Prepayments ......................................................................7
Section 1.8.    Default Rate ......................................................................8
Section 1.9.    Evidence of Indebtedness ..................................................9
Section 1.10.    Commitment Terminations .................................................9
Section 1.11.    Substitution of DIP Lenders .............................................10
Section 1.12.    Appointment of Parent as Agent for Borrowers .............10
Section 1.13.    Defaulting DIP Lenders ...................................................10

SECTION 2.    FEES ..................................................................................11

Section 2.1.    Fees .................................................................................11

SECTION 3.    PLACE AND APPLICATION OF PAYMENTS; WEEKLY
SETTLEMENT; COMPUTATION OF OBLIGATIONS OUTSTANDING ................12

Section 3.1.    Place and Application of Payments ..................................12
Section 3.2.    Weekly Settlement ...........................................................14
Section 3.3.    Computation of Obligations Outstanding .........................16

SECTION 4.    SECURITY ...........................................................................16

Section 4.1.    Security ...........................................................................16
Section 4.2.    Perfection of Security Interests .......................................17
Section 4.3.    Receivables and Inventory Collections ...........................17
Section 4.4.    Cash Collateral Account ..................................................18
Section 4.5.    Rights of DIP Agent .........................................................18
Section 4.6.    Performance by DIP Agent of Debtor's Post-Petition
Obligations ......................................................................19
Section 4.7.    DIP Agent's Appointment as Attorney-in-Fact .............19
Section 4.8.    Amounts on Deposit .........................................................21
Section 4.9.    Stay .................................................................................21

SECTION 5.    DEFINITIONS; INTERPRETATION .........................................21

Section 5.1.    Definitions .......................................................................21
Section 5.2.    Interpretation ...................................................................38
Section 5.3.    Change in Accounting Principles .....................................39

SECTION 6.                   REPRESENTATIONS AND WARRANTIES................................................39

       Section 6.1.       Organization and Qualification...............................................39
       Section 6.2.       Subsidiaries...........................................................................39
       Section 6.3.       Authority and Validity of Obligations ...................................40
       Section 6.4.       Use of Proceeds; Margin Stock...............................................40
       Section 6.5.       Financial Reports ...................................................................41
       Section 6.6.       No Material Adverse Change...................................................41
       Section 6.7.       Full Disclosure ......................................................................41
       Section 6.8.       Trademarks, Franchises, and Licenses....................................41
       Section 6.9.       Governmental Authority and Licensing...................................42
       Section 6.10.     Good Title ..............................................................................42
       Section 6.11.     Litigation and Other Controversies.........................................42
       Section 6.12.     Taxes......................................................................................42
       Section 6.13.     Approvals ...............................................................................42
       Section 6.14.     Affiliate Transactions.............................................................43
       Section 6.15.     Investment Company ..............................................................43
       Section 6.16.     ERISA....................................................................................43
       Section 6.17.     Compliance with Laws ...........................................................43
       Section 6.18.     Other Agreements ..................................................................44
       Section 6.19.     Federal Food Security Act ......................................................44
       Section 6.20.     Broker Fees ............................................................................44
       Section 6.21.     No Default..............................................................................44
       Section 6.22.     Financing Orders....................................................................44
       Section 6.23.     Super-Priority Administrative Expense ...................................44

SECTION 7.                   CONDITIONS PRECEDENT ..........................................................45

       Section 7.1.       All Credit Events....................................................................45
       Section 7.2.       Initial Credit Event.................................................................46

SECTION 8.                   COVENANTS.............................................................................48

       Section 8.1.       Maintenance of Business ........................................................48
       Section 8.2.       Maintenance of Properties ......................................................48
       Section 8.3.       Taxes and Assessments...........................................................48
       Section 8.4.       Insurance................................................................................49
       Section 8.5.       Financial Reports ...................................................................49
       Section 8.6.       Inspection...............................................................................51
       Section 8.7.       Borrowings and Guaranties.....................................................52
       Section 8.8.       Liens......................................................................................53
       Section 8.9.       Investments, Acquisitions, Loans, and Advances....................54
       Section 8.10.     Mergers, Consolidations and Sales .........................................54
       Section 8.11.     Maintenance of Subsidiaries ...................................................55
       Section 8.12.     Dividends and Certain Other Restricted Payments..................55
       Section 8.13.     ERISA....................................................................................55
       Section 8.14.     Compliance with Laws ...........................................................55
       Section 8.15.     Burdensome Contracts With Affiliates....................................56

Section 8.16.   No Changes in Fiscal Year ........................................................57
Section 8.17.   Formation of Subsidiaries; Inactive Subsidiaries ...........................57
Section 8.18.   Change in the Nature of Business ..............................................57
Section 8.19.   Use of Loan Proceeds .............................................................57
Section 8.20.   No Restrictions on Subsidiary Distributions...................................57
Section 8.21.   Federal Food Security Act ........................................................57
Section 8.23.   Capital Expenditures ..............................................................58
Section 8.23.   Chapter 11 Claims..................................................................58
Section 8.24.   Asset Purchases, Executory Contracts, Pre-Petition Debt and
           Payments Outside the Ordinary Course of Business .........................58
Section 8.25.   Limitation on Restrictions on Subsidiary Distributions...........................58
Section 8.26.   Joint Venture Distributions, Etc..................................................58
Section 8.27.   Cash Flow Forecasts and Cash Flow Reports.............................58
Section 8.28.   COO ...................................................................................59
Section 8.29.   Sale Efforts..........................................................................60

SECTION 9.           EVENTS OF DEFAULT AND REMEDIES ........................................60

Section 9.1.   Events of Default ....................................................................60
Section 9.2.   Remedies upon Default..............................................................64
Section 9.3.   Relief from Stay .....................................................................65
Section 9.4.   Collateral for Undrawn Letters of Credit........................................65
Section 9.5.   Notice of Default.....................................................................66
Section 9.6.   Expenses ..............................................................................66

SECTION 10.          CHANGE IN CIRCUMSTANCES...................................................66

Section 10.1.   Increased Cost and Reduced Return .............................................66
Section 10.2.   Lending Offices .....................................................................67
Section 10.3.   Discretion of DIP Lender as to Manner of Funding ............................68

SECTION 11.          THE AGENTS .......................................................................68

Section 11.1.   Appointment and Authorization of DIP Agent...........................68
Section 11.2.   DIP Agent and its Affiliates........................................................68
Section 11.3.   Action by DIP Agent ................................................................68
Section 11.4.   Consultation with Experts ..........................................................69
Section 11.5.   Liability of DIP Agent; Credit Decision .........................................69
Section 11.6.   Indemnity ............................................................................70
Section 11.7.   Resignation of DIP Agent and Successor DIP Agent.............................70
Section 11.8.   Funds Transfer and Deposit Account Liability Arrangements.................70
Section 11.9.   Authorization to Enter into, and Enforcement of, the
           Collateral Documents.............................................................71
Section 11.10.   Authorization to Release or Subordinate or Limit Liens ..........................71

SECTION 12.          THE GUARANTEES ...............................................................72

Section 12.1.   The Guarantees .......................................................................72

Section 12.2.     Guarantee Unconditional ........................................................72

Section 12.3.     Discharge Only upon Payment in Full; Reinstatement in
                     Certain Circumstances ..........................................73

Section 12.4.     Subrogation .......................................................................73

Section 12.5.     Waivers .............................................................................74

Section 12.6.     Stay of Acceleration .........................................................74

Section 12.7.     Benefit to Guarantors .......................................................74

Section 12.8.     Guarantor Covenants ........................................................74

SECTION 13.           MISCELLANEOUS ..............................................................74

Section 13.1.     Withholding Taxes ...........................................................74

Section 13.2.     No Waiver, Cumulative Remedies ....................................76

Section 13.3.     Non-Business Days ...........................................................76

Section 13.4.     Documentary Taxes ..........................................................76

Section 13.5.     Survival of Representations ..............................................76

Section 13.6.     Survival of Indemnities ....................................................76

Section 13.7.     Sharing of Set-Off ............................................................76

Section 13.8.     Notices ..............................................................................77

Section 13.9.     Counterparts .....................................................................77

Section 13.10.    Successors and Assigns .....................................................77

Section 13.11.    Participants .......................................................................78

Section 13.12.    Assignments ......................................................................78

Section 13.13.    Amendments; Waivers; Forbearances ..............................79

Section 13.14.    Headings ...........................................................................80

Section 13.15.    Costs and Expenses; Indemnification ................................80

Section 13.16.    Set-off ...............................................................................81

Section 13.17.    Entire Agreement .............................................................82

Section 13.18.    Governing Law .................................................................82

Section 13.19.    Severability of Provisions .................................................82

Section 13.20.    Excess Interest ..................................................................83

Section 13.21.    Construction .....................................................................83

Section 13.22.    DIP Lender's Obligations Several .....................................83

Section 13.23.    Inquiries ...........................................................................83

Section 13.24.    Release of Claims .............................................................83

Section 13.25.    Submission to Jurisdiction; Waiver of Jury Trial .............84

Section 13.26.    Disclosure ........................................................................84

Section 13.27.    No Modification; No Discharge; Survival of Claims .........84

Section 13.28.    Pre-Petition Loan Documents ...........................................84

Section 13.29.    Bankruptcy Code Waivers ................................................85

Section 13.30.    Validation of Liens ...........................................................85

Signature Page ......................................................................................................S-1

EXHIBIT A      —    Notice of Payment Request
EXHIBIT B      —    DIP Revolving Note
EXHIBIT C      —    Borrowing Base Certificate
EXHIBIT D      —    Compliance Certificate
EXHIBIT E      —    Additional Borrower Supplement
EXHIBIT F      —    Assignment and Acceptance
EXHIBIT G      —    Interim Financing Order
EXHIBIT H      —    Cash Management Order
EXHIBIT I      —    Permitted Assumed Executory Contracts
SCHEDULE 1    —    DIP Revolving Credit Commitments
SCHEDULE 6.2   —    Subsidiaries
Schedule 6.11   —    Litigation

# SENIOR SECURED, SUPER-PRIORITY POST-PETITION CREDIT AGREEMENT

This Senior Secured, Super-Priority Post-Petition Credit Agreement is entered into as of October 4, 2010, by and among International Garden Products, Inc., a Delaware corporation (the *"Parent"*), Iseli Nursery, Inc., an Oregon corporation, and Weeks Wholesale Rose Grower, a California corporation (collectively, including the Parent, the *"Borrowers"* and each individually a *"Borrower"*), each as debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, the direct and indirect Subsidiaries of the Parent from time to time party hereto as Guarantors (collectively the *"Guarantors"* and each individually a *"Guarantor"*), each as debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the Borrowers and Guarantors being collectively referred to herein as the *"Debtors"* and each individually a *"Debtor"*; and the cases of the Borrowers and the Guarantors who are Debtors being collectively referred to herein as the *"Chapter 11 Cases"* and each a *"Chapter 11 Case"*), Harris N.A. (*"Harris"*), MFC Capital Funding, Inc. (*"MFC"*), U.S. Bank National Association (*"USBank"*), and Bank of the West (*"BOTW"*; Harris, MFC, USBank, and BOTW, together with any other financial institutions from time to time party to this Agreement, being hereinafter referred to collectively as the *"DIP Lenders"* and individually as a *"DIP Lender"*), and Harris, acting as DIP Agent for the DIP Lenders. All capitalized terms used herein without definition shall have the same meanings herein as such terms are defined in Section 5.1 hereof.

## PRELIMINARY STATEMENT

A.    On October 4, 2010 (the *"Petition Date"*) the Borrowers and the Guarantors filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware initiating the Chapter 11 Cases and have continued in possession of their assets and the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

B.    The Parent owns, directly or indirectly, all of the issued and outstanding capital stock or other equity interests of each of the other Borrowers and the Guarantors.

C.    The Borrowers and the Guarantors have requested that the DIP Lenders enter into certain financing arrangements with the Borrowers pursuant to which the DIP Lenders may make loans and provide other financial accommodations to the Borrowers.

D.    The DIP Lenders are willing to make such loans and advances and provide such financial accommodations on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.    THE CREDIT FACILITIES.

*Section 1.1.    DIP Revolving Credit Commitments.* Subject to the terms and conditions hereof, each DIP Lender, by its acceptance hereof, severally agrees to make a loan or loans

(individually a *"DIP Loan"* and collectively the *"DIP Loans"*) in U.S. Dollars to the Borrowers from time to time on a revolving basis up to such DIP Lender's DIP Revolving Credit Commitment, subject to any reductions thereof pursuant to the terms hereof, before the Termination Date. The DIP Loans shall be used solely for the purposes set forth in Section 6.4 hereof. The sum of the aggregate principal amount of DIP Loans and L/C Obligations (if any) at any time outstanding shall not exceed the DIP Revolving Credit Commitments or, if less, the Availability Limit then in effect. Each Borrowing of DIP Loans shall be made ratably from the DIP Lenders in proportion to their respective DIP Revolver Percentages. The maximum amount of the DIP Revolving Credit which each DIP Lender agrees to extend to the Borrowers shall be such DIP Lender's DIP Revolving Credit Commitment (subject to any reductions thereof pursuant to the terms hereof). DIP Loans may be repaid and the principal amount thereof re-borrowed before the Termination Date, subject to the terms and conditions hereof. Notwithstanding any other provision of this Agreement to the contrary, the DIP Agent shall have the right from time to time to establish reserves against the amount of DIP Revolving Credit which the Borrowers may otherwise request hereunder in such amounts and with respect to such matters (including without limitation, reserves for the Administrative Expense Carve-Out and reserves with respect to the Funds Transfer and Deposit Account Liability) as the DIP Agent shall deem necessary or appropriate in its reasonable judgment. The amount of such reserves shall be deemed usage of the DIP Revolving Credit Commitments when calculating the amount of availability under the DIP Revolving Credit for purposes of Sections 1 and 7 hereof. The DIP Agent agrees to give the Borrowers five (5) Business Days prior notice of the establishment of any such reserve.

Section 1.2.    *Letters of Credit.* (a) *General Terms.* Subject to the terms and conditions hereof, as part of the DIP Revolving Credit, the DIP Agent may, in its sole discretion with the prior written consent of 100% of the DIP Lenders acting in their sole discretion, issue standby and commercial letters of credit (each a *"Letter of Credit"*) for the account of the Borrowers, or any of them. Each Letter of Credit shall be issued by the DIP Agent, but each DIP Lender shall be obligated to reimburse the DIP Agent for such DIP Lender's DIP Revolver Percentage of the amount of each drawing thereunder and, accordingly, each Letter of Credit shall constitute usage of the DIP Revolving Credit Commitment of each DIP Lender pro rata in an amount equal to its DIP Revolver Percentage of the L/C Obligations then outstanding. Letters of Credit shall only be requested for the purposes set forth in Section 6.4 hereof and as authorized by the Financing Order.

(b)    *Applications.* At any time before the Termination Date, the DIP Agent may, in its sole discretion with the prior written consent of 100% of the DIP Lenders acting in their sole discretion, at the request of any Borrower, issue one or more Letters of Credit in U.S. Dollars, in a form satisfactory to the DIP Agent, with expiration dates no later than the earlier of 12 months from the date of issuance or 30 days prior to the Termination Date (unless otherwise approved by the DIP Agent), in an aggregate face amount as set forth above, upon the receipt of an application duly executed by the Parent, on behalf of the requesting Borrower, for the relevant Letter of Credit in the form then customarily prescribed by the DIP Agent for the Letter of Credit requested (each an *"Application"*). Notwithstanding anything contained in any Application to the contrary: (i) the Borrowers shall pay fees in connection with each Letter of Credit as set forth in Section 2.1 hereof, (ii) except as otherwise provided herein or in the Financing Order,

before the occurrence of a Default or an Event of Default, the DIP Agent will not call for the funding by the Borrowers of any amount under a Letter of Credit before being presented with a drawing thereunder, and (iii) if the DIP Agent is not timely reimbursed for the amount of any drawing under a Letter of Credit on the date such drawing is paid, the obligation of the Borrowers to reimburse the DIP Agent for the amount of such drawing shall bear interest (which the Borrowers hereby promise to pay) from and after the date such drawing is paid at a rate per annum equal to the sum of the Applicable Margin plus the Base Rate from time to time in effect (computed on the basis of a year of 360 days, and the actual number of days elapsed). The DIP Agent may with the written consent of 100% of the DIP Lenders issue amendments to the Letter(s) of Credit increasing the amount, or extending the expiration date, thereof at the request of the Borrowers subject to the conditions of Section 7 hereof and the other terms of this Section 1.2.

(c)  *The Reimbursement Obligations.*  Subject to Section 1.2(b) hereof, the obligation of the Borrowers to reimburse the DIP Agent for all drawings under a Letter of Credit (a *"Reimbursement Obligation"*) shall be governed by the Application related to such Letter of Credit, except that reimbursement shall be made by no later than 12:00 Noon (Chicago time) on the date when each drawing is paid if the Borrowers have been informed of such drawing by the DIP Agent on or before 11:30 a.m. (Chicago time) on the date when such drawing is paid or, if notice of such drawing is given to the Borrowers after 11:30 a.m. (Chicago time) on the date when such drawing is paid, by the end of such day, in immediately available funds at the DIP Agent's principal office in Chicago, Illinois or such other office as the DIP Agent may designate in writing to the Borrowers. If the Borrowers do not make any such reimbursement payment on the date due and the Participating DIP Lenders fund their participations therein in the manner set forth in Section 1.2(d) below, then all payments thereafter received by the DIP Agent in discharge of any of the relevant Reimbursement Obligations shall be distributed in accordance with Section 1.2(d) below.

(d)  *The Participating Interests.*  Each DIP Lender (other than the DIP Lender then acting as the DIP Agent in issuing the relevant Letter of Credit), by its acceptance hereof, severally agrees to purchase from the DIP Agent, and the DIP Agent hereby agrees to sell to each such DIP Lender (a *"Participating DIP Lender"*), an undivided percentage participating interest (a *"Participating Interest"*), to the extent of its DIP Revolver Percentage, in each Letter of Credit issued by, and each Reimbursement Obligation owed to, the DIP Agent. Upon any failure by the Borrowers to pay any Reimbursement Obligation at the time required on the date the related drawing is paid, as set forth in Section 1.2(c) above, or if the DIP Agent is required at any time to return to the Borrowers, or any of them, or to a trustee, receiver, liquidator, custodian or other Person any portion of any payment of any Reimbursement Obligation, each Participating DIP Lender shall, not later than the Business Day it receives a certificate in the form of Exhibit A hereto from the DIP Agent to such effect, if such certificate is received before 2:00 p.m. (Chicago time), or not later than 2:00 p.m. (Chicago time) the following Business Day, if such certificate is received after such time, pay to the DIP Agent an amount equal to such Participating DIP Lender's DIP Revolver Percentage of such unpaid or recaptured Reimbursement Obligation together with interest on such amount accrued from the date the related payment was made by the DIP Agent to the date of such payment by such Participating DIP Lender at a rate per annum equal to: (i) from the date the related payment was made by the

DIP Agent to the date 2 Business Days after payment by such Participating DIP Lender is due hereunder, the Federal Funds Rate for each such day and (ii) from the date 2 Business Days after the date such payment is due from such Participating DIP Lender to the date such payment is made by such Participating DIP Lender, the Base Rate in effect for each such day. Each such Participating DIP Lender shall thereafter be entitled to receive its DIP Revolver Percentage of each payment received in respect of the relevant Reimbursement Obligation and of interest paid thereon, with the DIP Agent retaining its DIP Revolver Percentage as a DIP Lender hereunder.

In the absence of the gross negligence or willful misconduct of the DIP Agent, the several obligations of the Participating DIP Lenders to the DIP Agent under this Section 1.2 shall be absolute, irrevocable, and unconditional under any and all circumstances whatsoever and shall not be subject to any set-off, counterclaim or defense to payment which any Participating DIP Lender may have or have had against any or all of the Borrowers, the DIP Agent, any other DIP Lender or any other Person whatsoever. Without limiting the generality of the foregoing, such obligations shall not be affected by any Default or Event of Default or by any reduction or termination of any DIP Revolving Credit Commitment of any DIP Lender, and each payment by a Participating DIP Lender under this Section 1.2 shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)     *Indemnification.*  The Participating DIP Lenders shall, to the extent of their respective DIP Revolver Percentages, indemnify the DIP Agent (to the extent not reimbursed by the Borrowers) against any cost, expense (including reasonable counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from the DIP Agent's gross negligence or willful misconduct) that the DIP Agent may suffer or incur in connection with any Letter of Credit. The obligations of the Participating DIP Lenders under this Section 1.2(e) and all other parts of this Section 1.2 shall survive termination of this Agreement and of all Applications, Letters of Credit, and all drafts and other documents presented in connection with drawings thereunder.

(f)     *Manner of Obtaining Letters of Credit.*  The Borrowers shall provide at least three (3) Business Days' advance written notice to the DIP Agent of each request for the issuance of a Letter of Credit, such notice in each case to be accompanied by an Application for such Letter of Credit properly completed and executed by the Parent, acting as agent for the Borrowers, and in the case of an extension or an increase in the amount of a Letter of Credit, a written request therefor, in a form acceptable to the DIP Agent, in each case, together with the fees called for by this Agreement. The DIP Agent shall promptly notify the DIP Lenders of any request for a Letter of Credit hereunder, or any amendment or extension thereto, and not issue, amend or extend any such Letter of Credit without the consent of 100% of the DIP Lenders.

*Section 1.3.     Interest.*  Each DIP Loan made or maintained by a DIP Lender shall bear interest (computed on the basis of a year of 360 days and the actual days elapsed) on the unpaid principal amount thereof at a rate per annum equal to the sum of the Applicable Margin plus the Base Rate from time to time in effect, payable monthly in arrears on the first Business Day of each calendar month and at maturity (whether by acceleration or otherwise).

"*Base Rate*" means, for any day, the rate per annum equal to the greatest of: (a) the rate of interest announced or otherwise established by the DIP Agent from time to time as its prime commercial rate, as in effect on such day, with any change in the Base Rate resulting from a change in said prime commercial rate to be effective as of the date of the relevant change in said prime commercial rate (it being acknowledged and agreed that such rate may not be the DIP Agent's best or lowest rate), (b) the sum of (i) the rate determined by the DIP Agent to be the average (rounded upward, if necessary, to the next higher 1/100 of 1%) of the rates per annum quoted to the DIP Agent at approximately 10:00 a.m. (Chicago time) (or as soon thereafter as is practicable) on such day (or, if such day is not a Business Day, on the immediately preceding Business Day) by two or more Federal funds brokers selected by the DIP Agent for sale to the DIP Agent at face value of Federal funds in the secondary market in an amount equal or comparable to the principal amount for which such rate is being determined, *plus* (ii) 1/2 of 1%, and (c) the LIBOR Quoted Rate for such day *plus* 1.00%. As used herein, the term "*LIBOR Quoted Rate*" means, for any day, the rate per annum equal to the quotient of (i) the rate per annum (rounded upwards, if necessary, to the next higher one hundred-thousandth of a percentage point) for deposits in U.S. Dollars for a one-month interest period which appears on the LIBOR01 Page as of 11:00 a.m. (London, England time) on such day (or, if such day is not a Business Day, on the immediately preceding Business Day) divided by (ii) one (1) minus the Eurodollar Reserve Percentage.

"*Eurodollar Reserve Percentage*" means the maximum reserve percentage, expressed as a decimal, at which reserves (including, without limitation, any emergency, marginal, special, and supplemental reserves) are imposed by the Board of Governors of the Federal Reserve System (or any successor) on "*eurocurrency liabilities*", as defined in such Board's Regulation D (or any successor thereto), subject to any amendments of such reserve requirement by such Board or its successor, taking into account any transitional adjustments thereto. For purposes of this definition, the relevant DIP Loans shall be deemed to be "*eurocurrency liabilities*" as defined in Regulation D without benefit or credit for any prorations, exemptions or offsets under Regulation D. The Eurodollar Reserve Percentage shall be adjusted automatically on and as of the effective date of any change in any such reserve percentage.

"*LIBOR01 Page*" means the display designated as "*LIBOR01 Page*" on the Reuters Service (or such other page as may replace the LIBOR01 Page on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for U.S. Dollar deposits).

(c) *Rate Determinations*. The DIP Agent shall determine each interest rate applicable to the DIP Loans and the Reimbursement Obligations hereunder, and its determination thereof shall be conclusive and binding except in the case of manifest error.

Section 1.4. *Minimum Borrowing Amounts*. Each Borrowing of DIP Loans advanced hereunder shall be in an amount not less than $100,000 (unless otherwise approved by the DIP Agent).

*Section 1.5.    Manner of Borrowing DIP Loans.    (a) Notice to the DIP Agent.*    The Borrowers shall give notice to the DIP Agent by no later than 12:00 noon (Chicago time) on the date the Borrowers request the DIP Lenders to advance a Borrowing.    All such notices concerning a Borrowing shall specify the date of the requested advance (which shall be a Business Day) and the amount of the requested Borrowing to be advanced.    The Borrowers agree that the DIP Agent may rely on any such telephonic or telecopy notice given by any person the DIP Agent in good faith believes is an Authorized Representative without the necessity of independent investigation and, in the event any such notice by telephone conflicts with any written confirmation, such telephonic notice shall govern if the DIP Agent has acted in reliance thereon.

(b)    *Notice to the DIP Lenders.*    The DIP Agent shall give prompt telephonic or telecopy notice to each DIP Lender of any notice from the Borrowers received pursuant to Section 1.5(a) above.

(c)    *Reimbursement Obligations.*    In the event the Borrowers fail to give notice pursuant to Section 1.5(a) above of a Borrowing equal to the amount of a Reimbursement Obligation and has not notified the DIP Agent by 12:00 noon (Chicago time) on the day such Reimbursement Obligation becomes due that they intend to repay such Reimbursement Obligation through funds not borrowed under this Agreement, the Borrowers shall be deemed to have requested a Borrowing under the DIP Revolving Credit on such day in the amount of the Reimbursement Obligation then due, which Borrowing shall be applied to pay the Reimbursement Obligation then due.

(d)    *Disbursement of DIP Loans.*    Not later than 2:00 p.m. (Chicago time) on the date of any requested advance of a new Borrowing, subject to Section 7 hereof, each DIP Lender shall make available its DIP Loan comprising part of such Borrowing in funds immediately available at the principal office of the DIP Agent in Chicago, Illinois.    The DIP Agent shall make the proceeds of each new Borrowing available to the Borrowers at the DIP Agent's principal office in Chicago, Illinois, by depositing such proceeds to the credit of the Parent's general operating account maintained with the DIP Agent or as the Parent and the DIP Agent may otherwise agree.

(e)    *DIP Agent Reliance on DIP Lender Funding.*    Unless the DIP Agent shall have been notified by a DIP Lender by 2:00 p.m. (Chicago time) on the date on which such DIP Lender is scheduled to make payment to the DIP Agent of the proceeds of a DIP Loan (which notice shall be effective upon receipt) that such DIP Lender does not intend to make such payment, the DIP Agent may assume that such DIP Lender has made such payment when due and the DIP Agent may in reliance upon such assumption (but shall not be required to) make available to the Borrowers the proceeds of the DIP Loan to be made by such DIP Lender and, if any DIP Lender has not in fact made such payment to the DIP Agent, such DIP Lender shall, on demand, pay to the DIP Agent the amount made available to the Borrowers attributable to such DIP Lender together with interest thereon in respect of each day during the period commencing on the date such amount was made available to the Borrowers and ending on (but excluding) the date such DIP Lender pays such amount to the DIP Agent at a rate per annum equal to: (i) from the date the related advance was made by the DIP Agent to the date 2 Business Days after payment by such DIP Lender is due hereunder, the Federal Funds Rate for each such day and (ii) from the

date 2 Business Days after the date such payment is due from such DIP Lender to the date such payment is made by such DIP Lender, the Base Rate in effect for each such day. If such amount is not received from such DIP Lender by the DIP Agent immediately upon demand, the Borrowers will, on demand, repay to the DIP Agent the proceeds of the DIP Loan attributable to such DIP Lender with interest thereon at a rate per annum equal to the interest rate applicable to the relevant DIP Loan.

Section 1.6.    *Maturity of DIP Loans.* Each DIP Loan, both for principal and interest not sooner paid, shall mature and be due and payable by the Borrowers on the Termination Date.

Section 1.7.    *Prepayments.* (a) *Optional.* The Borrowers may prepay in whole or in part (but, if in part, then in an amount such that the minimum amount required for a Borrowing pursuant to Section 1.4 hereof remains outstanding) without premium or penalty any Borrowing of DIP Loans at any time upon prior notice delivered by the Borrowers to the DIP Agent no later than 12:00 noon (Chicago time) on the date of prepayment (or, in any case, such shorter period of time then agreed to by the DIP Agent).

(b)    *Mandatory.* (i) To the extent that any Disposition or Event of Loss which generates Net Proceeds in an amount in excess of $100,000 in the aggregate from a single transaction or series of related transactions includes any Pre-Petition Collateral or Post-Petition Collateral (herein, an *"Asset Sale"*; it being understood and agreed that no Disposition shall occur without Bankruptcy Court approval and with the DIP Lenders and Pre-Petition Lenders reserving all rights, if any, to object to any such sale) prior to the Termination Date and outside the ordinary course of business (including, for purposes hereof, the sale of obsolete inventory or property not currently used in the business operations of the Borrowers), 100% of the Net Proceeds (as hereinafter defined) from such Disposition or Event of Loss shall be paid to the DIP Agent for application to the DIP Credit as described below. Asset Sale proceeds shall not include any proceeds of any Event of Loss to the extent the relevant Loan Party has elected to use such proceeds to repair, rebuild, or replace the assets subject to such Event of Loss, no Event of Default exists and, to the extent of proceeds in excess of $100,000 with respect to any single Event of Loss, the Required DIP Lenders have approved such repair, rebuilding or replacement. Any property so repaired, rebuilt or replaced shall constitute part of the Post-Petition Collateral and shall be subject to the Replacement Liens for the benefit of the Pre-Petition Agent and Pre-Petition Lenders. As used herein with respect to Asset Sales, the term *"Net Proceeds"* means the gross sale price less actual taxes payable and the costs of such sale which have been approved by the Required DIP Lenders or, as applicable, the amount received or to be received in respect of an Event of Loss, net of out-of-pocket costs directly related thereto. Any such proceeds of sale designated to pay such taxes and costs of sale which are not required to be disbursed at the closing of such sale shall be held in escrow by the DIP Agent subject to the lien of the DIP Agent (for the benefit of itself and the DIP Lenders) and the Pre-Petition Agent (for the benefit of itself and Pre-Petition Lenders) until applied to pay such taxes and costs of sale. Prior to the Termination Date, the Net Proceeds of Asset Sales shall be applied as follows: all Net Proceeds shall be first applied to reduce the DIP Revolving Credit (and a corresponding reduction in the DIP Revolving Credit Commitments by the amount of such Net Proceeds applied to the DIP Loans then outstanding, except to the extent the sale or monetization of the asset in question (including, without limitation, any settlement of the note obligation owing to

the Borrowers by Aequitas Catalyst Fund, LLC or an affiliate thereof relating to the previous sale of substantially all of the assets of Skagit) is specifically provided for in the Cash Flow Forecast as an assumed source of cash during the relevant period) then outstanding until paid in full unless 100% of the DIP Lenders otherwise agree, with any remaining Net Proceeds applied to the Pre-Petition Obligations (and applied in accordance with the Pre-Petition Credit Agreement) until paid in full.

