## EXHIBIT D

[Stalking Horse Purchaser Agreement]

ASSET PURCHASE AGREEMENT

DATED AS OF APRIL 8, 2011

BY AND AMONG

INTERNATIONAL GARDEN PRODUCTS, INC.,

ISELI NURSERY, INC.,

WEEKS WHOLESALE ROSE GROWER,

CALIFORNIA NURSERY SUPPLY,

OLD SKAGIT, INC.

AND

IGP ACQUISITION LLC, A DELAWARE LIMITED LIABILITY COMPANY

# TABLE OF CONTENTS

**ARTICLE 1 DEFINITIONS** ..................................................................................................**1**

  1.1 <u>Definitions.</u> ....................................................................................................... 1
  1.2 <u>Other Definitions and Interpretive Matters</u> ................................................... 10

**ARTICLE 2 PURCHASE AND SALE; CLOSING** ...........................................................**11**

  2.1 <u>Purchase and Sale.</u> .......................................................................................... 11
  2.2 <u>Excluded Assets.</u> ............................................................................................. 11
  2.3 <u>Assumed Liabilities.</u> ...................................................................................... 12
  2.4 <u>Excluded Liabilities.</u> ...................................................................................... 13
  2.5 <u>Assignments; Cure Costs.</u> .............................................................................. 14
  2.6 <u>Further Assurances.</u> ........................................................................................ 14

**ARTICLE 3 PURCHASE PRICE** .....................................................................................**15**

  3.1 <u>Purchase Price.</u> ............................................................................................... 15
  3.2 <u>Deposit.</u> .......................................................................................................... 15
  3.3 <u>Estimated Net Cash Consideration.</u> ............................................................... 15
  3.4 <u>Closing Date Payments.</u> ................................................................................. 16
  3.5 <u>Post-Closing Adjustment.</u> .............................................................................. 16
  3.6 <u>Allocation of Purchase Price.</u> ........................................................................ 17

**ARTICLE 4 CLOSING** .....................................................................................................**18**

  4.1 <u>Closing Date.</u> .................................................................................................. 18
  4.2 <u>Payment on the Closing Date.</u> ........................................................................ 18
  4.3 <u>Buyer's Additional Deliveries.</u> ...................................................................... 18
  4.4 <u>Sellers' Deliveries.</u> ......................................................................................... 18

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLERS** .....................**19**

  5.1 <u>Organization and Good Standing.</u> .................................................................. 19
  5.2 <u>Authority; Validity; Consents.</u> ....................................................................... 20
  5.3 <u>No Conflict.</u> .................................................................................................... 20

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF BUYER** .......................**20**

  6.1 <u>Organization and Good Standing.</u> .................................................................. 20
  6.2 <u>Authority; Validity; Consents.</u> ....................................................................... 20
  6.3 <u>No Conflict.</u> .................................................................................................... 21
  6.4 <u>Brokers or Finders.</u> ........................................................................................ 21
  6.5 <u>Buyer's Acknowledgment.</u> ............................................................................. 21
  6.6 <u>Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same.</u> ......... 21
  6.7 <u>Financing/Availability of Funds.</u> ................................................................... 22
  6.8 <u>No Other Representations or Warranties of Sellers.</u> ...................................... 22

**ARTICLE 7 ACTION PRIOR TO THE CLOSING DATE** ................................................................**23**

| | | |
|---|---|---|
| 7.1 | Investigation of the Business By Buyer | 23 |
| 7.2 | Operations Prior to the Closing Date | 23 |
| 7.3 | Third Party Consents | 24 |
| 7.4 | Governmental Approvals | 24 |
| 7.5 | Representations and Warranties | 25 |
| 7.6 | Notice of Developments | 25 |
| 7.7 | Bankruptcy Court Approval | 25 |
| 7.8 | Bankruptcy Filings | 27 |
| 7.9 | Non-Solicitation and No Shop Period | 27 |

**ARTICLE 8 ADDITIONAL AGREEMENTS** ................................................................**27**

| | | |
|---|---|---|
| 8.1 | Taxes | 27 |
| 8.2 | Collection of Receivables | 28 |
| 8.3 | Name Change | 28 |
| 8.4 | Employee Matters | 28 |
| 8.5 | Post-Closing Cooperation and Access to Books and Records | 29 |
| 8.6 | Tax Returns | 30 |
| 8.7 | Exclusive Remedy | 30 |
| 8.8 | Insurance Contracts | 30 |
| 8.9 | Good Faith Efforts to Close by May 31, 2011; Disclosure | 30 |
| 8.10 | Potential UCC Payment | 30 |

**ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE** ............**31**

| | | |
|---|---|---|
| 9.1 | Accuracy of Representations | 31 |
| 9.2 | Sellers' Performance | 31 |
| 9.3 | No Order | 31 |
| 9.4 | Governmental Authorizations | 31 |
| 9.5 | Sellers' Deliveries | 32 |
| 9.6 | Bidding Procedures Order and Sale Order | 32 |
| 9.7 | No Dismissal or Conversion | 32 |
| 9.8 | Other | 32 |

**ARTICLE 10 CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE32**

| | | |
|---|---|---|
| 10.1 | Accuracy of Representations | 32 |
| 10.2 | Buyer's Performance | 32 |
| 10.3 | No Order | 32 |
| 10.4 | Governmental Authorizations | 33 |
| 10.5 | Buyer's Deliveries | 33 |
| 10.6 | Bidding Procedures Order and Sale Order | 33 |
| 10.7 | Cash Consideration | 33 |

**ARTICLE 11 TERMINATION** ................................................................**33**

| | | |
|---|---|---|
| 11.1 | Termination Events | 33 |
| 11.2 | Effect of Termination | 34 |

**ARTICLE 12 GENERAL PROVISIONS** ...........................................................................................**35**

12.1    Non-Survival of Representations and Warranties; Survival of Contracts. ............................... 35
12.2    Confidential Nature of Obligations. ....................................................................................... 35
12.3    Public Announcements. ........................................................................................................... 35
12.4    Notices. .................................................................................................................................... 36
12.5    Waiver. ..................................................................................................................................... 37
12.6    Entire Agreement; Amendment. ............................................................................................. 37
12.7    Assignment. ............................................................................................................................. 37
12.8    Severability. ............................................................................................................................. 37
12.9    Section Headings, Construction. ............................................................................................ 38
12.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver. ............................. 38
12.11   Counterparts. ........................................................................................................................... 38
12.12   Time of Essence. ..................................................................................................................... 39
12.13   No Third Party Beneficiaries. ................................................................................................ 39
12.14   Sellers' Disclosure Schedule. ................................................................................................ 39
12.15   Expenses. ................................................................................................................................. 39
12.16   Non-Recourse. ......................................................................................................................... 39

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement") is made as of April 8, 2011 (the "Effective Date") by and among **INTERNATIONAL GARDEN PRODUCTS, INC.**, a Delaware corporation ("IGP"), **ISELI NURSERY, INC.**, an Oregon corporation ("Iseli"), **WEEKS WHOLESALE ROSE GROWER**, a California corporation ("Weeks"), **CALIFORNIA NURSERY SUPPLY**, a California corporation ("CNS"), and **OLD SKAGIT, INC.**, a Delaware corporation ("OSI", and collectively with IGP, Iseli, Weeks and CNS, "Sellers"), and **IGP ACQUISITION LLC**, a Delaware limited liability company ("Buyer"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Article 1.

## RECITALS

**WHEREAS,** Sellers operate commercial nurseries throughout the United States, producing a variety of ornamental shrubs, color plants and container-grown plants for sale through premium independent garden centers, leading home centers and mass merchandisers (the "Business");

**WHEREAS,** on October 4, 2010, Sellers commenced the Bankruptcy Case in the Bankruptcy Court;

**WHEREAS,** Sellers desire to sell to Buyer all of the Acquired Assets, and Buyer desires to purchase from Sellers the Acquired Assets and assume the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

**WHEREAS,** the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Acquired Assets pursuant to Sections 363 and 365 of the Bankruptcy Code; and

**WHEREAS,** the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of an Order of the Bankruptcy Court, in form and substance acceptable to Sellers, under, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code, approving Sellers' entry into this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and intending to be legally bound, the Parties agree as follows.

## ARTICLE 1
## DEFINITIONS

1.1     Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Acquired Assets" has the meaning set forth in Section 2.1.

"Action" means any and all civil, criminal or administrative actions, lawsuits, arbitrations, investigations, proceedings, hearings, charges, complaints, citations, demands, assessments, audits, judgments and claims (including employment-related claims or audits by any taxing authority), regardless of whether a proceeding or lawsuit has been initiated, relating to or asserted by a Person.

"Adjustment Deposit" has the meaning set forth in Section 3.5(c).

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

"Agreement" has the meaning set forth in the introductory paragraph.

"Allocation Schedule(s)" has the meaning set forth in Section 3.6.

"Assigned Agreements" means the Contracts listed or described in Schedule 1.1 (Assigned Agreements) hereto, as the same may be supplemented pursuant to Section 2.5 (regarding Consent Pending Contracts), it being understood that the San Joaquin Horticulture Agreement shall be an Assigned Agreement.

"Assignment of Copyrights" has the meaning set forth in Section 4.4(c).

"Assignment of Domain Names" has the meaning set forth in Section 4.4(c).

"Assignment of Patents" has the meaning set forth in Section 4.4(c).

"Assignment of Trademarks" has the meaning set forth in Section 4.4(c).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Trade Payable Adjustment" means zero dollars less the book value (determined consistent with past practice) of all Trade Payables. This adjustment will decrease the Net Cash Consideration if Trade Payables are more than zero dollars.

"Assumed Transferred Employee Liability Adjustment" means $1,810,000 less the book value (determined consistent with past practice) of the Transferred Employee Liability. The resulting amount may only be a negative number and shall be deemed to be zero if the resulting amount is a positive number. This adjustment will decrease Net Cash Consideration if the Transferred Employee Liability is more than $1,810,000.

"Assumption Agreement" has the meaning set forth in Section 2.3.

"Auction" has the meaning set forth in Section 7.7(e).

"Avoidance Actions" means any and all claims for relief of Sellers or others entitled to bring said claims under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Case" means the voluntary cases commenced by Sellers under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court, case numbers 10-13207 through 10-13211, inclusive, for the purpose, in part, of consummating the sale transaction contemplated by this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 et. seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Benefit Plan" has the meaning set forth in Section 8.4(b).

"Bidding Procedures Hearing" has the meaning set forth in Section 7.7(e).

"Bidding Procedures Order" means an Order of the Bankruptcy Court in the form attached hereto as **Exhibit A**.

"Bill of Sale" means the Bill of Sale substantially in the form attached hereto as **Exhibit B**.

"Break-Up Fee" has the meaning set forth in Section 7.7(e).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day of the year on which national banking institutions in Chicago, Illinois are open to the public for conducting business and are not required or authorized to close.

"Buyer" has the meaning set forth in the introductory paragraph.

"Buyer Plan" has the meaning set forth in Section 8.4(b).

"Buyer Material Adverse Effect" means any fact, condition, change, violation, inaccuracy, circumstance, effect or event ("Effect"), individually or in the aggregate, that has, or is reasonably likely to have, a material adverse effect on Buyer and Guarantor, taken as a whole; *provided, however,* that "Buyer Material Adverse Effect" shall not include the following, nor shall any of the following be taken into account in determining whether there has been a Buyer Material Adverse Effect: (a) general business or economic conditions; (b) changes in GAAP; (c) acts or omissions of Buyer or Guarantor carried out (or omitted to be carried out) in accordance with this Agreement; (d) any Effect caused by events, changes or developments relating to the transactions contemplated by this Agreement or the announcement thereof; (e) compliance with the terms of, or the taking of any action required or contemplated by, this Agreement or any ancillary agreement, or the failure to take any action prohibited by this Agreement or any ancillary agreement; or (f) any actions taken, or failure to take action, in each case, to which IGP (in consultation with, and approval of, the Postpetition Agent and the Prepetition Agent) has in writing expressly approved, consented to or requested.