(ii)    The Borrowers shall, on each date the DIP Revolving Credit Commitments are reduced pursuant to Sections 1.7(b)(i) and Section 1.10 hereof or the amount available under the DIP Revolving Credit Commitments is reduced pursuant to Section 1.1 hereof or the Availability Limit is reduced in accordance with the definition thereof, prepay the DIP Loans and, if necessary, prefund the L/C Obligations by the amount, if any, necessary to reduce the sum of the aggregate principal amount of DIP Loans and L/C Obligations then outstanding to the amount to which the DIP Revolving Credit Commitments or amount available thereunder or the Availability Limit have been so reduced.

(iii)    Each prepayment of DIP Loans under this Section 1.7(b) shall be made by the payment of the principal amount to be prepaid and, in the case of any termination or reduction in the DIP Revolving Credit Commitments, accrued interest thereon to the date of prepayment. Each prefunding of L/C Obligations shall be made in accordance with Section 9.4 hereof.

(c)    Any amount of DIP Loans paid or prepaid before the Termination Date may, subject to the terms and conditions of this Agreement, be borrowed, repaid and borrowed again.

*Section 1.8.    Default Rate.*  Notwithstanding anything to the contrary contained herein, while any Event of Default exists or after acceleration, the Borrowers shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the principal amount of all DIP Loans, Reimbursement Obligations, and letter of credit fees owing by them at a rate per annum equal to:

(a)    for any DIP Loan, the sum of 2.0% plus the Applicable Margin plus the Base Rate from time to time in effect;

(b)    for any Reimbursement Obligation, the sum of 2.0% plus the amount due under Section 1.2(b) with respect thereto; and

(c)    for any Letter of Credit, the sum of 2.0%, plus the letter of credit fee due under Section 2.1(b) hereof with respect thereto;

*provided, however,* that in the absence of acceleration and subject to Section 9.2 hereof, any adjustments pursuant to this Section shall be made at the election of the DIP Agent, acting at the request or with the consent of the Required DIP Lenders, with written notice to the Borrowers. While any Event of Default exists or after acceleration, interest shall be paid on demand of the DIP Agent at the request or with the consent of the Required DIP Lenders.

*Section 1.9.    Evidence of Indebtedness.*    (a) Each DIP Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such DIP Lender resulting from each DIP Loan made by such DIP Lender from time to time, including the amounts of principal and interest payable and paid to such DIP Lender from time to time hereunder.

(b)    The DIP Agent shall also maintain accounts in which it will record (i) the amount of each DIP Loan made hereunder and the type thereof, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each DIP Lender hereunder and (iii) the amount of any sum received by the DIP Agent hereunder from the Borrowers and each DIP Lender's share thereof.

(c)    The entries maintained in the accounts maintained pursuant to paragraphs (a) and (b) above shall be *prima facie* evidence of the existence and amounts of the Obligations therein recorded; *provided, however,* that the failure of the DIP Agent or any DIP Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Obligations in accordance with their terms.

(d)    Any DIP Lender may request that its DIP Loans be evidenced by a promissory note or notes in the forms of Exhibit B (hereinafter referred to collectively as the *"Notes"* and individually as a *"Note"*).  In such event, the Borrowers shall prepare, execute and deliver to such DIP Lender a Note payable to such DIP Lender or its registered assigns in the amount of the relevant DIP Revolving Credit Commitment.  Thereafter, the DIP Loans evidenced by such Note or Notes and interest thereon shall at all times (including after any assignment pursuant to Section 13.12) be represented by one or more Notes payable to the order of the payee named therein or any assignee pursuant to Section 13.12, except to the extent that any such DIP Lender or assignee subsequently returns any such Note for cancellation and requests that such DIP Loans once again be evidenced as described in subsections (a) and (b) above.

*Section 1.10.    Commitment Terminations.*  (a) *Voluntary.*  The Borrowers shall have the right at any time and from time to time, upon 5 Business Days prior written notice to the DIP Agent (or such shorter period of time then agreed to by the DIP Agent), to terminate the DIP Revolving Credit Commitments issued to them in whole or in part, any partial termination to be (i) in an amount not less than $1,000,000 or such greater amount which is an integral multiple thereof, and (ii) allocated ratably among the DIP Lenders in proportion to their respective DIP Revolver Percentages thereto, *provided* that the DIP Revolving Credit Commitments may not be reduced to an amount less than the sum of the aggregate principal amount of DIP Loans and L/C Obligations then outstanding.  The DIP Agent shall give prompt notice to each DIP Lender of any such termination of the DIP Revolving Credit Commitments.

(b)    *Mandatory DIP Revolving Credit Termination.*    The DIP Revolving Credit Commitments shall ratably terminate by an amount equal to 100% of Net Cash Proceeds to the extent required by Section 1.7(b) hereof.

(c)    Any termination of the DIP Revolving Credit Commitments pursuant to this Section 1.10 may not be reinstated.

*Section 1.11.    Substitution of DIP Lenders.*  In the event (a) the Borrowers receive a claim from any DIP Lender for compensation under Section 10.3 or 13.1 hereof, (b) the Borrowers receive notice from any DIP Lender of any illegality pursuant to Section 10.1 hereof, (c) any DIP Lender is a Defaulting DIP Lender, or (d) a DIP Lender fails to consent to an amendment or waiver requested under Section 13.13 hereof at a time when the Required DIP Lenders have approved such amendment or waiver (any such DIP Lender referred to in clause (a), (b), (c), or (d) above being hereinafter referred to as an *"Affected DIP Lender"*), the Borrowers may, in addition to any other rights the Borrowers may have hereunder or under applicable law, require, at their expense, any such Affected DIP Lender to assign, at par, without recourse, all of its interest, rights, and obligations hereunder (including its DIP Revolving Credit Commitment and the DIP Loans and participation interests in Letters of Credit and other amounts at any time owing to it hereunder and the other Loan Documents) to a commercial bank or other financial institutional specified by the Borrowers, *provided* that (i) such assignment shall not conflict with or violate any law, rule or regulation or order of any court or other governmental authority, (ii) the Borrowers shall have received the written consent of the DIP Agent, which consent shall not be unreasonably withheld, to such assignment, (iii) the Borrowers shall have paid to the Affected DIP Lender all monies (including all accrued interest and fees) other than such principal owing to it hereunder, and (iv) the assignment is entered into in accordance with the other requirements of Section 13.12 hereof (provided any assignment fees and reimbursable expenses due thereunder shall be paid by the Borrowers).

*Section 1.12.    Appointment of Parent as Agent for Borrowers.*  Each Borrower hereby irrevocably appoints the Parent as its agent hereunder to make requests on such Borrower's behalf under Section 1 hereof for Borrowings, to request Letters of Credit on its behalf, and to execute all Applications therefor, and to take any other action contemplated by the Loan Documents with respect to the credit extended hereunder to such Borrower. The DIP Agent and the DIP Lenders shall be entitled to conclusively presume that any action by the Parent under the Loan Documents is taken on behalf of all of the Borrowers whether or not the Parent so indicates.

*Section 1.13.    Defaulting DIP Lenders.*  Anything contained herein to the contrary notwithstanding, in the event that any DIP Lender at any time is a Defaulting DIP Lender, then (a) during any Defaulting DIP Lender Period with respect to such Defaulting DIP Lender, such Defaulting DIP Lender shall be deemed not to be a *"DIP Lender"* for purposes of voting on any matters (including the granting of any consents or waivers) with respect to any of the Loan Documents and such Defaulting DIP Lender's DIP Revolving Credit Commitments shall be excluded for purposes of determining *"Required DIP Lenders"* (provided that the foregoing shall not permit an increase in such DIP Lender's Commitments or an extension of the maturity date of such DIP Lender's DIP Loans or other Obligations without such DIP Lender's consent); (b) to the extent permitted by applicable law, until such time as the Defaulting DIP Lender Excess with respect to such Defaulting DIP Lender shall have been reduced to zero, any voluntary prepayment of the DIP Loans shall, if the DIP Agent so directs at the time of making such voluntary prepayment, be applied to the DIP Loans of other DIP Lenders as if such Defaulting DIP Lender had no DIP Loans outstanding; (c) such Defaulting DIP Lender's Commitments and outstanding DIP Loans shall be excluded for purposes of calculating any commitment fee payable to DIP Lenders pursuant to Section 2.1 in respect of any day during any

Defaulting DIP Lender Period with respect to such Defaulting DIP Lender, and such Defaulting DIP Lender shall not be entitled to receive any fee pursuant to Section 2.1 with respect to such Defaulting DIP Lender's DIP Revolving Credit Commitment in respect of any Defaulting DIP Lender Period with respect to such Defaulting DIP Lender (and any Letter of Credit fee otherwise payable to a DIP Lender who is a Defaulting DIP Lender shall instead be paid to the DIP Agent, as the issuer of Letters of Credit, for its use and benefit); (d) the utilization of DIP Revolving Credit Commitments as at any date of determination shall be calculated as if such Defaulting DIP Lender had funded all DIP Loans of such Defaulting DIP Lender; and (e) if so requested by the DIP Agent at any time during the Defaulting DIP Lender Period with respect to such Defaulting DIP Lender, the Borrowers shall deliver to the DIP Agent cash collateral in an amount equal to such Defaulting DIP Lender's DIP Revolver Percentage of L/C Obligations then outstanding (to be, held by the DIP Agent as set forth in Section 9.4 hereof). No DIP Revolving Credit Commitment of any DIP Lender shall be increased or otherwise affected, and, except as otherwise expressly provided in this Section, performance by the Borrowers of their obligations hereunder and the other Loan Documents shall not be excused or otherwise modified as a result of the operation of this Section. The rights and remedies against a Defaulting DIP Lender under this Section are in addition to other rights and remedies which the Borrowers may have against such Defaulting DIP Lender and which the DIP Agent or any DIP Lender may have against such Defaulting DIP Lender.

SECTION 2.    FEES.

*Section 2.1.    Fees.*

(a)    *Commitment Fee.* The Borrowers shall pay to the DIP Agent for the ratable account of the DIP Lenders in accordance with their DIP Revolver Percentages a commitment fee at the rate per annum equal to the Applicable Margin (computed on the basis of a year of 360 days and the actual number of days elapsed) on the average daily Unused DIP Revolving Credit Commitments. Such commitment fee shall be payable monthly in arrears on the first Business Day of each month (commencing on the first such date occurring after the date hereof) and on the Termination Date, unless the DIP Revolving Credit Commitments are terminated in whole on an earlier date, in which event the commitment fee for the period to the date of such termination in whole shall be paid on the date of such termination.

(b)    *Letter of Credit Fees.* On the date of issuance or extension, or increase in the amount, of any Letter of Credit pursuant to Section 1.2 hereof, the Borrowers shall pay to the DIP Agent for its own account a fronting fee equal to 0.125% of the face amount of (or of the increase in the face amount of) such Letter of Credit. Monthly in arrears, on the first Business Day of each month, commencing on the first such date occurring after the date hereof, and on the Termination Date, the Borrowers shall pay to the DIP Agent, for the ratable benefit of the DIP Lenders in accordance with their DIP Revolver Percentages, a letter of credit fee at a rate per annum equal to the Applicable Margin (computed on the basis of a year of 360 days and the actual number of days elapsed) applied to the daily face amount of Letters of Credit outstanding during such quarter. In addition, the Borrowers shall pay to the DIP Agent for its own account the DIP Agent's standard issuance, drawing, negotiation, amendment, assignment, and other administrative fees for each Letter of Credit as established by the DIP Agent from time to time.

(c)  *DIP Agent and Other Fees.*  The Borrowers shall pay to the DIP Agent, for its own use and benefit, such fees agreed to between the DIP Agent and the Borrowers in a fee letter dated as of October 4, 2010, or as otherwise agreed to in writing between them.

(d)  *Audit Fees.*  The Borrowers shall pay to the DIP Agent for audits of the Collateral performed by the DIP Agent or the DIP Lenders or their agents or representatives in such amounts as the DIP Agent may from time to time request (the DIP Agent acknowledging and agreeing that such charges shall be computed in the same manner as it at the time customarily uses for the assessment of charges for similar collateral audits plus reimbursement for out-of-pocket costs and expenses, including, but not limited to, airfare, lodging and meals).

SECTION 3.    PLACE AND APPLICATION OF PAYMENTS; WEEKLY SETTLEMENT; COMPUTATION OF OBLIGATIONS OUTSTANDING.

*Section 3.1.    Place and Application of Payments.  (a) Payments Generally.*  All payments of principal of and interest on the DIP Loans and the Reimbursement Obligations, and of all other Obligations payable by the Borrowers under this Agreement and the other Loan Documents, shall be made by such Borrowers to the DIP Agent by no later than 12:00 Noon (Chicago time) on the due date thereof at the office of the DIP Agent in Chicago, Illinois (or such other location as the DIP Agent may designate to the Borrowers), for the benefit of the DIP Lender or DIP Lenders entitled thereto.  Any payments received after such time shall be deemed to have been received by the DIP Agent on the next Business Day.  All such payments shall be made in U.S. Dollars in immediately available funds at the place of payment, in each case without set-off or counterclaim.  The DIP Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest on DIP Loans and on Reimbursement Obligations in which the DIP Lenders have purchased Participating Interests ratably to the DIP Lenders and like funds relating to the payment of any other amount payable to any DIP Lender to such DIP Lender, in each case to be applied in accordance with the terms of this Agreement.  If the DIP Agent causes amounts to be distributed to the DIP Lenders in reliance upon the assumption that the Borrowers will make a scheduled payment and such scheduled payment is not so made, each DIP Lender shall, on demand, repay to the DIP Agent the amount distributed to such DIP Lender together with interest thereon in respect of each day during the period commencing on the date such amount was distributed to such DIP Lender and ending on (but excluding) the date such DIP Lender repays such amount to the DIP Agent, at a rate per annum equal to:  (i) from the date the distribution was made to the date 2 Business Days after payment by such DIP Lender is due hereunder, the Federal Funds Rate for each such day and (ii) from the date 2 Business Days after the date such payment is due from such DIP Lender to the date such payment is made by such DIP Lender, the Base Rate in effect for each such day.

(b)  *Application of Collateral Proceeds Prior to the Termination Date.*  Prior to the Termination Date, all proceeds of inventory and accounts receivable of the Borrowers and the Guarantors and all Cash Collateral generated in the ordinary course of each Borrower's and Guarantor's business (other than amounts subject to Section 1.7(b)(i) hereof) shall be deposited in the Collection Accounts referred to in Section 4.3 hereof and applied daily as follows:  *First*, to the payment of normal operating expenses in accordance with Section 4.4 hereof consistent with the terms of the Cash Flow Forecast and the Interim Financing Order and any Final

Financing Order approved by the DIP Lenders; *Second*, to the costs, fees and expenses of the DIP Agent (including without limitation the fees and expenses of its counsel, advisor and other professionals previously employed or retained by the DIP Agent); *Third*, to regularly scheduled payments due under agreements relating to Hedging Liability (as defined in the Prepetition Credit Agreement) as Adequate Protection Payments to the extent permitted by the Financing Order owed to one or more of the Pre-Petition Lenders; *Fourth*, to interest and fees then due on the Post-Petition Obligations; *Fifth*, to Adequate Protection Payments of interest, fees, and expenses then due and owing to the Pre-Petition Agent and Pre-Petition Lenders to the extent permitted by the Financing Order; *Sixth*, to the prepayment of all outstanding DIP Loans and unreimbursed Reimbursement Obligations hereunder until all such DIP Loans and Reimbursement Obligations shall be fully paid (but without any reduction in the DIP Revolving Credit Commitments resulting from such prepayments except as otherwise required by this Agreement); *Seventh*, to be held by the DIP Agent in the Cash Collateral Account (including to prefund outstanding Letters of Credit in an amount equal to 105% of the amount of all such Letters of Credit) until released or applied pursuant to Section 4.4 hereof; and *Finally*, as the Financing Order shall provide if then in effect and otherwise as shall be determined by the Bankruptcy Court.

(c)     *Application of Payments and Collections on and after the Termination Date.* On and after the occurrence of the Termination Date, all payments and collections from Collateral (including proceeds of any Disposition or Event of Loss) shall be applied as follows:

(i)     first, to the costs, fees and expenses of the DIP Agent and the DIP Lenders, and to Funds Transfer and Deposit Account Liability (if any) owing to the DIP Lenders;

(ii)     second, to the payment of any outstanding Post-Petition Obligations consisting of interest and fees due under the Loan Documents to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof;

(iii)     third, to the payment of principal on the DIP Loans, unpaid Reimbursement Obligations, together with amounts to be held by the DIP Agent as collateral security for any outstanding L/C Obligations pursuant to Section 4.4(b) hereof (until the DIP Agent is holding an amount of cash equal to 105% of the then outstanding amount of all such L/C Obligations), the aggregate amount paid to, or held as collateral security for, the DIP Lenders and DIP Agent to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof;

(iv)     fourth, to the payment of all other unpaid Post-Petition Obligations and all other indebtedness, obligations, and liabilities of the Borrower and its Subsidiaries secured by the Loan Documents to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof;

(v)     fifth, to reduce the Pre-Petition Obligations under the Pre-Petition Credit Agreement on the basis set forth in the Pre-Petition Credit Agreement (provided a portion of the Cash Collateral shall be available to pay the Administrative Expense Carve Out or

a portion thereof in aggregate amount to be determined with the consent of the DIP Lenders); and

(vi)    finally, to the Borrowers or as otherwise required by applicable law.

(d)    *Account Debit.* Each Borrower hereby irrevocably authorizes the DIP Agent to charge any of such Borrower's deposit accounts maintained with the DIP Agent for the amounts from time to time necessary to pay any then due Obligations; *provided* that the Borrowers acknowledge and agree that the DIP Agent shall not be under an obligation to do so and the DIP Agent shall not incur any liability to the Borrowers, or any of them, or any other Person for the DIP Agent's failure to do so.

Section 3.2.    *Weekly Settlement.* (a) In order to minimize the frequency of transfers of funds between the DIP Agent and each DIP Lender, advances and repayments of DIP Loans will be settled according to the procedures described in this Section 3.2. The DIP Agent shall, once every seven (7) days, or sooner, if so elected by the DIP Agent in its discretion, but in each case on a Business Day (each such day being a *"Settlement Date"*), distribute to each DIP Lender a statement (the *"DIP Agent's Report"*) disclosing as of the immediately preceding Business Day, the aggregate unpaid principal balance of DIP Loans outstanding as of such date (including DIP Loans made by the DIP Agent under Section 3.2(d) hereof), repayments and prepayments of principal received from the Borrowers with respect to the DIP Loans since the immediately preceding DIP Agent's Report, and additional DIP Loans made to the Borrowers since the date of the immediately preceding DIP Agent's Report and the Borrowing Base as of the most recent determination thereof. Each DIP Agent's Report shall disclose the net amount (the *"Settlement Amount"*) due to or due from the DIP Lenders to effect a Settlement of any DIP Loan and the calculations therefor. The DIP Agent's Report submitted to a DIP Lender shall be prima facie evidence of the amount due to or from such DIP Lender to effect a Settlement of any DIP Loan. If the DIP Agent's Report discloses a net amount due from the DIP Agent to any DIP Lender to effect the Settlement of a DIP Loan, the DIP Agent, concurrently with the delivery of the DIP Agent's Report to the DIP Lenders, shall transfer, by wire transfer or otherwise, such amount to such DIP Lender in funds immediately available to such DIP Lender, in accordance with such DIP Lender's instructions. If the DIP Agent's Report discloses a net amount due to the DIP Agent from any DIP Lender to affect the Settlement of any DIP Loan, then such DIP Lender shall wire transfer such amount, in funds immediately available to the DIP Agent, as instructed by the DIP Agent. Such net amount due from a DIP Lender to the DIP Agent shall be due on the Settlement Date if such DIP Agent's Report is received before 12:00 noon (Chicago time) and such net amount shall be due on the first Business Day following the Settlement Date if such DIP Agent's Report is received after 12:00 noon (Chicago time). Notwithstanding the foregoing, payments actually received by the DIP Agent with respect to the following items shall be distributed by the DIP Agent to each DIP Lender as follows:

(i)    as soon as possible, but in any event, within one Business Day after receipt thereof by the DIP Agent, payments applicable to interest on the DIP Loans shall be paid to each DIP Lender in proportion to its pro rata share of such DIP Loans, subject to any adjustments for any DIP Loans made by the DIP Agent under Section 3.2(d) hereof so that the DIP Agent alone shall receive interest on the DIP Loans so made until

Settlement with such DIP Lender on such DIP Loans and each DIP Lender shall only receive interest on the amount of funds actually advanced by such DIP Lender. Each DIP Lender's share of interest accruing each day on the DIP Loans shall be based on such DIP Lender's daily funded loan balance; and

(ii)     as soon as possible, but in any event, within one Business Day after receipt thereof by the DIP Agent, payments applicable to the fees set forth in Section 2.1 hereof and expenses payable under this Agreement, shall in each case be paid to each DIP Lender as set forth in the applicable Section hereof.

(b)     All funds advanced to the Borrowers by the DIP Agent or a DIP Lender pursuant to this Section 3.2 shall for all purposes be treated as a DIP Loan made by such DIP Lender and all funds received by any DIP Lender pursuant to this Section 3.2 shall for all purposes be treated as a repayment of amounts owed with respect to DIP Loans made by such DIP Lender.

(c)     Payments to effect a Settlement shall be made without set-off, counterclaim or reduction of any kind. The failure or refusal of any DIP Lender to make available to the DIP Agent at the aforesaid time and place the amount of the Settlement Amount due from such DIP Lender (i) shall not relieve any other DIP Lender from its several obligation hereunder to make available to the DIP Agent the amount of such other DIP Lender's Settlement Amount and (ii) shall not impose upon such other DIP Lender any liability with respect to such failure or refusal or otherwise increase the DIP Revolving Credit Commitment of such other DIP Lender.

(d)     Notwithstanding the requirements set forth in Section 1.5 above, the DIP Agent may, in its sole discretion without conferring with the DIP Lenders but on their behalf and subject to the conditions set forth in Section 7.1 hereof, make DIP Loans in amounts requested by the Borrowers. Any such DIP Loans so funded by the DIP Agent shall be deemed DIP Loans made by the DIP Agent under its DIP Revolving Credit Commitment, except for purposes of Section 2.1(a) hereof. Each DIP Lender's obligation to fund its portion of any such DIP Loan made by the DIP Agent will commence on the date such DIP Loan is actually so made by the DIP Agent. However, until the date on which the Settlement of such DIP Loan is required in accordance with this Section 3.2 above, such obligation of the DIP Lender shall be satisfied by the DIP Agent making such DIP Loan. The Borrower acknowledges and agrees that the making of such DIP Loans by the DIP Agent under this Section 3.2(d) shall be subject in all respects to the provisions of this Agreement as if each such DIP Loan were made in response to a notice requesting such DIP Loan made in accordance with Section 1.5 hereof, including without limitation the limitations set forth in Sections 1.1 and 1.7(b) hereof and the requirements of Section 7 hereof. All actions taken by the DIP Agent pursuant to the provisions of this Section 3.2(d) shall be conclusive and binding on the Borrowers and the DIP Lenders in the absence of manifest error. Notwithstanding anything herein to the contrary, prior to the Settlement with any DIP Lender of any DIP Loan funded by the DIP Agent under this Section, interest payable on such DIP Loan otherwise allocable to such DIP Lender shall be for the sole account of the DIP Agent and payment of principal on such DIP Loan otherwise allocable to such DIP Lender shall be for the sole account of the DIP Agent.

*Section 3.3. Computation of Obligations Outstanding.* For the purpose of calculating the aggregate principal balance of Obligations outstanding hereunder, Obligations shall be deemed to be paid on the date payments or collections, as the case may be, are applied by the DIP Agent to such Obligations; *provided, however,* for purposes of calculating interest payable by the Borrowers on the DIP Loans and on any other interest-bearing Obligations under this Agreement, any payment or collection of the Obligations by virtue of the application of proceeds of Collateral pursuant to Section 3.1 hereof shall be deemed to be applied to the DIP Loans or other interest-bearing Obligations one (1) Business Day after receipt of such payment or collection by the DIP Agent (any additional amount payable by any Borrower solely by virtue of this deemed application to be paid to and retained by the DIP Agent for its sole account as an administrative fee, with the DIP Lenders to have no right to any share thereof); *further provided, however,* that each payment or collection received by wire or ACH transfer directly to the Concentration Account maintained with the DIP Agent as contemplated by Section 4 hereof shall be deemed applied on the date of the DIP Agent's receipt of such transfer. The DIP Agent shall apply all payments and collections received in respect of the Obligations, and all proceeds of Collateral, in each case received by the DIP Agent, in reduction of the Obligations promptly after the DIP Agent deems such sums collected in good funds in accordance with its then standard criteria for determining availability of funds. Notwithstanding the foregoing, if any item credited by the DIP Agent in reduction of the Obligations is not honored, the DIP Agent may reverse any provisional credit which has been given for the item and make appropriate adjustments to the amount of interest and principal otherwise due hereunder.

SECTION 4.    SECURITY.

*Section 4.1. Security.* As collateral security for the prompt and complete payment and performance (whether at stated maturity, by acceleration or otherwise) of the Post-Petition Obligations and the Adequate Protection Obligations and to induce the DIP Lenders to make the DIP Credit available to the Borrowers in accordance with the terms hereof, each of the Borrowers and Guarantors hereby assigns, creates, grants, conveys, mortgages, pledges, hypothecates and transfers to the DIP Agent for the benefit of the DIP Lenders first priority Liens and for the benefit of the Pre-Petition Lenders second priority Liens (subject to Permitted Liens permitted by, and with the priority established by, the Interim Financing Order) in accordance with Sections 364(c) and (d) of the Bankruptcy Code in all right, title and interest of each Borrower and each Guarantor in and to any and all Property, assets and things of value of every kind or type, tangible, intangible, real, personal and fixed, whether now owned or hereafter acquired and wherever located, including, without limitation, real property (including without limitation all leasehold interests, mineral leases, and mineral and water rights), the Cash Collateral Account and all other deposit accounts, accounts, chattel paper (including electronic chattel paper), instruments, documents (including electronic documents of title), all of each Borrower's and each Guarantor's rights and claims relating to all deposits and reserves held by utilities and trade creditors, inventory, farm products, rights against contract growers, equipment, rolling stock (including titled and non-titled vehicles), general intangibles (including, without limitation, payment intangibles, intellectual property, interests in partnerships and joint ventures and tax refunds), letter of credit rights, supporting obligations, commercial tort claims, investment property, and, subject to the terms of the Interim Financing Order and in any event upon entry of the Final Financing Order, all Bankruptcy Recoveries and other bankruptcy-related

causes of action, including any recovery thereon, including but not limited to, all causes of action under Chapter 5 of the Bankruptcy Code, including Section 506(c), Sections 544 through 550 and Section 553 or other applicable law, all pursuant to Section 364(c) and (d) of the Bankruptcy Code and, to the extent not otherwise included, (a) all proceeds of each of the foregoing, (b) all accessions to, substitutions and replacements (including any Property repaired, rebuilt or replaced with casualty insurance proceeds and condemnation awards) for, and insurance and condemnation proceeds, rents, profits and products of each of the foregoing, (c) the Pre-Petition Collateral, and (d) all Property of each Borrower and each Guarantor held by the DIP Agent or any DIP Lender, including without limitation, the funds from time to time on deposit in the Collection Accounts referred to in Section 4.3 hereof, any funds held in escrow by the DIP Agent pursuant to the last sentence of Section 1.7(b)(i) hereof and all other Property of every description, now or hereafter in the possession or custody of or in transit to the DIP Agent or any DIP Lender for any purpose, including safekeeping, collection or pledge, for the account of any Borrower or any Guarantor or as to which any Borrower or any Guarantor may have any right or power (all of which being hereinafter collectively referred to as the "*Collateral*").

Section 4.2. *Perfection of Security Interests*. (a) At the request of the DIP Agent and at the Borrowers' expense, each Borrower and Guarantor shall (i) execute and deliver to the DIP Agent documentation reasonably satisfactory to the DIP Agent evidencing the Liens granted hereby, providing for the perfection of such Liens, and evidencing that the automatic stay provisions of Section 362 of the Bankruptcy Code have been modified to permit the execution, delivery and filing of such documentation, and (ii) perform or take any and all steps at any time reasonably necessary to perfect, maintain, protect and enforce the DIP Agent's Lien on the Collateral; *provided, however,* that no such documentation shall be required as a condition to the validity, priority or perfection of any of the Liens created pursuant to this Agreement which security interests and liens shall be deemed valid and properly perfected upon approval by the Bankruptcy Court of the Financing Order.

(b) Until all Post-Petition Obligations and Adequate Protection Obligations have been indefeasibly satisfied and paid in full in cash by the Debtors and the DIP Revolving Credit Commitments shall have terminated, the DIP Agent's security interest in the Collateral as security for such obligations shall continue in full force and effect.

(c) Notwithstanding the provisions of Section 4.2(a) hereof, or failure on the part of any Borrower, any Guarantor, the DIP Agent or any DIP Lender to perfect, maintain, protect or enforce the DIP Agent's Lien on the Collateral, the Financing Order shall automatically, and without further action by any Person, perfect the DIP Agent's Lien against the Collateral.