"Buyer's Disclosure Schedule" means the Disclosure Schedule attached hereto as **Exhibit C**, dated as of the date hereof, delivered by Buyer to Sellers in connection with this Agreement.

"Buyer Termination Notice" has the meaning set forth in Section 11.1(b)(i).

"Cash Consideration" means cash in the amount of $26,670,000.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" means the date and time as of which the Closing occurs as set forth in Section 4.1.

"Closing Date Payment" has the meaning set forth in Section 3.4.

"Closing Statement" has the meaning set forth in Section 3.5(a).

"Confidentiality Agreement" means the confidentiality agreement, dated as of January 27, 2011, between Guarantor, an affiliate of Buyer, and Sellers, as modified by the terms and conditions set forth in the e-mail exchange of February 20, 2011 between William Blair & Company, LLC and Buyer's attorneys, Kavinoky Cook LLP.

"Consent" means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with or notice to, any Governmental Authority or other Person.

"Consent Pending Contract" has the meaning set forth in Section 2.5(b).

"Contract" means any agreement, contract, obligation, understanding, or undertaking (whether written or oral) that is legally binding, including, but not limited to, Deeds, Intellectual Property, Leases and licenses.

"Contract Retention Period" has the meaning set forth in Section 2.5(c).

"Copyrights" means all United States and foreign copyrights and copyrightable subject matter, whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals and extensions of copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention and all associated Goodwill.

"Cure Costs" has the meaning set forth in Section 2.5(a).

"Deeds" means the quitclaim or substantively comparable form of deeds transferring title to the Owned Real Property to be delivered pursuant to Section 4.4(b).

"Deposit" means a deposit in the amount of ten percent (10%) of the Cash Consideration in good and immediately available funds paid by Buyer to Sellers to an account with the Postpetition Agent on or before one (1) Business Day following the date of filing of the Sale Motion with the Bankruptcy Court, which shall also constitute the deposit required pursuant to the Bidding Procedures Order.

"DIP Agreement" means that certain Senior Secured, Super-Priority Post-Petition Credit Agreement, dated as of October 4, 2010, among Sellers, as borrowers, the guarantors specified therein, Harris N.A., as administrative agent, and Harris N.A., MFC Capital Funding, Inc., U.S. Bank, National Association, and Bank of the West, each as lenders, as such may be amended.

"Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet. A Domain Name may or may not also be a Trademark.

"Effective Date" means the date as of which this Agreement was executed as set forth in the first sentence of this Agreement.

"Eligible Employees" has the meaning set forth in Section 8.4(a).

"Encumbrance" means any charge, lien, claim, mortgage, lease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Equipment" means all furniture, equipment, computers, machinery, apparatus, appliances, implements, spare parts, supplies and all other tangible personal property of every kind and description owned by Sellers.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning set forth in Section 3.5(c).

"Estimated Net Cash Consideration" has the meaning set forth in Section 3.3.

"Excess" has the meaning set forth in Section 3.5(b).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Bank Accounts" has the meaning set forth in Section 2.2(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which order (or any revision, modification or amendment thereof) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

"GAAP" means United States generally accepted accounting principles as consistently and historically applied by Sellers.

"Governmental Authority" means any United States federal, state or local, Canadian federal, provincial or local, or any foreign government, governmental authority, regulatory or administrative authority or any court, tribunal or judicial body having jurisdiction, or any quasi-governmental or private body exercising any regulatory, governmental or quasi-governmental authority, or any Self-Regulatory Organization.

"Governmental Authorization" means any approval, consent, license, permit, waiver, or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Goodwill" means any and all goodwill of any or all of Sellers attributable to any of the Acquired Assets or the Business.

"Guaranty" means the Guaranty of Guarantor substantially in the form attached hereto as **Exhibit D**.

"Guarantor" means Gardens Alive, Inc., a Delaware corporation owned by Niles Kinerk.

"Intellectual Property" means all intellectual property rights of any kind owned, used or licensed (as licensor or licensee) by Sellers, including all Software, Copyrights, Patents, Trademarks, Trade Secrets, Domain Names, all rights to privacy and proprietary rights to personal information, and all rights and remedies related thereto (including the right to sue for and recover damages, profits and any other remedy in connection therewith) for past, present or future infringement, misappropriation or other violation relating to any of the foregoing and all associated Goodwill.

"Inventory Accounts Receivable Adjustment" means (a) the book value (determined consistent with past practice) of all inventory and accounts receivable of Sellers as of the Closing Date included in the Acquired Assets, net of reserves (determined consistent with past practice) on the books of Sellers as of the Closing Date, less (b) $43,000,000. The resulting amount may be a positive or negative number. If the resulting amount is a positive number, in no event shall such resulting amount be greater than

$1,000,000. This adjustment will increase the Net Cash Consideration if the book value of inventory and receivables, net of reserves (determined consistent with past practice), is more than $43,000,000 (but such increase will be capped at $1,000,000), and will decrease Net Cash Consideration if such amounts are less than $43,000,000. In connection with the Inventory Accounts Receivable Adjustment, for purposes of this Agreement (including, without limitation, Section 3.5 hereof), (a) Buyer acknowledges and agrees that Sellers current reserves for inventory are adequate and (b) no further negative adjustments for Sellers inventory reserves shall be made or required to be made.

"IRC" means the Internal Revenue Code of 1986, as amended, and regulations issued by the IRS pursuant to the Internal Revenue Code.

"IRS" means the Internal Revenue Service of the United States.

"KEIP Motion" has the meaning set forth in Section 8.10.

"Leased Real Property" means all real property which is the subject of a Lease.

"Leases" refer collectively to the leases and other occupancy agreements described on Section 1.1 (Leases) of Sellers' Disclosure Schedule, pursuant to which Sellers occupy real property used in connection with the operation of the Business.

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Liability" means all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"Net Cash Consideration" means the Cash Consideration plus (a) the Assumed Trade Payables Adjustment (which may only be a negative number) plus (b) the Inventory Accounts Receivable Adjustment (which may be a positive or negative number) plus (c) the Assumed Transferred Employee Liability Adjustment (which may only be a negative number).

"Order" means any award, writ, injunction, judgment, order, ruling, directive, stipulation, determination or decree entered, issued, made, or rendered by or with any Governmental Authority.

"Owned Real Property" refers collectively to the real property owned by one or more Sellers and described on Section 1.1 (Owned Real Property) of Sellers' Disclosure Schedule.

"Party" or "Parties" means, individually or collectively, Buyer and Sellers.

"Patents" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, inventions (whether or not patentable or reduced to practice) or improvements thereto.

"Payment Account" has the meaning set forth in Section 3.4.

"Permits" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances and orders of any Governmental Authority which

are necessary for Sellers to own, lease and operate their properties and assets or to carry on the Business in substantially the manner in which it is now being conducted.

"Permitted Encumbrances" means (i) statutory liens for current property Taxes and assessments (A) not yet due and payable or (B) being contested in good faith by appropriate proceedings for which adequate reserves have been made in accordance with GAAP, including liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Sellers, (ii) easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto, (iii) Encumbrances that constitute or secure Assumed Liabilities (including Encumbrances arising under the Assigned Agreements), (iv) Encumbrances, title exceptions or other imperfections of title caused by or resulting from the acts of Buyer or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (v) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Encumbrances arising in the ordinary course of business with respect to amounts not yet overdue or amounts being contested in good faith by appropriate Proceedings that do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto, (vi) local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect relating to the real property that do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto and (vii) the Encumbrances listed in Section 1.1 (Encumbrances) of the Sellers' Disclosure Schedule and approved by Buyer, which approval shall not be unreasonably withheld.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or other entity or Governmental Authority.

"Petition Date" means the date on which Sellers commenced the Bankruptcy Case.

"Potential UCC Payment" shall mean cash in an amount up to, and including, $250,000.

"Postpetition Agent" means Harris N.A., in its capacity as administrative agent for the Sellers' postpetition secured lenders under the DIP Agreement.

"Prepetition Agent" means Harris N.A., in its capacity as administrative agent for the Sellers' prepetition secured lenders.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Purchased Deposits" means all deposits (including customer deposits and security deposits for rent and electricity) and prepaid charges and expenses of Sellers.

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualifying Bid" has the meaning set forth in Section 7.7(e).

"Real Property" means the Owned Real Property and the Leased Real Property.

"Representative" means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, financial advisors and restructuring advisors.

"Requested Party" has the meaning set forth in Section 8.5(b).

"Sale Documents" has the meaning set forth in Section 8.10.

"Sale Order" means an order of the Bankruptcy Court pursuant to Sections 105, 363(b), 363(f) and 365(b) of the Bankruptcy Code, which order has not been stayed by a court of competent jurisdiction, authorizing and approving, inter alia, this Agreement and the transactions contemplated hereby, the sale of the Acquired Assets to the Buyer on the terms and conditions set forth herein free and clear of all Encumbrances to the extent provided under the Bankruptcy Code (within the meaning of Section 363(f) of the Bankruptcy Code), such that Buyer will not incur any liability as a successor to the Business or the Acquired Assets, the assumption and assignment of the Assigned Agreements to Buyer, and containing a finding that the transactions contemplated by the Agreement were undertaken by the Sellers and the Buyer at arms length, without collusion, and in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code and releasing all Actions that Sellers hold against Buyer, including causes of action that arise in favor of Sellers under the Bankruptcy Code, that accrue prior to the Closing, including those causes of action arising under Sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code, substantially in the form attached hereto as **Exhibit E** or otherwise in form and substance reasonably acceptable to the Sellers, the Buyer, and the Prepetition Agent and Postpetition Agent.

"Self-Regulatory Organization" means any securities exchange, futures exchange, contract market, any other exchange or corporation or similar self-regulatory body or organization applicable to a Party.

"Seller Material Adverse Effect" means any fact, condition, change, violation, inaccuracy, circumstance, effect or event ("Effect"), individually or in the aggregate, that has, or is reasonably likely to have, a material adverse effect on the Acquired Assets or the Business (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole; *provided, however*, that "Seller Material Adverse Effect" shall not include the following, nor shall any of the following be taken into account in determining whether there has been a Seller Material Adverse Effect: (a) general business or economic conditions; (b) changes in GAAP; (c) acts or omissions of any Seller carried out (or omitted to be carried out) in accordance with this Agreement; (d) any Effect caused by events, changes or developments relating to the transactions contemplated by this Agreement or the announcement thereof; (e) any condition arising by reason of commencement of the Bankruptcy Case or Sellers operating as debtors in possession thereunder if in accordance with applicable law and consistent with performance of Sellers' obligations under this Agreement; (f) compliance with the terms of, or the taking of any action required or contemplated by, this Agreement or any ancillary agreement, or the failure to take any action prohibited by this Agreement or any ancillary agreement; or (g) any actions taken, or failure to take action, in each case, to which the Buyer has in writing expressly approved, consented to or requested.

"Sellers" has the meaning set forth in the introductory paragraph.

"Sellers' Disclosure Schedule" means the Sellers' Disclosure Schedule attached hereto as **Exhibit K**.

"Sellers' Knowledge" means the actual knowledge of James H. Hulbert, III and James Holding.

"Sellers' Termination Notice" has the meaning set forth in Section 11.1(c)(i).

"Shortfall" has the meaning set forth in Section 3.5(b).

"Software" means all computer software programs (whether in source code, object code or other form) and software systems owned, licensed, or used by Sellers, including all databases, compilations, tool sets, compilers, "proprietary" languages, related documentation, technical manuals and materials, and any license to use or other rights related to the foregoing.

"Standstill Period" means the period of time starting on the date of this Agreement and continuing until such time as the Bankruptcy Court designates the Buyer or some other buyer as the "stalking horse bidder", or this Agreement is terminated pursuant to Section 11.1

"Subsidiaries" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors, or similar managing body.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the IRC), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any transferee liability in respect of any items described in clause (i) above.

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment, or collection of any Tax or the administration of any laws, regulations, or administrative requirements relating to any Tax.