Section 4.3. *Receivables and Inventory Collections*. The Borrowers and Guarantors agree to continue, or if appropriate, forthwith make, such arrangements as shall be necessary or appropriate to assure that all proceeds of the inventory and accounts receivable of the Borrowers and Guarantors and all other Cash Collateral generated after the Effective Date are deposited (in the same form as received) in an account maintained with the DIP Agent or accounts under the control of the DIP Agent (except for local petty cash accounts and local payroll accounts approved by the DIP Agent, if any (the *"Petty Cash and Payroll Accounts"*)) which provide for collections therein to be transmitted, upon the DIP Agent's request, to an account maintained

with or otherwise under the exclusive dominion and control of the DIP Agent, all such accounts maintained with or under the control of the DIP Agent to constitute special restricted accounts (each a *"Collection Account"* and collectively the *"Collection Accounts"*). The Borrowers and Guarantors acknowledge that the DIP Agent has (and is hereby granted to the extent that it does not already have) a Lien on each of the Collection Accounts and all funds contained therein to secure the Post-Petition Obligations and Adequate Protection Obligations, subject to the provisions of the Financing Order and the Bankruptcy Code. Cash held in the Collection Accounts shall constitute Cash Collateral subject to the Financing Order (if in effect) and otherwise as the Bankruptcy Court shall determine.

Section 4.4. *Cash Collateral Account.* (a) All Cash Collateral and other amounts referred to in Section 3.1(b) shall be deposited by the Debtors in one or more accounts subject to the DIP Agent's first priority perfected Lien and, if at any time required by the DIP Agent, under its exclusive dominion and control (collectively, the *"Cash Collateral Account"*). Such funds shall be held in the Cash Collateral Account until such time as the amounts held therein are applied by the relevant Debtor to pay normal operating expenses consistent with the Cash Flow Forecast and the Interim Financing Order and any Final Financing Order approved by the DIP Lenders or applied as provided in Section 3.1(b) hereof, *provided* that (i) except as otherwise provided in Section 3.1(c), the Net Proceeds of Dispositions and Events of Loss shall be applied as set forth in Section 1.7(b)(i) hereof, (ii) the DIP Agent may hold up to $50,000 of Cash Collateral at any one time as collateral security for Funds Transfer and Deposit Account Liability that may arise in connection with lockbox and cash management services afforded to the Debtors (and the DIP Agent my apply all or any part of such Cash Collateral to any such Funds Transfer and Deposit Account Liability as and when due), and (iii) during the existence of an Event of Default all amounts held in the Cash Collateral Account shall be applied as required by Section 3.1(c). In no event shall any Debtor use Cash Collateral to obtain letters of credit or similar extensions of credit from third parties. Proceeds of Cash Collateral shall only be requested by the Borrowers and applied to the payment of obligations permitted by Section 6.4 hereof as if such Cash Collateral were proceeds of DIP Loans hereunder, and each request for the release of Cash Collateral shall be deemed a representation and warranty by the Borrowers on the date on such request as to the facts specified in subsections (a) through (d), both inclusive, of Section 7.1 hereof as if such release of Cash Collateral was a Credit Event hereunder.

(b)    If the prepayment of the amount available for drawing under any or all outstanding Letters of Credit is required under Section 1.7(b) or under Section 9.2, the Borrowers shall forthwith pay the amount required to be so prepaid, to be held by the DIP Agent in a separate Cash Collateral Account as security for, and for application by the DIP Agent (to the extent available) to, the reimbursement of any payment under any Letter of Credit then or thereafter made by the DIP Agent until all Reimbursement Obligations have been paid in full in cash and no Letters of Credit remain outstanding, and thereafter to be applied as provided in Section 4.4(a).

Section 4.5. *Rights of DIP Agent.* The DIP Agent may, or upon the direction of the Required DIP Lenders, shall, in each case at any time on or after the Termination Date, after five (5) days prior written notice to the Borrowers of its intention to do so (absent any emergency relief provided by the Bankruptcy Court after request therefor from the Borrowers pursuant to a

Emergency Stay Hearing as provided for in the Financing Order), notify Account Debtors, parties to contracts with any Borrower or Guarantor, account debtors and other obligors on accounts, chattel paper, instruments, payment intangibles, and any other rights to payment of any Borrower or Guarantor that the right, title and interest of the Borrowers and the Guarantors in and under such accounts, chattel paper, instruments, payment intangibles, and other rights to payment have been assigned to the DIP Agent and that payments shall be made directly to the DIP Agent. Upon the request of the DIP Agent on or after the Termination Date, the Borrowers and the Guarantors will so notify such parties to contracts, account debtors and other obligors on accounts, chattel paper, contracts, instruments, payment intangibles, and any other rights to payment. The DIP Agent may at any time in its own name or in the name of others communicate with such parties to such accounts, chattel paper, contracts, instruments, payment intangibles, and any other rights to payment to verify with such persons to the DIP Agent's satisfaction the existence, amount and terms of any such accounts, chattel paper, contracts, instruments, payment intangibles, and any other rights to payment.

*Section 4.6.* *Performance by DIP Agent of Debtor's Post-Petition Obligations.* If any Borrower or Guarantor fails to perform or comply with any of its agreements contained in this Agreement, the other Loan Documents or the Financing Order and such failure continues beyond any applicable notice and cure period and the DIP Agent, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the reasonable expenses of the DIP Agent incurred in connection with such performance or compliance, together with interest thereon at the rate per annum determined by adding 2.0% to the Applicable Margin plus the Base Rate from time to time in effect, shall be payable jointly and severally by the Borrowers and Guarantors to the DIP Agent on demand, and shall constitute Post-Petition Obligations secured by the Collateral. Moreover, neither the DIP Agent nor any DIP Lender shall in any way be responsible for the payment of any costs incurred in connection with preserving or disposing of Collateral pursuant to Section 506(c) of the Bankruptcy Code, and the Collateral may not be charged for the incurrence of any such cost.

*Section 4.7.* *DIP Agent's Appointment as Attorney-in-Fact.* (a) The Borrowers and Guarantors each hereby irrevocably constitutes and appoints the DIP Agent and any officer of the DIP Agent with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority upon the occurrence and during the continuation of any Event of Default in the place and stead of each Borrower and Guarantor and in the name of any Borrower or Guarantor or in the DIP Agent's own name, from time to time in the DIP Agent's discretion, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary and desirable to accomplish such purpose, and, without limiting the generality of the foregoing, the Borrowers and Guarantors each hereby gives the DIP Agent the power and right, on behalf of such Borrowers and Guarantors, without notice to or assent from any of them, to do the following:

> (i) to ask, demand, collect, receive and give acquittances and receipts for any and all monies due and to become due under any Collateral and, in the name of any Borrower or Guarantor or the DIP Agent's own name or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Collateral and to file any claim or to take any other

action or proceeding in any court of law or equity or otherwise deemed appropriate by the DIP Agent for the purpose of collecting any and all moneys due under any Collateral whenever payable and to file any claims or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the DIP Agent for the purpose of collecting any and all such moneys due under any Collateral whenever payable;

(ii)     to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral, to effect any repairs or any insurance called for by the terms of this Agreement, and to pay all or any part of the premiums therefor and the costs thereof; and

(iii)     (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due, and to become due, and to become due thereunder, directly to the DIP Agent or as the DIP Agent shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against any Borrower or Guarantor, assignments, verifications and notices in connection with accounts and other documents constituting or relating to the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action or proceeding brought against any Borrower or Guarantor with respect to any Collateral; (F) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the DIP Agent may deem appropriate; (G) to license or, to the extent permitted by an applicable license, sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any trademark, throughout the world for such term or terms, on such conditions, and in such manner, as the DIP Agent shall in its sole discretion determine is appropriate to liquidate the Collateral; and (H) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the DIP Agent were the absolute owner thereof for all purposes, and to do, at the option of the DIP Agent and at the Borrowers' expense, at any time, or from time to time, all acts and things which the DIP Agent reasonably deems necessary to protect, preserve or realize upon the Collateral and the DIP Agent's lien therein, in order to effect the intent of this Agreement, all as fully and effectively as the Borrowers and the Guarantors might do.

(b)     The Borrowers and Guarantors hereby ratify, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof. The power of attorney granted pursuant to this Section is a power coupled with an interest and shall be irrevocable until the Post-Petition Obligations and the Adequate Protection Obligations are indefeasibly paid in full in cash and the DIP Revolving Credit Commitments have terminated.

(c)     The powers conferred on the DIP Agent hereunder are solely to protect the DIP Agent's and the DIP Lenders' interests in the Collateral and shall not impose any duty upon any

of them to exercise any such powers. The DIP Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or DIP Agents shall be responsible to any Borrower or Guarantor for any act or failure to act, except for its own gross negligence or willful misconduct.

(d)     Each Borrower and Guarantor also authorizes the DIP Agent at any time and from time to time (i) to communicate, in the name of any Borrower or Guarantor or in the DIP Agent's own name (at the DIP Agent's option), with any party to any contract with regard to the assignment of the right, title and interest of such Borrower or Guarantor in and under the contracts hereunder and other matters relating thereto and (ii) to execute any endorsements, assignments or other instruments or conveyance or transfer with respect to the Collateral.

Section 4.8.     *Amounts on Deposit.*  Without limiting the foregoing, the parties hereto acknowledge and agree that all deposit accounts of the Debtors maintained with Harris N.A. and all funds therein as of the Petition Date constitute Pre-Petition Collateral and all deposit accounts of the Debtors maintained with Harris N.A. and all funds therein on and after the Petition Date also constitute Collateral for the Post-Petition Obligations and the Adequate Protection Obligations hereunder.  The funds on deposit in such accounts constitute Cash Collateral for all purposes hereof, and may be released to the Borrowers or applied to the Obligations (in such order and manner as the Administrative Agent may determine in its discretion) in accordance with the terms of this Agreement and the Financing Order.

Section 4.9.     *Stay.*  Any applicable stay shall be deemed to be lifted to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise their rights under this Section 4.

SECTION 5.     DEFINITIONS; INTERPRETATION.

Section 5.1.     *Definitions.*  The following terms when used herein shall have the following meanings:

"*Account Debtor*" means the Person who is obligated to make payment on any Receivable.

"*Adequate Protection Obligations*" means all present and future obligations of the Debtors under any order or orders of the Bankruptcy Court to pay principal, interest, fees, costs, expenses and charges on or with respect to the Pre-Petition Obligations under Sections 361 and 506(b) of the Bankruptcy Code to compensate the Pre-Petition Lenders and the Pre-Petition Agent for the post-petition use of Pre-Petition Collateral and proceeds thereof and for any post-petition diminution in value of Pre-Petition Collateral and to provide the Replacement Liens, all as contemplated by this Agreement and the Financing Orders.

"*Administrative Expense Carve-Out*" means the Carve Out (as defined in the Financing Order), *provided* that no part of the Administrative Expense Carve-Out shall be used to object to or contest any post-petition lien or Post-Petition Obligations or to challenge (as opposed to investigate) any pre-petition lien of the Pre-Petition Agent or the Pre-Petition Lenders or to

otherwise seek affirmative relief against the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders.

*"Administrative Questionnaire"* means an Administrative Questionnaire in a form supplied by the Administrative Agent.

*"Affiliate"* means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, another Person. A Person shall be deemed to control another Person for the purposes of this definition if such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the other Person, whether through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise; *provided that*, in any event for purposes of this definition, any Person that owns, directly or indirectly, 10% or more of the securities having the ordinary voting power for the election of directors or governing body of a corporation or 10% or more of the partnership or other ownership interest of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

*"Agents"* means the DIP Agent, and any other agent appointed or otherwise designated by the DIP Agent pursuant to Section 11.9 hereof.

*"Agreement"* means this Senior Secured, Super-Priority Post-Petition Credit Agreement, as it may be amended, modified, supplemented, or restated from time to time pursuant to the terms hereof.

*"Applicable Margin"* means (a) 4.0% with respect to the DIP Loans, (b) 4.0% with respect to the Letter of Credit participation fee payable under Section 2.1 hereof, and (c) 0.25% with respect to the DIP Revolving Credit Commitment fee payable under Section 2.1 hereof.

*"Application"* is defined in Section 1.2(b) hereof.

*"Authorized Representative"* means those persons shown on the list of officers of the Parent, as the agent for the Borrowers, provided by the Parent pursuant to Section 7.2 hereof or on any update of any such list provided by the Parent to the DIP Agent, or any further or different officers of the Parent so named by any Authorized Representative in a written notice to the DIP Agent.

*"Availability Limit"* means, unless otherwise consented to in writing by 100% of the DIP Lenders, (a) $2,750,000 from the Petition Date through and including 10/31/10; (b) $4,750,000 from 11/01/10 through and including 11/30/10; (c) $7,250,000 from 12/01/10 through and including 12/31/10; (d) $7,500,000 from 01/01/11 through and including 01/31/11; (e) $7,250,000 from 02/01/11 through and including 02/28/11; (f) $7,000,000 from 03/01/11 through and including 03/31/11; (g) $6,000,000 from 04/01/11 through and including 04/30/11; and (h) $1,500,000 from 05/01/11 through and including the Maturity Date.

*"Base Rate"* is defined in Section 1.3(a) hereof.

*"Bankruptcy Code"* shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 *et seq.*

*"Bankruptcy Court"* shall mean the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases from time to time.

*"Bankruptcy Recoveries"* means any claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or their estates under Chapter 5 of the Bankruptcy Code.

*"Borrowers"* and *"Borrower"* each is defined in the first paragraph of this Agreement.

*"Borrowing"* means the total of DIP Loans of a single type advanced on a single date. Borrowings of DIP Loans are made and maintained ratably from each of the DIP Lenders under a Credit according to their DIP Revolver Percentages of such Credit.

*"Borrowing Base"* means, as of any time it is to be determined, the sum of:

    (A)    80% (or such lesser percentage as the DIP Agent may determine from time to time pursuant hereto) of the remainder of then outstanding unpaid amount of Eligible Receivables of each Borrower less any and all returns, rebates, discounts (which may, at the DIP Agent's option, be calculated on the shortest terms), claims, credits, allowances, finance charges, and/or taxes of any nature at any time issued, owing, available to or claimed by Account Debtors, granted, outstanding or payable in connection with such Eligible Receivables at such time; *plus*

    (B)    50% (or such lesser percentage as the DIP Agent may determine from time to time pursuant hereto) of the value (computed at the lower of market or cost using the average cost method of inventory valuation applied by the relevant Borrower in accordance with GAAP and, to the extent not already accounted for in such valuation to the reasonable satisfaction of the DIP Agent, net of the current Shrinkage Reserve) of Eligible Inventory of each Borrower; *minus*

    (C)    the sum of (x) the aggregate amount of grower payables then outstanding and owing by any Borrower or by any direct or indirect Subsidiary of such Borrower (and, if such payables are denominated in a currency other than U.S. Dollars, such payables shall be measured at the U.S. Dollar equivalent thereof as determined in good faith by the Borrowers and established to the reasonable satisfaction of the DIP Agent), (y) the aggregate amount of Liens claimed by any Person (other than the DIP Agent) arising from goods or services provided by such Person to or for the benefit of any Borrower or otherwise filed against the Property of any Borrower included in clause (A) or (B) above, (z) reserves for the Administrative Expense Carve Out and such other reserves (if any) established pursuant to Section 1.1 hereof;

*provided* that the Borrowing Base shall be computed only as against and on so much of the Collateral as is included on the Borrowing Base Certificates furnished from time to time by the

Borrowers pursuant to the terms hereof and, if required by the DIP Agent pursuant to any of the terms hereof or any Collateral Document, as verified by such other evidence reasonably required to be furnished to the DIP Agent pursuant hereto or pursuant to any such Collateral Document. The DIP Agent may from time to time reduce the percentages applicable to Eligible Receivables and Eligible Inventory as they relate to the Borrowing Base if the DIP Agent determines in its reasonable judgment that there has been a material adverse change in circumstances relating to the Collateral taken as a whole from those circumstances in existence on the date of this Agreement or in the condition (financial or otherwise) of the Borrowers and Guarantors taken as a whole. The DIP Agent agrees to give the Borrowers five (5) Business Days prior notice of the establishment of the reduction of any such percentage.

*"Borrowing Base Certificate"* means the certificate in the form of Exhibit C hereto, or in such other form acceptable to the DIP Agent, to be delivered to the DIP Agent and the DIP Lenders pursuant to Section 7.2 and 8.5 hereof.

*"Budget"* means the budget projecting the Debtors' budgeted cash receipts and disbursements (including Costs of Reorganization), including, to the extent directly relating to Isel or Weeks, by each such Borrower, on a monthly basis from the Petition Date through the Maturity Date delivered to satisfy the requirements of Section 7.2(k) hereof and approved by 100% of the DIP Lenders.

*"Business Day"* means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in Chicago, Illinois.

*"Canadian Dollars"* means the lawful currency of Canada.

*"Capital Expenditures"* means, with respect to any Person for any period, the aggregate amount of all expenditures (whether paid in cash or accrued as a liability) by such Person during that period for the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to property, plant, or equipment (including replacements, capitalized repairs, and improvements) which should be capitalized on the balance sheet of such Person in accordance with GAAP.

*"Capital Lease"* means any lease of Property which in accordance with GAAP is required to be capitalized on the balance sheet of the lessee.

*"Capitalized Lease Obligation"* means, for any Person, the amount of the liability shown on the balance sheet of such Person in respect of a Capital Lease determined in accordance with GAAP.

*"Cash Collateral"* means the cash collateral (within the meaning Section 363 of the Bankruptcy Code) subject to the Liens securing the Obligations or any portion thereof.

*"Cash Collateral Account"* shall have the meaning set forth in Section 4.4 hereof.

*"Cash Equivalents"* means (a) investments in direct obligations of the United States of America or of any agency or instrumentality thereof whose obligations constitute full faith and credit obligations of the United States of America, provided that any such obligations shall mature within one year of the date of issuance thereof; (b) investments in commercial paper rated at least P-1 by Moody's and at least A-1 by S&P maturing within one year of the date of issuance thereof; (c) investments in certificates of deposit issued by any DIP Lender or by any United States commercial bank having capital and surplus of not less than $100,000,000 which have a maturity of one year or less; (d) investments in repurchase obligations with a term of not more than 7 days for underlying securities of the types described in subsection (a) above entered into with any bank meeting the qualifications specified in subsection (c) above, provided all such agreements require physical delivery of the securities securing such repurchase agreement, except those delivered through the Federal Reserve Book Entry System; (e) investments in money market funds that invest solely, and which are restricted by their respective charters to invest solely, in investments of the type described in the immediately preceding subsections (a), (b), (c), and (d) above.

*"Cash Flow Forecast"* means the cash flow forecast projecting the Debtors' budgeted cash receipts and disbursements (including Costs of Reorganization), including, to the extent directly relating to Isel or Weeks, by each such Borrower, on a weekly basis from the Petition Date through the period ending 13 weeks thereafter delivered to satisfy the requirements of Section 7.2(k) hereof and attached to the Interim Financing Order, as such cash flow forecast may from time to time be extended or otherwise modified with the consent of 100% of the DIP Lenders.

*"CERCLA"* means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§9601 *et seq.,* and any future amendments.

*"Change of Control"* means the occurrence of any of the following: (a) the acquisition by any *"person"* or *"group"* (as such terms are used in sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) at any time of beneficial ownership of 50% or more of the outstanding capital stock of the Parent on a fully-diluted basis, other than acquisitions of such interests by shareholders who hold their equity interests in the Parent on the Effective Date, or (b) the Parent fails to own and control, directly or through a Wholly-owned Subsidiary, 100% of the equity interests in the other Borrowers hereunder, other than any of the Inactive Subsidiaries, (c) the failure of individuals who are members of the board of directors (or similar governing body) of the Parent on the Effective Date (together with any new or replacement directors whose initial nomination for election was approved by a majority of the directors who were either directors on the Effective Date or previously so approved) to constitute a majority of the board of directors (or similar governing body) of the Parent.

*"Chapter 11 Cases"* and *"Chapter 11 Case"* each is defined in the introductory paragraph of this Agreement.

*"Code"* means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

*"Collateral"* means all properties, rights, interests and privileges from time to time subject to the Liens granted to the DIP Agent, or any security trustee therefor, by the Collateral Documents for the benefit of the DIP Lenders and their Affiliates as provided for herein.

*"Collateral Account"* is defined in Section 9.4 hereof.

*"Collateral Documents"* means this Agreement, the Financing Order, and all other mortgages, deeds of trust, security agreements, assignments, financing statements and other documents as shall from time to time secure or relate to the Post-Petition Obligations, and the Funds Transfer and Deposit Account Liability, or any part thereof.

*"Collection Accounts"* is defined in Section 4.3 hereof.

*"Controlled Group"* means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with any of the Borrowers, are treated as a single employer under Section 414 of the Code.

*"Costs of Reorganization"* means all legal, professional and advisory fees paid by the Debtors (whether or not incurred by the Debtors) in connection with the Chapter 11 Cases as set forth in the Cash Flow Forecast and approved in the Financing Order or as may be otherwise approved from time to time by the Bankruptcy Court, subject to the DIP Lenders' and the DIP Agent's right to object thereto.

*"Credit"* means the DIP Revolving Credit.

*"Credit Event"* means the advancing of any DIP Loan or the issuance of, or extension of the expiration date or increase in the amount of, any Letter of Credit.

*"Debtor"* and *"Debtors"* each is defined in the introductory paragraph of this Agreement.

*"Default"* means any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

*"Defaulting DIP Lender"* means any DIP Lender that (a) has failed to fund any portion of the DIP Loans, participations in L/C Obligations required to be funded by it hereunder (herein, a *"Defaulted Loan"*) within two (2) Business Days of the date required to be funded by it hereunder unless such failure has been cured, (b) has otherwise failed to pay over to the DIP Agent or any other DIP Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, unless the subject of a good faith dispute or unless such failure has been cured, or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding or a receiver or conservator has been appointed for such DIP Lender.

*"Defaulting DIP Lender Excess"* means, with respect to any Defaulting DIP Lender, the excess, if any, of such Defaulting DIP Lender's DIP Revolver Percentage of the aggregate

outstanding principal amount of DIP Loans of all DIP Lenders (calculated as if all Defaulting DIP Lenders other than such Defaulting DIP Lender had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of all DIP Loans of such Defaulting DIP Lender.

"*Defaulting DIP Lender Period*" means, with respect to any Defaulting DIP Lender, the period commencing on the date upon which such DIP Lender first became a Defaulting DIP Lender and ending on the earliest of the following dates: (i) the date on which all DIP Revolving Credit Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable and (ii) the date on which (a) such Defaulting DIP Lender is no longer insolvent, the subject of a bankruptcy or insolvency proceeding or, if applicable, under the direction of a receiver or conservator, (b) the Defaulting DIP Lender Excess with respect to such Defaulting DIP Lender shall have been reduced to zero (whether by the funding by such Defaulting DIP Lender of any Defaulted Loans of such Defaulting DIP Lender or otherwise), and (c) such Defaulting DIP Lender shall have delivered to Borrower and the DIP Agent a written reaffirmation of its intention to honor its obligations hereunder with respect to its DIP Revolving Credit Commitments.

"*DIP Agent*" means Harris N.A. and any successor pursuant to Section 11.7 hereof.

"*DIP Agent's Report*" is defined in Section 3.2.

"*DIP Credit*" means and includes the DIP Revolving Credit.

"*DIP Lenders*" and "*DIP Lender*" each is defined in the first paragraph of this Agreement, and including each assignee DIP Lender pursuant to Section 13.12 hereof.

"*DIP Revolving Credit Commitment*" means, as to any DIP Lender, the obligation of such DIP Lender to make DIP Loans and to participate in Letters of Credit issued to or for the account of any Borrower hereunder in an aggregate principal or face amount at any one time outstanding not to exceed the amount set forth opposite such DIP Lender's name on Schedule 1.1 attached hereto and made a part hereof and for the period referred to therein. The Borrowers and the DIP Lenders acknowledge and agree that the DIP Revolving Credit Commitments of the DIP Lenders aggregate $7,500,000 as of the date hereof.

"*DIP Revolver Percentage*" means, for each DIP Lender, the percentage of the DIP Revolving Credit Commitments represented by such DIP Lender's DIP Revolving Credit Commitment or, if the DIP Revolving Credit Commitments have been terminated, the percentage held by such DIP Lender (including through participation interests in Reimbursement Obligations) of the aggregate principal amount of all DIP Loans and L/C Obligations then outstanding.

"*DIP Revolving Credit*" means the credit facility for making DIP Loans and issuing Letters of Credit described in Sections 1.1 and 1.2 hereof.

"*DIP Loan*" is defined in Section 1.1 hereof.

*"Disposition"* means the sale, lease, conveyance or other disposition of Property.

*"Effective Date"* is defined in Section 7.2 hereof.

*"Eligible Inventory"* means all Inventory of any Borrower which the DIP Agent, in its reasonable judgment, deems to be Eligible Inventory; *provided that* in no event shall Inventory be deemed Eligible Inventory unless all representations and warranties set forth in the Collateral Documents with respect to such Inventory are true and correct and such Inventory:

(a)    is an asset of such Borrower to which it has good and marketable title, is freely assignable, and is subject to a perfected, first priority Lien in favor of the DIP Agent for the benefit of the DIP Lenders free and clear of any other Liens (other than Liens permitted by Section 8.8 and the Financing Order that are subordinate to the Liens granted in favor of the DIP Agent for the benefit of the DIP Lenders);

(b)    is located in the United States of America at a Permitted Collateral Location as set forth in the Security Agreement (or is in transit to such an approved location for up to 15 days so long as such goods are then insured under cargo policies for the full amount thereof naming the DIP Agent as loss payee) and, in the case of facilities not owned by such Borrower, which are at all times subject to lien waiver agreements from such mortgagees, landlords or other third parties in form and substance satisfactory to the DIP Agent;

(c)    is not so identified to a contract to sell that it constitutes a Receivable;

(d)    has not been returned to such Borrower after a sale, is not obsolete or slow moving, and is of good and merchantable quality free from any defects which might adversely affect the market value thereof;

(e)    consists of plant materials held for sale, including, without limitation, flower and vegetable seeds, junipers, conifers, broad leaf evergreens, shrubs, flower bulbs, non-flowering bulbs, flowering colored varietals and specialty plants and planting materials and supplies (but specifically excluding containers and labels of all Borrowers, except for containers of Iseli Nursery, Inc., up to an aggregate book value of $350,000), fertilizers, pesticides and growing media which is readily usable or marketable by such Borrower in the ordinary course of its business;

(f)    does not consist of mother stock (*i.e.*, plants that are not intended for sale from which cuttings are taken) or cuttings in the propagation stage (exclusive of pre-finished cuttings which are in saleable condition);

(g)    substantially conforms to such Borrower's advertised or represented specifications, applicable government standards and regulations and other quality standards and has not been determined by the DIP Agent to be unacceptable due to age, type, variety, quality, quantity, or location; and

(h)     is not covered by a warehouse receipt or similar document.

*"Eligible Receivables"* means all Receivables of any Borrower which the DIP Agent, in its reasonable judgment, deem to be Eligible Receivables; *provided that* in no event shall a Receivable be deemed an Eligible Receivable unless all representations and warranties set forth in the Collateral Documents with respect to such Receivable are true and correct and such Receivable:

(a)     arises out of the sale of finished goods inventory delivered to and accepted by, or out of the rendition of services fully performed and accepted by, the Account Debtor on such Receivable in the ordinary course of business on ordinary trade terms, and such Receivable does not represent a pre-billed Receivable or a progress billing;

(b)     is payable in U.S. Dollars or Canadian Dollars, which shall be measured at the U.S. Dollar equivalent thereof as determined in good faith by the Borrowers and established to the reasonable satisfaction of the DIP Agent, and the Account Debtor on such Receivable is located within the United States of America or Canada or, if such right has arisen out of the sale of such goods shipped to, or out of the rendition of services to, an Account Debtor located in any other country, such right is either (i) secured by a valid and irrevocable transferable letter of credit issued by a DIP Lender reasonably acceptable to the DIP Agent for the full amount thereof or (ii) secured by an insurance policy issued by EXIM Bank or any other insurer satisfactory to the DIP Agent (which in any event shall insure not less than one hundred percent (100%) of the face amount of such Receivable and shall be subject to such deductions as are acceptable to the DIP Agent), and in each case which has been assigned or transferred to the DIP Agent in a manner acceptable to the DIP Agent;

(c)     is the valid, binding and legally enforceable obligation of the Account Debtor obligated thereon and such Account Debtor is not (i) a Subsidiary or an Affiliate of any Borrower, (ii) a shareholder, director, officer or employee of any Borrower or any Subsidiary, (iii) the United States of America or Canada, or any state or political or provincial subdivision thereof, or any department, agency or instrumentality of any of the foregoing, unless the Assignment of Claims Act or any similar federal, provincial, state or local statute, as the case may be, is complied with to the satisfaction of the DIP Agent, (iv) a debtor under any proceeding under the United States Bankruptcy Code, as amended, or any other comparable bankruptcy or insolvency law, or (v) an assignor for the benefit of creditors;

(d)     is not evidenced by an instrument or chattel paper unless the same has been endorsed and delivered to the DIP Agent;

(e)     is an asset of such Person to which it has good and marketable title, is freely assignable, and is subject to a perfected, first priority Lien in favor of the DIP Agent for the benefit of the DIP Lenders free and clear of any other Liens (other than Liens permitted by Section 8.8 and the Financing Order that are subordinate to the Liens granted in favor of the DIP Agent);

(f)     is not owing from an Account Debtor who is also a creditor or supplier of such Person, is not subject to any offset, counterclaim or other defense with respect thereto and, with respect to said account receivable or the contract or purchase order out of which the same arose, no surety bond was required or given in connection therewith;

(g)     is not unpaid more than 90 days after the original invoice date (which must be not more than 10 Business Days subsequent to the shipment date or the date services were fully performed and is issued on ordinary trade terms of not more than 60 days); *provided* that Iseli Nursery, Inc. may issue invoices on trade terms of 90 days or more; *provided further* that, in the case of Receivables due to Iseli Nursery, Inc. on trade terms of 90 days or more or Receivables due to Weeks Wholesale Rose Grower on ordinary trade terms of not more than 60 days, up to $3,500,000 of such Receivables which remain unpaid in whole or in part not more than, in the case of such Receivables due to Iseli Nursery, Inc., 120 days and, in the case of such Receivables due to Weeks Wholesale Rose Grower, 120 days subsequent to the shipment date may be included herein;

(h)     is not owed by an Account Debtor who is obligated on Receivables more than 25% of the aggregate unpaid balance of which have been past due for longer than the relevant period specified in subsection (g) above unless the DIP Agent has approved the continued eligibility thereof;

(i)     would not cause the total Receivables owing from any one Account Debtor and its Affiliates to a Borrower to exceed 10% of all Eligible Receivables of such Borrower (25% in the case of Receivables owing from Shemin Nurseries, Inc., Master Nursery Garden, True Value, Armstrong Garden Centers, Inc., McHutchison or Costco Wholesale Corporation);

(j)     would not cause the total Receivables owing from any one Account Debtor and its Affiliate to exceed any credit limit established for purposes of determining eligibility hereunder by the DIP Agent in its reasonable judgment for such Account Debtor and for which the DIP Agent has given the Borrower at least five (5) Business Day's prior notice of the establishment of any such credit limit; and

(k)     does not arise from a sale on a bill-and-hold, guaranteed sale, sale-or-return, sale-on-approval, consignment or any other repurchase or return basis.