"Third Party Consents" means the consents, approvals and waivers set forth in Section 1.4 of the Sellers' Disclosure Schedule.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names (including all assumed or fictitious names under which the Business is conducted), and any other indicia of source of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all Goodwill related to or symbolized by the foregoing.

"Trade Payables" means all Liabilities of Sellers consisting of trade obligations of Sellers arising in the ordinary course of the Business incurred on or after the Petition Date and existing as of immediately prior to the Closing, as well as all obligations to customers of Sellers incurred on or after the Petition Date for refunds, rebates, returns, discounts and the like existing as of the Closing Date.

"Trade Secrets" means confidential information and trade secrets.

"Transaction Documents" means this Agreement and any other agreements, instruments, or documents entered into pursuant to this Agreement.

"Transfer" has the meaning set forth in Section 2.5(b).

"Transferred Employees" has the meaning set forth in Section 8.4(a).

"Transferred Employee Liability" means all Liabilities of Sellers with respect to accrued payroll (including accrued payroll Taxes), accrued bonus, accrued commission pay, accrued vacation pay, severance and accrued holiday pay of Sellers' officers and employees as of the Closing Date who become Transferred Employees.

"Transfer Taxes" has the meaning set forth in Section 8.1(b).

"San Joaquin Horticulture Agreement" means that certain agreement, dated November 2010, between Weeks Wholesale Rose Grower and San Joaquin Horticulture LLC.

1.2     Other Definitions and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. If any Schedule or Exhibit is incomplete on the date hereof, Buyer and Sellers shall use their respective best efforts to complete such incomplete Schedule or Exhibit prior to April 15, 2011 but in any event such incomplete Schedule or Exhibit shall be completed prior to the Auction, it being understood that the content of all Schedules and Exhibits shall be approved by Sellers and Buyer, and provided further, that the list of Assigned Agreements may be amended until the Closing Date, upon mutual agreement of Sellers and Buyer.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Schedule," "Section" or "Article" are to the corresponding Schedule, Section or Article, respectively, of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    No Strict Construction.  The Parties participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
### PURCHASE AND SALE; CLOSING

2.1    Purchase and Sale.

Upon the terms and subject to the conditions of this Agreement, at Closing, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase and acquire, free and clear of all Encumbrances (other than Permitted Encumbrances) to the extent provided under the Bankruptcy Code, all right, title and interest of Sellers in, to or under all of the properties and assets of Sellers (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business, all associated Goodwill, the Business as a going concern and copies of Excluded Assets described in Section 2.2(c), (h) and (i), but in all cases, only to the extent the same are transferable or assignable by Sellers (herein collectively called the "Acquired Assets").

2.2    Excluded Assets.

Notwithstanding anything in Section 2.1 to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to Buyer, and Sellers shall retain all of their respective rights, title and interests in, to and under, and Buyer shall have no rights with respect to, any of the following (collectively, the "Excluded Assets"):

(a)    all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits;

(b)    all bank accounts of Sellers set forth on Section 2.2(b) of the Sellers' Disclosure Schedule (collectively, the "Excluded Bank Accounts");

(c)    all insurance policies or rights to proceeds thereof, including any tail insurance policies that provide coverage to Sellers or their respective Affiliates or Representatives after the Closing, or which relate to or cover Liabilities that are not among the Assumed Liabilities (as defined below);

(d)    all rights, claims or causes of action of Sellers or others entitled to bring such claims against third parties arising out of events occurring prior to the Closing Date, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers and all rights, claims and causes of action of Sellers or others entitled to bring such claims against former officers, directors, employees, members, principals, agents, and representatives of any Seller, but excluding (i) Avoidance Actions and (ii) such rights, claims and causes of action arising out of the Assigned Agreements;

(e)    all Tax refunds and rebates, credits and similar items relating to or arising out of the operation of the Business and to any period, or portion of any period, on or prior to the Closing Date;

(f)  the Purchase Price delivered (or required to be delivered) to Sellers pursuant to this Agreement;

(g)  any shares of capital stock or other equity interests of any of the Sellers or any of the Sellers' Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any of the Sellers or any of the Sellers' Subsidiaries;

(h)  all minute books, stock ledgers, corporate seals and stock certificates of Sellers or any of the Sellers' Subsidiaries;

(i)  any Contract that is not an Assigned Agreement, and all rights under any such Contract that is not an Assigned Agreement, *provided, however,* that at any time that is at least one (1) Business Day prior to the Closing, Buyer, in its discretion, by written notice to Sellers, may include as an Assigned Agreement any Contract or Contracts, and, in such circumstances, such Contract or Contracts shall not constitute Excluded Assets (and shall constitute Acquired Assets), and Buyer shall acquire rights and assume any Liabilities with respect thereto pursuant to Section 2.3 and Section 2.5 hereof, *provided further,* that if Sellers have moved for the assumption of any such Contracts at the request of the Buyer and an order relating to the assumption has been granted by the Bankruptcy Court, Buyer shall have the obligations under Section 2.3 and Section 2.5 hereof as if such Contracts were an Assigned Agreement and be liable for all Cure Costs that may be due.  Upon Buyer's reasonable request, Sellers shall provide additional information as to the Liabilities under the Contracts sufficient for Buyer to make an informed assessment whether to accept an assignment and assumption of such Contracts;

(j)  any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document;

(k)  all Purchased Deposits paid in connection with, or relating primarily to, any Excluded Asset or Excluded Liability;

(l)  any property or asset of any kind (whether tangible, intangible or otherwise) held or used by any Seller pursuant to any Contract which is not among the Assigned Agreements transferred to Buyer; and

(m)  any right, property or asset that is listed or described in Section 2.2(m) of the Sellers' Disclosure Schedule.

2.3  Assumed Liabilities.

Upon the terms and subject to the conditions of this Agreement, at Closing, Buyer shall execute and deliver to Sellers the Assumption Agreement attached hereto as **Exhibit F** (the "Assumption Agreement") pursuant to which Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (collectively the "Assumed Liabilities") and no others:

(a)  Acquired Assets.  All Liabilities arising after the Closing Date with respect to the Acquired Assets or the operation of the Business following the Closing.

(b)  Assigned Agreements.  All Liabilities of Sellers under the Assigned Agreements.

(c)  Assumed Trade Payables.  All Trade Payables.

(d)     Cure Costs.  All Cure Costs.

(e)     Transferred Employees.  All Transferred Employee Liability, *provided, however,* that Buyer shall not be obligated to pay any severance pay or stay bonus to any particular Transferred Employee unless such Transferred Employee is terminated by Buyer under circumstances that the severance or stay bonus would have been payable by Sellers had the Transferred Employee been terminated by Sellers.

(f)     All Transfer Taxes.  All Transfer Taxes.

(g)     Other Liabilities.  All Liabilities set forth in Section 2.3(g) of the Sellers' Disclosure Schedule, subject to the prior approval of Buyer, not to be unreasonably withheld.

2.4     Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Sellers, and Sellers shall be responsible for the payment, satisfaction or discharge in any manner of all Liabilities of Sellers, other than the Assumed Liabilities (collectively the "Excluded Liabilities").  For the avoidance of doubt, the Excluded Liabilities include, but are not limited to, the following:

(a)     other than as specifically set forth herein, including in Section 2.3(g), any Liability of Sellers or their directors, officers, stockholders or agents (acting in such capacities), arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including (except as otherwise specifically set forth herein) all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of Sellers;

(b)     other than as specifically set forth herein, any Liability relating to events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(c)     other than as specifically set forth herein, any Liability to any Person at any time employed by Sellers at any time or to any such Person's spouse, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by Sellers, whenever such claims mature or are asserted, including (except as otherwise specifically set forth herein), all Liabilities arising (i) under the Benefit Plans, (ii) under any employment, wage and hour restriction, equal opportunity, discrimination, plant closing or immigration and naturalization laws, (iii) under any collective bargaining laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(d)     any pension or retirement Liability of Sellers to its current or former employees which are accrued as of the Closing Date, whether or not under any Benefit Plan;

(e)     other than as specifically set forth herein, any Liability for Taxes attributable to periods prior to the Closing Date;

(f)     any Liability incurred by Sellers or its respective directors, officers, stockholders, agents or employees (acting in such capacities) after the Closing Date; and

(g)     any Liability relating to or arising out of the ownership or operation of an Excluded Asset.

2.5     Assignments; Cure Costs.

(a)     Sellers shall assume and assign all Assigned Agreements to Buyer as of the Closing Date pursuant to Section 365 of the Bankruptcy Code and the Sale Order. In connection with such assumption and assignment or any assignment and assumption pursuant to Section 2.5(c), Buyer shall cure all monetary defaults under such Assigned Agreements to the extent required by Section 365(b) of the Bankruptcy Code (such amounts, the "Cure Costs").

(b)     To the extent that any Contract to be sold, transferred, conveyed or assigned (any sale, transfer, conveyance or assignment, a "Transfer") to Buyer pursuant to the terms of Section 2.1 is not capable of being Transferred to Buyer (after giving effect to the Sale Order) without the Consent of a third Person (each such Contract, a "Consent Pending Contract"), or if such Transfer or attempted Transfer would, or if the subsequent Transfer or attempted Transfer of the equity interests of Buyer would, constitute a breach thereof or a violation of any Legal Requirement, nothing in this Agreement or in any document, agreement or instrument delivered pursuant to this Agreement will constitute a Transfer or an attempted Transfer thereof prior to the time at which all Consents necessary for such Transfer will have been obtained unless an Order of the Bankruptcy Court effects such Transfer without Consent.

(c)     Sellers shall hold and not reject pursuant to Section 365 of the Bankruptcy Code any Consent Pending Contracts for a period of thirty (30) days following the Closing Date (the "Contract Retention Period") and otherwise after receiving further written notice(s) (each, an "Assumption Notice") from Buyer during the Contract Retention Period requesting assumption and assignment of any Consent Pending Contract, Sellers shall, subject to Buyer's demonstrating adequate assurance of future performance thereunder (if applicable), take all actions reasonably necessary to seek to assume and assign to Buyer pursuant to Section 365 of the Bankruptcy Code any Contract(s) set forth in an Assumption Notice, and any applicable Cure Cost shall be satisfied in accordance with Section 2.5(a) hereof. Sellers agree and acknowledge that the covenant set forth in this Section 2.5(c) shall survive the Closing; provided, that, with respect to any Consent Pending Contract, Buyer shall compensate Sellers for reasonable third party Liabilities for the continuation of such Consent Pending Contracts during the Contract Retention Period up to and including the date which is ten (10) days following Sellers' receipt of written notice from Buyer authorizing rejection of the same, it being understood and agreed that Sellers' obligation to assume and assign any Consent Pending Contract shall be conditioned upon Buyer's payment of such amounts and that Buyer's covenant to pay such amounts shall survive the Closing until the later of (x) the termination of the Contract Retention Period and (y) payment in full by Buyer to Sellers of such amounts required to be paid prior to such termination. Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to Buyer pursuant to this Section 2.5(c), such Contract shall be deemed an Assigned Agreement. Sellers shall have the right at any time following the expiration of the Contract Retention Period to reject any Consent Pending Contracts pursuant to section 365 of the Bankruptcy Code.

2.6     Further Assurances.

At the Closing, and at all times thereafter as may be necessary, Sellers shall for no additional consideration execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary or appropriate to vest in Buyer good and indefeasible title, to the extent transferable or

assignable, to the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) to the extent provided in the Sale Order and to comply with the purposes and intent of this Agreement and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment by Sellers and assumption by Buyer of the Assigned Agreements, and each of the parties hereto shall use its reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and execute and deliver such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement. For the avoidance of doubt, nothing herein shall be deemed to obligate Buyer or Sellers to execute any documents or papers which would require such party to make or incur any monetary obligation not imposed on such party pursuant to the other provisions of this Agreement or otherwise expand in any material respect such party's obligations beyond those imposed upon it/them pursuant to the other provisions hereof.