*"Environmental Claim"* means any investigation, notice, violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding or claim (whether administrative, judicial or private in nature) arising (a) pursuant to, or in connection with an actual or alleged violation of, any Environmental Law, (b) in connection with any Hazardous Material, (c) from any abatement, removal, remedial, corrective or response action in connection with a Hazardous Material, Environmental Law or order of a governmental authority or (d) from any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

*"Environmental Law"* means any current or future Legal Requirement pertaining to (a) the protection of health, safety and the indoor or outdoor environment, (b) the conservation, management or use of natural resources and wildlife, (c) the protection or use of surface water or groundwater, (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Material or (e) pollution (including any Release to air, land, surface water or groundwater), and any amendment, rule, regulation, order or directive issued thereunder.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute thereto.

*"Essential Creditor"* means (a) essential trade creditors who agree to provide goods and services to the Debtors on a normal and customary basis, (b) the holders of certain tax claims, and (c) certain employee related claims, in each case to the extent provided for in the Cash Flow Forecast or, if not provided for in the Cash Flow Forecast, to the extent mutually agreed to by the Borrowers and either (i) the DIP Agent to the extent not exceeding $75,000 in the aggregate during any Cash Flow Forecast period and (ii) 100% of the DIP Lenders if not provided for in clause (i) above.

*"Essential Trade Creditor"* means any Essential Creditor who is a trade creditor.

*"Event of Default"* means any event or condition identified as such in Section 9.1 hereof.

*"Event of Loss"* means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property or (b) any condemnation, seizure, or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

*"Federal Funds Rate"* means the fluctuating interest rate per annum described in part (ii) of clause (b) of the definition of Base Rate appearing in Section 1.3(a) hereof.

*"Final Financing Order"* means a final order of the Bankruptcy Court authorizing and approving the DIP Credit Facility as provided for herein, in substantially the form of the Interim Financing Order and otherwise acceptable to 100% of the DIP Lenders (subject to modifications as may be required by the Bankruptcy Court and approved by the DIP Agent after reasonable attempts to provide notice to, and with the approval of, 100% of the then available DIP Lenders), as the same may be amended or extended with the consent of 100% of the DIP Lenders (subject to modifications as may be required by the Bankruptcy Court and approved by the DIP Agent after reasonable attempts to provide notice to, and with the approval of, 100% of the then available DIP Lenders).

*"Financing Order"* means the Interim Financing Order prior to entry of the Final Financing Order and means the Final Financing Order at all times thereafter.

*"Funds Transfer and Deposit Account Liability"* means the liability of any Borrower or any Guarantor owing to any of the DIP Lenders or any Affiliates of such DIP Lenders arising out of (a) the execution or processing of electronic transfers of funds by automatic clearing house transfer, wire transfer or otherwise to or from the deposit accounts of such Borrower or such Guarantor now or hereafter maintained with any of the DIP Lenders or their Affiliates, (b) the acceptance for deposit or the honoring for payment of any check, draft or other item with respect to any such deposit accounts, and (c) any other deposit, disbursement, and cash management services afforded to such Borrower or such Guarantor by any of such DIP Lenders or their Affiliates.

*"GAAP"* means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

*"Hazardous Material"* means any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant or material which is hazardous or toxic, and includes, without limitation, (a) asbestos, polychlorinated biphenyls and petroleum (including crude oil or any fraction thereof) and (b) any material classified or regulated as "hazardous" or "toxic" or words of like import pursuant to an Environmental Law.

*"Hazardous Material Activity"* means any activity, event or occurrence involving a Hazardous Material, including, without limitation, the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation, handling of or corrective or response action to any Hazardous Material.

*"Inactive Subsidiaries"* means each Subsidiary of any Borrower which has no operations and no Property other than the minimum amount of assets required under applicable state law to maintain such Subsidiary's corporate existence, but in no event more than a market value of $10,000 in assets. As of the Effective Date, the following Subsidiaries are Inactive Subsidiaries:

| Name of Subsidiary | Jurisdiction of Organization |
|---|---|
| Old Skagit, Inc. | Delaware |

*"Indebtedness for Borrowed Money"* means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the deferred purchase price of property or services (excluding trade accounts payable arising in the ordinary course of business which are not more than sixty (60) days past due), (c) all indebtedness secured by any Lien upon Property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all Capitalized Lease Obligations of such Person, and (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money.

*"Interim Financing Order"* means an order entered into by the Bankruptcy Court on an interim basis after notice given in a hearing conducted in accordance with Bankruptcy Rule 4001(c) and substantially in the form attached hereto as Exhibit G, as the same may be amended or extended with the consent of 100% of the DIP Lenders (subject to modifications as may be required by the Bankruptcy Court and approved by the DIP Agent after reasonable attempts to provide notice to, and with the approval of, 100% of the then available DIP Lenders).

*"Inventory"* means all goods which are held for sale or lease or are to be furnished under contracts of service or are raw materials, work in process or materials used or consumed in business in which the relevant Borrower now has or hereafter acquires title to.

*"L/C Obligations"* means the aggregate undrawn face amounts of all outstanding Letters of Credit and all unpaid Reimbursement Obligations.

*"Legal Requirement"* means any treaty, convention, statute, law, regulation, ordinance, license, permit, governmental approval, injunction, judgment, order, consent decree or other requirement of any governmental authority, whether federal, state, or local.

*"Lending Office"* is defined in Section 10.4 hereof.

*"Letter of Credit"* is defined in Section 1.2(a) hereof.

*"Lien"* means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any Property, including the interests of a vendor or lessor under any conditional sale, Capital Lease or other title retention arrangement.

*"Lien Finding"* means an order of the Bankruptcy Court in form and substance satisfactory to the DIP Agent finding that the Pre-Petition Lenders are fully secured by the Pre-Petition Collateral by means of a valid, first priority, senior, fully perfected and non-avoidable security interest and lien on the Pre-Petition Primary Collateral, excluding only Permitted Liens that are not avoidable permitted by the Interim Financing Order and any Final Financing Order.

*"Lien Validation Process"* means the procedure set forth in the Interim Financing Order for dealing with objections to the validity of the Liens in the Pre-Petition Collateral or confirming such Liens in the absence of any objection thereto.

*"Loan Documents"* means this Agreement, the Notes (if any), the Applications, the Collateral Documents, and each other instrument or document to be delivered hereunder or thereunder or otherwise in connection therewith, including the Financing Order.

*"Loan Parties"* means the Borrowers and the Guarantors from time to time party hereto.

*"Material Adverse Effect"* means (a) a material adverse change in, or material adverse effect upon, the business, Property, condition (financial or otherwise), results of operations or business prospects of the Borrowers and the Guarantors taken as a whole, (b) a material adverse

effect upon the ability of any Borrower or any Guarantor to perform its obligations under the Loan Documents, or (c) a material adverse effect upon the validity or enforceability of any of the Loan Documents or the rights or remedies of the DIP Agent or the DIP Lenders thereunder.

"*Maturity Date*" means June 30, 2011 (or such later date agreed upon by the Borrowers and 100% of the DIP Lenders).

"*Moody's*" means Moody's Investors Service, Inc.

"*Mortgages*" means each of the deeds of trust and mortgages between the relevant Borrower and the DIP Agent relating to such Person's real property owned as of the Effective Date and located in Boring, Oregon (with respect to Iseli Nursery, Inc.), and Wasco, California (in the case of Weeks Wholesale Rose Grower), and the leasehold deed of trust (relating to the property in Porter, Washington, leased by Iseli Nursery, Inc.), and any other mortgages or deeds of trust delivered to the DIP Agent pursuant to Section 4.3 hereof or otherwise granted to secure the Post-Petition Obligations and the Adequate Protection Obligations or any part thereof (including, without limitation, the Financing Order), as the same may be amended, modified, supplemented or restated from time to time.

"*Non-debtor Subsidiary*" means a Subsidiary of any Borrower that is not a debtor or debtor-in-possession in a proceeding under the Bankruptcy Code.

"*Note*" and "*Notes*" each is defined in Section 1.9 hereof.

"*Obligations*" means the Pre-Petition Obligations, the Post-Petition Obligations, and the Adequate Protection Obligations.

"*Participating DIP Lender*" is defined in Section 1.2(d) hereof.

"*Participating Interest*" is defined in Section 1.2(d) hereof.

"*Permitted Liens*" means the "Permitted Prior Encumbrances," as such term is defined in the Interim Financing Order and any Final Financing Order.

"*Person*" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization or any other entity or organization, including a government or agency or political subdivision thereof.

"*Petty Cash and Payroll Accounts*" is defined in Section 4.3 hereof.

"*Petition Date*" is defined in the preamble hereto.

"*Plan*" means any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code that either (a) is maintained by a member of the Controlled Group for employees of a member of the Controlled Group or (b) is maintained pursuant to a collective bargaining agreement or any other

arrangement under which more than one employer makes contributions and to which a member of the Controlled Group is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions.

*"Post-Petition Obligations"* means any and all present and future indebtedness, obligations and liabilities, fixed or contingent, of the Borrowers and the Guarantors to the DIP Lenders or the DIP Agent arising on and after the date hereof under or in connection with this Agreement, the Financing Order or the other Loan Documents or evidenced by the Notes or in connection with the Letters of Credit, including without limitation the payment of the principal of and interest on the DIP Loans and the Reimbursement Obligations and amounts arising on or after the Petition Date with respect to Funds Transfer and Deposit Account Liability as defined herein.

*"Premises"* means the real property owned or leased by any Borrower or any Subsidiary, including without limitation the real property and improvements thereon owned by any Borrower or any Subsidiary subject to the Lien of the Mortgages or any other Collateral Documents.

*"Pre-Petition Agent"* mean Harris N.A., in its capacity as administrative agent under the Pre-Petition Credit Agreement.

*"Pre-Petition Collateral"* means all collateral security for the Pre-Petition Obligations which was in existence as of the Petition Date and all proceeds thereof.

*"Pre-Petition Credit Agreement"* means that certain Fifth Amended and Restated Agreement dated as of December 22, 2005, by and among the Borrowers, certain Subsidiaries of the Borrowers, as guarantors thereunder, the Pre-Petition Lenders, and the Pre-Petition Agent, as the same has from time to time been modified or amended. The parties hereto, being all of the parties to the Pre-Petition Credit Agreement, hereby agree that from and after the date hereof "Required Lenders", as such term is defined in the Pre-Petition Credit Agreement, shall mean, as of the date of determination thereof, the majority in number of the Pre-Petition Lenders collectively holding more than 62% of the sum of the total outstanding Revolving Loans and Term Loans constituting Pre-Petition Liabilities under the Pre-Petition Credit Agreement.

*"Pre-Petition Lenders"* means the several DIP Lenders and letter of credit issuers from time to time parties to the Pre-Petition Credit Agreement.

*"Pre-Petition Loan Documents"* means the Pre-Petition Credit Agreement, the Pre-Petition Security Documents, and any other security agreement, pledge agreement, trust deed, mortgage, collateral assignment, financing statement or other instrument or agreement executed and delivered in connection therewith.

*"Pre-Petition Loans"* means the loans provided for by the Pre-Petition Credit Agreement.

*"Pre-Petition Mortgages"* shall mean any and all mortgages, deeds of trust, deeds to secured debt and other instruments or documents granting or creating a Lien on real property (or

any interest therein) at any time delivered to the Pre-Petition Agent or any Pre-Petition Lender to provide collateral security for all or any part of the Pre-Petition Obligations.

*"Pre-Petition Obligations"* means all the indebtedness, obligations and liabilities, fixed or contingent, of the Borrowers and its Subsidiaries to the Pre-Petition Lenders or the Pre-Petition Agent arising or in connection with the Pre-Petition Credit Agreement or evidenced by the promissory notes issued by the Borrowers thereunder or in connection with the letters of credit issued by the Pre-Petition Agent thereunder, including without limitation the payment of the principal of and interest on the Pre-Petition Loans made thereunder and all amounts outstanding on the Petition Date relating to Funds Transfer and Deposit Account Liability and Hedging Liability, as such terms are defined in the Pre-Petition Credit Agreement.

*"Pre-Petition Pledge Agreement"* means that certain Pledge Agreement dated as of September 30, 2005, among the Borrowers and certain Subsidiaries of the Borrowers and the Pre-Petition Agent, as the same may be amended, modified, supplemented, or restated from time to time.

*"Pre-Petition Security Agreement"* means the Security Agreement dated as of September 30, 2005. from the Borrowers and certain Subsidiaries of the Borrowers to the Pre-Petition Agent, as the same may be supplemented, amended, restated or otherwise modified from time to time and any agreement entered into in substitution therefore or replacement thereof.

*"Pre-Petition Security Documents"* means the Pre-Petition Mortgages, the Pre-Petition Pledge Agreement, Pre-Petition Security Agreement, and all other security documents delivered to the Pre-Petition Agent granting a Lien on Property of any Person to secure all or any part of the Pre-Petition Obligations.

*"Property"* means, as to any Person, all types of real, personal, tangible, intangible or mixed property owned by such Person whether or not included in the most recent balance sheet of such Person and its subsidiaries under GAAP.

*"RCRA"* means the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§6901 *et seq.*, and any future amendments.

*"Receivables"* means all rights to the payment of a monetary obligation, now or hereafter owing to any Borrower, evidenced by an account, instrument, chattel paper or general intangible.

*"Reimbursement Obligation"* is defined in Section 1.2(c) hereof.

*"Release"* means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migration, dumping, or disposing into the indoor or outdoor environment, including, without limitation, the abandonment or discarding of barrels, drums, containers, tanks or other receptacles containing or previously containing any Hazardous Material.

"*Required DIP Lenders*" means, as of the date of determination thereof, a majority in numbers of the DIP Lenders collectively holding more than 62% of the sum of the total outstanding DIP Loans, interests in Letters of Credit (if any) and Unused DIP Revolving Credit Commitments of the DIP Lender.

"*Replacement Liens*" means the replacement Liens granted to the Pre-Petition Agent (or the DIP Agent as collateral agent for the Pre-Petition Agent and Pre-Petition Lenders) on all Post-Petition Collateral for and to the extent of the post-petition use of Pre-Petition Collateral and proceeds thereof and for any post-petition diminution in value of Pre-Petition Collateral.

"*S&P*" means Standard & Poor's Ratings Services Group, a division of The McGraw-Hill Companies, Inc.

"*Settlement*" means as of any time, the making of, or the receiving of, payments, in immediately available funds, by a DIP Lender, to the extent necessary to cause such DIP Lender's actual share of the outstanding amount of DIP Loans (after giving effect to any DIP Loan to be made on such day) to be equal to such DIP Lender's ratable share (as hereinafter set forth) of the DIP Loans then outstanding (after giving effect to any DIP Loan to be made on such day), in any case where, prior to such event or action, such DIP Lender's actual share of the DIP Loans is not so equal. For purposes hereof, a DIP Lender's "ratable share" of the outstanding DIP Loans as of any time shall mean its DIP Revolver Percentage thereof.

"*Settlement Amount*" is defined in Section 3.2 hereof.

"*Settlement Date*" is defined in Section 3.2 hereof.

"*Shrinkage Reserve*" means a reserve reasonably established by the Borrowers from time to time and established to the reasonable satisfaction of the DIP Agent based upon the Borrowers' historical scrap reserves and actual book-to-physical adjustments made for written-off inventory and for dead, diseased or discolored inventory.

"*Subsidiary*" means, as to any particular parent corporation or organization, any other corporation or organization more than 50% of the outstanding Voting Stock of which is at the time directly or indirectly owned by such parent corporation or organization or by any one or more other entities which are themselves subsidiaries of such parent corporation or organization. Unless otherwise expressly noted herein, the term "*Subsidiary*" means any Subsidiary of a Borrower or of any of its direct or indirect Subsidiaries.

"*Superpriority Claim*" means a claim against any Borrower or any Guarantor in any of the Chapter 11 Cases which is an administrative expense claim with the priority authorized under Section 364(c)(1) of the Bankruptcy Code, with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507 of the Bankruptcy Code and over any or all other costs and expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 506(c) or 726 of the Bankruptcy Code. When used with reference to the claim of the DIP Agent, the DIP Lenders, the Pre-Petition Agent, and the Pre-Petition Lenders in respect of the Post-Petition Obligations or Adequate Protection Obligations, the term Superpriority Claim shall

mean a claim which has priority over all such costs and expenses. When used with reference to any other party, such party shall have a Superpriority Claim if its claim is an administrative expense claim having priority over any administrative expenses of the kind specified in Sections 503(b) or 507 of the Bankruptcy Code or any of such other costs and expenses.

*"Termination Date"* means the earliest to occur of the following: (a) the Maturity Date; (b) the Borrowers propose to the Bankruptcy Court a chapter 11 plan that is not approved by 100% of the DIP Lenders; (c) the date that a plan of reorganization of any Debtor confirmed by an order of the Bankruptcy Court entered pursuant to Sections 1129 and 1141 of the Bankruptcy Code becomes effective pursuant to its terms; or (d) the date on which the DIP Lenders terminate the DIP Revolving Credit Commitments after the occurrence of an Event of Default and giving of written notice by the DIP Agent to the Borrowers of such Event of Default and of the DIP Lenders' intention to terminate the DIP Revolving Credit Commitments as a result thereof.

*"Unfunded Vested Liabilities"* means, for any Plan at any time, the amount (if any) by which the present value of all vested nonforfeitable accrued benefits under such Plan exceeds the fair market value of all Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of a member of the Controlled Group to the PBGC or the Plan under Title IV of ERISA.

*"Unused DIP Revolving Credit Commitments"* means, at any time, the difference between (i) the DIP Revolving Credit Commitments then in effect and (ii) the aggregate outstanding principal amount of DIP Loans and L/C Obligations.

*"U.S. Dollars"* and *"$"* each means the lawful currency of the United States of America.

*"Voting Stock"* of any Person means capital stock or other equity interests of any class or classes (however designated) having ordinary power for the election of directors or other similar governing body of such Person, other than stock or other equity interests having such power only by reason of the happening of a contingency.

*"Welfare Plan"* means a "welfare plan" as defined in Section 3(1) of ERISA.

*"Wholly-owned Subsidiary"* means a Subsidiary of which all of the issued and outstanding shares of capital stock (other than directors' qualifying shares as required by law) or other equity interests are owned by any Borrower and/or one or more Wholly-owned Subsidiaries within the meaning of this definition.

Section 5.2.     *Interpretation.*  The foregoing definitions are equally applicable to both the singular and plural forms of the terms defined. The words *"hereof"*, *"herein"*, and *"hereunder"* and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All references to time of day herein are references to Chicago, Illinois time unless otherwise specifically provided. Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this

Agreement, it shall be done in accordance with GAAP except where such principles are inconsistent with the specific provisions of this Agreement.

Section 5.3. *Change in Accounting Principles.* If, after the date of this Agreement, there shall occur any change in GAAP from those used in the preparation of the financial statements referred to in Section 6.5 hereof and such change shall result in a change in the method of calculation of any financial covenant, standard or term found in this Agreement, the Borrowers or the Required DIP Lenders may by notice to the DIP Lenders and the Borrowers, respectively, require that the DIP Lenders and the Borrowers negotiate in good faith to amend such covenants, standards, and term so as equitably to reflect such change in accounting principles, with the desired result being that the criteria for evaluating the financial condition of the Borrowers and their Subsidiaries shall be the same as if such change had not been made. No delay by the Borrowers or the Required DIP Lenders in requiring such negotiation shall limit their right to so require such a negotiation at any time after such a change in accounting principles. Until any such covenant, standard, or term is amended in accordance with this Section 5.3, financial covenants shall be computed and determined in accordance with GAAP in effect prior to such change in accounting principles. Without limiting the generality of the foregoing, the Borrowers shall neither be deemed to be in compliance with any financial covenant hereunder nor out of compliance with any financial covenant hereunder if such state of compliance or noncompliance, as the case may be, would not exist but for the occurrence of a change in accounting principles after the date hereof.

SECTION 6.    REPRESENTATIONS AND WARRANTIES.

The Borrowers represent and warrant to the Agents and the DIP Lenders as follows:

Section 6.1. *Organization and Qualification.* Each Borrower is duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it is organized, has full and adequate power to own its Property and conduct its business as now conducted, and is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it requires such licensing or qualifying, except where the failure to do so would not have a Material Adverse Effect.

Section 6.2. *Subsidiaries.* Each Subsidiary is duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it is organized, has full and adequate power to own its Property and conduct its business as now conducted, and is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it requires such licensing or qualifying, except where the failure to do so would not have a Material Adverse Effect. Schedule 6.2 hereto identifies each Subsidiary, the jurisdiction of its organization, the percentage of issued and outstanding shares of each class of its capital stock or other equity interests owned by any Borrower and its other Subsidiaries and, if such percentage is not 100% (excluding directors' qualifying shares as required by law), a description of each class of its authorized capital stock and other equity interests and the number of shares of each class issued and outstanding. All of the outstanding shares of capital stock and other equity interests of each Subsidiary are validly issued and outstanding and fully paid and nonassessable and all such shares and other equity

interests indicated on Schedule 6.2 as owned by a Borrower or another Subsidiary are owned, beneficially and of record, by such Borrower or such Subsidiary free and clear of all Liens other than the Liens granted in favor of the DIP Agent pursuant to the Collateral Documents and subordinate Liens permitted by Section 8.8 hereof and the Financing Order. There are no outstanding commitments or other obligations of any Subsidiary to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Subsidiary.

Section 6.3.    Authority and Validity of Obligations.    The Borrowers have full right and authority to enter into this Agreement and the other Loan Documents executed by it, to make the borrowings herein provided for, to issue the Notes in evidence thereof, to grant to the DIP Agent the Liens described in the Collateral Documents, and to perform all of their obligations hereunder and under the other Loan Documents executed by it.  The Loan Documents delivered by the Borrowers have been duly authorized, executed and delivered by such Persons and constitute valid and binding obligations of such Persons enforceable in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law); and this Agreement and the other Loan Documents do not, nor does the performance or observance by any Borrower or any Guarantor of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon any Borrower or any Guarantor or any provision of the organizational documents *(e.g.,* charter, articles or certificate of incorporation and by-laws, articles or certificate of association and operating agreement, partnership agreement, or other similar organizational documents) of any Borrower or any Guarantor, (b) contravene or constitute a default under any covenant, indenture or agreement of or affecting any Borrower or any Guarantor or any of its Property, in each case where such contravention or default is reasonably likely to have a Material Adverse Effect, or (c) result in the creation or imposition of any Lien on any Property of any Borrower or any Guarantor other than the Liens granted in favor of the DIP Agent pursuant to the Collateral Documents.

Section 6.4.    Use of Proceeds; Margin Stock.    The Borrowers shall use the proceeds of the (a) the DIP Loans solely for (i) the payment of normal operating expenses consistent with the Cash Flow Forecast then in effect, (ii) the payment of drawings made under Letters of Credit (if any), (ii) the payment of professional fees of the DIP Agent and the DIP Lenders (limited, in the case of attorneys fees of any DIP Lender other than the DIP Agent, to no more than $15,000 in the aggregate per DIP Lender) and the Pre-Petition Agent related to the Post-Petition Obligations and the Pre-Petition Obligations, (iii) the payment of interest, fees and expenses on the DIP Credits, (iv) the payment of the Administrative Expense Carve Out, and (v) the payment of Hedging Liability outstanding under the Pre-Petition Loan Documents as a Pre-Petition Obligation and the payment of Funds Transfer and Deposit Account Liability (whether outstanding under the Pre-Petition Loan Documents as a Pre-Petition Obligation or incurred on or after the Petition Date as a Post-Petition Obligation) as and when due, and (b) the Letters of Credit solely for the payment of normal operating expenses consistent with the Cash Flow Forecast then in effect. Neither the Borrowers nor any Subsidiaries are engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning

of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any DIP Loan or any other extension of credit made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

Section 6.5.    *Financial Reports.* The consolidated balance sheet of the Borrowers and their Subsidiaries as at June 30, 2009, and the related consolidated statements of income, retained earnings and cash flows of the Borrowers and their Subsidiaries other than the commencement of the Chapter 11 Cases for the fiscal year then ended, and accompanying notes thereto, which financial statements are accompanied by the audit report of Moss Adams LLP, independent public accountants, the unaudited consolidated balance sheet of the Borrowers and their Subsidiaries as at June 30, 2010, and the related consolidated statements of income, retained earnings and cash flows of the Borrowers and their Subsidiaries for the fiscal year then ended, and the unaudited interim consolidated balance sheet of the Borrowers and their Subsidiaries as at August 31, 2010, and the related consolidated statements of income, retained earnings and cash flows of the Borrowers and their Subsidiaries for the two (2) months then ended, heretofore furnished to the DIP Agent and the DIP Lenders, fairly present in all material respects the consolidated financial condition of the Borrowers and their Subsidiaries as at said dates and the consolidated results of their operations and cash flows for the periods then ended in conformity with GAAP applied on a consistent basis. Neither any Borrower nor any Subsidiary has contingent liabilities which are material to it other than as indicated on such financial statements or, with respect to future periods, on the financial statements furnished pursuant to Section 8.5 hereof.

Section 6.6.    *No Material Adverse Change.* Since August 31, 2010, except for the commencement of the Chapter 11 Cases, there has been no change in the condition (financial or otherwise) or business prospects of the Borrowers or their Subsidiaries which, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect.

Section 6.7.    *Full Disclosure.* (a) The statements and information furnished to the DIP Agent and the DIP Lenders in connection with the negotiation of this Agreement and the other Loan Documents and the commitments by the DIP Lenders to provide all or part of the financing contemplated hereby do not contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein not misleading, the DIP Agent and the DIP Lenders acknowledging that as to any projections furnished to the DIP Agent and the DIP Lenders, the Borrowers only represent that the same were prepared on the basis of information and estimates the Borrowers believed to be reasonable at the time made.

(b)    The Budget and the initial Cash Flow Forecast has been prepared in good faith based upon assumptions believed by the Borrowers to be reasonable as of the date hereof, and each subsequent Cash Flow Forecast shall be prepared in good faith based upon assumptions believed by the Borrowers to be reasonable as of the date such subsequent Cash Flow Forecast is furnished to the DIP Lenders.

Section 6.8.    *Trademarks, Franchises, and Licenses.*    The Borrowers and their Subsidiaries own, possess, or have the right to use all necessary patents, licenses, franchises,

trademarks, trade names, trade styles, copyrights, trade secrets, know how and confidential commercial and proprietary information to conduct their businesses as now conducted, without known conflict with any patent, license, franchise, trademark, trade name, trade style, copyright or other proprietary right of any other Person.

Section 6.9. *Governmental Authority and Licensing.* The Borrowers and their Subsidiaries have received all licenses, permits, and approvals of all federal, state, local, and foreign governmental authorities, if any, necessary to conduct their business, in each case where the failure to obtain or maintain the same, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect. No investigation or proceeding which, if adversely determined, is reasonably likely to result in revocation or denial of any material license, permit, or approval is pending or, to the knowledge of the Borrowers, threatened.

Section 6.10. *Good Title.* The Borrowers and their Subsidiaries have good and defensible title (or valid leasehold interests) to their assets as reflected on the most recent consolidated balance sheet of the Borrowers and their Subsidiaries furnished to the DIP Agent and the DIP Lenders (except for sales of assets in the ordinary course of business), subject to no Liens other than such thereof as are permitted by Section 8.8 hereof.

Section 6.11. *Litigation and Other Controversies.* Except as disclosed on Schedule 6.11 hereof, there is no litigation or governmental or arbitration proceeding or labor controversy pending, nor to the knowledge of the Borrowers threatened, against any Borrower or any Subsidiary which if adversely determined, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect.

Section 6.12. *Taxes.* All tax returns required to be filed by each of the Borrowers and its Subsidiaries in any jurisdiction have, in fact, been filed, and all taxes, assessments, fees and other governmental charges upon the Borrowers or any of their Subsidiaries or upon any of their respective Properties, income or franchises, which are shown to be due and payable in such returns, have been paid, except such taxes, assessments, fees and governmental charges, if any, as are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and as to which adequate reserves established in accordance with GAAP have been provided. The Borrowers do not know of any proposed additional tax assessment against the Borrowers or against any of their Subsidiaries for which adequate provisions in accordance with GAAP have not been made on their accounts. Adequate provisions in accordance with GAAP for taxes on the books of each of the Borrowers and its Subsidiaries have been made for all open years, and for its current fiscal period.

Section 6.13. *Approvals.* No authorization, consent, license, or exemption from, or filing or registration with, any court or governmental department, agency or instrumentality, nor any approval or consent of the any other Person, is or will be necessary to the valid execution, delivery or performance by the Borrowers or any Subsidiaries of this Agreement or any other Loan Document, except for entry of the Interim Financing Order and such other approvals which have been obtained prior to the date of this Agreement and which remain in full force and effect.

Section 6.14. *Affiliate Transactions.* Neither the Borrowers nor any Subsidiaries are a party to any contracts or agreements with any of their Affiliates on terms and conditions which are less favorable to the Borrowers or such Subsidiaries than would be usual and customary in similar contracts or agreements between Persons not affiliated with each other.

Section 6.15. *Investment Company.* None of the Borrowers nor any of their Subsidiaries is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 6.16. *ERISA.* The Borrowers and each other member of their Controlled Group has fulfilled their obligations under the minimum funding standards of and are in compliance in all material respects with ERISA and the Code to the extent applicable to them and have not incurred any liability to the PBGC or a Plan under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA. Neither the Borrowers nor any Subsidiaries have any contingent liabilities with respect to any post-retirement benefits under a Welfare Plan, other than liability for continuation coverage described in article 6 of Title I of ERISA.

Section 6.17. *Compliance with Laws.* (a) The Borrowers and their Subsidiaries are in compliance with the requirements of all federal, state, local and foreign laws, rules, and regulations applicable to or pertaining to their Properties or business operations (including, without limitation, the Occupational Safety and Health Act of 1970, the Americans with Disabilities Act of 1990, and laws and regulations establishing quality criteria and standards for air, water, land and toxic or hazardous wastes and substances), where any such non-compliance, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect.