## ARTICLE 3
### PURCHASE PRICE

3.1 <u>Purchase Price</u>.

The purchase price (the "<u>Purchase Price</u>") for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets shall consist of:

        (i)     cash sufficient to pay the Net Cash Consideration; and

        (ii)    cash sufficient to pay, if applicable pursuant to <u>Section 8.10</u>, the Potential UCC Payment; and

        (iii)   the assumption of the Assumed Liabilities, together with assurance of payment of the Assumed Liabilities, in a manner and in form and content reasonably satisfactory to Sellers.

3.2 <u>Deposit</u>.

Sellers shall hold the Deposit in a segregated, interest bearing account with interest to accrue thereon for the benefit of Buyer, or for the benefit of Sellers in the event of the termination of this Agreement by Sellers pursuant to <u>Section 11.1(c)(i)</u>. Sellers will be entitled to retain the Deposit and interest accrued thereon upon Closing or in the event of the termination of this Agreement by Sellers pursuant to <u>Section 11.1(c)(i)</u>. Subject to the preceding sentence, Buyer shall be entitled to a return of the Deposit and interest accrued thereon to the extent provided in <u>Section 11.2(c)</u>.

3.3 <u>Estimated Net Cash Consideration</u>.

Starting as soon as the Effective Date, but in any event not less than five (5) Business Days prior to the anticipated Closing Date, Seller shall provide Buyer with a schedule setting forth the estimated Assumed Trade Payable Adjustment, the estimated Assumed Transferred Employee Liability Adjustment, the estimated Inventory Accounts Receivable Adjustment and the estimated Net Cash Consideration, and Buyer shall verify such estimates based on its continuing due diligence. Such estimates shall be determined and verified based on the books and records of Sellers maintained in accordance with past practices and used to provide financial data to all interested parties, including, but not limited to, the Bankruptcy Court and the Creditors Committee, as applied on a basis consistent with such past practices. Buyer shall as soon as reasonably practical notify Sellers in writing of any disagreement with such estimates, which notice will specifically identify items of disagreement and Buyer's position on these

items, and Sellers and Buyer shall cooperate in good faith with each other to resolve any disputes. On the Closing Date, Sellers and Buyer shall agree on the estimated Assumed Trade Payable Adjustment, the estimated Assumed Transferred Employee Liability Adjustment and the estimated Inventory Accounts Receivable Adjustment determined in accordance with the procedures set forth in this section, and the estimated Net Cash Consideration shall be determined based on such agreed estimates (the "Estimated Net Cash Consideration").

3.4     Closing Date Payments.

(a)     At the Closing, Buyer shall pay to Sellers the Estimated Net Cash Consideration, less (i) the Adjustment Deposit and (ii) the Deposit (plus interest accrued thereon), in good and immediately available funds (such amount, the "Closing Date Payment"). The Closing Date Payment shall be paid by wire transfer of immediately available funds to the Postpetition Agent at an account designated by it in writing to Buyer and Sellers not less than one (1) Business Day prior to the Closing Date (the "Payment Account").

(b)     If applicable pursuant to the terms of Section 8.10, at the Closing, Buyer shall pay the Potential UCC Payment in good and immediately available funds in accordance with the terms of Section 8.10.

(c)     At the Closing, Buyer shall pay the Adjustment Deposit to the Escrow Agent.

3.5     Post-Closing Adjustment.

(a)     Within thirty (30) days after the Closing Date, Buyer shall prepare and deliver to Sellers a statement (the "Closing Statement"), prepared in accordance with GAAP applied on a consistent basis with past practices and taking into account the same reserves as used in preparing projections for the Bankruptcy Court and the creditors committee, reflecting the Assumed Trade Payable Adjustment, the Assumed Transferred Employee Liability Adjustment, the Inventory Accounts Receivable Adjustment, the Net Cash Consideration, all as of the Closing Date, as well as a reconciliation of the foregoing to the estimates of such items pursuant to Section 3.3. Sellers' consultant, FTI Consulting, as well as the Postpetition Agent and the Prepetition Agent and their consultant, Alvarez & Marsal, shall be permitted to have all reasonable access to the books, records and work papers containing financial information of Buyer relevant to matters covered by the Closing Statement, until the Net Cash Consideration has finally been determined, to verify the accuracy and completeness thereof. The fees and expenses of Sellers' consultant shall be borne solely by Sellers, and the fees and expenses of Buyer's accountants and consultants shall be borne solely by Buyer. The Closing Statement shall be conclusive and binding upon Buyer and Sellers unless Sellers (or the Postpetition Agent or Prepetition Agent, as collateral assignees of Sellers' rights hereunder) object in writing to any item or items shown on the Closing Statement within twenty (20) days after delivery of the Closing Statement. Such writing shall assert that the Closing Statement is in error specifying in reasonable detail the amount in dispute and the basis for such dispute. If the parties do not agree within ten (10) days thereafter as to the amount in dispute, such amount or amounts shall be submitted to the Bankruptcy Court for resolution and final determination.

(b)     In the event that the Net Cash Consideration as finally determined in the manner provided herein (x) is less than the Estimated Net Cash Consideration (the amount by which such Net Cash Consideration is less than the Estimated Net Cash Consideration, the "Shortfall"), the Purchase Price shall be decreased, on a dollar-for-dollar basis, by an amount equal to the Shortfall, or (y) is greater than the Estimated Net Cash Consideration (the amount by which such Net Cash Consideration is greater than the Estimated Net Cash Consideration, the "Excess"), the Purchase Price shall be increased, on a dollar-for-dollar basis, by an amount equal to the Excess. Promptly after the final determination of Net

Cash Consideration pursuant to this Section 3.5(b), but in any event no more than five (5) Business Days after such determination, (x) Escrow Agent shall pay to Buyer, by wire transfer of immediately available funds to an account designated by Buyer, an amount equal to the Shortfall, if any, it being understood that the Adjustment Deposit shall be used first to satisfy such obligation (with any remaining balance promptly paid by the Escrow Agent by wire transfer of immediately available funds to the Payment Account), and if the Adjustment Deposit is insufficient to pay the Shortfall, Sellers shall pay to Buyer, in immediately available funds, the remainder of the Shortfall, if any, and (y) Buyer shall pay to Sellers, in immediately available funds, an amount equal to the Excess, if any (with the Adjustment Deposit promptly paid by the Escrow Agent by wire transfer of immediately available funds to the Payment Account).

(c)     At the Closing, Buyer shall deposit an amount equal to ten percent (10%) of the Estimated Net Cash Consideration (the "Adjustment Deposit") into escrow with an escrow holder reasonably satisfactory to Buyer and Sellers (and the Postpetition Agent and the Prepetition Agent) (the "Escrow Agent") and pursuant to an escrow agreement reasonably satisfactory to Buyer and Sellers (and the Postpetition Agent and the Prepetition Agent). Upon the final resolution of the adjustment contemplated by this Section 3.5(b) and payment in full of any amounts to which Sellers or Buyer may be entitled thereunder, any portion of the Adjustment Deposit not used or needed to pay a Shortfall shall promptly be paid by the Escrow Agent by wire transfer of immediately available funds to the Payment Account.

3.6     Allocation of Purchase Price.

Within one hundred eighty (180) days after the Closing, Buyer shall deliver to Sellers for Sellers' review and approval allocation schedule(s) (the "Allocation Schedule(s)") allocating the Purchase Price, including the Assumed Liabilities that are liabilities for federal income Tax purposes, among the Acquired Assets, *provided* that such allocation shall not be used to determine the allocation or distribution of proceeds to, or be binding upon, the Sellers' secured creditors. The Allocation Schedule(s) shall be reasonable and shall be prepared in accordance with Section 1060 of the IRC and the regulations thereunder. Sellers agree that, following their approval of the Allocation Schedule(s), such approval not to be unreasonably conditioned, delayed or withheld, Sellers shall sign the Allocation Schedule(s) and return an executed copy thereof to Buyer, it being understood and agreed that on or before the twentieth (20th) Business Day following their receipt of the Allocation Schedule(s) from Buyer as herein provided, Sellers shall either deliver an executed copy thereof to Buyer or, in the event that Sellers shall have objections to all or any portion of the Allocation Schedule(s), Sellers shall deliver to Buyer a written objection to such Allocation Schedule(s), which written objection shall set forth in reasonable detail the basis for the objections of Sellers thereto. In the event that Sellers shall deliver a written objection to the Allocation Schedule(s), Sellers and Buyer shall thereafter work in good faith to resolve any and all objections set forth therein, and upon the resolution of all such objections, Sellers and Buyer shall execute and deliver to the other Party or Parties a signed copy of such agreed upon Allocation Schedule(s). Buyer and Sellers will each file IRS Form 8594, and all Tax Returns, in accordance with the Allocation Schedule(s) that are agreed upon by the Parties pursuant to the terms of this Section 3.6. Buyer, on the one hand, and Sellers, on the other hand, each agrees to provide the other promptly with any other information required to complete Form 8594.

# ARTICLE 4
## CLOSING

4.1     Closing Date.

The consummation of the transactions contemplated by this Agreement, including the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Bryan Cave LLP in Chicago, Illinois at 10:00 a.m. local time, no later than the third Business Day following the date on which the conditions set forth in Article 9 and Article 10 have been satisfied or waived (other than those conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction of such conditions (or the waiver thereof by the Party entitled to waive such conditions)), or at such other place or time as Buyer and Sellers may mutually agree. The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date." The Closing shall be effective as of 12:01 a.m. on the Closing Date.

4.2     Payment on the Closing Date.

Subject to satisfaction or waiver (if permissible) of the conditions set forth in Article 9 and Article 10, at the Closing, Buyer shall pay to Sellers the Closing Date Payment by wire transfer of immediately available funds to the Payment Account in the United States specified not less than one (1) Business day prior to the Closing Date by the Postpetition Agent.

4.3     Buyer's Additional Deliveries.

At or prior to the Closing, Buyer shall deliver to Sellers:

(a)     a certificate of an authorized manager of Buyer, dated the Closing Date, in form and substance reasonably satisfactory to Sellers, as to (i) a copy of the resolutions of the board of managers of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and the other Transaction Documents to which it is a party and the performance by Buyer of its obligations hereunder and thereunder; and (ii) incumbency and signatures of the manager or officer of Buyer executing the Transaction Documents;

(b)     the Assumption Agreement and each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(c)     the Guaranty, duly executed by the Guarantor ;

(d)     the certificates required to be delivered pursuant to Sections 10.1 and 10.2; and

(e)     such other assignments, endorsements and other good and sufficient instruments of conveyance, assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request in order to consummate the transactions contemplated hereby.

4.4     Sellers' Deliveries.

At or prior to the Closing, Sellers shall deliver to Buyer:

(a)     a certificate of an authorized officer of each Seller, dated the Closing Date, in form and substance reasonably satisfactory to Buyer, as to (i) a copy of the resolutions of the board of directors of such Seller authorizing and approving such Seller's execution and delivery of this Agreement

and the other Transaction Documents to which it is a party and the performance by such Seller of its obligations hereunder and thereunder; and (ii) incumbency and signatures of the officer of such Seller executing the Transaction Documents;

(b) the Bill of Sale, Assumption Agreement, Deeds and each other Transaction Document to which any Seller is a party, duly executed each Seller a party thereto;

(c) instruments of assignment of the Patents (the "Assignment of Patents"), Trademarks (the "Assignment of Trademarks"), Copyrights (the "Assignment of Copyrights") and Domain Names (the "Assignment of Domain Names") that are owned by the relevant Sellers, transferable and assignable by Sellers, and included in the Acquired Assets, if any, duly executed by Sellers, in form for recordation with the appropriate Governmental Authorities, substantially in the form of **Exhibits G, H, I and J**, respectively, and any other assignments or instruments with respect to any Intellectual Property included in the Acquired Assets for which an assignment or instrument is required to assign, transfer and convey any and all interest of Sellers in such assets to Buyer, to the extent the same are transferable and assignable;

(d) a certified copy of the Sale Order;

(e) the certificates required to be delivered pursuant to Sections 9.1 and 9.2;

(f) certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code; and

(g) such other bills of sale, assignments, deeds, endorsements, and other good and sufficient instruments of conveyance, assumption and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request in order to consummate the transactions contemplated hereby.