(b) Without limiting the representations and warranties set forth in Section 6.17(a) above, except for such matters individually or in the aggregate, which could not reasonably be expected to result in a Material Adverse Effect, the Borrowers represent and warrant that: (i) the Borrowers and their Subsidiaries, and each of the Premises, comply in all material respects with all applicable Environmental Laws; (ii) the Borrowers and their Subsidiaries have obtained all governmental approvals required for their operations and each of the Premises by any applicable Environmental Law; (iii) the Borrowers and their Subsidiaries have not, and the Borrowers have no knowledge of any other Person who has, caused any Release, threatened Release or disposal of any Hazardous Material at, on, about, or off any of the Premises in any material quantity and, to the knowledge of the Borrowers, none of the Premises are adversely affected by any Release, threatened Release or disposal of a Hazardous Material originating or emanating from any other property; (iv) none of the Premises contain and have contained any: (1) underground storage tank, (2) material amounts of asbestos containing building material, (3) landfills or dumps, (4) hazardous waste management facility as defined pursuant to RCRA or any comparable state law, or (5) site on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law; (v) the Borrowers and their Subsidiaries have not used a material quantity of any Hazardous Material and have conducted no Hazardous Material Activity at any of the Premises; (vi) the Borrowers and their Subsidiaries have no material liability for response or corrective action, natural resource damage or other harm pursuant to CERCLA, RCRA or any comparable state law; (vii) the Borrowers and their Subsidiaries are not subject to, have no notice or knowledge of

and are not required to give any notice of any Environmental Claim involving any Borrower or any Subsidiary or any of the Premises, and there are no conditions or occurrences at any of the Premises which could reasonably be anticipated to form the basis for an Environmental Claim against any Borrower or any Subsidiary or such Premises; (viii) none of the Premises are subject to any, and the Borrowers have no knowledge of any imminent, restriction on the ownership, occupancy, use or transferability of the Premises in connection with any (1) Environmental Law or (2) Release, threatened Release or disposal of a Hazardous Material; and (ix) there are no conditions or circumstances at any of the Premises which pose an unreasonable risk to the environment or the health or safety of Persons.

Section 6.18.    *Other Agreements*.  Neither the Borrowers nor any Subsidiaries are in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its Property, except which default if uncured, individually or in the aggregate with other such defaults, is reasonably likely to have a Material Adverse Effect.

Section 6.19.    *Federal Food Security Act*.  Neither the Borrowers nor any Subsidiaries have received notice given pursuant to Section 1324(e)(1) or (3) of the Federal Food Security Act and, to the knowledge of the Borrowers, there has not been filed any financing statement or notice, purportedly in compliance with the provisions of the Federal Food Security Act, purporting to perfect a security interest in farm products purchased by the Borrowers nor any Subsidiaries in favor of a secured creditor of the seller of such farm products.  The Borrowers and each of their Subsidiaries have registered pursuant to Section 1324(c)(2)(D) of the Federal Food Security Act, with the Secretary of State of each State in which are produced farm products purchased by the Borrowers or such Subsidiaries and which has established or hereafter establishes a central filing system, as a buyer of farm products produced in such State; and the Borrowers will maintain, and will cause all Subsidiaries to maintain, each such registration in full force and effect.

Section 6.20.    *Broker Fees*.  No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated thereby; and the Borrowers hereby indemnify the DIP Agent and the DIP Lenders against, and agree that they will hold the DIP Agent and the DIP Lenders harmless from, any claim, demand, or liability for any such broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable attorneys' fees) arising in connection with any such claim, demand, or liability.

Section 6.21.    *No Default*.  No Default or Event of Default has occurred and is continuing.

Section 6.22.    *Financing Orders*.  The applicable Financing Order has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any Bankruptcy Judge or District Court Judge and is not subject to any pending stay.

Section 6.23.    *Super-Priority Administrative Expense*. Upon entry of the Interim Financing Order, (a) pursuant to Section 364(c)(1) of the Bankruptcy Code, the Post-Petition Obligations shall at all times constitute allowed administrative expense claims in the Chapter 11 Cases

having priority over all administrative expenses of the kind specified in Section 503(b) or 507 of the Bankruptcy Code, whether arising or incurred in any of the Chapter 11 Cases or (subject to Section 726(b) of the Bankruptcy Code) in any superseding case or cases under Chapter 7 of the Bankruptcy Code) except as otherwise provided in the Interim Financing Order, (b) the Post-Petition Obligations shall at all times otherwise constitute Superpriority Claims, and (c) pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, the Post-Petition Obligations shall at all times be secured by a first priority Lien on the Collateral, subject in each case only to the Permitted Liens and the fees and expenses subject to the Administrative Expense Carve-Out.

SECTION 7.     CONDITIONS PRECEDENT.

The obligation of each DIP Lender to advance any DIP Loan or extend any other credit hereunder shall be subject to the following conditions precedent:

*Section 7.1.     All Credit Events.* At the time of each Credit Event hereunder:

(a)     each of the representations and warranties set forth herein and in the other Loan Documents shall be and remain true and correct in all material respects as of said time, except to the extent the same expressly relate to an earlier date;

(b)     the Borrowers and their Subsidiaries shall be in compliance with all of the terms and conditions hereof and of the other Loan Documents, and no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Credit Event;

(c)     in the case of any request for an extension of credit under the DIP Revolving Credit, after giving effect to such extension of credit the aggregate principal amount of all DIP Loans and L/C Obligations outstanding under this Agreement shall not exceed the DIP Revolving Credit Commitment or, if less, the Availability Limit then in effect;

(d)     in the case of a Borrowing the DIP Agent shall have received the notice required by Section 1.5 hereof, in the case of the issuance of any Letter of Credit the DIP Agent shall have received a duly completed Application for such Letter of Credit together with any fees called for by Section 2.1 hereof and, in the case of an extension or increase in the amount of a Letter of Credit, a written request therefor in a form acceptable to the DIP Agent together with fees called for by Section 2.1 hereof;

(e)     the applicable Financing Order shall be in full force and effect and the Debtors shall be in compliance with all the terms hereof and, with respect to the Financing Order, it shall be final and non-appealable; and

(f)     such extension of credit shall not violate any order, judgment or decree of any court or other authority or any provision of law or regulation applicable to the DIP

Agent or any DIP Lender (including, without limitation, Regulation U of the Board of Governors of the Federal Reserve System) as then in effect.

Each request for a Borrowing hereunder and each request for the issuance of, increase in the amount of, or extension of the expiration date of, a Letter of Credit shall be deemed to be a representation and warranty by the Borrowers on the date on such Credit Event as to the facts specified in subsections (a) through (d), both inclusive, of this Section 7.1; *provided, however,* that each of the DIP Lenders (including, for purposes hereof, the DIP Agent in connection with advances made by it on behalf of the DIP Lenders under Sections 1.5 and 3.2(d) hereof) may continue to make advances under the DIP Revolving Credit, in its sole discretion, notwithstanding the failure of the Borrowers to satisfy one or more of the conditions set forth above and any such advances so made shall not be deemed a waiver of any Default or Event of Default or other condition set forth above that may then exist (each DIP Lender hereby acknowledging and agreeing that the DIP Agent may, in its sole discretion, without conferring with the DIP Lenders, but on their behalf, elect to make additional advances hereunder notwithstanding the failure of the Borrowers to satisfy one or more of the conditions set forth in this Section 7.1 until the DIP Agent is provided a written notice from such DIP Lender advising the DIP Agent of such DIP Lender's decision not to extend further credit as a result of the Borrowers' failure to satisfy the conditions set forth above, *provided that* the DIP Agent shall not knowingly make an advance hereunder if, after giving effect thereto, the sum of the aggregate principal amount of DIP Loans when taken together with L/C Obligations then outstanding would exceed the DIP Revolving Credit Commitments in effect at such time or, if less, the Availability Limit then in effect.

Section 7.2.    *Initial Credit Event.*    Before or concurrently with the initial Credit Event (the date upon which the following have been satisfied (or waived by the DIP Lenders) being referred to herein as the *"Effective Date"*):

(a)    the DIP Agent shall have received for each DIP Lender this Agreement duly executed by the Borrowers and the DIP Lenders;

(b)    if requested by any DIP Lender, the DIP Agent shall have received for such DIP Lender duly executed Notes of the Borrowers payable to such DIP Lender dated the date hereof and otherwise in compliance with the provisions of Section 1.9 hereof;

(c)    the DIP Agent shall have received for each DIP Lender copies of resolutions of each Borrower's Board of Directors authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, together with specimen signatures of the persons authorized to execute such documents on such Borrower's behalf, all certified in each instance by its Secretary or Assistant Secretary;

(d)    the DIP Agent shall have received for each DIP Lender a list of the Borrowers' Authorized Representatives;

(e)     the DIP Agent shall have received for itself and for the DIP Lenders the initial fees called for by Section 2.1 hereof and reimbursement for all expenses incurred on or prior to the Effective Date called for by Section 13.15 hereof;

(f)     the DIP Agent shall have received evidence of insurance required by Section 8.4 hereof;

(g)     the Interim Financing Order after notice given and a hearing conducted in accordance with Bankruptcy Rule 4001(c) shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been amended, modified, stayed, vacated, reversed or rescinded in any respect;

(h)     prior to or concurrently with the initial Credit Event hereunder, the commitments of the Pre-Petition Lenders under the Pre-Petition Credit Agreement shall terminate;

(i)     a cash management order in the form of Exhibit H hereto and otherwise acceptable to 100% of the DIP Lenders (subject to modifications as may be required by the Bankruptcy Court and approved by the DIP Agent after reasonable attempts to provide notice to, and with the approval of, 100% of the then available DIP Lenders), including procedures requiring all proceeds of Collateral and all revenues, income and cash flow of the Borrowers and Guarantors to be deposited in a Collection Account or such other arrangement as is acceptable to the DIP Agent such that the DIP Agent attains exclusive dominion and control of such accounts and proceeds of collection deposited therein shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been amended, modified, stayed, vacated, reversed or rescinded in any respect;

(j)     the Borrowers shall have provided to the DIP Agent a list of outstanding checks drawn on Harris N.A. and the first check number to be used on and after the Petition Date;

(k)     receipt by the DIP Agent of the Budget and initial 13-week Cash Flow Forecast, in form and substance satisfactory to 100% of the DIP Lenders;

(l)     no trustee, or other disinterested person with expended powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Debtor or its respective business or Properties, including, without limitation the Collateral, no order shall be entered appointing such a trustee or other disinterested person and no motion by or supported by the Debtors shall be pending seeking such relief;

(m)     the Borrowers shall have reimbursed the Pre-Petition Agent for all fees and expenses incurred by it, including the fees and expenses of Chapman and Cutler LLP and Klehr, Harrison, Harvey, Branzburg LLP, counsel to the Pre-Petition Agent, and of Alvarez and Marsal, Pre-Petition Agent's financial consultant, in connection with the

Pre-Petition Credit Agreement and the transactions contemplated hereby for which the Borrowers have received an invoice;

(n)     the Borrowers shall have paid the out-of-pocket costs and expenses (including the fees and expenses of Klehr, Harrison, Harvey, Branzburg LLP, counsel to the Post-Petition Agent, and Alvarez and Marsal, the DIP Agent's financial consultant) incurred by the DIP Lenders and the DIP Agent in connection with this Agreement and the transaction contemplated hereby for which the Borrower has received an invoice;

(o)     the DIP Agent's Liens in the Collateral shall be perfected first priority Liens and the Collateral shall be free and clear of all other Liens except Liens permitted by Section 8.8 hereof;

(p)     the DIP Agent shall have received a fully executed Internal Revenue Service Form W-9 for each Borrower; and

(q)     the DIP Agent shall have received for the account of the DIP Lenders such other agreements, instruments, documents, certificates, and opinions as the DIP Agent may reasonably request.

SECTION 8.     COVENANTS.

The Borrowers agree that, so long as any credit is available to or in use by any of the Borrowers hereunder, except to the extent compliance in any case or cases is waived in writing pursuant to the terms of Section 13.13 hereof:

*Section 8.1.     Maintenance of Business.*     Each Borrower shall, and shall cause each Subsidiary to, preserve and maintain its existence, except as otherwise provided in Sections 8.10, 8.11 and 8.17 hereof. Each Borrower shall, and shall cause each Subsidiary to, preserve and keep in force and effect all licenses, permits, franchises, approvals, patents, trademarks, trade names, trade styles, copyrights, and other proprietary rights necessary to the proper conduct of its business where the failure to do so is reasonably likely to have a Material Adverse Effect.

*Section 8.2.     Maintenance of Properties.*     Each Borrower shall, and shall cause each Subsidiary to, maintain, preserve and keep its property, plant and equipment in good repair, working order and condition (ordinary wear and tear excepted) and shall from time to time make all needful and proper repairs, renewals, replacements, additions and betterments thereto so that at all times the efficiency thereof shall be fully preserved and maintained, except to the extent that, in the reasonable business judgment of such Person, any such Property is no longer necessary for the proper conduct of the business of such Person.

*Section 8.3.     Taxes and Assessment*s.     Each Borrower shall duly pay and discharge, and shall cause each Subsidiary to duly pay and discharge, all taxes, rates, assessments, fees and governmental charges upon or against it or its Property, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being

contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor.

Section 8.4.    *Insurance.*  Each Borrower shall insure and keep insured, and shall cause each Subsidiary to insure and keep insured, with good and responsible insurance companies, all insurable Property owned by it which is of a character usually insured by Persons similarly situated and operating like Properties against loss or damage from such hazards and risks, and in such amounts, as are insured by Persons similarly situated and operating like Properties; and each Borrower shall insure, and shall cause each Subsidiary to insure, such other hazards and risks (including, without limitation, business interruption, employers' and public liability risks) with good and responsible insurance companies as and to the extent usually insured by Persons similarly situated and conducting similar businesses. Each Borrower shall in any event maintain, and cause each of its Subsidiaries to maintain, insurance on the Collateral to the extent required by the Collateral Documents including, without limitation, naming the DIP Agent as loss payee on all such insurance policies under lender loss payable endorsements satisfactory to the DIP Agent.  The Borrowers shall, upon the request of the DIP Agent, furnish to the DIP Agent and the DIP Lenders a certificate setting forth in summary form the nature and extent of the insurance maintained pursuant to this Section.

Section 8.5.    *Financial Reports.*  Each Borrower shall, and shall cause each Subsidiary to, maintain a standard system of accounting in accordance with GAAP and shall furnish to the DIP Agent, each DIP Lender and each of their duly authorized representatives such information respecting the business and financial condition of the Borrowers and their Subsidiaries as the DIP Agent or such DIP Lender may reasonably request; and without any request, the Borrowers shall furnish to the DIP Agent and the DIP Lenders:

(a)    as soon as available, and in any event no later than the third Business Day of each calendar week, a Borrowing Base Certificate showing the computation of the Borrowing Base in reasonable detail prepared on a consolidated and consolidating basis as of the close of business on the last day of the prior week, together with a sales register, credit memo report, cash receipts journal, schedule of payments on receivables, updated inventory report, along with such other information as may be reasonably required by the DIP Agent in connection therewith, and in form and substance, and with such detail, as the DIP Agent may reasonably require, prepared by the Borrowers and certified to by their chief financial officer, corporate controller or another officer or employee of the Borrowers reasonably acceptable to the DIP Agent;

(b)    as soon as available, and in any event within 20 days after the last day of each calendar month, an accounts receivable aging, an accounts payable aging, and an inventory stock status report, each in reasonable detail prepared as of the last day of such month by the Borrowers and certified to by their chief financial officer or another officer of the Borrowers reasonably acceptable to the DIP Agent;

(c)    as soon as available, and in any event within 30 days after the last day of each calendar month, a copy of the balance sheet of the Borrowers and their Subsidiaries as of the last day of such month and the statements of income, retained earnings, and cash

flows of the Borrowers and their Subsidiaries for the month and for the fiscal year-to-date period then ended, each in reasonable detail prepared on a consolidated and consolidating basis, showing in comparative form, in the case of the consolidated statements, the figures for the corresponding date and period in the previous fiscal year as well as in comparative form against the Borrowers' business plan for the current fiscal year (with an explanation of any material variances of actual results against such plan), prepared by the Borrowers in accordance with GAAP (subject to the absence of footnote disclosures and year-end audit adjustments), certified to by their chief financial officer or another officer of the Borrowers reasonably acceptable to the DIP Agent;

(d)     as soon as available, and in any event within 120 days after the close of each fiscal year of the Borrowers, a copy of the consolidated and consolidating balance sheet of the Borrowers and their Subsidiaries as of the last day of the period then ended and the consolidated statements of income, retained earnings, and cash flows of the Borrowers and their Subsidiaries for the period then ended, and accompanying notes thereto, each in reasonable detail showing in comparative form the figures for the previous fiscal year, accompanied in the case of the consolidated financial statements by an unqualified opinion of Moss Adams LLP or another firm of independent public accountants of recognized standing, selected by the Borrowers and reasonably satisfactory to the DIP Agent and the Required DIP Lenders, to the effect that the consolidated financial statements have been prepared in accordance with GAAP and present fairly, in all material respects, in accordance with GAAP the consolidated financial condition of the Borrowers and their Subsidiaries as of the close of such fiscal year and the results of their operations and cash flows for the fiscal year then ended and that an examination of such accounts in connection with such financial statements has been made in accordance with generally accepted auditing standards and, accordingly, such examination included such tests of the accounting records and such other auditing procedures as were considered necessary in the circumstances;

(e)     promptly after the sending or filing thereof, copies of each financial statement, report, notice or proxy statement sent by any Borrower or any Subsidiary to its stockholders, and copies of each regular, periodic or special report, registration statement or prospectus filed by any Borrower or any Subsidiary with any securities exchange or the Securities and Exchange Commission or any successor agency;

(f)     notice of any Change in Control;

(g)     promptly, upon receipt, copies of all reports submitted to the Borrowers by their independent public accountants, including, without limitation, any management report prepared in connection with the annual audit referred to in Section 8.5(d);

(h)     promptly such supporting documentation and additional reports concerning the Borrowing Base, and additional financial and other information as the DIP Agent or the Required DIP Lenders may from time to time reasonably request;

(i)    promptly after knowledge thereof shall have come to the attention of any responsible officer of the Borrowers, written notice of (i) any threatened or pending litigation or governmental or arbitration proceeding or labor controversy against the Borrowers or any Subsidiaries which, if adversely determined, are reasonably likely to have a Material Adverse Effect, (ii) the occurrence of any Default or Event of Default hereunder, (iii) any asserted Lien against the Property of the Borrowers or any Subsidiary not expressly permitted hereby or (iv) any notice of eviction relating to any sites where the Collateral or any part thereof is located;

(j)    furnish to the DIP Agent or its counsel promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of any Borrower or any Guarantor with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of any Borrower or any Guarantor to any official committee appointed in the Chapter 11 Cases;

(k)    promptly upon receiving the same, copies of all written offers which the Borrowers should reasonably expect to be of interest to the DIP Lenders and agreements regarding the recapitalization or any sale of any Borrower or Guarantor; and

(l)    as soon as available and in any event within 30 days after the last day of each month, a written certificate in the form attached hereto as Exhibit D signed by the chief financial officer of the Borrowers, or another officer of the Borrowers reasonably acceptable to the DIP Agent, to the effect that to the best of such officer's knowledge and belief no Default or Event of Default has occurred during the period covered by such statements or, if any such Default or Event of Default has occurred during such period, setting forth a description of such Default or Event of Default and specifying the action, if any, taken by the Borrowers or any Subsidiaries to remedy the same.

Section 8.6.    Inspection.  Each Borrower shall, and shall cause each Subsidiary to, permit the DIP Agent, each DIP Lender and each of their duly authorized representatives and agents to visit and inspect any of its Properties, corporate books and financial records, to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances and accounts with, and to be advised as to the same by, its executive officers, employees and independent public accountants (and by this provision the Borrowers hereby authorize such accountants to discuss with the DIP Agent and such DIP Lenders the finances and affairs of the Borrowers and each of their Subsidiaries) at such reasonable times and intervals as the DIP Agent or any such DIP Lender may designate and, so long as no Default or Event of Default exists, with reasonable prior notice to the Borrowers.  The DIP Agent may obtain (or direct the Borrowers to obtain and provide to the DIP Agent) updated appraisals or valuations on any assets of any Borrower or any Subsidiary, or portions thereof, from time to time as the DIP Agent may request, which appraisal or valuation reports shall in each case be prepared by an appraiser or valuation company acceptable to the DIP Agent and be in such format and contain such detail as the DIP Agent may request.  The costs and expenses incurred in obtaining any such appraisal or valuation shall in each case be borne by the Borrowers (whether obtained by the DIP Agent or the Borrowers).  The Borrowers shall, at the DIP Agent's request, provide, at the Borrowers' expense, updated environmental questionnaires concerning activities and

conditions affecting the real property owned, leased or operated by any Borrower or any Subsidiary and/or environmental reports prepared for the DIP Agent by an environmental consultant or an environmental engineering firm acceptable to the DIP Agent concerning any real property owned, leased or operated by any Borrower or any Subsidiary.

Section 8.7.    *Borrowings and Guaranties.*    The Borrowers shall not, nor shall they permit any of their Subsidiaries to, issue, incur, assume, create or have outstanding any Indebtedness for Borrowed Money, or incur liabilities for interest rate, currency, or commodity cap, collar, swap, or similar hedging arrangements, or be or become liable as endorser, guarantor, surety or otherwise for any debt, obligation or undertaking of any other Person, or otherwise agree to provide funds for payment of the obligations of another, or supply funds thereto or invest therein or otherwise assure a creditor of another against loss, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another, or subordinate any claim or demand it may have to the claim or demand of any other Person; *provided, however,* that the foregoing shall not restrict nor operate to prevent:

(a)    the Pre-Petition Obligations owing to the Pre-Petition Agent and the Pre-Petition Lenders (and their Affiliates), and the Post-Petition Obligations and Funds Transfer and Deposit Account Liability of the Borrowers owing to the DIP Agent and the DIP Lenders (and their Affiliates);

(b)    purchase money indebtedness and Capitalized Lease Obligations of the Borrowers and their Subsidiaries in an aggregate amount not to exceed $500,000 at any one time outstanding and, to the extent incurred after the Effective Date, entered into in accordance with the Financing Order and consistent with the approved Cash Flow Forecast;

(c)    obligations of the Borrowers arising out of interest rate and foreign currency hedging agreements entered into with financial institutions in the ordinary course of business and, to the extent incurred after the Effective Date, entered into in accordance with the Financing Order and consistent with the approved Cash Flow Forecast;

(d)    endorsement of items for deposit or collection of commercial paper received in the ordinary course of business;

(e)    indebtedness from time to time owing by any Borrower to another Borrower and, to the extent incurred after the Effective Date, entered into in accordance with the Financing Order and consistent with the approved Cash Flow Forecast; and

(f)    unsecured indebtedness of the Borrowers and their Subsidiaries in an aggregate amount not to exceed $100,000 at any one time outstanding and, to the extent incurred after the Effective Date, entered into in accordance with the Financing Order and consistent with the approved Cash Flow Forecast.

*Section 8.8.  Liens.*  The Borrowers shall not, nor shall they permit any of their Subsidiaries to, create, incur or permit to exist any Lien of any kind on any Property owned by any such Person; *provided, however,* that the foregoing shall not apply to nor operate to prevent:

(a)  Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations or other similar charges (other than Liens arising under ERISA), good faith cash deposits in connection with tenders, contracts or leases to which the Borrowers or any Subsidiaries are a party or other cash deposits required to be made in the ordinary course of business, provided in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves have been established therefor;

(b)  mechanics', workmen's, materialmen's, landlords', carriers', or other similar Liens arising in the ordinary course of business with respect to obligations which are not due or which are being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest;

(c)  the pledge of assets for the purpose of securing an appeal, stay or discharge in the course of any legal proceeding, provided that the aggregate amount of liabilities of the Borrowers and their Subsidiaries secured by a pledge of assets permitted under this subsection, including interest and penalties thereon, if any, shall not be in excess of $100,000 at any one time outstanding and, to the extent arising after the Effective Date, is entered into in accordance with the Financing Order and consistent with the Cash Flow Forecast then in effect and made with the consent of the DIP Agent ;

(d)  Liens created under the Pre-Petition Loan Documents securing the Pre-Petition Obligations;

(e)  Liens granted in favor of the DIP Agent pursuant to the Collateral Documents;

(f)  Liens on property of the Borrowers or any Subsidiaries created solely for the purpose of securing indebtedness permitted by Section 8.7(b) hereof, representing or incurred to finance the purchase price of Property, provided that no such Lien shall extend to or cover other Property of the Borrowers or such Subsidiaries other than the respective Property so acquired, and the principal amount of indebtedness secured by any such Lien shall at no time exceed the purchase price of such Property, as reduced by repayments of principal thereon;

(g)  easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and which do not materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of the Borrowers or any Subsidiaries; and

(h)     statutory grower liens attaching to the Inventory arising in the ordinary course of business with respect to obligations which are not due or which are being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and for which adequate reserves have been established.

Section 8.9.     *Investments, Acquisitions, Loans, and Advances.* The Borrowers shall not, nor shall they permit any of their Subsidiaries to, directly or indirectly, make, retain or have outstanding any investments (whether through purchase of stock or obligations or otherwise) in, or loans or advances (other than for travel advances and other similar cash advances made to employees in the ordinary course of business) to, any other Person, or acquire all or any substantial part of the assets or business of any other Person or division thereof; *provided, however,* that the foregoing shall not apply to nor operate to prevent:

(a)     Cash Equivalents maintained with the DIP Agent;

(b)     the Borrowers' investments existing on the date of this Agreement in their respective Subsidiaries;

(c)     intercompany advances made from time to time from any Borrower to another Borrower in the ordinary course of business and, to the extent incurred after the Effective Date, entered into in accordance with the Financing Order and consistent with the approved Cash Flow Forecast; and

(d)     other investments, loans and advances in addition to those otherwise permitted by this Section in an aggregate amount not to exceed $100,000 at any one time outstanding and, to the extent incurred after the Effective Date, entered into in accordance with the Financing Order and consistent with the approved Cash Flow Forecast.

In determining the amount of investments, acquisitions, loans, and advances permitted under this Section, investments and acquisitions shall always be taken at the original cost thereof (regardless of any subsequent appreciation or depreciation therein), and loans and advances shall be taken at the principal amount thereof then remaining unpaid. Notwithstanding any other term or provision hereof, in no event shall any Borrower, nor shall it permit any of its Subsidiaries to, make any loan or advance to or investment in, or transfer any Property to, or guaranty or otherwise support any obligations for the benefit of, or otherwise enter into any transaction with any Inactive Subsidiary, other than causing any Inactive Subsidiary to be dissolved under the laws of its state of organization.

Section 8.10.     *Mergers, Consolidations and Sales.* The Borrowers shall not, nor shall they permit any of their Subsidiaries to, be a party to any merger or consolidation, or sell, transfer, lease or otherwise dispose of all or any part of their Property, including any disposition of Property as part of a sale and leaseback transaction, or in any event sell or discount (with or without recourse) any of its notes or accounts receivable; *provided, however,* that so long as no Default or Event of Default exists this Section shall not apply to nor operate to prevent:

(a)     the sale of inventory in the ordinary course of business;

(b)     the sale, transfer, lease, or other disposition of Property of the Borrowers to one another in the ordinary course of its business;

(c)     the sale, transfer or other disposition of any tangible personal property that, in the reasonable business judgment of the Borrowers or their Subsidiary has become obsolete or worn out, and which is disposed of in the ordinary course of business;

(d)     Asset Sales approved in writing by the Required DIP Lenders; and

(e)     the liquidation of any or all of the Inactive Subsidiaries.

Section 8.11.     *Maintenance of Subsidiaries.*    The Borrowers shall not assign, sell or transfer, nor shall it permit any of their Subsidiaries to issue, assign, sell or transfer, any shares of capital stock or other equity interests of a Subsidiary; *provided, however,* that the foregoing shall not operate to prevent (a) Liens on the equity interests of Subsidiaries granted to the DIP Agent pursuant to the Collateral Documents, and (b) the issuance, sale and transfer to any person of any shares of capital stock of a Subsidiary solely for the purpose of qualifying, and to the extent legally necessary to qualify, such person as a director of such Subsidiary, and (c) any transaction permitted by Section 8.10(e) above.

Section 8.12.     *Dividends and Certain Other Restricted Payments.*    The Borrowers shall not, nor shall they permit any of their Subsidiaries to, (a) declare or pay any dividends on or make any other distributions in respect of any class or series of its capital stock or other equity interests (including, without limitation, any payments in respect of stock appreciation rights), (b) directly or indirectly purchase, redeem or otherwise acquire or retire any of its capital stock or other equity interests or any warrants, options, or similar agreements to acquire the same, or (c) pay any management fees to any shareholder or Affiliate of the Parent.

Section 8.13.     *ERISA.*    Each Borrower shall, and shall cause each Subsidiary to, promptly pay and discharge all obligations and liabilities arising under ERISA of a character which if unpaid or unperformed is reasonably likely to result in the imposition of a Lien against any of its Property.  Each Borrower shall, and shall cause each Subsidiary to, promptly notify the DIP Agent and each DIP Lender of (a) the occurrence of any reportable event (as defined in ERISA) with respect to a Plan, (b) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor, (c) its intention to terminate or withdraw from any Plan, and (d) the occurrence of any event with respect to any Plan which would result in the incurrence by any Borrower or any Subsidiary of any material liability, fine or penalty, or any material increase in the contingent liability of any Borrower or any Subsidiary with respect to any post-retirement Welfare Plan benefit.

Section 8.14.     *Compliance with Laws.*    (a) Each Borrower shall, and shall cause each Subsidiary to, comply in all respects with the requirements of all federal, state, local, and foreign laws, rules, regulations, ordinances, and orders applicable to or pertaining to its Property or business operations, where any such non-compliance, individually or in the aggregate, is

reasonably likely to have a Material Adverse Effect or could result in a Lien upon any of their Property.