## ARTICLE 5
### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the corresponding sections or subsections of the Sellers' Disclosure Schedule or in any update thereto pursuant to Section 7.5 (whether or not the representations and warranties in Article 5 expressly refer to such schedule), the Sellers hereby represent and warrant to Buyer as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

5.1 Organization and Good Standing.

Sellers have the full power and authority to own their property and carry on the nature of the Business. Each Seller is a corporation duly organized, validly existing and, except as a result of the commencement or continuance of the Bankruptcy Case, in good standing under the laws of their respective state of organization (Delaware for IGP; Oregon for Iseli; California for Weeks). Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their Business or the nature of their properties makes such qualification or licensing necessary, except where the failure to so qualify or be licensed or in good standing would not have a Material Adverse Effect.

5.2     Authority; Validity; Consents.

Sellers have, subject to requisite Bankruptcy Court approval, the requisite corporate power and authority necessary to enter into and perform their obligations under this Agreement and the other Transaction Documents to which they are party and to consummate the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approval, the execution, delivery and performance by Sellers of this Agreement and the other Transaction Documents to which they are party and the consummation of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate actions in respect thereof. Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents to which the Sellers are party constitute the legal, valid and binding obligations of Sellers enforceable against them in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to requisite Bankruptcy Court approval, except as set forth in Section 5.2 of the Sellers' Disclosure Schedule, Sellers are not required to give any notice to, make any filing with or obtain any consent, approval or authorization from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

5.3     No Conflict.

When the consents and other actions described in Section 5.2 of the Sellers' Disclosure Schedule have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Sellers under (a) any agreement, indenture, or other instrument to which any Seller is bound, (b) the articles of incorporation and bylaws of Sellers, (c) any Order, or (d) any Permit or Legal Requirement; in the case of the preceding clauses (a), (c) and (d), except for such breaches, defaults, conflicts or accelerations that would not have a Material Adverse Effect.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

6.1     Organization and Good Standing.

Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the full power and authority to own its property, carry on its business as now being conducted and as proposed to be conducted following the Closing, and to carry out the transactions contemplated hereby.

6.2     Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is party and the consummation of the transactions contemplated herein and therein have been duly and validly authorized by all necessary

limited liability company actions in respect thereof. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against it in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as set forth in Section 6.2 of the Buyer's Disclosure Schedule, Buyer is not required to give any notice to, make any filing with or obtain any consent, approval or authorization from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

6.3     No Conflict.

When the consents and other actions described in Section 6.2 of the Buyer's Disclosure Schedule have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the limited liability company agreement of Buyer, (c) any Order, or (d) any Permit or Legal Requirement; in the case of the preceding clauses (a), (c) and (d), except for such breaches, defaults, conflicts or accelerations that do not, and are not reasonably likely to, individually or in the aggregate, materially and adversely affect the ability of Buyer to carry out its obligations under this Agreement and the other Transaction Documents to which it is a party, and to consummate the transactions contemplated hereby.

6.4     Brokers or Finders.

Neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee, commission or similar payment to any broker, finder, investment banker, agent or intermediary in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which any Seller is or will become liable or which may encumber any Seller's assets or property, and Buyer shall indemnify and hold harmless Sellers from any claims with respect to any such fees, commissions or similar payments.

6.5     Buyer's Acknowledgment.

Buyer is not aware of any facts or circumstance, which (with or without notice or lapse of time or both) would cause any representations or warranties of any Seller to be untrue or incorrect in any respect.

6.6     Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same.

Buyer agrees, warrants, and represents that, except as set forth in this Agreement, (a) Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Buyer's own investigation of the Acquired Assets and (b) none of the Sellers nor any real estate broker, agent, officer, employee, servant, attorney, or representative of any Seller has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets or the Assumed Liabilities, any part of the Acquired Assets or the Assumed Liabilities, relating to the financial performance of the Acquired Assets or the Business, or the physical condition of the Acquired Assets. Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS." Buyer confirms that Sellers have made available to Buyer the opportunity to ask questions of the officers and

management of Sellers and to acquire additional information about the Business, the Acquired Assets and the Assumed Liabilities. Buyer agrees, warrants, and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon Buyer's own investigation of all such matters, and that Buyer assumes all risks with respect thereto. EXCEPT AS SET FORTH IN THIS AGREEMENT, NO SELLER MAKES ANY EXPRESS WARRANTY, ANY WARRANTY OF MERCHANTABILITY, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS.

6.7     Financing/Availability of Funds.

Guarantor has agreed to provide the financing for the transactions contemplated by this Agreement on the Closing Date as contemplated by this Agreement. There are no conditions precedent or other contingencies related to the funding of the full amount of the Purchase Price, other than there not having occurred a Buyer Material Adverse Effect or a Seller Material Adverse Effect. Buyer has no reason to believe that the financing will not be made available to Buyer on the Closing Date. Buyer will have at and after the Closing, funds sufficient to pay the Purchase Price and any other amounts required to be paid in connection with the consummation of the transactions contemplated hereby, and to pay all related fees and expenses.

6.8     No Other Representations or Warranties of Sellers.

(a)     Except for the representations and warranties contained in Article 5, Buyer acknowledges that no Seller nor any other Person on behalf of any Seller makes any other express or implied representation or warranty with respect to any Seller or the Business (including representations and warranties as to the condition of the Acquired Assets). No Seller nor any other Person will have or be subject to any liability or indemnification obligation to Buyer or any other Person resulting from the distribution to Buyer, or use by Buyer of, any such information, including any information, documents, projections, forecasts or other material made available to Buyer in certain "data rooms," confidential information memoranda or management presentations in expectation of the transactions contemplated by this Agreement.

(b)     In connection with investigation by Buyer, Buyer has received or may receive from Sellers certain projections, forward-looking statements and other forecasts and certain business plan information. Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that, except for the representations and warranties contained in Article 5 and subject to the terms and conditions hereof, Buyer shall have no claim against anyone with respect thereto. Accordingly, except for the representations and warranties contained in Article 5, Buyer acknowledges that no Seller makes any representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## ARTICLE 7
### ACTION PRIOR TO THE CLOSING DATE

7.1     <u>Investigation of the Business By Buyer</u>.

(a)     From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Sellers may be bound, upon reasonable notice, Sellers shall afford Buyer's authorized Representatives reasonable access during normal business hours to the offices, properties, key employees, outside accountants, agreements and other documentation and financial records (including computer files, retrieval programs and similar documentation) with respect to the Business, the Acquired Assets and the Assumed Liabilities to the extent Buyer reasonably deems necessary, and shall permit Buyer and its authorized Representatives to make copies of such materials at Buyer's sole expense. From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Sellers may be bound, Sellers shall furnish to Buyer or its authorized Representatives such additional information concerning the Acquired Assets, the Business and the Assumed Liabilities as shall be reasonably requested by Buyer or its authorized Representatives, including all such information as shall be reasonably necessary to enable Buyer or its authorized Representatives to (i) verify the accuracy of Sellers' representations and warranties contained in this Agreement, (ii) verify that Sellers have complied with the covenants contained in this Agreement, (iii) determine whether the conditions set forth in <u>Article 9</u> have been satisfied, and (iv) for the purpose of determining the Assumed Trade Payable Adjustment, the Assumed Transferred Employee Liability Adjustment and the Inventory Accounts Receivable Adjustment. From and after the date hereof until the Closing, Sellers shall use their commercially reasonable efforts to cause their outside accountants and outside counsel to cooperate with Buyer in such investigation. It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers in this Agreement. Notwithstanding anything to the contrary herein, no such investigation or examination shall be permitted, and no such documents or information shall be required to be provided or made available, to the extent that it would require Sellers to disclose documents or information subject to attorney-client privilege. For the avoidance of doubt, nothing in this Section 7.1 is intended to create a due diligence contingency in favor of Buyer.

(b)     From and after the date hereof until the Closing, as reasonably requested by Buyer from time to time, Sellers shall use commercially reasonable efforts to cooperate with Buyer in connection with arranging such meetings or telephone conferences with material suppliers and customers of the Business as may be necessary and appropriate for Buyer to conduct a comprehensive review of Sellers' relations with its customers and suppliers.

(c)     Buyer reserves the right to supplement and amend Schedule 1.1 (Assigned Agreements).

7.2     <u>Operations Prior to the Closing Date</u>.

Between the date hereof and the Closing, Sellers shall use commercially reasonable efforts to maintain the Acquired Assets and operate and carry on the Business only in the ordinary course consistent with past practice since the commencement of the Bankruptcy Case and taking into account Sellers' status as debtors in possession and subject to the availability of funding therefor, except as otherwise expressly provided in this Agreement or in any orders of the Bankruptcy Court. Between the date hereof and the Closing, consistent with and subject to the foregoing and to the extent permitted or required by the Bankruptcy Case, Sellers shall use commercially reasonable efforts to continue operating the Business as a going concern, and to maintain the business organization of the Business intact and to preserve the goodwill of the manufacturers, suppliers, contractors, licensors, employees, customers, distributors and

others having business relations with the Business. In connection therewith, between the date hereof and the Closing, no Seller shall, other than in the ordinary course of business, (i) offer employment for any period on or after the Closing Date to any employee or agent of the Business regarding whom Buyer makes offers of employment in accordance with the terms set forth herein or (ii) otherwise attempt to persuade any such employee or agent to terminate his or her relationship with the Business.

7.3     Third Party Consents.

Subject to Section 2.5(a), from and after the date hereof until the Closing, each of Sellers, on the one hand, and Buyer, on the other hand, will reasonably cooperate with the other to secure, before the Closing Date, all Third Party Consents to the extent such consents are not provided for, or the need for which are obviated or satisfied, by the Sale Order, *provided* that, subject to Section 2.5(a), neither Sellers nor Buyer shall have any obligation to offer or pay any consideration in order to obtain any such consents, approvals or waivers (in the case of Sellers, unless Buyer requests that Sellers make such a payment or provide such other consideration and Buyer agrees to pay Sellers or provide such other consideration in advance for such payment and any associated costs); *provided, however*, that neither Buyer nor Sellers shall be required to waive any of the conditions to Closing set forth in Article 9 or Article 10, respectively.

7.4     Governmental Approvals.

(a)     From and after the date hereof until the Closing Date, Sellers and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable Legal Requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any Governmental Authority required to be obtained by them under non-United States antitrust or competition laws, in order to assign or transfer any Permits to Buyer, to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in Article 9 and in Article 10, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order; *provided, however*, that neither Sellers, on the one hand, nor Buyer, on the other hand, shall make any agreement or understanding affecting the Acquired Assets or the Business (excluding the Excluded Assets or Excluded Liabilities) as a condition for obtaining any such consents or approvals except with the prior written consent of the other (which consent shall not be unreasonably withheld or delayed. Each of Sellers, on the one hand, and Buyer, on the other hand, shall act diligently and reasonably to cooperate with the other, to the extent commercially reasonable, to obtain the consents and approvals contemplated by this Section 7.4(a); *provided, however*, neither Sellers nor Buyer shall be required to waive any of the conditions to Closing set forth in Article 10 or Article 9, respectively.

(b)     Sellers and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each Party shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental

Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. Sellers and Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective commercially reasonable efforts to obtain the grant thereof by an Order as soon as possible.

7.5     Representations and Warranties.

Prior to the Closing, Sellers shall have the right to supplement, modify or update the Sellers' Disclosure Schedule. Notwithstanding anything to the contrary herein, Buyer shall not be entitled to claim that any representation or warranty of any Seller has been breached, and no Seller shall be liable to Buyer, on account of any fact, matter or circumstance of which Buyer was aware on or prior to the date hereof or of which Buyer becomes aware prior to its Closing. No supplement, modification or update of the Sellers' Disclosure Schedule pursuant to this Section 7.5 shall be taken into account for purposes of determining whether the conditions to consummation of the transactions contemplated hereby set forth in Article 9 have been satisfied.