(b) Without limiting the agreements set forth in Section 8.14(a) above, each Borrower shall at all times, and shall cause each Subsidiary at all times to do the following: (i) comply in all material respects with, and maintain each of the Premises in compliance in all material respects with, all applicable Environmental Laws; (ii) require that each tenant and subtenant, if any, of any of the Premises or any part thereof comply in all material respects with all applicable Environmental Laws; (iii) obtain and maintain in full force and effect all material governmental approvals required by any applicable Environmental Law for operations conducted by the Borrower at each of the Premises; (iv) cure any material violation by it or at any of the owned Premises of applicable Environmental Laws; (v) not allow the presence or operation at any of the Premises of any (1) landfill or dump or (2) hazardous waste management facility or solid waste disposal facility as defined pursuant to RCRA or any comparable state law; (vi) not manufacture, use, generate, transport, treat, store, release, dispose or handle any Hazardous Material at any of the Premises except in the ordinary course of its business and in Material compliance with any applicable Environmental Law; (vii) within 10 Business Days notify the DIP Agent in writing of and provide any reasonably requested documents upon receiving knowledge of any of the following in connection with any Borrower or any Subsidiary or any of the Premises: (1) any material liability for response or corrective action, natural resource damage or other harm pursuant to CERCLA, RCRA or any comparable federal, state, provincial or local law; (2) any material Environmental Claim; (3) any material violation of an Environmental Law or material Release, threatened Release or disposal of a Hazardous Material in violation of any permit under any applicable Environmental Law; (4) any restriction on the ownership, occupancy, use or transferability arising pursuant to any (x) Release, threatened Release or disposal of a Hazardous Material or (y) Environmental Law; or (5) any environmental, natural resource, health or safety condition, which could reasonably be expected to have a Material Adverse Effect; (viii) conduct at its expense any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any material Release, threatened Release or disposal of a Hazardous Material as required by any applicable Environmental Law, (ix) abide by and observe any restrictions on the use of the Premises imposed by any governmental authority as set forth in a deed or other instrument affecting any Borrower's or any Subsidiary's interest therein; (x) promptly provide or otherwise make available to the DIP Agent any reasonably requested environmental record concerning the Premises which any Borrower or any Subsidiary possesses or can reasonably obtain; and (xi) perform, satisfy, and implement any operation or maintenance actions required by any governmental authority or Environmental Law, or included in any no further action letter or covenant not to sue issued by any governmental authority under any Environmental Law.

*Section 8.15. Burdensome Contracts With Affiliates.* The Borrowers shall not, nor shall they permit any of their Subsidiaries to, enter into any contract, agreement or business arrangement with any of their Affiliates on terms and conditions which are less favorable to the Borrowers or such Subsidiaries than would be usual and customary in similar contracts, agreements or business arrangements between Persons not affiliated with each other.

*Section 8.16. No Changes in Fiscal Year.* The fiscal year of the Borrowers and their Subsidiaries ends June 30th of each year, and the Borrowers shall not, nor shall it permit any of their Subsidiaries to, change their fiscal year from their present basis.

*Section 8.17. Formation of Subsidiaries; Inactive Subsidiaries.* (a) *Formation of Subsidiaries.* Except for existing Subsidiaries designated on Schedule 6.2 hereto, the Borrowers shall not, nor shall they permit any of their Subsidiaries to, form or acquire any other Subsidiaries.

(b) *Inactive Subsidiaries.* The Borrowers shall not permit any Subsidiary that is an Inactive Subsidiary to hereafter engage in any trade or business or have total assets with a market value in excess of $10,000.

*Section 8.18. Change in the Nature of Business.* The Borrowers shall not, nor shall they permit any of their Subsidiaries to, engage in any business or activity if as a result the general nature of the business of the Borrowers or any Subsidiaries would be changed in any material respect from the general nature of the business engaged in by it as of the date of this Agreement.

*Section 8.19. Use of Loan Proceeds.* The Borrowers shall use the credit extended under this Agreement solely for the purposes set forth in, or otherwise permitted by, Section 6.4 hereof.

*Section 8.20. No Restrictions on Subsidiary Distributions.* Except as provided herein, the Borrowers shall not, nor shall they permit any of their Subsidiaries to, directly or indirectly create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Borrower or any Subsidiary to: (a) guarantee the Obligations and Funds Transfer and Deposit Account Liability and grant Liens on its assets to the DIP Agent for the benefit of the DIP Lenders as required by Sections 4 and 12 hereof or to the Pre-Petition Agent for the benefit of the Pre-Petition Lenders as required by the Pre-Petition Loan Documents, (b) in the case of any Subsidiary, pay dividends or make any other distribution on any of such Subsidiary's capital stock or other equity interests owned by any Borrower or any other Subsidiary, (c) pay any indebtedness owed to any Borrower or any Subsidiary, (d) make loans or advances to any Borrower or any Subsidiary, or (e) transfer any of its Property to any Borrower or any Subsidiary.

*Section 8.21. Federal Food Security Act.* The Borrowers shall, and shall cause their Subsidiaries to, register, pursuant to Section 1324(c)(2)(D) of the Federal Food Security Act, with the Secretary of State of each state in which are produced farm products purchased by the Borrowers or such Subsidiaries and which has established or hereafter establishes a central filing system, as a buyer of farm products produced in such state, and the Borrowers shall maintain, and shall cause their Subsidiaries to maintain, each such registration in full force and effect; and the Borrowers shall promptly notify the DIP Agent of any notice given pursuant to Section 1324(e)(1) or (3) of the Federal Food Security Act received by the Borrowers or any of their Subsidiaries.

*Section 8.22.    Capital Expenditures.* The Borrowers shall not, nor shall they permit any of their Subsidiaries to, at any time incur any obligations to pay for Capital Expenditures except as expressly provided for and consistent with the Cash Flow Forecast then in effect.

*Section 8.23.    Chapter 11 Claims.* The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly create, incur, assume or suffer to exist or permit any unsecured claim in the Chapter 11 Cases or (subject to Section 726(b) of the Bankruptcy Code) any superseding case or cases under Chapter 7 of the Bankruptcy Code (including, without limitation, any deficiency claim remaining after the satisfaction of a Lien that secures a claim) to be pari passu with or senior to the claims of the DIP Agent and the DIP Lenders against the Borrowers and the Guarantors on the Post-Petition Obligations, or apply to the Bankruptcy Court for authority so to do, except for the Administrative Expense Carve-Out and Liens expressly permitted by the Financing Order and securing obligations consistent with the Cash Flow Forecast then in effect and Section 8.7 and 8.8 of this Agreement.

*Section 8.24.    Asset Purchases, Executory Contracts, Pre-Petition Debt and Payments Outside the Ordinary Course of Business.* The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly (a) purchase any assets outside the ordinary course of business, (b) assume any material executory contracts (other than executory contracts listed and described on Exhibit I hereto) under Section 365 of the Bankruptcy Code without the prior approval of the DIP Agent, (c) pay any pre-petition debt, other than (i) the Pre-Petition Obligations as permitted by this Agreement and the Financing Order, (ii) pre-petition and post petition obligations owed to Essential Trade Creditors to the extent set forth in the Cash Flow Forecast then in effect or otherwise approved in writing by the Required DIP Lenders, and (iii) pre-petition and post petition obligations to other Essential Creditors that are not trade creditors, to the extent set forth in the Cash Flow Forecast then in effect or otherwise approved in writing by the Required DIP Lenders, and (d) make any payments outside the ordinary course of their respective businesses.

*Section 8.25.    Limitation on Restrictions on Disclosure of Certain Information.* The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly enter into or suffer to exist or become effective any consensual encumbrance, restriction or limitation (including in the form of confidentiality agreements) on the ability of any Borrower or any Guarantor to disclose to the DIP Agent or the DIP Lenders the information and matters the Borrowers and Guarantors are required to report pursuant to this Agreement (including, without limitation,  Section 8.5(j) and (k) hereof).

*Section 8.26.    Joint Venture Distributions, Etc.* To the extent permitted by applicable law and regulation, each Borrower shall, and shall cause its Subsidiaries to, take such action from time to time as may be required to cause amounts available for distribution by any joint venture (if any) to be distributed and paid over to such Borrower.

*Section 8.27.    Cash Flow Forecasts and Cash Flow Reports.* (a) *Cash Flow Forecasts.* Three weeks prior to the expiration of the initial 13-week Cash Flow Forecast delivered pursuant to Section 7.2(k) hereof and three weeks prior to the expiration of each subsequent Cash Flow Forecast as provided for herein, the Borrower shall prepare an updated and extended Cash Flow

Forecast showing receipts and disbursements (including, to the extent directly relating to the Iseli and Weeks, by each such Borrower) for the following 13-week period which shall be in form and substance satisfactory to, and approved by, 100% of the DIP Lenders. The Borrowers shall represent that the relevant Cash Flow Forecast has been prepared in good faith based upon assumptions believed by the Borrowers and their COO (as hereinafter defined) to be reasonable as of the date the relevant Cash Flow Forecast was furnished to the DIP Agent and the DIP Lenders. The DIP Lenders shall either approve or disapprove of the updated and extended Cash Flow Forecast in writing within seven (7) Business Days of Borrowers' delivery thereof and any failure by a DIP Lender to respond within such time frame shall be deemed to be such DIP Lender's approval thereof.

(b)  *Cash Flow Reports.*  The Borrowers shall provide to the DIP Agent and the DIP Lenders a weekly cash flow report (the *"Cash Flow Report")* by Wednesday of each week (commencing October 13, 2010) showing actual weekly cash receipts and disbursements (including, to the extent directly relating to the Iseli and Weeks, by Borrower) for the immediately prior week (Saturday to Friday) and a comparison of all actual cash receipts and disbursements to the Cash Flow Forecast then in effect on both a weekly basis and on a cumulative basis from the Petition Date through the last day of the immediately preceding week, and each Cash Flow Report shall be in form and substance reasonably satisfactory to the DIP Agent and certified by the chief financial officer or COO of the Parent.

(c)  *Maximum Permitted Variances.*  The Borrowers shall not permit (i) the aggregate cash disbursements by line item for the period commencing on the Petition Date and ending on the last day of each week (determined on a cumulative basis since the Petition Date) to exceed the total amounts for such line item as set forth in the Cash Flow Forecast for such period by more than 20% of such amounts unless approved by the Required DIP Lenders, and (ii) the aggregate cash disbursements for the period commencing on the Petition Date and ending on the last day of each week (determined on a cumulative basis since the Petition Date) to exceed the total amounts for cash disbursements as set forth in the Cash Flow Forecast for such period by more than 10% of such amounts unless approved by the Required DIP Lenders.

(d)  The Cash Flow Forecasts may only be modified with the written approval of 100% of the DIP Lenders.

(e)  The Cash Flow Forecast then in effect shall be redetermined to the satisfaction of 100% of the DIP Lenders within two (2) Business Days following the consummation of any one or more Asset Sales that results in Net Proceeds in excess of $500,000.

*Section 8.28.*   *COO.*  The Borrowers will continuously maintain Sandeep Gupta to act as the Borrowers' Chief Operating Officer (*"COO"*) or such other COO selected by the Borrowers and reasonably acceptable to the Required DIP Lenders to, among other things, review the Borrowers' cash flow forecast and business plan, assist the Borrowers in identifying and liquidating slow moving inventory, assist the Borrowers in implementing their workforce reduction initiatives, and assist the Borrowers in their sale and restructuring efforts. In the event the COO ceases for any reason to act in that capacity the Borrower shall engage a successor COO reasonably acceptable to the DIP Agent within five (5) Business Days. The scope of the

COO's engagement and the authority granted to such officer must be reasonably satisfactory to the DIP Agent, which engagement shall provide for, among other things, the COO to report and be responsible directly to the Board of Directors of the Borrowers. The Borrowers shall take reasonable steps to cause the COO to be available for discussions with the DIP Agent and the DIP Lenders and the Pre-Petition Agent and Pre-Petition Lenders from time to time.

Section 8.29. *Sale Efforts.* The Borrowers shall comply with the following covenants: (i) within thirty (30) days of the Petition Date or such later date approved in writing by the Required DIP Lenders, the Bankruptcy Court shall have entered an order authorizing the Borrowers to retain an investment banking firm, and on terms and conditions, reasonably acceptable to the Required DIP Lenders to market substantially all of the assets of the Borrowers for sale as a going concern, and (ii) by March 31, 2011, the Borrowers shall have received one or more binding letters of intent from third parties for the purchase of substantially all of the Collateral or of either the Iseli or Weeks business units by no later than June 30, 2011, unless otherwise approved in writing by 100% of the DIP Lenders. The Borrowers and their advisors shall provide DIP Agent and DIP Lenders with bi-weekly telephonic reports of all sale efforts, expressions of interest and offers received. The Borrowers shall keep the DIP Agent and DIP Lenders informed on a current basis of the status of all written proposals for any sale received and provide the DIP Agent and DIP Lenders with copies of all such proposals and other related communications received from third parties within two (2) Business Days after any Borrower's receipt thereof; and the Borrowers shall permit the DIP Agent and the DIP Lenders to have reasonable access to professionals of the investment banking firm upon reasonable notice to discuss the sale efforts.

SECTION 9.    EVENTS OF DEFAULT AND REMEDIES.

Section 9.1. *Events of Default.* Any one or more of the following shall constitute an *"Event of Default"* hereunder:

(a)     (i) default in the payment when due of all or any part of the principal of or interest on any DIP Loan (whether at the stated maturity thereof or at any other time provided for in this Agreement) or of any Reimbursement Obligation or of any fee or other Obligation payable hereunder or under any other Loan Document, (ii) default in the payment when due of all or any part of any Adequate Protection Obligation when due in accordance with the terms of the Financing Order, or (iii) default for a period of 5 Business Days of any Funds Transfer and Deposit Account Liability when due; or

(b)     default in the observance or performance of any covenant set forth in Sections 8.1, 8.5, 8.7, 8.8, 8.9, 8.10, 8.11, 8.12, 8.19, 8.20, 8.23, 8.24, 8.25, 8.26, 8.27, 8.28, or 8.29 hereof or of any provision in any Loan Document dealing with the use, disposition or remittance of the proceeds of Collateral or requiring the maintenance of insurance thereon; or

(c)     default in the observance or performance of any other provision hereof or of any other Loan Document which is not remedied within 15 days after the earlier of (i) the date on which such failure shall first become known to any officer of any

Borrower or (ii) written notice thereof is given to the Parent, as agent for the Borrowers, by the DIP Agent; *provided, however,* that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any covenant which is not capable of being cured at all or within such 15-day period or which is a willful and knowing breach by any Borrower; or

(d)     any representation or warranty made herein or in any other Loan Document or in any certificate furnished to the DIP Agent or the DIP Lenders pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby proves untrue in any material respect as of the date of the issuance or making or deemed making thereof; or

(e)     any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an event of default under any of the other Loan Documents, or any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of the DIP Agent in any Collateral purported to be covered thereby except as expressly permitted by the terms thereof, or any Subsidiary takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder; or

(f)     default shall occur under any Indebtedness for Borrowed Money issued, assumed or guaranteed by any of the Borrowers or their Subsidiaries aggregating in excess of $100,000 or under any indenture, agreement or other instrument under which such Indebtedness for Borrowed Money may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated), or any such Indebtedness for Borrowed Money shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise), in each case other than such defaults arising as a result of the filing of the Chapter 11 Cases and other than matters that are otherwise stayed pursuant thereto; or

(g)     any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes shall be entered or filed against any of the Borrowers or their Subsidiaries, or against any of their Property that is not effectively stayed as a result of the Bankruptcy Code and the filing of the Chapter 11 Cases or that relate to any post-petition liability or debt in an aggregate amount in excess of $100,000 (except to the extent fully covered by insurance unless coverage under the applicable insurance policy is denied by the insurer), and which remains undischarged, unvacated, unbonded or unstayed for a period of 30 days; or

(h)     any of the Borrowers or their Subsidiaries, or any member of their Controlled Group, shall fail to pay when due an amount or amounts aggregating in excess of $100,000 which it shall have become liable to pay to the PBGC or to a Plan under Title IV of ERISA; or notice of intent to terminate a Plan or Plans having aggregate

Unfunded Vested Liabilities in excess of $100,000 (collectively, a *"Material Plan"*) shall be filed under Title IV of ERISA by any of the Borrowers or their Subsidiaries, or any other member of their Controlled Group, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any Material Plan or a proceeding shall be instituted by a fiduciary of any Material Plan against any of the Borrowers or their Subsidiaries, or any member of their Controlled Group, to enforce Section 515 or 4219(c)(5) of ERISA and such proceeding shall not have been dismissed within 30 days thereafter; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated; or

(i)     any Change of Control shall occur; or

(j)     there shall occur any Material Adverse Effect other than the commencement of the Chapter 11 Cases; or

(k)     any Non-debtor Subsidiary (other than Inactive Subsidiaries), if any, shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its Property, (v) institute any proceeding seeking to have entered against it an order for relief under the Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in Section 9.1(l) hereof; or

(l)     a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for any Non-debtor Subsidiary (other than Inactive Subsidiaries), or any substantial part of any of its Property, or a proceeding described in Section 9.1(k)(v) shall be instituted against any Non-debtor Subsidiary (other than Inactive Subsidiaries), and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of 60 days; or

(m)     if there shall occur a cessation of a substantial part of the business of any Borrower for a period which may be reasonably expected to have a Material Adverse Effect; or any Borrower shall suffer the loss or revocation of any material license or permit now held or hereafter acquired by such Borrower which is necessary to the continued or lawful operation of its business; or any Borrower shall be enjoined, restrained or in any way prevented by court, governmental or administrative order from conducting all or any material part of its business affairs; or any material lease or agreement pursuant to which any Borrower leases or occupies any premises on which any

Collateral is located shall be canceled or terminated prior to the expiration of its stated term and such cancellation or termination has a Material Adverse Effect; or any material part of the Collateral shall be taken through condemnation or the value of such Property shall be materially impaired through condemnation; or

(n)     if any Borrower or any of its Subsidiaries shall be convicted under any criminal law that could lead to a forfeiture of any Property of such Person; or

(o)     the failure of any Borrower or Guarantor to comply with any of the terms of the Financing Order or the occurrence of any condition or event which permits the DIP Agent or the DIP Lenders to exercise any of the remedies set forth in the Financing Order; or

(p)     the granting of a Lien on or other interest in any Property of any Borrower or Guarantor, or Superpriority Claim, by any Bankruptcy or District Court Judge which is superior to or ranks in parity with the Lien of the DIP Agent granted in this Agreement and the Financing Order except for the Administrative Expense Carve Out and as otherwise permitted under the Financing Order; or

(q)     any Lien purported to be created by this Agreement, the Interim Financing Order or the Final Financing Order in any of the Collateral shall, for any reason, cease to be valid or any action is commenced by any Debtor which contests the validity, perfection or enforceability of any pre-petition Liens of Pre-Petition Agent under any of the Pre-Petition Loan Documents or any Lien created by this Agreement, the Interim Financing Order or the Final Financing Order; or

(r)     (i) An order shall be entered by the Bankruptcy Court confirming a chapter 11 plan of any Debtor without the consent of 100% of the DIP Lenders and the Pre-Petition Lenders constituting the Required Lenders under the Pre-Petition Credit Agreement or (ii) there shall be substantial consummation of a plan of reorganization of any Debtor; or

(s)     any material provision of any Loan Document shall, for any reason, cease to be valid and binding on any Borrower or any Guarantor, or any Borrower or any Guarantor shall so assert in any pleading filed in any court, or any Lien created by the Loan Documents or the Financing Order shall cease to be a valid and perfected Lien against any of the Collateral purported to be covered thereby pursuant to Sections 364(c) and (d) of the Bankruptcy Code; or

(t)     any of the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; or

(u)     a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code shall be appointed in any of the Chapter 11 Cases or any motion by or supported by the Debtors shall be pending seeking such relief; or

(v)    an order of the Bankruptcy Court shall be entered in any of the Chapter 11 Cases appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or any motion by or supported by the Debtors shall be pending seeking such relief; or

(w)    the Financing Order shall be amended, modified, stayed, vacated, reversed or rescinded in any which materially and adversely affects the rights of the DIP Lenders or the DIP Agent and which modification is not acceptable to 100% of the DIP Lenders; or

(x)    an application shall be filed by any Debtor for the approval of any other Superpriority Claim in any of the Chapter 11 Cases which is pari passu with or senior to the claims of the DIP Agent and the DIP Lenders with respect to the Post-Petition Obligations (except for the Administrative Expense Carve-Out) or there shall arise any such pari passu or Superpriority Claim; or

(y)    the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code with respect to any Lien on any assets of any Borrower or any Guarantor having an aggregate net book value (determined in accordance with GAAP) in excess of $100,000 for all such assets; or

(z)    other than as contemplated by the Cash Flow Forecast in effect at such time, any Debtor ceases operation of any of its businesses or takes any material action for the purpose of effecting the foregoing without the prior written consent of the Required DIP Lenders; or

(aa)    the Bankruptcy Court shall not enter an order making a Lien Finding acceptable to the DIP Agent within 45 days following the appointment of the first creditors' committee or, if no creditors' committee is appointed, 60 days following entry of the Interim Order (or such later date as may be agreed to by the Required DIP Lenders); or

(bb)    the Final Financing Order acceptable to the 100% of the DIP Lenders shall not be entered within 75 days after the Petition Date or such later date as to which the DIP Agent may agree after notice to and consultation with, and with the approval of, 100% of the then available DIP Lenders.

Section 9.2.    *Remedies upon Default.*  Upon the occurrence of the Maturity Date or upon the occurrence and during the continuation of any Event of Default beyond the applicable cure period (if any) and upon the expiration of five (5) days after written notice by the DIP Agent to the Borrowers, the DIP Agent (on behalf of the DIP Lenders) and the Pre-Petition Agent (on behalf of the Pre-Petition Lenders) may take any or all of the following actions (absent any emergency relief provided by the Bankruptcy Court after request therefore from the Borrowers

pursuant to a Emergency Stay Hearing as provided for in the Financing Order), in each case without further order of or application to the Bankruptcy Court:

(a) declare the principal of and accrued interest on the outstanding Post-Petition Obligations to be immediately due and payable;

(b) set off any amounts in any account (including any accounts maintained by any Borrower or any Guarantor with the DIP Agent or any DIP Lender)

(c) terminate the DIP Revolving Credit Commitments and any other obligations of the DIP Lenders to extend any further credit hereunder on the date (which may be the date thereof) stated in such notice;

(d) demand that any Cash Collateral be applied to reduce or collateralize the Post-Petition Obligations and Pre-Petition Obligations as set forth in Section 3.1 hereof;

(e) demand payment of interest on the Post-Petition Obligations and Pre-Petition Obligations at the default rates set forth herein and in the Financing Order, in which event interest at such rates shall accrue and be payable as therein set forth without further order of or application to the Bankruptcy Court;

(f) the automatic stay shall be deemed lifted as to the Collateral and the DIP Agent may, and upon request of the Required DIP Lenders shall, foreclose and realize upon and exercise any other rights or remedies with respect to the Collateral (without regard to whatever other action the DIP Agent or the DIP Lenders may be taking) as security for the Post-Petition Obligations and Pre-Petition Obligations.

Section 9.3.    Relief from Stay.    Nothing contained in this Agreement shall impair or otherwise effect the DIP Agent's or the DIP Lenders' right to seek relief from the automatic stay as to their Collateral for cause at any time, which right the DIP Agent and DIP Lenders hereby fully reserve.

Section 9.4.    Collateral for Undrawn Letters of Credit.    (a) If the prepayment of the amount available for drawing under any or all outstanding Letters of Credit is required under Section 1.7, Section 3.1, or under Section 9.2 above, the Borrowers shall forthwith pay the amount required to be so prepaid, to be held by the DIP Agent as provided in subsection (b) below.

(b)    All amounts prepaid pursuant to subsection (a) above shall be held by the DIP Agent in one or more separate collateral accounts (each such account, and the credit balances, properties and any investments from time to time held therein, and any substitutions for such account, any certificate of deposit or other instrument evidencing any of the foregoing and all proceeds of and earnings on any of the foregoing being collectively called the *"Collateral Account"*) as security for, and for application by the DIP Agent (to the extent available) to, the reimbursement of any payment under any Letter of Credit then or thereafter made by the DIP Agent, and to the payment of the unpaid balance of any DIP Loans and all other Obligations.

The Collateral Account shall be held in the name of and subject to the exclusive dominion and control of the DIP Agent for the benefit of the holders of the Obligations. If and when requested by the Borrowers, the DIP Agent shall invest funds held in the Collateral Account from time to time in direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America with a remaining maturity of one year or less, *provided* that the DIP Agent is irrevocably authorized to sell investments held in the Collateral Account when and as required to make payments out of the Collateral Account for application to amounts due and owing from the Borrowers to the DIP Agent or DIP Lenders; *provided, however,* that (i) if the Borrowers shall have made payment of all obligations referred to in subsection (a) above required under Section 1.7(b) hereof, at the request of the Parent the DIP Agent shall release to the Parent (as agent for the Borrowers) amounts held in the Collateral Account so long as at the time of the release and after giving effect thereto no Default or Event of Default exists, and (ii) if the Borrowers shall have made payment of all obligations referred to in subsection (a) above required under Section 9.2 hereof, so long as no Letters of Credit, DIP Revolving Credit Commitments, DIP Loans or other Obligations or Funds Transfer and Deposit Account Liability remain outstanding, at the request of the Parent the DIP Agent shall release to the Parent (as agent for the Borrowers) any remaining amounts held in the Collateral Account.

*Section 9.5.    Notice of Default.* The DIP Agent shall give notice to the Parent, as agent for the Borrowers, under Section 9.1(c) hereof promptly upon being requested to do so by any DIP Lender and shall thereupon notify all the DIP Lenders thereof.

*Section 9.6.    Expenses.* The Borrowers agree to pay to the DIP Agent and each DIP Lender, and any other holder of any Obligation outstanding hereunder, all expenses reasonably incurred or paid by the DIP Agent and such DIP Lender or any such holder, including reasonable attorneys' fees and expenses and court costs, in connection with any Default or Event of Default by the Borrowers hereunder or in connection with the enforcement of any of the Loan Documents (including all such costs and expenses arising in connection with the Chapter 11 Cases or any other proceeding under the United States Bankruptcy Code affecting any of the Borrowers or their Subsidiaries).

SECTION 10.    CHANGE IN CIRCUMSTANCES.

*Section 10.1.    Increased Cost and Reduced Return.* (a) If, on or after the date hereof, the adoption of any applicable law, rule or regulation, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any DIP Lender (or its Lending Office) with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:

       (i)    shall subject any DIP Lender (or its Lending Office) to any tax, duty or other charge with respect to its Letter(s) of Credit, or its participation in any thereof, any Reimbursement Obligations owed to it or its obligation to issue a Letter of Credit, or to participate therein, or shall change the basis of taxation of payments to any DIP Lender (or its Lending Office) of the principal of or interest on its Letter(s) of Credit, or participations therein or any other amounts due under this Agreement or any other Loan

Document in respect of its Letter(s) of Credit, any participation therein, any Reimbursement Obligations owed to it, or its obligation to issue a Letter of Credit, or acquire participations therein (except for changes in the rate of tax on the overall net income of such DIP Lender or its Lending Office imposed by the jurisdiction in which such DIP Lender's principal executive office or Lending Office is located); or

(ii)    shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System) against assets of, deposits with or for the account of, or credit extended by, any DIP Lender (or its Lending Office) or shall impose on any DIP Lender (or its Lending Office) or on the interbank market any other condition affecting its Letter(s) of Credit, or its participation in any thereof, any Reimbursement Obligation owed to it, or its obligation to issue a Letter of Credit, or to participate therein;

and the result of any of the foregoing is to increase the cost to such DIP Lender (or its Lending Office) of issuing or maintaining a Letter of Credit, or participating therein, or to reduce the amount of any sum received or receivable by such DIP Lender (or its Lending Office) under this Agreement or under any other Loan Document with respect thereto, by an amount deemed by such DIP Lender to be material, then, within 15 days after demand by such DIP Lender (with a copy to the DIP Agent), the Borrowers shall be obligated to pay to such DIP Lender such additional amount or amounts as will compensate such DIP Lender for such increased cost or reduction.

(b)    If, after the date hereof, any DIP Lender or the DIP Agent shall have determined that the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any DIP Lender (or its Lending Office) or any corporation controlling such DIP Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has had the effect of reducing the rate of return on such DIP Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such DIP Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such DIP Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such DIP Lender to be material, then from time to time, within 15 days after demand by such DIP Lender (with a copy to the DIP Agent), the Borrowers shall pay to such DIP Lender such additional amount or amounts as will compensate such DIP Lender for such reduction.

(c)    A certificate of a DIP Lender claiming compensation under this Section and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive if reasonably determined. In determining such amount, such DIP Lender may use any reasonable averaging and attribution methods.

*Section 10.2. Lending Offices.* Each DIP Lender may, at its option, elect to make its DIP Loans hereunder at the branch, office or affiliate specified on the appropriate signature page

hereof (each a *"Lending Office"*) for each type of DIP Loan available hereunder or at such other of its branches, offices or affiliates as it may from time to time elect and designate in a written notice to the Borrowers and the DIP Agent.

Section 10.3. *Discretion of DIP Lender as to Manner of Funding.* Notwithstanding any other provision of this Agreement, each DIP Lender shall be entitled to fund and maintain its funding of all or any part of its DIP Loans in any manner it sees fit.

SECTION 11. THE AGENTS.

Section 11.1. *Appointment and Authorization of DIP Agent.* Each DIP Lender hereby appoints Harris N.A. as the DIP Agent under the Loan Documents and hereby authorizes the DIP Agent to take such action as DIP Agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the DIP Agent by the terms thereof, together with such powers as are reasonably incidental thereto. The DIP Lenders expressly agree that the DIP Agent is not acting as a fiduciary of the DIP Lenders in respect of the Loan Documents, the Borrowers or otherwise, and nothing herein or in any of the other Loan Documents shall result in any duties or obligations on the DIP Agent or any of the DIP Lenders except as expressly set forth herein.

Section 11.2. *DIP Agent and its Affiliates.* The DIP Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any other DIP Lender and may exercise or refrain from exercising such rights and power as though it were not the DIP Agent, and the DIP Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of business with any Borrower or any Affiliate of any Borrower as if it were not the DIP Agent under the Loan Documents. The term *"DIP Lender"* as used herein and in all other Loan Documents, unless the context otherwise clearly requires, includes the DIP Agent in its individual capacity as a DIP Lender. References in Section 1 hereof to the DIP Agent's DIP Loans, or to the amount owing to the DIP Agent for which an interest rate is being determined, refer to the DIP Agent in its individual capacity as a DIP Lender.