7.6     Notice of Developments.

From and after the date hereof until the Closing, Sellers shall promptly notify Buyer, upon Sellers obtaining Knowledge, of (a) any change or development which would cause any of the representations and warranties in Article 5 above not to be true and correct in all material respects, or (b) any material failure of Sellers to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

7.7     Bankruptcy Court Approval.

(a)     Sellers and Buyer acknowledge that this Agreement and the sale of the Acquired Assets and the assumption and assignment of the Assigned Agreements are subject to Bankruptcy Court approval and the entry of the Sale Order. Sellers and Buyer acknowledge that to obtain approval of this Agreement and the Sale Order, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and best price possible for the Acquired Assets, including (i) giving notice of the transactions contemplated by this Agreement to creditors and other interested parties, (ii) subjecting the transaction contemplated by this Agreement to a process whereby interested parties may submit alternative offers to the Sellers for the Acquired Assets (or portions thereof) that may constitute higher and/or better offers in connection with the Bidding Procedures Order, and (iii) complying with any and all other provisions of the Bankruptcy Code and orders of the Bankruptcy Court relating to the sale of the Acquired Assets.

(b)     In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Sellers shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c)     From and after the date hereof until the Closing, so long as Buyer is not in breach of this Agreement, Sellers shall not take any action which is intended to result in, or fail to take any action

the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

(d)      Buyer acknowledges that it is Buyer's obligation to provide adequate assurance of future performance of the Assigned Agreements and Leases pursuant to Section 365(b) of the Bankruptcy Code and, notwithstanding anything to the contrary herein, that Sellers shall not be obligated to assume and assign any Assigned Agreement or Lease with respect to which Buyer fails to satisfy the Bankruptcy Court as to adequate assurance of future performance (collectively, if any, the "Non-Assured Contracts") and Buyer's obligation to close the transactions contemplated herein shall not be conditioned upon the transfer and assignment to Buyer of any such Non-Assured Contracts.

(e)      In connection with the sale of the Acquired Assets, the Sellers shall advertise to the public in a commercially reasonable manner as required by the Bankruptcy Code or as shall be directed by the Bankruptcy Court following a preliminary hearing on the Sale Motion (the "Bidding Procedures Hearing") and the entry of the Bidding Procedures Order. The Bidding Procedures Order shall be in the form attached hereto as **Exhibit A** or otherwise in form and substance reasonably satisfactory to the Sellers, the Buyer, the Prepetition Agent and the Postpetition Agent, and in any event it shall: (i) schedule the sale hearing; (ii) schedule an auction to be held in Delaware at an address designated by Sellers, which auction shall be held two (2) Business Days prior to the date of the sale hearing, or at such other date and time as the Sellers, the Buyer, the Prepetition Agent and the Postpetition Agent may otherwise agree (the "Auction"); (iii) require, as a precondition to participation in the Auction, the submission of a competing bid for some or all of the Acquired Assets no later than 5:00 p.m. Central Standard Time at least three (3) Business Days prior to the Auction (a "Qualifying Bid"); (iv) require any Qualifying Bid to be accompanied by (w) an earnest money deposit by wire transfer, certified or cashier's check, in the amount of the Deposit, to be held by Sellers, (x) an executed confidentiality agreement, (y) an executed asset purchase agreement substantially in the form of this Agreement, including the obligation, if applicable pursuant to the terms of Section 8.10, to make the Potential UCC Payment under the same terms as provided hereunder, along with a red-line marked against this Agreement, and (z) written evidence reasonably satisfactory to the Sellers, the Prepetition Agent and the Postpetition Agent in their mutual discretion of evidence of the party's ability to consummate the transaction and payment of the purchase price in cash at the Closing; (v) be a firm offer and not contain any contingencies to the validity, effectiveness or binding nature of the offer, including, without limitation, contingencies for financings, due diligence or inspection; notwithstanding the foregoing in this subparagraph (v), a bid may contain any contingencies contained herein; (vi) require that any Qualifying Bid be higher and better than the offer of the Buyer hereunder with Cash Consideration that is at least three hundred thousand dollars ($300,000) greater than the sum of (A) the Cash Consideration provided under this Agreement plus (B) the Break-Up Fee; (vii) require that any subsequent bid at the Auction be at least $100,000 greater than the preceding bid (it being understood that if a higher Qualifying Bid described in clause (vi) above is made, Buyer shall have the right to apply the Break-Up Fee as a credit against the Cash Consideration specified in any subsequent higher Qualifying Bid made by the Buyer); (viii) provide that the Buyer shall be entitled to a break-up fee in the amount of $800,000 (the "Break-Up Fee") in the event that the Bankruptcy Court fails to approve a sale to the Buyer as provided herein and instead approves a sale of the Acquired Assets to a Person that has submitted a Qualifying Bid or subsequent higher bid at the Auction and such sale closes; (ix) provide that the Break-Up Fee shall be entitled to administrative priority under Section 503(b) of the Bankruptcy Code; (x) sets a bar date for cure amounts for any Contracts or Leases, excluding the Consent Pending Contracts, to be assumed hereunder, which bar date shall be no later than the Closing Date; and (xi) reserve the Buyer's right to object to any bid being deemed a Qualifying Bid.

7.8    Bankruptcy Filings.

From and after the date hereof until the Closing Date, Sellers shall deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed in the Bankruptcy Cases at the time of their filing, but with respect to any such papers that Sellers may file that relates, in whole or in part, to this Agreement, or Buyer, its constituent members or its or their agents or representatives, Sellers shall use its reasonable efforts to provide such prior notice as may be reasonable under the circumstances before the filing of such papers.

7.9    Non-Solicitation and No Shop Period.

Each Seller agrees that during the Standstill Period, such Seller will not, and will cause its affiliates and their respective agents and representatives not to, directly or indirectly, (i) solicit, entertain or encourage inquiries or proposals, or enter into an agreement or negotiate with any other person or entity or to otherwise respond to inquiries regarding the Acquired Assets for the purpose of such person or entity becoming a  "stalking horse bidder" for the Acquired Assets, or (ii) recommend any other Person as a "stalking horse bidder."  Notwithstanding anything to the contrary in this Agreement, the terms of this Agreement may be publically disclosed to seek its approval pursuant to Section 7.7, and Sellers and their respective agents and representatives shall be free to provide due diligence information and to solicit, entertain and encourage inquiries and negotiations with other persons and entities interested in becoming Qualified Bidders at the Auction.


# ARTICLE 8
## ADDITIONAL AGREEMENTS

8.1    Taxes.

(a)    Except as specifically set forth herein (including Section 8.1(b)), Sellers shall be liable for and shall pay, and pursuant to Section 8.1(c) shall reimburse Buyer for, all Taxes (whether assessed or unassessed) applicable to the Business and the Acquired Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date.  Without limiting the obligations of Buyer contained elsewhere in this Agreement (including Section 8.1(b)), Buyer shall be liable for and shall pay, and pursuant to Section 8.1(c) shall reimburse the applicable Seller for, all Taxes (whether assessed or unassessed) applicable to the Business, the Acquired Assets and the Assumed Liabilities, in each case attributable to periods (or portions thereof) beginning after the Closing Date.  For purposes of this paragraph (a), any period beginning before and ending after the Closing Date shall be treated as two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)    Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code ("Transfer Taxes") shall be borne by Buyer.  Sellers and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Purchased Assets from any such Transfer Taxes.  Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by Sellers, Buyer shall prepare and deliver to Sellers a copy of such Tax Return at least ten (10) days before the due date thereof, and Sellers shall promptly execute such Tax Return and deliver it to Buyer, which shall cause it to be filed.

(c)     Sellers or Buyer, as the case may be, shall promptly provide reimbursement for any Tax paid by one Party all or a portion of which is the responsibility of the other Party in accordance with the terms of this Section 8.1. Within a reasonable time prior to the payment of any such Tax, the Party paying such Tax shall give notice to the other of the Tax payable and each Party's respective liability therefor, although failure to do so will not relieve the other Party from its liability hereunder.

8.2     Collection of Receivables.

If, after the Closing Date, Sellers shall receive payment from any account debtor with respect to any Assigned Agreement, Sellers shall promptly thereafter deliver such funds and assets to Buyer and take all steps necessary to vest title to such funds and/or assets in Buyer. Sellers shall provide Buyer with a written report on the status of such collections, if any, within ten (10) days after Buyer's written request, which request may not be sent more frequently than one time every ninety (90) days.

8.3     Name Change.

Within thirty (30) days after the Closing Date, Sellers shall take such corporate and other actions necessary to change their company names to ones that are not similar to, or confusing with, their current names, including any necessary filings required by the law of the state of their respective organization, and shall promptly thereafter provide Buyer with written evidence of such name changes.

8.4     Employee Matters.

(a)     Transferred Employees. Prior to the Closing, and except with respect to those employees listed in Schedule 8.4(a), which schedule shall not be subject to amendment or modification thereafter, Buyer shall offer employment to each of Sellers' employees who remain employed by Sellers immediately prior to the Closing (the "Eligible Employees"), and all such offers of employment shall be on substantially similar terms and at substantially the same annual rate of pay at which such employees were employed as of the Effective Date. Those employees who accept Buyer's offer of employment and commence working for Buyer on the Closing Date shall hereafter be referred to as "Transferred Employees." So long as offers of employment have been mailed or delivered to all Eligible Employees by Buyer prior to Closing, then Buyer shall be deemed to have satisfied its obligation to offer employment to the Eligible Employees prior to Closing. Notwithstanding anything to the contrary in this Agreement, if on or within ninety (90) days after the Closing Date Buyer desires to transfer all or part of the Acquired Assets to a third party, it shall be a condition precedent of such transfer that such third party shall make offers of employment to any Transferred Employees who are then in the employ of Buyer on substantially similar terms and at substantially the same annual rate of pay at which such employees were employed as of the Effective Date.

(b)     Credit Under Buyer Plans. Buyer will cause any employee benefit plans of Buyer (or any Affiliate thereof sponsoring or maintaining such plans) which the Transferred Employees are entitled to participate in from and after the Closing Date (the "Buyer Plans") to take into account for purposes of eligibility and vesting thereunder, service by the Transferred Employees with Sellers prior to the Closing as if such service were with Buyer, to the same extent such service was credited under a comparable employee benefit plan of Sellers ("Benefit Plan") prior to the Closing (except to the extent it would result in the duplication of benefits). In addition, with respect to each Buyer Plan that is a "welfare benefit plan" (as defined in Section 3(1) of ERISA), Buyer shall, or shall cause an Affiliate of Buyer sponsoring or maintaining such Buyer Plan, to (i) cause there to be waived any pre-existing condition, exclusions, actively at work requirements, unsuitability requirements or other eligibility limitations and (ii) give effect, in determining any deductible, co-insurance and maximum out-of-pocket limitations, to

claims incurred and amounts paid by, and amounts reimbursed to, the Transferred Employees and their dependents under a comparable Benefit Plan of Sellers prior to the Closing.

(c)     Employment Tax Reporting.  With respect to Transferred Employees, Buyer and Sellers shall use the standard procedure set forth in Revenue Procedure 2004-53m 2004-34 I.R.B. 320, for purposes of employment tax reporting.

(d)     No Obligation.  Other than as expressly set forth in this Agreement, nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee.  No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of Sellers or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including, without limitation, in respect of continued employment (or resumed employment) for any specified period.

8.5     Post-Closing Cooperation and Access to Books and Records.

For a period ending on the later of (i) the closing of the Bankruptcy Case and (ii) three (3) years after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim):

(a)     Buyer shall not dispose of or destroy any of the business records and files of the Business held by Buyer or any of its Subsidiaries and relating to the period preceding the Closing Date. If Buyer wishes to dispose of or destroy such records and files after that time, Buyer shall first give thirty (30) days' prior written notice to Sellers or any successor or designated bankruptcy estates representative, and Sellers or any successor or designated bankruptcy estates representative shall have the right, at their option and expense, upon prior written notice to the notifying party within such 30-day period, to take possession of the records and files within fifteen (15) days after the date of such notice.