Section 11.3. *Action by DIP Agent.* If the DIP Agent receives from the Borrowers a written notice of an Event of Default pursuant to Section 8.5 hereof, the DIP Agent shall promptly give each of the DIP Lenders written notice thereof. The obligations of the DIP Agent under the Loan Documents are only those expressly set forth therein. Without limiting the generality of the foregoing, the DIP Agent shall not be required to take any action hereunder with respect to any Default or Event of Default, except as expressly provided in this Agreement and the Financing Order. Upon the occurrence of an Event of Default, the DIP Agent shall take such action to enforce its Lien on the Collateral and to preserve and protect the Collateral as may be directed by the Required DIP Lenders as provided in this Agreement and the other Loan Documents, including the Financing Order. Unless and until the Required DIP Lenders give such direction, the DIP Agent may (but shall not be obligated to) take or refrain from taking such actions as it deems appropriate and in the best interest of all the DIP Lenders. In no event, however, shall the DIP Agent be required to take any action in violation of applicable law or of any provision of any Loan Document, and the DIP Agent shall in all cases be fully justified in failing or refusing to act hereunder or under any other Loan Document unless it first receives any further assurances of its indemnification from the DIP Lenders that it may require, including

prepayment of any related expenses and any other protection it requires against any and all costs, expense, and liability which may be incurred by it by reason of taking or continuing to take any such action. The DIP Agent shall be entitled to assume that no Default or Event of Default exists unless notified in writing to the contrary by a DIP Lender or the Borrowers. In all cases in which the Loan Documents do not require the DIP Agent to take specific action, the DIP Agent shall be fully justified in using its discretion in failing to take or in taking any action thereunder. Any instructions of the Required DIP Lenders where called for under the specific provisions of the Loan Documents, or of any other group of DIP Lenders where called for under the specific provisions of the Loan Documents, shall be binding upon all the DIP Lenders and the holders of the Obligations.

Section 11.4.    *Consultation with Experts.*    The DIP Agent may consult with legal counsel, independent public accountants, financial advisors, business consultants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

Section 11.5.    *Liability of DIP Agent; Credit Decision.*    Neither the DIP Agent nor any of its directors, officers, agents, or employees shall be liable for any action taken or not taken by it in connection with the Loan Documents:  (i) with the consent or at the request of the Required DIP Lenders or (ii) in the absence of its own gross negligence or willful misconduct. Neither the DIP Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into or verify: (i) any statement, warranty or representation made in connection with this Agreement, any other Loan Document or any Credit Event; (ii) the performance or observance of any of the covenants or agreements of any Borrower or any Subsidiary contained herein or in any other Loan Document; (iii) the satisfaction of any condition specified in Section 7 hereof, except receipt of items required to be delivered to the DIP Agent; or (iv) the validity, effectiveness, genuineness, enforceability, perfection, value, worth or collectibility hereof or of any other Loan Document or of any other documents or writing furnished in connection with any Loan Document or of any Collateral; and the DIP Agent makes no representation of any kind or character with respect to any such matter mentioned in this sentence. The DIP Agent may execute any of its duties under any of the Loan Documents by or through employees, agents, and attorneys-in-fact and shall not be answerable to the DIP Lenders, the Borrowers, or any other Person for the default or misconduct of any such agents or attorneys-in-fact selected with reasonable care. The DIP Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, other document or statement (whether written or oral) believed by it to be genuine or to be sent by the proper party or parties. In particular and without limiting any of the foregoing, the DIP Agent shall have no responsibility for confirming the accuracy of any compliance certificate or other document or instrument received by it under the Loan Documents. The DIP Agent may treat the payee of any Note as the holder thereof until written notice of transfer shall have been filed with the DIP Agent signed by such payee in form satisfactory to the DIP Agent.  Each DIP Lender acknowledges that it has independently and without reliance on the DIP Agent or any other DIP Lender, and based upon such information, investigations and inquiries as it deems appropriate, made its own credit analysis and decision to extend credit to the Borrowers in the manner set forth in the Loan Documents.  It shall be the responsibility of each DIP Lender to keep itself

informed as to the creditworthiness of the Borrowers and their Subsidiaries, and the DIP Agent shall have no liability to any DIP Lender with respect thereto.

Section 11.6. *Indemnity.* The DIP Lenders shall ratably, in accordance with their respective DIP Revolver Percentages, indemnify and hold the DIP Agent, and its directors, officers, employees, agents, and representatives harmless from and against any liabilities, losses, costs or expenses suffered or incurred by it under any Loan Document or in connection with the transactions contemplated thereby, regardless of when asserted or arising, except to the extent they are promptly reimbursed for the same by the Borrowers and except to the extent that any event giving rise to a claim relates to Funds Transfer and Deposit Account Liability owing to the DIP Agent as a DIP Lender hereunder or was caused by the gross negligence or willful misconduct of the party seeking to be indemnified. The obligations of the DIP Lenders under this Section shall survive termination of this Agreement. The DIP Agent shall be entitled to offset amounts received for the account of a DIP Lender under this Agreement against unpaid amounts due from such DIP Lender to the DIP Agent hereunder (whether as fundings of participations, indemnities or otherwise), but shall not be entitled to offset against amounts owed to the DIP Agent by any DIP Lender arising outside of this Agreement and the other Loan Documents.

Section 11.7. *Resignation of DIP Agent and Successor DIP Agent.* The DIP Agent may resign at any time by giving written notice thereof to the DIP Lenders and the Borrowers. Upon any such resignation of the DIP Agent, the Required DIP Lenders shall have the right to appoint a successor DIP Agent to serve in the same capacity as such resigning DIP Agent. If no successor DIP Agent shall have been so appointed by the Required DIP Lenders, and shall have accepted such appointment, within 30 days after the retiring DIP Agent's giving of notice of resignation then the retiring DIP Agent may, on behalf of the DIP Lenders, appoint a successor DIP Agent, which shall be any DIP Lender hereunder or any commercial bank organized under the laws of the United States of America or of any State thereof and having a combined capital and surplus of at least $200,000,000. Upon the acceptance of its appointment as the DIP Agent hereunder, such successor DIP Agent shall thereupon succeed to and become vested with all the rights and duties of the retiring DIP Agent under the Loan Documents, and the retiring DIP Agent shall be discharged from its duties and obligations thereunder. After any retiring DIP Agent's resignation hereunder as DIP Agent, the provisions of this Section 11 and all protective provisions of the other Loan Documents shall inure to its benefit as to any actions taken or omitted to be taken by it while it was DIP Agent, but no successor DIP Agent shall in any event be liable or responsible for any actions of its predecessor. If any DIP Agent resigns and no successor is appointed, the rights and obligations of such DIP Agent shall be automatically assumed by the Required DIP Lenders and (i) the Borrowers shall be directed to make all payments due each DIP Lender hereunder directly to such DIP Lender and (ii) the DIP Agent's rights in the Collateral Documents shall be assigned without representation, recourse or warranty to the DIP Lenders as their interests may appear.

Section 11.8. *Funds Transfer and Deposit Account Liability Arrangements.* By virtue of a DIP Lender's execution of this Agreement or an assignment agreement pursuant to Section 13.12 hereof, as the case may be, any Affiliate of such DIP Lender with whom any Borrower or Guarantor has entered into an agreement creating Funds Transfer and Deposit

Account Liability shall be deemed a DIP Lender party hereto for purposes of any reference in a Loan Document to the parties for whom the DIP Agent is acting, it being understood and agreed that the rights and benefits of such Affiliate under the Loan Documents consist exclusively of such Affiliate's right to share in payments and collections out of the Collateral and the Guaranties as more fully set forth in Section 3.1 hereof. In connection with any such distribution of payments and collections, the DIP Agent shall be entitled to assume no amounts are due to any DIP Lender or its Affiliate with respect to Funds Transfer and Deposit Account Liability unless such DIP Lender or its Affiliate has notified the DIP Agent in writing of the amount of any such liability owed to it prior to such distribution.

Section 11.9. *Authorization to Enter into, and Enforcement of, the Collateral Documents.* The DIP Agent is hereby irrevocably authorized by each of the DIP Lenders to execute and deliver the Collateral Documents on behalf of each of the DIP Lenders and their Affiliates and to take such action and exercise such powers under the Collateral Documents as the DIP Agent considers appropriate, *provided* the DIP Agent shall not amend the Collateral Documents unless such amendment is agreed to in writing by 100% of the DIP Lenders. Each DIP Lender acknowledges and agrees that it will be bound by the terms and conditions of the Collateral Documents upon the execution and delivery thereof by the DIP Agent. Except as otherwise specifically provided for herein, no DIP Lender (or its Affiliates) other than the DIP Agent shall have the right to institute any suit, action or proceeding in equity or at law for the foreclosure or other realization upon any Collateral or for the execution of any trust or power in respect of the Collateral or for the appointment of a receiver or for the enforcement of any other remedy under the Collateral Documents; it being understood and intended that no one or more of the DIP Lenders (or their Affiliates) shall have any right in any manner whatsoever to affect, disturb or prejudice the Lien of the DIP Agent (or any security trustee therefor) under the Collateral Documents by its or their action or to enforce any right thereunder, and that all proceedings at law or in equity shall be instituted, had, and maintained by the DIP Agent (or its security trustee) in the manner provided for in the relevant Collateral Documents for the benefit of the DIP Lenders and their Affiliates.

Section 11.10. *Authorization to Release or Subordinate or Limit Liens.* The DIP Agent is hereby irrevocably authorized by each of the DIP Lenders to (a) release any Lien covering any Collateral that is sold, transferred, or otherwise disposed of in accordance with the terms and conditions of this Agreement and the relevant Collateral Documents (including a sale, transfer, or disposition permitted by the terms of Section 8.10 hereof or which has otherwise been consented to in accordance with Section 13.13 hereof), (b) release or subordinate any Lien on Collateral consisting of goods financed with purchase money indebtedness or under a Capital Lease to the extent such purchase money indebtedness or Capitalized Lease Obligation, and the Lien securing the same, are permitted by Sections 8.7(b) and 8.8(e) hereof, and (c) reduce or limit the amount of the indebtedness secured by any particular item of Collateral to an amount not less than the estimated value thereof to the extent necessary to reduce mortgage registry, filing and similar tax.

SECTION 12.    THE GUARANTEES.

*Section 12.1.    The Guarantees.*    To induce the DIP Lenders to provide the credits described herein and in consideration of benefits expected to accrue to each of the Borrowers by reason of the DIP Revolving Credit Commitments and for other good and valuable consideration, receipt of which is hereby acknowledged, each Borrower and each Subsidiary party hereto (including any Subsidiary formed or acquired after the Effective Date and becoming a Borrower hereunder by executing an Additional Borrower Supplement in the form attached hereto as Exhibit E or such other form acceptable to the DIP Agent)(each a *"Guarantor"* and collectively the *"Guarantors"*) hereby unconditionally and irrevocably guarantee jointly and severally to the DIP Agent, the DIP Lenders, and their Affiliates, and each other holder of any of the Obligations and Funds Transfer and Deposit Account Liability, the due and punctual payment of all present and future Obligations and Funds Transfer and Deposit Account Liability, including, but not limited to, the due and punctual payment of principal of and interest on the DIP Loans, the Reimbursement Obligations, the due and punctual payment of all other Obligations now or hereafter owed by the Borrowers evidenced by or arising out of the Loan Documents, and the due and punctual payment of all Funds Transfer and Deposit Account Liability, in each case as and when the same shall become due and payable, whether at stated maturity, by acceleration or otherwise, according to the terms hereof and thereof.  In case of failure by any Borrower or other obligor punctually to pay any Obligations or Funds Transfer and Deposit Account Liability guaranteed hereby, each Guarantor hereby unconditionally agrees to make such payment or to cause such payment to be made punctually as and when the same shall become due and payable, whether at stated maturity, by acceleration or otherwise, and as if such payment were made by the relevant Borrower or such other obligor.

*Section 12.2.    Guarantee Unconditional.*    The obligations of each Guarantor under this Section 12 shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, or otherwise affected by:

      (a)    any extension, renewal, settlement, compromise, waiver, or release in respect of any obligation of any Borrower or other obligor or of any other guarantor under this Agreement or any other Loan Document or by operation of law or otherwise;

      (b)    any modification or amendment of or supplement to this Agreement or any other Loan Document or any agreement relating to Funds Transfer and Deposit Account Liability;

      (c)    any change in the corporate existence, structure, or ownership of, or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting, any Borrower or other obligor, any other guarantor, or any of their respective assets, or any resulting release or discharge of any obligation of any Borrower or other obligor or of any other guarantor contained in any Loan Document;

      (d)    the existence of any claim, set-off, or other rights which any Borrower or other obligor or any other guarantor may have at any time against the DIP Agent, any DIP Lender, or any other Person, whether or not arising in connection herewith;

(e)     any failure to assert, or any assertion of, any claim or demand or any exercise of, or failure to exercise, any rights or remedies against any Borrower or other obligor, any other guarantor, or any other Person or Property;

(f)     any application of any sums by whomsoever paid or howsoever realized to any obligation of any Borrower or other obligor, regardless of what obligations of such Borrower or other obligor remain unpaid;

(g)     any invalidity or unenforceability relating to or against any Borrower or other obligor or any other guarantor for any reason of this Agreement or of any other Loan Document or any agreement relating to Funds Transfer and Deposit Account Liability or any provision of applicable law or regulation purporting to prohibit the payment by any Borrower or other obligor or any other guarantor of the principal of or interest on any DIP Loan or any Reimbursement Obligation or any other amount payable under the Loan Documents or any agreement relating to Funds Transfer and Deposit Account Liability; or

(h)     any other act or omission to act or delay of any kind by the DIP Agent, any DIP Lender, or any other Person or any other circumstance whatsoever that might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of any Guarantor under this Section 12.

*Section 12.3.     Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances.* Each Guarantor's obligations under this Section 12 shall remain in full force and effect until the DIP Revolving Credit Commitments are terminated, all Letters of Credit have expired, and the principal of and interest on the DIP Loans and all other Obligations payable by the Borrowers and the Guarantors under this Agreement and all other Loan Documents and, if then outstanding and unpaid, all Funds Transfer and Deposit Account Liability shall have been paid in full in cash. If at any time any payment of the principal of or interest on any DIP Loan or any Reimbursement Obligation or any other Obligation payable by the Borrower or other obligor or any Guarantor under the Loan Documents or any agreement relating to Funds Transfer and Deposit Account Liability is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of a Borrower or other obligor or of any guarantor, or otherwise, each Guarantor's obligations under this Section 12 with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made at such time.

*Section 12.4.     Subrogation.* Each Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise, until all the Obligations and Funds Transfer and Deposit Account Liability shall have been paid in full in cash subsequent to the termination of all the DIP Revolving Credit Commitments and expiration of all Letters of Credit. If any amount shall be paid to a Guarantor on account of such subrogation rights at any time prior to the later of (x) the payment in full of the Obligations and Funds Transfer and Deposit Account Liability and all other amounts payable by the Borrower hereunder and the other Loan Documents and (y) the termination of the DIP Revolving Credit Commitments and expiration of all Letters of Credit, such amount shall be held in trust for the

benefit of the DIP Agent and the DIP Lenders (and their Affiliates) and shall forthwith be paid to the DIP Agent for the benefit of the DIP Lenders (and their Affiliates) or be credited and applied upon the Obligations and Funds Transfer and Deposit Account Liability, whether matured or unmatured, in accordance with the terms of this Agreement.

Section 12.5.    *Waivers.*    Each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest, and any notice not provided for herein, as well as any requirement that at any time any action be taken by the DIP Agent, any DIP Lender, or any other Person against any Borrower or other obligor, another guarantor, or any other Person.

Section 12.6.    *Stay of Acceleration.*    If acceleration of the time for payment of any amount payable by any Borrower or other obligor under this Agreement or any other Loan Document, or under any agreement relating to Funds Transfer and Deposit Account Liability, is stayed upon the insolvency, bankruptcy or reorganization of such Borrower or such obligor, all such amounts otherwise subject to acceleration under the terms of this Agreement and the other Loan Documents, or under any agreement relating to Funds Transfer and Deposit Account Liability, shall nonetheless be payable by the Guarantors hereunder forthwith on demand by the DIP Agent made at the request of the Required DIP Lenders.

Section 12.7.    *Benefit to Guarantors.*    The Borrowers and Guarantors are engaged in related businesses and integrated to such an extent that the financial strength and flexibility of the Borrowers have a direct impact on the success of each Guarantor.  Each Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder.

Section 12.8.    *Guarantor Covenants.*    Each Guarantor shall take such action as any Borrower is required by this Agreement to cause such Guarantor to take, and shall refrain from taking such action as any Borrower is required by this Agreement to prohibit such Guarantor from taking.

SECTION 13.    MISCELLANEOUS.

Section 13.1.    *Withholding Taxes.*

(a)    *Payments Free of Withholding.*    Except as otherwise required by law and subject to Section 13.1(b) hereof, each payment by the Borrowers and Guarantors under this Agreement or the other Loan Documents shall be made without withholding for or on account of any present or future taxes (other than overall net income taxes on the recipient) imposed by or within the jurisdiction in which any Borrower or Guarantor is domiciled, any jurisdiction from which any Borrower or Guarantor makes any payment, or (in each case) any political subdivision or taxing authority thereof or therein.    If any such withholding is so required, the Borrowers and Guarantors shall make the withholding, pay the amount withheld to the appropriate governmental authority before penalties attach thereto or interest accrues thereon and forthwith pay such additional amount as may be necessary to ensure that the net amount actually received by each DIP Lender and the DIP Agent free and clear of such taxes (including such taxes on such additional amount) is equal to the amount which that DIP Lender or the DIP Agent (as the case may be) would have received had such withholding not been made.    If the DIP Agent or any DIP

Lender pays any amount in respect of any such taxes, penalties or interest, the Borrowers and Guarantors shall reimburse the DIP Agent or such DIP Lender for that payment on demand in the currency in which such payment was made. If any Borrower or Guarantor pays any such taxes, penalties or interest, it shall deliver official tax receipts evidencing that payment or certified copies thereof to the DIP Lender or the DIP Agent on whose account such withholding was made (with a copy to the Agent if not the recipient of the original) on or before the thirtieth day after payment.

(b)    *U.S. Withholding Tax Exemptions.* Each DIP Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall submit to the Borrowers and the DIP Agent on or before the date the initial Credit Event is made hereunder or, if later, the date such financial institution becomes a DIP Lender hereunder, two duly completed and signed copies of (i) either Form W-8 BEN (relating to such DIP Lender and entitling it to a complete exemption from withholding under the Code on all amounts to be received by such DIP Lender, including fees, pursuant to the Loan Documents and the Obligations) or Form W-8 ECI (relating to all amounts to be received by such DIP Lender, including fees, pursuant to the Loan Documents and the Obligations) of the United States Internal Revenue Service or (ii) solely if such DIP Lender is claiming exemption from United States withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a Form W-8 BEN, or any successor form prescribed by the Internal Revenue Service, and a certificate representing that such DIP Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of any Borrower and is not a controlled foreign corporation related to any Borrower (within the meaning of Section 864(d)(4) of the Code). Thereafter and from time to time, each DIP Lender shall submit to the Borrowers and the DIP Agent such additional duly completed and signed copies of one or the other of such Forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) and such other certificates as may be (i) requested by the Borrowers in a written notice, directly or through the DIP Agent, to such DIP Lender and (ii) required under then-current United States law or regulations to avoid or reduce United States withholding taxes on payments in respect of all amounts to be received by such DIP Lender, including fees, pursuant to the Loan Documents or the Obligations. Upon the request of the Borrowers or the DIP Agent, each DIP Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall submit to the Borrowers and the DIP Agent a certificate to the effect that it is such a United States person.

(c)    *Inability of DIP Lender to Submit Forms.* If any DIP Lender determines, as a result of any change in applicable law, regulation or treaty, or in any official application or interpretation thereof, that it is unable to submit to the Borrowers or the DIP Agent any form or certificate that such DIP Lender is obligated to submit pursuant to subsection (b) of this Section 13.1 or that such DIP Lender is required to withdraw or cancel any such form or certificate previously submitted or any such form or certificate otherwise becomes ineffective or inaccurate, such DIP Lender shall promptly notify the Borrowers and DIP Agent of such fact and the DIP Lender shall to that extent not be obligated to provide any such form or certificate and will be entitled to withdraw or cancel any affected form or certificate, as applicable.

*Section 13.2.    No Waiver, Cumulative Remedies.*  No delay or failure on the part of the DIP Agent or any DIP Lender or on the part of the holder or holders of any of the Obligations in the exercise of any power or right under any Loan Document shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right.  The rights and remedies hereunder of the DIP Agent, the DIP Lenders and of the holder or holders of any of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

*Section 13.3.    Non-Business Days.*  If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable.  In the case of any payment of principal falling due on a day which is not a Business Day, interest on such principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

*Section 13.4.    Documentary Taxes.*  The Borrowers agree to pay on demand any documentary, stamp or similar taxes payable in respect of this Agreement or any other Loan Document, including interest and penalties, in the event any such taxes are assessed, irrespective of when such assessment is made and whether or not any credit is then in use or available hereunder.

*Section 13.5.    Survival of Representations.*  All representations and warranties made herein or in any other Loan Document or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

*Section 13.6.    Survival of Indemnities.*  All indemnities and other provisions relative to reimbursement to the DIP Lenders of amounts sufficient to protect the yield of the DIP Lenders with respect to the DIP Loans and Letters of Credit, including, but not limited to, Sections 10.3 and 13.15 hereof, shall survive the termination of this Agreement and the other Loan Documents and the payment of the Obligations.

*Section 13.7.    Sharing of Set-Off.*  Each DIP Lender agrees with each other DIP Lender a party hereto that if such DIP Lender shall receive and retain any payment, whether by realization of security, set-off or application of deposit balances or otherwise, on any of the DIP Loans or Reimbursement Obligations in excess of its ratable share of payments on all such Obligations then outstanding to the DIP Lenders, then such DIP Lender shall purchase for cash at face value, but without recourse, ratably from each of the other DIP Lenders such amount of the DIP Loans or Reimbursement Obligations, or participations therein, held by each such other DIP Lenders (or interest therein) as shall be necessary to cause such DIP Lender to share such excess payment ratably with all the other DIP Lenders; *provided, however,* that if any such purchase is made by any DIP Lender, and if such excess payment or part thereof is thereafter recovered from such purchasing DIP Lender, the related purchases from the other DIP Lenders shall be rescinded

ratably and the purchase price restored as to the portion of such excess payment so recovered, but without interest. For purposes of this Section, amounts owed to or recovered by the DIP Agent in connection with Reimbursement Obligations in which DIP Lenders have been required to fund their participation shall be treated as amounts owed to or recovered by the DIP Agent as a DIP Lender hereunder.

Section 13.8. *Notices.* Except as otherwise specified herein, all notices hereunder and under the other Loan Documents shall be in writing (including, without limitation, notice by telecopy) and shall be given to the relevant party at its address or telecopier number set forth below, or such other address or telecopier number as such party may hereafter specify by notice to the DIP Agent and the Borrowers given by courier, by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt. Notices under the Loan Documents to any DIP Lender shall be addressed to its address or telecopier number set forth on its Administrative Questionnaire; and notices under the Loans Documents to the Borrowers, any Guarantor, or the DIP Agent shall be addressed to its respective address or telecopier number set forth below:

| to the Borrowers and Guarantors: | to the DIP Agent: |
|---|---|
| c/o International Garden Products, Inc. | Harris N.A. |
| 20340 SE Highway 212 | 115 South LaSalle Street, 12W |
| Damascus, Oregon 97089 | Chicago, Illinois 60603 |
| Attention:   Jay Hulbert | Attention:   Jason Clary |
| Telephone: _____ | Telephone:  (312) 461-6204 |
| Telecopy: _____ | Telecopy:   (312) 461-7958 |

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section or in the relevant Administrative Questionnaire and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, 5 days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section or in the relevant Administrative Questionnaire; *provided* that any notice given pursuant to Section 1 hereof shall be effective only upon receipt

Section 13.9. *Counterparts.* This Agreement may be executed in any number of counterparts, and by the different parties hereto on separate counterpart signature pages, and all such counterparts taken together shall be deemed to constitute one and the same instrument.

Section 13.10. *Successors and Assigns.* This Agreement shall be binding upon the Borrowers and their successors and assigns, and shall inure to the benefit of the DIP Agent and each of the DIP Lenders and the benefit of their respective successors and assigns, including any subsequent holder of any of the Obligations. The Borrowers and Guarantors may not assign any of their rights or obligations under any Loan Document without the written consent of all of the DIP Lenders.

*Section 13.11.    Participants.*  Each DIP Lender shall have the right at its own cost to grant participations (to be evidenced by one or more agreements or certificates of participation) in the DIP Loans made and Reimbursement Obligations and/or DIP Revolving Credit Commitments held by such DIP Lender at any time and from time to time to one or more other Persons; provided that no such participation shall relieve any DIP Lender of any of its obligations under this Agreement, and, provided, further that no such participant shall have any rights under this Agreement except as provided in this Section, and the DIP Agent shall have no obligation or responsibility to such participant.  Any agreement pursuant to which such participation  is granted shall provide that the granting DIP Lender shall retain the sole right and responsibility to enforce the obligations of the Borrowers under this Agreement and the other Loan Documents including, without limitation, the right to approve any amendment, modification or waiver of any provision of the Loan Documents, except that such agreement may provide that such DIP Lender will not agree to any modification, amendment or waiver of the Loan Documents with respect to any items in Sections 13.13(i) and 13.13(ii).  Any party to which such a participation has been granted shall have the benefits of Section 10.1 hereof.  The Borrowers authorize each DIP Lender to disclose to any participant or prospective participant under this Section any financial or other information pertaining to the Borrowers and their Subsidiaries.

*Section 13.12.    Assignments.*  (a) Each DIP Lender shall have the right at any time, with the prior consent of the DIP Agent (which is not to be unreasonably withheld or delayed), to sell, assign, transfer or negotiate all or any part of its rights and obligations under the Loan Documents (including, without limitation, the DIP Loans then held by such assigning DIP Lender, together with an equivalent percentage of its obligation to make loans and advances and participate in Letters of Credit) to one or more commercial banks or other financial institutions, provided that, unless otherwise agreed to by the DIP Agent, such assignment shall be of a fixed percentage (and not by its terms of varying percentage) of the assigning DIP Lender's rights and obligations under the Loan Documents and of each Credit; *provided, however,* that in order to make any such assignment (i) unless the assigning DIP Lender is assigning all of its DIP Revolving Credit Commitments, outstanding DIP Loans and interests in Letters of Credit, the assigning DIP Lender shall retain at least $750,000 in DIP Revolving Credit Commitments, outstanding DIP Loans and Reimbursement Obligations, (ii) the assignee DIP Lender shall have DIP Revolving Credit Commitments, outstanding DIP Loans and Reimbursement Obligations of at least $750,000, (iii) no percentage of a Credit may be assigned unless an equivalent percentage in each Credit is simultaneously assigned, (iv) each such assignment shall be evidenced by a written agreement (substantially in the form attached hereto as Exhibit F or in such other form acceptable to the DIP Agent) executed by such assigning DIP Lender, such assignee DIP Lender or DIP Lenders, and the DIP Agent, which agreement shall specify in each instance the portion of the Obligations which are to be assigned to the assignee DIP Lender and the portion of the DIP Revolving Credit Commitments of the assigning DIP Lender to be assumed by the assignee DIP Lender or DIP Lenders, and (v) the assigning DIP Lender shall pay to the DIP Agent a processing fee of $3,500 in connection with any such assignment agreement. Any such assignee shall become a DIP Lender for all purposes hereunder to the extent of the rights and obligations under the Loan Documents it assumes and the assigning DIP Lender shall be released from its obligations, and will have released its rights, under the Loan Documents to the extent of such assignment. The address for notices to such assignee DIP Lender shall be as specified in the assignment agreement executed by it.  Concurrently with the execution and delivery of such

assignment agreement, if requested, the Borrowers shall execute and deliver Notes to the assignee DIP Lender and the assigning DIP Lender in the respective amounts of their DIP Revolving Credit Commitments (or assigned principal amounts, as applicable) after giving effect to the reduction occasioned by such assignment (all such Notes to constitute *"Notes"* for all purposes of the Loan Documents), and the assignee DIP Lender shall thereafter surrender to the Borrowers its old Notes. The Borrowers authorize each DIP Lender to disclose to any purchaser or prospective purchaser of an interest in the DIP Loans and interests in the Letters of Credit owed to it or its DIP Revolving Credit Commitments under this Section any financial or other information pertaining to the Borrowers and their Subsidiaries.

(b)     Any DIP Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement to secure obligations of such DIP Lender, including any such pledge or grant to a Federal Reserve Bank, and this Section shall not apply to any such pledge or grant of a security interest; *provided* that no such pledge or grant of a security interest shall release a DIP Lender from any of its obligations hereunder or substitute any such pledgee or secured party for such DIP Lender as a party hereto; *provided further, however,* the right of any such pledgee or grantee (other than any Federal Reserve Bank) to further transfer all or any portion of the rights pledged or granted to it, whether by means of foreclosure or otherwise, shall be at all times subject to the terms of this Agreement.

*Section 13.13.     Amendments; Waivers; Forbearances.*  Any provision of this Agreement or the other Loan Documents may be amended or waived, or a forbearance with respect to any Event of Default under Section 9 may be entered into, if, but only if, such amendment, waiver or forbearance is in writing and is signed by (a) the Borrowers, (b) the Required DIP Lenders, and (c) if the rights or duties of the DIP Agent are affected thereby, the DIP Agent; provided that:

(i)     no amendment or waiver pursuant to this Section 13.13 shall (A) increase any DIP Revolving Credit Commitment of any DIP Lender without the consent of such DIP Lender or (B) reduce the amount of or postpone the date for scheduled payment of any principal of or interest on any DIP Loan or of any Reimbursement Obligation or of any fee payable hereunder without the consent of the DIP Lender to which such payment is owing or which has committed to make such DIP Loan or Letter of Credit (or participate therein) hereunder;

(ii)     no amendment or waiver pursuant to this Section 13.13 shall, unless signed by each DIP Lender, increase the DIP Revolving Credit Commitments of the DIP Lenders in the aggregate, extend the Maturity Date, change the definitions of Availability Limit, Termination Date or Required DIP Lenders, change the provisions of this Section 13.13, change any of the provisions set forth herein expressly requiring 100% of the DIP Lenders, consent to any priming Liens on the Collateral so long as the DIP Revolving Credit Commitments are outstanding or any DIP Credit is outstanding (except for the Liens granted hereby to the DIP Agent or as expressly permitted by Section 8.8 hereof or the approved Financing Order), release any material guarantor or all or any substantial part of the Collateral (except as otherwise provided for in the Loan Documents including, without limitation, the release of any Subsidiary as a co-obligor and guarantor hereunder in connection with the sale of it or its assets which shall be

subject to the consent of the Required DIP Lenders under Section 8.10 hereof), or affect the number of DIP Lenders required to take any action hereunder or under any other Loan Document; and

(iii)    unless agreed by each DIP Lender, the DIP Agent and the DIP Lenders may not forbear with respect to any Event of Default (a) which occurs under a section or subsection of this Agreement requiring 100% of the DIP Lenders to approve changes thereto or (b) for a period ending after the Maturity Date.