(b)     Each Party (the "Requested Party") shall allow any other Party (including, for clarity, any trust established under a chapter 11 plan of Sellers or any other successors of Sellers) and any of their directors, officers, employees, counsel, representatives, accountants and auditors, at such other Party's sole cost and expense, reasonable access during normal business hours, and upon reasonable advance notice, to all employees (including the assistance of such employees as described below) and files of the Requested Party and any books and records and other materials included in the Acquired Assets relating to periods prior to the Closing Date in connection with (A) the wind-down of the operations of Sellers, whether or not relating to or arising out of this Agreement or the transactions contemplated hereby, including the preparation of tax returns, amended tax returns or claim for refund (and any materials necessary for the preparation of any of the foregoing), financial statements for periods ending on or prior to the Closing Date, the management and handling of any audit, investigation, litigation or other proceeding in, whether such audit, investigation, litigation or other proceeding is a matter with respect to which indemnification may be sought hereunder), and complying with the rules and regulations of the IRS, the Securities and Exchange Commission or any other Governmental Authority or otherwise relating to Sellers' other businesses or operations or such causes of action; (B) the prosecution, investigation or resolution of any pending or potential causes of action; (C) the resolution or reconciliation of claims filed against Sellers' bankruptcy estates; or (D) otherwise in connection with carrying out the functions of any such trusts or successors; *provided, however,* that Sellers, on the one hand, and Buyer, on the other hand, will be required to sign a non-disclosure agreement, if reasonably requested by Buyer or Sellers or any successor or designated bankruptcy estates representative, respectively, prior to Buyer or Sellers or any successor or designated bankruptcy estates representative's

provision of information to Sellers or any successor or designated bankruptcy estates representative or Buyer, respectively, that constitutes a Trade Secret, or is otherwise confidential or proprietary in nature.

(c)     Sellers and Buyer agree to cooperate in good faith to determine the post-closing adjustment contemplated in Section 3.5 and to remit, or cause the Escrow Agent to remit, the payments described in such section as soon as reasonably practical.

8.6     Tax Returns.

Buyer hereby covenants that it will reasonably cooperate and assist Sellers in the preparation and filing of all necessary Tax Returns of Sellers for 2010 and 2011 that are required to be filed following the Closing Date; *provided, however* that any costs and expenses with respect to the preparation and filing of any such Seller Tax Returns shall be borne by Sellers; *provided, further, however*, that, except as expressly set forth in this Agreement, Buyer shall have no liability with respect to Taxes payable in connection with such Seller Tax Returns, and Buyer shall have no liability with respect to such Seller Tax Returns other than in connection with the willful or intentional misconduct of Buyer.

8.7     Exclusive Remedy.

In the event that a Closing pursuant to this Agreement does not occur, Sellers acknowledge and agree that their sole and exclusive remedy against the Buyer with respect to any and all claims relating to the subject matter of this Agreement or the transactions contemplated hereby (except for fraud or intentional misrepresentation) shall be to retain the Deposit as liquidated damages. In the event a Closing pursuant to this Agreement occurs, the parties shall have the rights and remedies provided for under applicable law.

8.8     Insurance Contracts.

Notwithstanding anything to the contrary contained herein, with respect to Contracts for casualty insurance coverage, including property, fire, flood and other similar coverages that may be in effect with respect to the Acquired Assets, on or prior to Closing Buyer may choose to notify Sellers that it wishes such coverages extended beyond Closing for a period of up to thirty (30) days, in which case Sellers shall use good faith efforts to continue such coverages in place for such time period, if such continuance is permissible under the terms of such coverages, with Buyer responsible for all premium costs related thereto.

8.9     Good Faith Efforts to Close by May 31, 2011; Disclosure.

Subject to the terms and conditions of this Agreement, Sellers and Buyer agree that they will use their good faith efforts to close the transactions contemplated hereunder, or a sale to a Person who submits a Qualifying Bid in the Auction, by May 31, 2011. Promptly following approval of this Agreement by the Bankruptcy Court, Sellers will disclose to Buyer the identities of Persons who submitted offers to acquire the Acquired Assets as part of the process that resulted in Sellers executing this Agreement; provided, however, no such disclosure will be made if Sellers determine that such disclosure violates the terms of any confidentiality or non-disclosure agreement in effect.

8.10     Potential UCC Payment.

Sellers have sought the unconditional support from the Unsecured Creditors Committee to the Sale Motion, including the Agreement, Bidding Procedures Order and sale procedures contained therein (collectively, the "Sale Documents"), and for the withdrawal of its objection to the Motion to authorize

the Sellers to enter into a Key Employee Incentive Plan ("KEIP Motion"), which the Sellers believe is integral to a successful sale process. Buyers acknowledge and agree that Sellers may (but are not required to) offer the Potential UCC Payment to the unsecured creditors in consideration for such unconditional support of the Sale Documents, the withdrawal of any objections the unsecured creditors may have filed to the Sale Documents and the withdrawal of its objection to the KEIP Motion. If Sellers notify Buyer at or prior to the Bidding Procedures Hearing that they have secured such support, and provide Buyer with evidence thereof and the specific amount of the Potential UCC Payment, Buyer agrees to make the Potential UCC Payment at Closing to an account specified by the Unsecured Creditors Committee.

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived (but only in writing) by Buyer:

9.1     Accuracy of Representations.

All of the representations and warranties made by Sellers in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects as so qualified therein) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); provided, however, that in the event of a breach of a representation or warranty, other than a representation or warranty qualified by a Material Adverse Effect, the condition set forth in this Section 9.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect. Buyer shall have received a certificate signed by a duly authorized representative of each of the Sellers to such effect.

9.2     Sellers' Performance.

Each Seller shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by such Seller on or prior to the Closing Date, and Buyer shall have received a certificate signed by a duly authorized representative of each of the Sellers to such effect.

9.3     No Order.

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order or Legal Requirement which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

9.4     Governmental Authorizations.

All authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Authority which are necessary to consummate the transactions contemplated hereby shall have been filed, been obtained or occurred and such authorizations, consents, orders or approvals shall not have expired or been withdrawn.

9.5     Sellers' Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 4.4 shall have been so delivered.

9.6     Bidding Procedures Order and Sale Order.

The Bidding Procedures Order and Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay, modification, reversal or vacation, and the Sale Order shall remain in full force and effect as of the Closing.

9.7     No Dismissal or Conversion.

The Bankruptcy Cases shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

9.8     Other.

There has been no Buyer Material Adverse Effect or Seller Material Adverse Effect.


# ARTICLE 10
## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived (but only in writing) by (i) IGP on behalf of the Sellers, and (ii) Harris N.A., in its capacity as Prepetition Agent and Postpetition Agent:

10.1     Accuracy of Representations.

All of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality, which shall be true and correct in all respects as so qualified therein) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date). Sellers shall have received a certificate signed by a duly authorized representative of Buyer to such effect.

10.2     Buyer's Performance.

Buyer shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by Buyer on or prior to the Closing Date, and Sellers shall have received a certificate signed by a duly authorized representative of Buyer to such effect.

10.3     No Order.

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order or Legal Requirement which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

10.4    Governmental Authorizations.

All authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Authority which are necessary to consummate the transactions contemplated hereby shall have been filed, been obtained or occurred and such authorizations, consents, orders or approvals shall not have expired or been withdrawn.

10.5    Buyer's Deliveries.

Each of the deliveries required to be made to Sellers pursuant to Section 4.3 shall have been so delivered.

10.6    Bidding Procedures Order and Sale Order.

The Bidding Procedures Order and Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay, modification, reversal or vacation, and the Sale Order shall remain in full force and effect as of the Closing.

10.7    Cash Consideration.

Buyer shall have paid (i) the Closing Date Payment in accordance with Sections 3.4 and 4.2 and (ii) if applicable pursuant to the terms of Section 8.10, the Potential UCC Payment.

## ARTICLE 11
## TERMINATION

11.1    Termination Events.

Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

(a)    by either Sellers or Buyer:

(i)    if a closing condition under Articles 9 or 10 hereof becomes impossible to satisfy on or before the Closing Date (or such earlier date on which the condition is required to be satisfied) in favor of the Party attempting to terminate the Agreement (unless such failure is caused by such terminating Party (or in the case of IGP as the termination party, is caused by any Seller));

(ii)    if the Closing shall not have occurred by June 30, 2011; *provided, however*, that the right to terminate this Agreement under this Section 11.1(a)(ii) shall not be available to any party whose failure (or in the case of a Seller as the terminating party, any Seller's failure) to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Sale Order to have been entered on or prior to such date;

(iii)    if a Governmental Authority issues a ruling or Order prohibiting the transactions contemplated hereby; or

(iv)    by mutual written consent of Sellers and Buyer.

(b)    by Buyer:

(i)	in the event of any material breach by Sellers of any of Sellers' agreements, covenants, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order, and the failure of Sellers to cure such breach within seven (7) days after receipt of the Buyer Termination Notice specified in this subsection; *provided, however*, that Buyer (i) is not itself in material breach of its representations, warranties, covenants or agreements contained herein or in the Bidding Procedures Order or the Sale Order, (ii) notifies Sellers in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Agreement as a result of the breach, and (iii) specifies in such Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bidding Procedures Order or the Sale Order of which Sellers are allegedly in material breach; or

(ii)	if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Sellers and such trustee rejects the transactions contemplated by this Agreement;

(c)	by Sellers:

(i)	in the event of any material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order, and the failure of the Buyer to cure such breach within seven (7) days after receipt of the Seller Termination Notice specified in this subsection; *provided, however*, that (i) Sellers are not themselves in material breach of their representations, warranties, covenants or agreements contained herein or in the Bidding Procedures Order or the Sale Order, (ii) IGP notifies Buyer in writing (the "Sellers' Termination Notice"), and (iii) IGP specifies in such Sellers' Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bidding Procedures Order or the Sale Order of which Buyer is allegedly in material breach; or

(ii)	if the Bankruptcy Court declines to approve the Agreement for any reason, including that the Sellers accept a different qualified offer for the Acquired Assets from a party that is not the Buyer in accordance with the provisions of the Bidding Procedures Order.

11.2	Effect of Termination.

(a)	In the event of termination of this Agreement by either party, except as otherwise provided in this Section 11.2, all rights and obligations of the parties under this Agreement shall terminate without any liability of any Party to any other Party. The provisions of Sections , 6.4, this Section 11.2, Sections 12.1, 12.2, 12.3, and 12.15 and, to the extent applicable, the other provisions of Article 12, shall expressly survive the expiration or termination of this Agreement.

(b)	Notwithstanding Section 11.2(a), in the event of a termination pursuant to Section 11.1(c)(i) only, Sellers shall be entitled to retain the Deposit as liquidated damages as their sole and exclusive remedy against Buyer in all respects for any claim against Buyer arising under this Agreement or otherwise.

(c)	In the event of a termination pursuant to this Article 11 (other than pursuant to Section 11.1(c)(i)), Sellers shall promptly return to Buyer the Deposit (together with interest accrued thereon).

(d)	In the event of a termination pursuant to Section 11.1(c)(ii) by the Sellers due to Sellers' acceptance of an alternative offer for the Acquired Assets from a party other than the Buyer in

accordance with the Bidding Procedures Order, the Buyer shall be entitled to payment of the Break-Up Fee as provided in Section 7.7(e) as Buyer's sole remedy.

## ARTICLE 12
## GENERAL PROVISIONS

12.1    Non-Survival of Representations and Warranties; Survival of Contracts.

All representations and warranties herein shall terminate on the Closing Date.  The covenants of the Parties herein shall survive the Closing Date according to their terms.