Section 13.14.    *Headings.*  Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

Section 13.15.    *Costs and Expenses; Indemnification.*  (a) The Borrowers agree to pay all costs and expenses of the DIP Agent in connection with the preparation, negotiation, and administration of the Loan Documents, including, without limitation, financial advisor fees, collateral field audit fees, travel expense, and the reasonable fees and disbursements of counsel to the DIP Agent, in connection with the preparation, negotiation, and execution of the Loan Documents, and any amendment, waiver or consent related thereto, whether or not the transactions contemplated herein are consummated, together with any fees and charges suffered or incurred by the DIP Agent in connection with periodic environmental audits, fixed asset and inventory appraisals, title insurance policies, collateral filing fees and lien searches.  The Borrowers further agree to indemnify the DIP Agent, each DIP Lender, and their respective directors, officers, employees, attorneys, advisors, and consultants (each such Person being called an *"Indemnitee"*) against all losses, claims, damages, penalties, judgments, liabilities, and reasonable expenses (including, without limitation, all reasonable fees and disbursements of counsel for any such Indemnitee (limited, in the case of attorneys fees of any DIP Lender other than the DIP Agent, to no more than $15,000 in the aggregate per DIP Lender) and all reasonable expenses of litigation or preparation therefor, whether or not the Indemnitee is a party thereto, or any settlement arrangement arising from or relating to any such litigation) which any of them may pay or incur arising out of or relating to any Loan Document or any of the transactions contemplated thereby or the direct or indirect application or proposed application of the proceeds of any DIP Loan or Letter of Credit, other than those which arise from the gross negligence or willful misconduct of the party claiming indemnification.  The Borrowers, upon demand by the DIP Agent or a DIP Lender at any time, shall reimburse the DIP Agent or such DIP Lender for any reasonable legal or other expenses (including, without limitation, all reasonable fees and disbursements of counsel for any such Indemnitee (limited, in the case of attorneys fees of any DIP Lender other than the DIP Agent, to no more than $15,000 in the aggregate per DIP Lender)) incurred in connection with investigating or defending against any of the foregoing described in the preceding sentence (including any settlement costs relating to the foregoing) except if the same is directly due to the gross negligence or willful misconduct of the party to be indemnified.  Without limiting the foregoing, the Borrowers and Guarantors hereby agree to indemnify and hold harmless each Indemnitee from and against all losses, claims, damages, expenses or liabilities, including, but not limited to, legal or other expenses incurred in connection with investigating, preparing to defend, or defending any such loss, claim, damage, expense or liability, incurred in respect of the DIP Credits, or the relationship between the DIP Agent and/or DIP Lenders and any Borrower or Guarantor, but excluding therefrom all expenses,

losses, claims, damages and liability to the extent that they are determined by the final judgment of a court of competent jurisdiction to have resulted from (i) willful misconduct or gross negligence of such Indemnitee or (ii) an action commenced by such Indemnitee against any Borrower or Guarantor and which results in a final judgment in favor of any of such Borrower or Guarantor. To the extent permitted by applicable law, no Borrower or Guarantor shall assert, and each such Person hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or the other Loan Documents or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any DIP Loan or Letter of Credit or the use of the proceeds thereof. The obligations of the Borrowers and Guarantors under this Section shall survive the repayment of the Obligations and the termination of this Agreement.

(b)     The Borrowers unconditionally agree to forever indemnify, defend and hold harmless, and covenant not to sue for any claim for contribution against, each Indemnitee for any damages, costs, loss or expense, including without limitation, response, remedial or removal costs and all fees and disbursements of counsel for any such Indemnitee (limited, in the case of attorneys fees of any DIP Lender other than the DIP Agent, to no more than $15,000 in the aggregate per DIP Lender), arising out of any of the following:   (i) any presence, release, threatened release or disposal of any hazardous or toxic substance or petroleum by any Borrower or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (ii) the operation or violation of any environmental law, whether federal, state, or local, and any regulations promulgated thereunder, by any Borrower or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (iii) any claim for personal injury or property damage in connection with any Borrower or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), and (iv) the inaccuracy or breach of any environmental representation, warranty or covenant by any Borrower or any Subsidiary made herein or in any other Loan Document evidencing or securing any Obligations or setting forth terms and conditions applicable thereto or otherwise relating thereto, except for damages arising from the willful misconduct or gross negligence of the party claiming indemnification. This indemnification shall survive the payment and satisfaction of all Obligations and the termination of this Agreement, and shall remain in force beyond the expiration of any applicable statute of limitations and payment or satisfaction in full of any single claim under this indemnification.   This indemnification shall be binding upon the successors and assigns of the Borrowers and shall inure to the benefit of each Indemnitee and its successors and assigns.

*Section 13.16.     Set-off.*     (a) In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default, with the written consent of the DIP Agent, each DIP Lender and each subsequent holder of any Obligation is hereby authorized by the Borrowers at any time or from time to time, without notice to the Borrowers or to any other Person, any such notice being hereby expressly waived, to set-off and to appropriate and to apply any and all deposits (general or special, including, but not limited to, indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts, and in whatever currency denominated) and any other indebtedness at any time held or owing by that DIP Lender or that subsequent holder to or

for the credit or the account of the Borrowers, whether or not matured, against and on account of the Obligations or Funds Transfer and Deposit Account Liability of any Borrower to that DIP Lender or that subsequent holder under such obligations, including, but not limited to, all claims of any nature or description arising out of or connected with the Loan Documents, irrespective of whether or not (a) that DIP Lender or that subsequent holder shall have made any demand hereunder or (b) the principal of or the interest on the DIP Loans and other amounts due hereunder shall have become due and payable pursuant to Section 9 and although said obligations and liabilities, or any of them, may be contingent or unmatured.

(b)     NOTWITHSTANDING THE FOREGOING SUBSECTION (A), AT ANY TIME THAT THE DIP LOANS OR ANY OTHER OBLIGATION OR FUNDS TRANSFER AND DEPOSIT ACCOUNT LIABILITY SHALL BE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, NO DIP LENDER SHALL EXERCISE A RIGHT OF SETOFF, BANKER'S LIEN OR COUNTERCLAIM OR TAKE ANY COURT OR ADMINISTRATIVE ACTION OR INSTITUTE ANY PROCEEDING TO ENFORCE ANY PROVISION OF THIS AGREEMENT OR ANY DIP LOAN OR OTHER OBLIGATION THAT IS NOT TAKEN BY THE DIP AGENT OR REQUIRED DIP LENDERS OR APPROVED IN WRITING BY THE DIP AGENT AND REQUIRED DIP LENDERS IF SUCH SETOFF OR ACTION OR PROCEEDING WOULD OR MIGHT (PURSUANT TO SECTIONS 580A, 580B, 580D AND 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR SECTION 2924 OF THE CALIFORNIA CIVIL CODE, IF APPLICABLE, OR OTHERWISE) AFFECT OR IMPAIR THE VALIDITY, PRIORITY OR ENFORCEABILITY OF THE LIENS GRANTED TO THE DIP AGENT PURSUANT TO THE COLLATERAL DOCUMENTS OR THE ENFORCEABILITY OF THE DIP LOANS AND OTHER OBLIGATIONS AND FUNDS TRANSFER AND DEPOSIT ACCOUNT LIABILITY, AND ANY ATTEMPTED EXERCISE BY ANY DIP LENDER OF ANY SUCH RIGHT WITHOUT OBTAINING SUCH CONSENT OF THE DIP AGENT SHALL BE NULL AND VOID. THIS SUBSECTION (B) SHALL BE SOLELY FOR THE BENEFIT OF EACH OF THE DIP LENDERS HEREUNDER.

Section 13.17.     *Entire Agreement.* The Loan Documents constitute the entire understanding of the parties thereto with respect to the subject matter thereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

Section 13.18.     *Governing Law.* This Agreement and the other Loan Documents (except as otherwise specified therein), and the rights and duties of the parties hereto, shall be construed and determined in accordance with the internal laws of the State of Illinois.

Section 13.19.     *Severability of Provisions.* Any provision of any Loan Document which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. All rights, remedies, and powers provided in this Agreement and the other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of law, and all the provisions of this Agreement and other Loan Documents are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement or the other Loan Documents invalid or unenforceable.

*Section 13.20.    Excess Interest.*  Notwithstanding any provision to the contrary contained herein or in any other Loan Document, no such provision shall require the payment or permit the collection of any amount of interest in excess of the maximum amount of interest permitted by applicable law to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the DIP Loans or other obligations outstanding under this Agreement or any other Loan Document (*"Excess Interest"*).  If any Excess Interest is provided for, or is adjudicated to be provided for, herein or in any other Loan Document, then in such event (a) the provisions of this Section shall govern and control, (b) neither any Borrower nor any guarantor or endorser shall be obligated to pay any Excess Interest, (c) any Excess Interest that the DIP Agent or any DIP Lender may have received hereunder shall, at the option of the DIP Agent, be (i) applied as a credit against the then outstanding principal amount of Obligations hereunder and accrued and unpaid interest thereon (not to exceed the maximum amount permitted by applicable law), (ii) refunded to the Borrowers, or (iii) any combination of the foregoing, (d) the interest rate payable hereunder or under any other Loan Document shall be automatically subject to reduction to the maximum lawful contract rate allowed under applicable usury laws (the *"Maximum Rate"*), and this Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in the relevant interest rate, and (e) neither the Borrowers nor any guarantor or endorser shall have any action against the DIP Agent or any DIP Lender for any damages whatsoever arising out of the payment or collection of any Excess Interest.  Notwithstanding the foregoing, if for any period of time interest on any of the Obligations is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on the Obligations shall remain at the Maximum Rate until the DIP Lenders have received the amount of interest which such DIP Lenders would have received during such period on the Obligations had the rate of interest not been limited to the Maximum Rate during such period.

*Section 13.21.    Construction.*  Nothing contained herein shall be deemed or construed to permit any act or omission which is prohibited by the terms of any Collateral Document, the covenants and agreements contained herein being in addition to and not in substitution for the covenants and agreements contained in the Collateral Documents.

*Section 13.22.    DIP Lender's Obligations Several.*  The obligations of the DIP Lenders hereunder are several and not joint.  Nothing contained in this Agreement and no action taken by the DIP Lenders pursuant hereto shall be deemed to constitute the DIP Lenders a partnership, association, joint venture or other entity.

*Section 13.23.    Inquiries.*  Each Borrower hereby authorizes and permits the DIP Agent and the DIP Lenders to respond to usual and customary credit inquiries from third parties concerning any Borrower or any of their Subsidiaries.

*Section 13.24.    Release of Claims.*  FOR VALUE RECEIVED, INCLUDING WITHOUT LIMITATION, THE AGREEMENTS OF THE DIP LENDERS IN THIS AGREEMENT AND THE AGREEMENTS OF THE PRE-PETITION LENDERS IN THE FINANCING ORDER, THE BORROWERS AND GUARANTORS (AS DEBTORS AND AS DEBTORS-IN-POSSESSION) HEREBY RELEASE EACH OF THE DIP AGENT, DIP LENDERS, PRE-PETITION AGENT, AND PRE-PETITION LENDERS, ITS CURRENT AND FORMER

SHAREHOLDERS, DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, ATTORNEYS, CONSULTANTS, AND PROFESSIONAL ADVISORS (COLLECTIVELY, THE *"RELEASED PARTIES"*) OF AND FROM ANY AND ALL DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, ACTS AND OMISSIONS, LIABILITIES, AND OTHER CLAIMS OF EVERY KIND OR NATURE WHATSOEVER, BOTH IN LAW AND IN EQUITY, KNOWN OR UNKNOWN, WHICH ANY BORROWER OR GUARANTOR HAS OR EVER HAD AGAINST THE RELEASED PARTIES FROM THE BEGINNING OF THE WORLD TO THIS DATE, INCLUDING, WITHOUT LIMITATION, THOSE ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE PRE-PETITION CREDIT AGREEMENT AND THE OTHER PRE-PETITION LOAN DOCUMENTS; AND THE BORROWERS AND GUARANTORS FURTHER ACKNOWLEDGE THAT, AS OF THE DATE HEREOF, THEY DO NOT HAVE ANY COUNTERCLAIM, SET-OFF OR DEFENSE AGAINST THE RELEASED PARTIES, EACH OF WHICH THE BORROWERS AND GUARANTORS HEREBY EXPRESSLY WAIVE.

Section 13.25.    *Submission to Jurisdiction; Waiver of Jury Trial.*   The Borrowers and Guarantors hereby submit to the nonexclusive jurisdiction of the United States District Court for the Northern District of Illinois and of any Illinois State court sitting in the City of Chicago for purposes of all legal proceedings arising out of or relating to this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby. The Borrowers and Guarantors irrevocably waive, to the fullest extent permitted by law, any objection which they may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum. THE BORROWERS, THE GUARANTORS, THE DIP AGENT, AND THE DIP LENDERS HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

Section 13.26.    *Disclosure.*   Each of the DIP Agent and the DIP Lenders may discuss the Borrowers' business and financial condition of the Borrowers and its Subsidiaries with each other, the Pre-Petition Lenders and the Pre-Petition Agent.

Section 13.27.    *No Modification; No Discharge; Survival of Claims.*   This Agreement, the credit extended hereunder, and the Loan Documents shall not be modified, altered or affected in any manner by any plan of reorganization or any order of confirmation for any Debtor of any other financing or extensions or incurring of indebtedness by any Debtor pursuant to Section 364(c) of the Bankruptcy Code. Without limiting the generality of the foregoing, each Borrower and Guarantor agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization (and each Borrower and Guarantor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the DIP Agent and the DIP Lenders pursuant to the Financing Order and described in Section 6.25 hereof and the Liens granted to the DIP Agent pursuant to this Agreement and the Financing Order and described in Section 4.1 hereof shall not be affected in any manner by the entry of an order confirming a plan of reorganization.

Section 13.28.    *Pre-Petition Loan Documents.*   Subject to the provisions of the Bankruptcy Code, the Pre-Petition Loan Documents shall remain in full force and effect, and the execution of this Agreement by the DIP Agent and the DIP Lenders, and the execution of the other Loan Documents by those of the Debtors party thereto, and the delivery to and acceptance thereof by

the DIP Agent and the DIP Lenders, do not and shall not constitute a waiver of any provision of the Pre-Petition Loan Documents.

Section 13.29. *Bankruptcy Code Waivers.* In consideration of the credit extended hereunder, to the extent not irreconcilably inconsistent with the provisions hereof or the Financing Order, each Borrower and Guarantor hereby agrees not to assert and affirmatively waives any claim it otherwise might have under Sections 105, 506(c) and 553(b) of the Bankruptcy Code.

Section 13.30. *Validation of Liens.* As provided in the Financing Order, each Borrower and each Guarantor approves and confirms the Pre-Petition Collateral, and acknowledges and agrees that the Pre-Petition Agent (for the benefit of itself and the Pre-Petition Lenders) holds valid and enforceable, non-avoidable, perfected and senior Liens in and to the collateral more particularly set forth in the Pre-Petition Security Documents and as summarized in the Interim Financing Order.

[SIGNATURE PAGES TO FOLLOW]

This Senior Secured, Super-Priority Post-Petition Credit Agreement is entered into between us for the uses and purposes hereinabove set forth as of the date first above written.

*"BORROWERS"*

INTERNATIONAL GARDEN PRODUCTS, INC., as debtor and debtor-in-possession
ISELI NURSERY, INC., as debtor and debtor-in-possession
WEEKS WHOLESALE ROSE GROWER, as debtor and debtor-in-possession

By _____
    Name _____
    Title _____

*"GUARANTORS"*

CALIFORNIA NURSERY SUPPLY, as debtor and debtor-in-possession

By _____
    Name _____
    Title _____

OLD SKAGIT, INC., as debtor and debtor-in-possession

By _____
    Name _____
    Title _____

*"DIP LENDERS"*

HARRIS N.A., in its individual capacity as a DIP
Lender and as DIP Agent


By _____
Name _____
Title _____

MFC CAPITAL FUNDING, INC.

By _____
    Name _____
    Title _____

U.S. Bank National Association

By _____
    Name _____
    Title _____

BANK OF THE WEST

By _____
    Name _____
    Title _____

[Date]

[Name of DIP Lender]
[Address]

Attention:

      Reference is made to the Senior Secured, Super-Priority Post-Petition Credit Agreement, dated as of October 4, 2010, among International Garden Products, Inc., Iseli Nursery, Inc., and Weeks Wholesale Rose Grower, each as debtor and debtor-in-possession, as Borrowers, the Guarantors party thereto, the DIP Lenders party thereto, and Harris N.A., as DIP Agent (the *"Credit Agreement"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Credit Agreement. [The Borrowers have failed to pay its Reimbursement Obligation in the amount of $_____. Your DIP Revolver Percentage of the unpaid Reimbursement Obligation is $_____] or [Harris N.A. has been required to return a payment by the Borrowers of a Reimbursement Obligation in the amount of $_____. Your DIP Revolver Percentage of the returned Reimbursement Obligation is $_____.]

Very truly yours,

HARRIS N.A., as DIP Agent


By _____
      Name _____
      Title _____

## DIP REVOLVING NOTE

U.S. $_____                                    October 4, 2010

FOR VALUE RECEIVED, the undersigned, International Garden Products, Inc., Iseli Nursery, Inc., and Weeks Wholesale Rose Grower, each as debtor and debtor-in-possession (collectively the *"Borrowers"* and each individually a *"Borrower"*), hereby jointly and severally promise to pay to the order of _____ (the *"DIP Lender"*) on the Termination Date of the hereinafter defined Credit Agreement, at the principal office of Harris N.A., as DIP Agent, in Chicago, Illinois (or such other office as the DIP Agent may designate in writing to the Borrowers), in immediately available funds, the principal sum of _____ Dollars ($_____) or, if less, the aggregate unpaid principal amount of all DIP Loans made by the DIP Lender to the Borrowers under its DIP Revolving Credit Commitment pursuant to the Credit Agreement, together with interest on the principal amount of each DIP Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Note is one of the Notes referred to in the Senior Secured, Super-Priority Post-Petition Credit Agreement dated as of October 4, 2010, among the Borrowers, the Guarantors party thereto, the DIP Lenders party thereto, and Harris N.A., as DIP Agent for the DIP Lenders (the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

The Borrowers hereby waive demand, presentment, protest or notice of any kind hereunder.

<div style="margin-left:40%">

INTERNATIONAL GARDEN PRODUCTS, INC., as debtor and debtor-in-possession
ISELI NURSERY, INC., as debtor and debtor-in-possession
WEEKS WHOLESALE ROSE GROWER, as debtor and debtor-in-possession

By _____
   Name _____
   Title _____

</div>

**EXHIBIT C**

**INTERNATIONAL GARDEN PRODUCTS, INC., ET AL.**

**BORROWING BASE CERTIFICATE**

To:     Harris N.A., as DIP Agent under, and
        the DIP Lenders party to, the Credit
        Agreement described below.

Pursuant to the terms of the Senior Secured, Super-Priority Post-Petition Credit Agreement dated as of October 4, 2010, among us (the *"Credit Agreement"*), we submit this Borrowing Base Certificate to you and certify that the information set forth below and on any attachments to this Certificate is true, correct and complete as of the date of this Certificate.

**SEE WORKSHEET ATTACHED**

Dated as of this _____ day of _____, _____.

INTERNATIONAL GARDEN PRODUCTS, INC. ,as
   debtor and debtor-in-possession
ISELI NURSERY, INC., as debtor and
   debtor-in-possession
WEEKS WHOLESALE ROSE GROWER, as debtor
and debtor-in-possession

By _____
   Name _____
   Title _____

**INTERNATIONAL GARDEN PRODUCTS, INC., ET AL.**

**COMPLIANCE CERTIFICATE**

To:   Harris N.A., as DIP Agent under, and
      the DIP Lenders party to, the Credit
      Agreement described below

      This Compliance Certificate is furnished to the DIP Agent and the DIP Lenders pursuant to that certain Senior Secured, Super-Priority Post-Petition Credit Agreement dated as of October 4, 2010, among us (the *"Credit Agreement"*). Unless otherwise defined herein, the terms used in this Compliance Certificate have the meanings ascribed thereto in the Credit Agreement.

      THE UNDERSIGNED HEREBY CERTIFIES THAT:

      1.   I am the duly elected _____ of International Garden Products, Inc. and each of the other Borrowers;

      2.   I have reviewed the terms of the Credit Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of the Borrowers and their Subsidiaries during the accounting period covered by the attached financial statements;

      3.   The examinations described in paragraph 2 did not disclose, and I have no knowledge of, the existence of any condition or the occurrence of any event which constitutes a Default or Event of Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Compliance Certificate, except as set forth below; and

      4.   The financial statements required by Section 8.5 of the Credit Agreement and being furnished to you concurrently with this Compliance Certificate are, to the best of my knowledge, true, correct and complete in all material respects as of the date and for the periods covered thereby.

      Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which the Borrowers have taken, are taking, or propose to take with respect to each such condition or event:

The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____, ___.

INTERNATIONAL GARDEN PRODUCTS, INC. , as
    debtor and debtor-in-possession
ISELI NURSERY, INC., as debtor and
    debtor-in-possession
WEEKS WHOLESALE ROSE GROWER, as debtor
and debtor-in-possession


By _____
    Name _____
    Title _____

## ADDITIONAL BORROWER SUPPLEMENT

_____, ____

HARRIS N.A., as DIP Agent for the DIP
Lenders named in the Senior Secured,
Super-Priority Post-Petition Credit
Agreement dated as of October 4, 2010,
among International Garden Products, Inc.,
Iseli Nursery, Inc., and Weeks Wholesale
Rose Grower, each as debtor and
debtor-in-possession, as Borrowers, the DIP
Lenders from time to time party thereto, and
the DIP Agent (the *"Credit Agreement"*)

Ladies and Gentlemen:

Reference is made to the Credit Agreement described above. Terms not defined herein
which are defined in the Credit Agreement shall have for the purposes hereof the meaning
provided therein. The undersigned, **[name of Subsidiary]**, a **[jurisdiction of incorporation or
organization]** hereby elects to be a *"Borrower"* for all purposes of the Credit Agreement,
effective from the date hereof. Without limiting the generality of the foregoing, the undersigned
hereby agrees to perform all the obligations of a Borrower under, and to be bound in all respects
by the terms of, the Credit Agreement and the other Loan Documents, including without
limitation Section 12 thereof, to the same extent and with the same force and effect as if the
undersigned were a signatory party thereto. The undersigned confirms that the representations
and warranties set forth in Section 6 of the Credit Agreement are true and correct as to the
undersigned as of the date hereof.

This Agreement shall be construed in accordance with and governed by the internal laws
of the State of Illinois.

Very truly yours,

[NAME OF SUBSIDIARY]

By _____
    Name _____
    Title _____

Acknowledged and agreed to as of the date first above written.

HARRIS N.A., as DIP Agent

By _____

    Name _____

    Title _____

## ASSIGNMENT AND ACCEPTANCE

Dated _____, ____

Reference is made to the Senior Secured, Super-Priority Post-Petition Credit Agreement dated as of October 4, 2010 (the *"Credit Agreement"*) among International Garden Products, Inc., Iseli Nursery, Inc., and Weeks Wholesale Rose Grower, each as debtor and debtor-in-possession, as Borrowers, the Guarantors party thereto, the DIP Lenders party thereto and Harris N.A., as DIP Agent for the DIP Lenders (the *"DIP Agent"*). Terms defined in the Credit Agreement are used herein with the same meaning.

_____ (the *"Assignor"*) and _____ (the *"Assignee"*) agree as follows:

1.      The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, a _____% interest in and to all of the Assignor's rights and obligations under the Credit Agreement as of the Effective Date (as defined below), including, without limitation, such percentage interest in the Assignor's DIP Revolving Credit Commitment as in effect on the Effective Date and the DIP Loans, if any, owing to the Assignor on the Effective Date and the Assignor's DIP Revolver Percentage of any outstanding L/C Obligations.

2.      The Assignor (i) represents and warrants that as of the date hereof (A) its DIP Revolving Credit Commitment is $_____, (B) the aggregate outstanding principal amount of DIP Loans made by it under the Credit Agreement that have not been repaid is $_____ and (C) the aggregate principal amount of Assignor's DIP Revolver Percentage of outstanding L/C Obligations is $_____; (ii) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim, lien, or encumbrance of any kind; (iii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document furnished pursuant thereto; and (iv) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrowers or their Subsidiaries or the performance or observance by the Borrowers or the Guarantors of any of their respective obligations under the Credit Agreement or any other instrument or document furnished pursuant thereto.

3.      The Assignee (i) confirms that it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered to the DIP Lenders pursuant to Section 8.5 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the DIP Agent, the Assignor or any other DIP Lender and based on such

documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iii) appoints and authorizes the DIP Agent to take such action as DIP Agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to the DIP Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a DIP Lender; and (v) specifies as its lending office (and address for notices) the offices set forth beneath its name on the signature pages hereof.

4. As consideration for the assignment and sale contemplated in Annex 1 hereof, the Assignee shall pay to the Assignor on the Effective Date in Federal funds an amount agreed upon between the Assignor and the Assignee. It is understood that commitment and/or letter of credit fees accrued to the Effective Date with respect to the interest assigned hereby are for the account of the Assignor and such fees accruing from and including the date hereof are for the account of the Assignee. Each of the Assignor and the Assignee hereby agrees that if it receives any amount under the Credit Agreement which is for the account of the other party hereto, it shall receive the same for the account of such other party to the extent of such other party's interest therein and shall promptly pay the same to such other party.

5. The effective date for this Assignment and Acceptance shall be _____, _____ (the *"Effective Assignment Date"*). Following the execution of this Assignment and Acceptance, it will be delivered to the DIP Agent for acceptance and recording by the DIP Agent.

6. Upon such acceptance and recording, as of the Effective Assignment Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a DIP Lender thereunder and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement.

7. Upon such acceptance and recording, from and after the Effective Assignment Date, the DIP Agent shall make all payments under the Credit Agreement in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and commitment fees with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement for periods prior to the Effective Assignment Date directly between themselves.

8.  This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of Illinois.

[ASSIGNOR DIP LENDER]

By _____
    Name _____
    Title _____

[ASSIGNEE DIP LENDER]

By _____
    Name _____
    Title _____

Lending office (and address for notices):

Accepted and consented to by the DIP Agent this _____ day of _____, _____

HARRIS N.A., as DIP Agent

By _____
    Name _____
    Title _____

# Exhibit G

# Interim Financing Order

# EXHIBIT H

# CASH MANAGEMENT ORDER

## EXHIBIT I

### PERMITTED ASSUMED EXECUTORY CONTRACTS

Settlement Agreement by and among L. Stan Neely (the "Trustee"), Geo. W. Park Seed Company, Inc., et al., consolidated entities in bankruptcy, San Joaquin Horticulture, LLC, Woolf Horticulture, LLC, and Weeks Wholesale Rose Grower.

Letter agreement between Cal Poly Pomona Foundation, Inc. and Weeks Wholesale Rose Grower for use of greenhouses and property for research and development activities.

Agriculture lease between Deutsche Bank National Trust Company, as Trustee of the Eugene Rene Leroy Trust and Weeks Wholesale Rose Grower.

Agriculture lease between John M. Rogers and Donna R. Rogers, as Trustees of the Rogers Family Trust and Weeks Wholesale Rose Grower.

Royalty licenses granting Weeks Wholesale Rose Grower the right to grow and sell patented roses between Weeks Wholesale Rose Grower and:


COMPANY:
CONARD-PYLE CO.
JACKSON & PERKINS CO.
SWANE'S NURSERY
DAVID AUSTIN ROSES
COINER NURSERY
KORDES/NEWFLORA
HARKNESS NEW ROSES
POULSEN ROSER APS
WARNER'S ROSES
MCGREDY ROSES INT'L
POTTSCHMIDT, JOHN
REMEMBER ME ROSES
STAR 2000 (NIRP INTERNATIONAL)
TAMU (SEQUOIA)
FRYER'S NURSERIES LTD
LOWE'S OWN ROOT ROSES
STRICKLAND, FRANK
ORARD ESTABLISHMENTS HORT
HEIRLOOM ROSES
BAILEY NURSERIES INC
EARMAN, EARNEST
MEREDITH CORP
WINCHEL (FRANKLIN & LUANNA)

ANGELICA NURSERIES INC
SPROUL, JAMES A
RADLER, WILLIAM J
MEYER, LAWRENCE E
DICKSON NURSERIES LTD
DYKSTRA MICHAEL
VERONA E WEEKS
GREENWOOD, CHRIS
NOR'EAST MINIATURE ROSES

Insurance agreements between the Company and:
Kaiser Permanente, Kaiser Foundation Health Plan of the Northwest
Kaiser Foundation Health Plan, Inc. and Kaiser Permanente Insurance Company
Oregon Dental Service
The Prudential Insurance Company of America
Navigators
ACE
Nationwide
Star Insurance Company
Liberty Northwest
Nationwide Agribusiness Insurance Co.
St. Paul Fire & Marine Insurance Co.
Endurance American Specialist Insurance Co.

Benefit provider agreements between the Company and:
Benefit Help Solutions, Inc.
Retirement Consulting Group, Inc.
Northwest Plan Services, Inc.
Wilmington Trust Retirement and Institutional Services Company

## SCHEDULE 1.1

## DIP REVOLVING CREDIT COMMITMENTS

| NAME OF DIP LENDER | DIP REVOLVING CREDIT COMMITMENTS |
|---|---|
| Harris N.A. | $2,733,050.83 |
| MFC Capital Funding, Inc. | $1,906,779.66 |
| U.S. Bank National Association | $1,906,779.66 |
| Bank of the West | $   953,389.85 |
| TOTAL | $7,500,000.00 |

## SCHEDULE 6.2

### SUBSIDIARIES

| NAME | JURISDICTION OF ORGANIZATION | PERCENTAGE OWNERSHIP | OWNER |
|---|---|---|---|
| Iseli Nursery, Inc. | Oregon | 100% | International Garden Products, Inc. |
| Weeks Wholesale Rose Grower | California | 100% | California Nursery Supply |
| California Nursery Supply | California | 100% | International Garden Products, Inc. |
| Old Skagit, Inc. | Delaware | 100% | International Garden Products, Inc. |

**SCHEDULE 6.11**

**LITIGATION**

1.    Vega v. Weeks Wholesale Rose Grower—wage and hour class action filed in February 2007

2.    Ashendene v. International Garden Products, Inc.—arbitration award and related judgments in connection with lease guaranty