12.2    Confidential Nature of Obligations.

The following paragraph is subject to any disclosure requirements under the Bankruptcy Code or imposed by the Bankruptcy Court or as Sellers may reasonably deem necessary or appropriate in order to facilitate the transactions contemplated herein:

Buyer and Sellers each agrees that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, at the request of the disclosing party, will return to the other party all copies of nonpublic documents and materials which have been furnished in connection therewith.  Such non-public documents, materials and information shall not be communicated to any third Person (other than to Buyer's and Sellers' counsel, accountants or financial advisors, in each case subject to the recipient's agreement to keep the same confidential).  No other party shall use any confidential information in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Acquired Assets; provided, however, that after the Closing, any confidential information included in the Acquired Assets or the Assumed Liabilities shall be deemed the confidential information of Buyer, and Sellers shall maintain the confidentiality thereof in accordance with this Section 12.2.  The obligation of each party to treat such documents, materials and other information in confidence shall not apply to any information which (i) is or becomes available to such party from a source other than the disclosing party, (ii) is or becomes available to the public other than as a result of disclosure by such party or its agents or (iii) is required to be disclosed under applicable law or judicial process (including under the Bankruptcy Code or as required by the Bankruptcy Court), but only to the extent it must be disclosed. Notwithstanding clause (iii) of the preceding sentence, in the event that any party is required to disclose any confidential information by applicable law, judicial process or rule of any national securities exchange, it is agreed that the party subject to such requirement will provide the other party with prompt notice of such requirement and such party may seek an appropriate protective order if it so desires.

12.3    Public Announcements.

The initial press release relating to this Agreement shall be a joint press release, the text of which shall be agreed to by the Buyer and Sellers.  Unless otherwise required by applicable Legal Requirement or by obligations of the Parties or their Affiliates pursuant to any listing agreement with or rules of any securities exchange or as otherwise permitted or contemplated by this Agreement, the Parties hereto shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other Party and shall not issue any such release or make any such statement without the prior written consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed).

12.4     Notices.

All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile or e-mail (with written confirmation of receipt), or (c) when received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (d) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, representative (if applicable) and facsimile numbers or e-mail addresses set forth below (or to such other addresses, representative and facsimile numbers as a Party may designate by notice to the other Parties given in accordance with this Section 12.4):

    (i)     If to Sellers, then to:

> c/o International Garden Products, Inc.
> 30590 SE Kelso Road
> Boring, Oregon  97009
> Attention: James H. Hulbert, III
> E-mail:  jhulbert@igpco.com
> Facsimile: (503) 663-0202

> with a copy (which shall not constitute notice) to:

> Bryan Cave LLP
> 161 N. Clark Street, Suite 4300
> Chicago, Illinois 60601
> Attn : Eric S. Prezant, Esq.
> E-mail : Eric.Prezant@bryancave.com
> Facsimile: (312) 602-5050, and

> Harris N.A., as DIP Agent and Administrative Agent
> 115 South LaSalle Street, 12W
> Chicago, Illinois 60603
> Attn: Jason Clary
> E-mail: jason.clary@harrisbank.com
> Facsimile: (312) 461-7958

> Chapman and Cutler LLP
> 111 West Monroe
> Chicago, Illinois  60603
> Attn: David T.B. Audley, Esq.
> E-mail:  audley@chapman.com
> Facsimile: (312) 516-3971

    (ii)    If to Buyer, then to:

> Gardens Alive, Inc.
> 5100 Schenley Place
> Lawrenceburg, Indiana  47025
> Attn:  K. Niles Kinerk, Chairman
> E-mail: nkinerk@gardensalive.com,  and

Eric Hamant, President and CEO
E-mail: ehamant@gardensalive.com

with a copy (which shall not constitute notice) to:

Kavinoky Cook LLP
726 Exchange Street, Suite 800
Buffalo, New York  14210
Attn:  David A. LoTempio, Esq.
E-mail: dlotempio@kavinokycook.com
Facsimile: 716-845-6474

12.5    Waiver.

Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given; and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    Entire Agreement; Amendment.

This Agreement (including the disclosure schedules and the exhibits hereto) and the other Transaction Documents supersede all prior agreements (other than the Confidentiality Agreement, which shall remain in full force and effect) between the Parties with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between the Parties with respect to their subject matter (other than the Confidentiality Agreement, which shall remain in full force and effect). This Agreement may not be amended except by a written agreement executed by Buyer and IGP.

12.7    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party hereto by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); *provided, however,* that Buyer shall be permitted, upon prior notice to Sellers, to assign all or part of its rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of its obligations under this Agreement.

12.8    Severability.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Legal Requirement or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any Party in any material respect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

12.9    Section Headings, Construction.

The headings of Sections in this Agreement are provided for convenience only and shall not affect its construction or interpretation. All references to "Article," "Section" or "Sections" refer to the corresponding Article, Section or Sections of this Agreement. All words used in this Agreement shall be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms. The Exhibits attached hereto and the Schedules attached hereto (including the Sellers' Disclosure Schedule and Buyer's Disclosure Schedule referred to herein and attached hereto) are hereby incorporated herein and made a part hereof as if fully set forth herein.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts executed in and to be performed in that State, and, to the extent applicable, the Bankruptcy Code.

(b)    The Parties agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Agreement or the transactions contemplated hereby and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; *provided* that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party: (i) agrees that all such actions or proceedings shall be heard and determined in a Delaware federal court sitting in Wilmington, Delaware; (ii) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (iv) agrees that service of process in any such action or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by Section 12.4 to such Party at its address as provided in Section 12.4 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by law).

(c)    EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.10(c).

12.11    Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

12.12  Time of Essence.

Time is of the essence in this Agreement.

12.13  No Third Party Beneficiaries.

This Agreement is for the sole benefit of the Guarantor, the Parties hereto and their permitted assigns, including the Postpetition Agent and Prepetition Agent as the collateral assignee of the rights of the Sellers hereunder, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

12.14  Sellers' Disclosure Schedule. The Sellers' Disclosure Schedule is qualified in its entirety by reference to the specific provisions of this Agreement and is not intended to constitute, and shall not be construed as constituting, representations or warranties of Sellers, except as and to the extent provided in this Agreement. The specification of any dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific item in the Sellers' Disclosure Schedule is not intended to imply that such amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed or are within or outside of the ordinary course of business, and none of the Parties shall use the fact of the setting forth of such amounts or the fact of the inclusion of any such item in the Sellers' Disclosure Schedule in any dispute or controversy with any party as to whether any obligation, item or matter not included in a section of the Sellers' Disclosure Schedule is or is not required to be disclosed (including whether such amounts or items are required to be disclosed as material) or in the ordinary course of business for the purposes of this Agreement. If and to the extent any information required to be furnished in any section of the Sellers' Disclosure Schedule is contained in this Agreement or in any section of the Sellers' Disclosure Schedule, such information shall be deemed to be included in all sections of the Sellers' Disclosure Schedule to the extent the relevance of such disclosure to such other section or sections is reasonably apparent on its face. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. In no event shall any disclosure of such additional matters be deemed or interpreted to broaden or otherwise amend any of the covenants or representations or warranties in this Agreement. The information contained in the Sellers' Disclosure Schedule is disclosed solely for purposes of this Agreement, and no information contained therein shall be deemed to be an admission by any party thereto to any third party of any matter whatsoever, including of any violation of law or breach of any agreement. Headings have been inserted in the sections of the Sellers' Disclosure Schedule for the convenience of reference only and shall to no extent have the effect of amending or changing the express description of the sections as set forth in this Agreement.

12.15  Expenses.

Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors, accountants and other advisors, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses, subject to Bankruptcy Court approval, whether or not the Closing shall have occurred. As between Buyer and Sellers, Sellers shall bear all of the costs of administration of the Bankruptcy Case.

12.16  Non-Recourse.

No past, present or future director, officer, manager, employee, incorporator, member, partner, stockholder, agent, attorney or representative of the respective parties to this Agreement, in such capacity (any such Person in such capacity, a "No Recourse Party"), shall have any liability or obligation with respect to this Agreement or the transactions contemplated hereby, or with respect to any claim or cause

of action that may arise out of this Agreement or the transactions contemplated hereby, or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby; in each case except for any claim or cause of action against a No Recourse Party (x) arising out of or in connection with the fraud, bad faith or willful misconduct of such No Recourse Party, including in connection with this Agreement or any other Transaction Document, or (y) otherwise expressly permitted to be brought against a No Recourse Party pursuant to any other Transaction Document, as applicable.  For the avoidance of doubt, nothing in this Section 12.16 is intended to or shall be deemed to in any way limit or affect any rights of Sellers or Buyer with respect to any claims against any person arising out of actions or conduct of such person arising prior to or outside the context of this Agreement.

*Signatures Appear on Next Page*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the date first written above.

**BUYER:**

IGP ACQUISITION LLC

By: _Eric Hamant_ _____
    Name: Eric Hamant
    Title:  Manager

**SELLERS:**

INTERNATIONAL GARDEN PRODUCTS, INC.

By: _____
    Name: James H. Hulbert, III
    Title: CEO

ISELI NURSERY, INC.

By: _____
    Name: James H. Hulbert, III
    Title: CEO

WEEKS WHOLESALE ROSE GROWER

By: _____
    Name: James H. Hulbert, III
    Title: CEO

CALIFORNIA NURSERY SUPPLY

By: _____
    Name: James H. Hulbert, III
    Title: CEO

OLD SKAGIT, INC.

By: _____
    Name: James H. Hulbert, III
    Title: CEO

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the date first written above.

**BUYER:**

IGP ACQUISITION LLC

By: _____
     Name: Eric Hamant
     Title:  Manager

**SELLERS:**

INTERNATIONAL GARDEN PRODUCTS, INC.

By: _____
     Name: James H. Hulbert, III
     Title: CEO

ISELI NURSERY, INC.

By: _____
     Name: James H. Hulbert, III
     Title: CEO

WEEKS WHOLESALE ROSE GROWER

By: _____
     Name: James H. Hulbert, III
     Title: CEO

CALIFORNIA NURSERY SUPPLY

By: _____
     Name: James H. Hulbert, III
     Title: CEO

OLD SKAGIT, INC.

By: _____
     Name: James H. Hulbert, III
     Title: CEO

# LIST OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Bidding Procedures Order |
| B | Bill of Sale |
| C | Buyer's Disclosure Schedule |
| D | Guaranty of Gardens Alive, Inc. |
| E | Sale Order |
| F | Assumption Agreement |
| G | Assignment of Patents |
| H | Assignment of Trademarks |
| I | Assignment of Copyrights |
| J | Assignment of Domain Names |
| K | Sellers' Disclosure Schedule |

# LIST OF SCHEDULES

1.  Buyer's Disclosure Schedule – See Exhibit C

2.  Sellers' Disclosure Schedule – See Exhibit K

3.  Schedule 1.1 - Assigned Agreements

    1.1.A  Contracts
    1.1.B  Copyrights
    1.1.C  Domain Names
    1.1.D  Owned Real Property
    1.1.E  Leased Real Property
    1.1.F  Leases
    1.1.G  Patents
    1.1.H  Permits
    1.1.I  Software
    1.1.J  Trademarks
    1.1.K  Trade Secrets

4.  Schedule 3.6 - Allocation Schedules – provide post-closing, per Section 3.6

5.  Schedule 8.4 – List of employees who will not be offered employment by Buyer

# EXHIBIT A

## BIDDING PROCEDURES ORDER

## EXHIBIT B

## BILL OF SALE

## EXHIBIT C

### BUYER'S DISCLOSURE SCHEDULE

## EXHIBIT D

## GUARANTY OF GARDENS ALIVE, INC.

# EXHIBIT E

## SALE ORDER

## EXHIBIT F

## ASSUMPTION AGREEMENT

# EXHIBIT G

## ASSIGNMENT OF PATENTS

# EXHIBIT H

## ASSIGNMENT OF TRADEMARKS

**EXHIBIT I**

**ASSIGNMENT OF COPYRIGHTS**

# EXHIBIT J

## ASSIGNMENT OF DOMAIN NAMES

# EXHIBIT K

## SELLERS' DISCLOSURE SCHEDULE