**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| INTERNATIONAL GARDEN PRODUCTS, INC., et al.,[1] | Case No. 10-13207 (KJC) |
| Debtors. | Jointly Administered |
| | Hearing Date: May 3, 2011 at 2:30 p.m. (ET) [Proposed]<br>Objections Due: May 3, 2011 at 2:30 p.m. (ET) [Proposed] |

# DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS WITH RESPECT TO RESOLUTION OF THE DEBTORS' CASES

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") file this motion (the "Motion"), pursuant to section 105(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an order substantially in the form attached hereto, approving a certain settlement term sheet (the "Term Sheet") by and among the Debtors and the Official Committee of Unsecured Creditors appointed in the Debtors' Chapter 11 cases (the "Committee"), in the form attached hereto as **Exhibit A**,[2] pursuant to which the Debtors and the Committee have agreed to, among other things, resolve certain disputes, objections and issues in the Debtors' cases (the "Cases"), including with respect to the Debtors' Motion for Orders: (I)(A) Approving Bid Procedures Relating to Sale of Substantially All of the Debtors' Assets

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers): International Garden Products, Inc. (5711), Weeks Wholesale Rose Grower (9716), California Nursery Supply (6835), Iseli Nursery, Inc. (6206), and Old Skagit, Inc. (2996).

[2] The summaries and descriptions of the terms and conditions of the Term Sheet set forth in the Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the Term Sheet. In the event there is a conflict between the Motion and the Term Sheet, the Term Sheet shall control in all respects.

Outside the Ordinary Course of Business, (B) Scheduling a Hearing to Consider the Sale, (C) Approving the Form and Manner of Notice of Sale by Auction, (D) Establishing Procedures for Noticing and Determining Cure Amounts, and (E) Granting Related Relief; and (II)(A) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All of the Debtors' Assets Outside the Ordinary Course of Business, (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief (the "Sale Motion") [D.I. 324] and the related proposed sale of substantially all of the Debtors' assets. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## BACKGROUND

3. On October 4, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4. The Debtors continue in possession of their respective properties and continue to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On October 21, 2010, the Office of the United States Trustee (the "U.S. Trustee")

appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I. 58]. No trustee or examiner has been appointed in the Debtors' Cases.

7. In connection with this Motion, the Debtors intend to file the <u>Declaration of Sandeep Gupta in Support of Approval of Settlement With Official Committee of Unsecured Creditors</u>, outlining the facts and circumstances supporting the relief requested herein, prior to the hearing on the Motion.

## **FACTS RELEVANT TO THIS MOTION**

**A.     Background of the Sale Process and Current Dispute.**

7. Since the Petition Date, the Debtors have been actively seeking potential buyers for their assets in order to address their outstanding liabilities, including their debts to their senior secured pre- and post-petition lenders (the "<u>Lenders</u>"), through the efforts of their senior management and with the help of their financial and legal advisors. Following a lengthy and comprehensive marketing process, the Debtors entered into a proposed asset purchase agreement (the "<u>APA</u>") with IGP Acquisition LLC (the "<u>Stalking Horse Purchaser</u>"), an affiliate of Gardens Alive, Inc., with respect to the proposed sale (the "<u>Sale</u>") of substantially all of the Debtors' assets. The Debtors subsequently filed the Sale Motion, requesting approval of the Sale and related bid procedures.

8. In connection with the sale process, the Debtors also filed their <u>Motion for Entry of an Order Authorizing Debtors to Implement a Key Employee Incentive Plan</u> (the "<u>KEIP Motion</u>") [D.I. 259], seeking approval of a key employee incentive plan (the "<u>KEIP</u>") to incentivize certain critical employees whose continued service is particularly important to the Debtors' sale process to maximize the value of the Debtors' estates by promptly and effectively marketing the Debtors' businesses for sale.

9. The Committee formally objected to the KEIP Motion and to approval of the KEIP. In addition, through its involvement with the sale process, the Committee expressed concerns about any potential Sale that would provide recoveries in the Debtors' cases only for the Lenders, and not for general unsecured creditors. The Committee accordingly reserved its rights to object to the Sale and the Debtors' Sale Motion if a consensual resolution could not be reached.

10. In light of disagreements among the parties, the Debtors, the Committee, the Lenders, and the Stalking Horse Purchaser engaged in extensive negotiations regarding the Sale, the KEIP, distributions to general unsecured creditors, and the ultimate resolution of the Debtors' Cases. The result of those discussions and negotiations is the attached Term Sheet, which provides for a significant distribution to general unsecured creditors in the Debtors' cases and encompasses a global resolution of all issues raised by the Committee.

11. The significant provisions of the Term Sheet are set forth below. Pursuant to this Motion, the Debtors request approval of the Term Sheet and the related proposed payment for distribution to general unsecured creditors. Approval of the Term Sheet will resolve the disputes among the parties with respect to the Sale, Sale Motion, and the KEIP.[3]

**B. Primary Terms of the Term Sheet.**

12. The Term Sheet provides, among other things, the following:

> a. Upon the closing of a successful Sale, the Lenders shall permit and direct the Stalking Horse Purchaser or other buyer of the Debtors' assets to make a payment of $300,000 (the "GUC Payment") from the Sale proceeds directly into a segregated account for the sole benefit of the

---

[3] The Committee has already unconditionally withdrawn its objection to the KEIP Motion, and the Court has entered an order approving the KEIP. However, in exchange for the Committee's agreement to withdraw its opposition to the KEIP, the Debtors committed to pursuing approval of the settlement described herein and in the Term Sheet, and thus, the KEIP's approval is relevant to this Motion.

Debtors' general unsecured creditors, as designated by the Committee, as a carve out from the proceeds of the Lenders' collateral. Neither the Debtors nor their estates will have any interest in, or share in any distribution of, the GUC Payment. The Debtors, the Lenders, and the Committee acknowledge and agree that any Sale shall provide for the GUC Payment, which shall be paid as a carve out from the Lenders' collateral, and that the Lenders are agreeing to allow the Committee to receive such funds on behalf of general unsecured creditors. The GUC Payment will only be made upon the closing of a Sale, as contemplated in the APA or as contemplated in a Sale to such other Buyer (as defined below) as may be approved by the Court on terms that include the Buyer's funding of the GUC Payment, and the Lenders will have no obligation to make or provide for the GUC Payment to general unsecured creditors absent the Buyer funding the GUC Payment at the closing of a Sale transaction.

b. The Stalking Horse Purchaser or such other party as may ultimately become the buyer of substantially all of the Debtors' assets (the "Buyer") must agree that it will not pursue and/or initiate any Chapter 5 actions purchased as part of the Sale, and further will not transfer its rights and interests in such actions to any third parties, and any Sale order will so provide.

c. The Lenders agree to waive and release any potential deficiency claim and/or other claims they may have against the Debtors and their estates beyond what they receive in proceeds from the Sale. The Lenders will not share in any way with the distribution of the GUC Payment to general unsecured creditors.

d. The Debtors shall pay all budgeted, allowed administrative expense claims and all fees payable pursuant to 28 U.S.C. § 1930 that accrue prior to dismissal of the Debtors' Cases, in accordance with the Debtors' post-petition secured financing facility (the "DIP Facility") and the latest approved cash flow forecast and budget approved thereunder. The Debtors are not currently aware of any administrative expense claims that are not provided for under their current cash flow forecast and budget in connection with the DIP Facility. The DIP Facility will terminate one (1) business day after the closing of a successful Sale transaction.

e. Following the closing of the Sale and the deposit of the GUC Payment as designated by the Committee, the Debtors will file a motion seeking the dismissal of their Cases (the "Dismissal Motion"). The Dismissal Motion will contemplate the distribution of the GUC Payment

5

to general unsecured creditors by the Committee or its counsel on a *pro rata* basis. The distribution will be made in accordance with a schedule of claims to be prepared by the Debtors in consultation with the Committee and attached to the Dismissal Motion and related proposed order setting forth the amounts of claims to be allowed, either as filed by the relevant claimants or as scheduled by the Debtors. All creditors (a) that have timely filed a proof of claim by the applicable claims bar date, or (b) that have not filed a proof of claim but that have a claim scheduled as liquidated, undisputed, and not contingent in the Debtors' schedules filed with the Bankruptcy Court, shall receive notice of the impending dismissal, proposed distribution, and the amount of their respective claims to be allowed for purposes of such distribution, and shall have the opportunity to object to the allowance of their claims in the amounts set forth on the applicable schedule to the Dismissal Motion. The Committee shall have standing to object to the amount listed for any particular claim and to approve the resolution of asserted unsecured claims in connection with the Dismissal Motion.

f. Upon the Bankruptcy Court entering a final, non-appealable order approving the Dismissal Motion (the "Dismissal"), the Committee shall cause the full amount of the GUC Payment to be distributed promptly to holders of allowed general unsecured claims in accordance with the schedule to the Dismissal Motion or as otherwise ordered by the Bankruptcy Court. The Committee shall be vested with full dominion and control over such funds, and shall have the power and authority to distribute the GUC Payment.

g. In addition to the GUC Payment, any funds being held as retainers by the Debtors' professionals that remain after application of such retainers to professional fees incurred through the date of Dismissal will be contributed to a segregated account for the benefit of the professionals of the Committee as a further carve out from the Lenders' collateral to assist in paying the fees, costs and expenses of the Committee in administering the GUC Payment, in an aggregate amount sufficient to satisfy such fees, costs and expenses, but in no case shall such amount exceed $10,000.

13. In exchange for the promises and commitments of the Debtors and the Lenders in connection with this Motion and the Term Sheet, the Committee has agreed to support the Sale, the Sale Motion, and certain other relief the Debtors have requested, including the KEIP.

14. For purposes of clarity, the Debtors are not requesting approval of the proposed Dismissal Motion and relief related to the Dismissal of the Debtors' Cases at this time, and the Committee's obligation to support the proposed Sale is not contingent on the approval of the Dismissal Motion or relief to be requested therein. Rather, through this Motion, the Debtors are simply requesting approval of the compromise set forth in the Term Sheet, which includes the Debtors' obligation to pursue the Dismissal Motion or other similar relief consistent with the terms outlined in the Term Sheet, as well as approval of the GUC Payment and its designation for the benefit of general unsecured creditors.

15. The settlement embodied in the Term Sheet is advantageous to the Debtors, their estates, creditors, and all parties in interest for a number of reasons. The settlement resolves essentially all remaining issues among the parties, and it provides a pathway for the ultimate conclusion of the Debtors' Cases. If the parties were to litigate the issues addressed in the Term Sheet, they would severely disrupt the anticipated Sale and ongoing sale process and would hinder the Debtors' ability to maximize value for all parties involved. On the other hand, the Term Sheet provides for a consensual resolution to the Debtors' cases that will benefit all constituent groups. Accordingly, the Debtors assert that the Term Sheet and related case resolution framework should be approved in the best interests of the Debtors, their estates and their creditors.

## RELIEF REQUESTED AND BASIS FOR RELIEF

16. By this Motion, the Debtors seek an Order, pursuant to sections 105(a) the Bankruptcy Code and Bankruptcy Rule 9019, approving the compromise embodied in the Term Sheet, approving the GUC payment and its designation for the benefit of general unsecured creditors (subject to the filing of the Dismissal Motion and the further order of the Court with

respect to the distribution of such funds), and granting such other and further relief as is necessary to implement the terms of the Term Sheet.

**A.     The Term Sheet And Case Resolution Are Appropriate And Should Be Approved.**

17.     Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

18.     Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)). In addition, the District of Delaware has recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the Bankruptcy Court. See In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004).

19.     Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interest of the estate." In re Key3Media Group, Inc., 336 B.R. 87, 92 (Bankr. D. Del. 2005); In re Marvel Entm't Group, 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)); see also In re Nutritional Sourcing Corp., 398 B.R. 816, 833 (Bankr. D. Del. 2008). Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968). The court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of

8

reasonableness." Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing In re Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000)); Coram, 315 B.R. at 330; Official Unsecured Creditors' Comm. of Pa. Truck Lines v. Pa. Truck Lines, Inc., 150 B.R. 595, 598 (E.D. Pa. 1992). The court need not be convinced that the settlement is the best possible compromise in order to approve it. Coram, 315 B.R. at 330.

20. Applying these principles to the instant matter, the Debtors submit that the Term Sheet is clearly in the best interests of the Debtors, their estates, and their creditors and should be approved. The Term Sheet will resolve essentially all remaining issues among the Debtors, the Committee, and the Lenders, and it provides a framework for concluding the Debtors' Cases promptly and amicably.

21. The Term Sheet and settlement also provide a recovery to general unsecured creditors through a carve out from the Lenders' collateral. Without the compromise embodied in the Term Sheet, general unsecured creditors likely would receive no distribution at all in the Debtors' Cases. In exchange, the Debtors, the Lenders, and the Buyer receive certainty with respect to the Sale and the recoveries that will be realized from it, obviating the need for any further litigation of remaining issues.

22. Approval of the Term Sheet will reduce administrative expenses in the Debtors' cases and maximize value for all creditors and will allow the Debtors to concentrate on concluding their Cases in an efficient and timely manner. It will also permit the Sale process to conclude quickly, fulfilling the ultimate purpose of these proceedings.

23. In light of the foregoing, the Debtors believe the Term Sheet and related settlement should be approved. The proposed Term Sheet and related order reflect a valuable resolution in light of the value being given and the contingencies of success in litigation and the

costs and delays attendant thereto. The compromise was heavily negotiated among the parties and is well within the range of reasonableness when considering the potential outcomes associated with litigating the various claims the parties might assert. For these reasons, the Debtors the Term Sheet and related resolution should be approved in the best interests of the Debtors, their estates, and their creditors

**B.      The Structure Set Forth In The Term Sheet For Concluding The Debtors' Cases And For Making Distributions To Creditors Is Permissible And Appropriate.**

24.     The Term Sheet's provisions governing the distribution of the GUC Payment to general unsecured creditors in connection with the Dismissal of the Debtors' cases represents a permissible compromise and should be approved.

25.     Following the closing of the Sale, the Debtors will no longer have any ongoing operations or any continuing businesses to reorganize. Lack of an ability to effectuate a plan of reorganization constitutes an appropriate basis for the dismissal of a Chapter 11 case. See 11 U.S.C. 1112(b)(1) (permitting dismissal for "cause" after notice and a hearing). It simply would not be practical or possible for the Debtors to propose a plan of reorganization following the Sale because they will lack the funding to continue paying administrative expenses as they accrue. Because the Debtors will not have the means to confirm and carry out a Chapter 11 plan of reorganization following approval of the Sale, dismissal will likely be appropriate.

26.     The only significant remaining task following the Sale will be to distribute the GUC Payment to general unsecured creditors. As described above, the GUC Payment will not constitute property of the Debtors' bankruptcy estates, as it is being carved out of funds that would otherwise constitute the proceeds of the Lenders' collateral and would be distributed to the Lenders absent their agreement. See, e.g., In re SPM Mfg. Corp., 984 F.2d 1305 (1st Cir. 1993) (holding that a secured creditor may share proceeds to which it is otherwise entitled with

unsecured creditors); In re World Health Alternatives, Inc., 344 B.R. 291 (Bankr. D. Del. 2006) (permitting a secured lender to carve out funds from its collateral for the benefit of unsecured creditors in exchange for committee's withdrawal of its objection to motion to sell substantially all of the debtor's assets); In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001) (holding that secured lender's distribution to management did not preclude confirmation of the plan).

27. The GUC Payment in connection with the Term Sheet provides the only potential recovery available for general unsecured creditors, and it will be immediately available for distribution to creditors in connection with the dismissal of the Debtors' Cases. The Term Sheet outlines a mechanism for distributing the GUC Payment to creditors quickly and efficiently. In connection with the Dismissal Motion, the Debtors intend to file a schedule of all general unsecured claims to be allowed, whether filed or scheduled, and will notify all creditors of the amounts of their claims to be allowed. Claims will be reconciled, and any disputes that arise with respect to the claim amounts will be addressed by the parties. The Committee will also distribute the GUC Payment funds to all creditors on a *pro rata* basis in accordance with the allowed general unsecured claim amounts. The method of distributions contemplated in the Term Sheet in connection with the anticipated Dismissal is permissible, and similar relief has been approved in other cases within this District.[4] See, e.g., In re Wickes Holdings, LLC, *et al.*, Case No. 08-10212 (KJC) (Bankr. D. Del., Order Dated May 11, 2009); In re New Weathervane Retail Corp., *et al.*, Case No. 04-11649 (PJW) (Bankr. D. Del., Order Dated September 2, 2005);

---

[4] A more complete explanation of the method and procedures for determining claims and making distributions to creditors will be set forth in the Dismissal Motion to be filed following the closing of the Sale transaction.

see also In re SPM Mfg. Corp., 984 F.2d 1305; In re World Health Alternatives, Inc., 344 B.R. 291 (Bankr. D. Del. 2006).

28. In addition, dismissal of the Debtors' cases is proper because the alternative—conversion to cases under Chapter 7—is impractical. Dismissal of the Debtors' cases will maximize the value of the remaining assets available to administer the GUC Payment and the remaining case issues. Conversion to a Chapter 7 liquidation and the appointment of a trustee would impose significant and unnecessary additional administrative costs on the estates, reducing the funds available for creditors. The parties can reconcile claims and the Committee can distribute the GUC Payment effectively without the necessity of such an additional administrative burden.

29. However, the Debtors are not requesting approval of the Dismissal and of the final procedures for distributions to creditors pursuant to this Motion. Rather, such issues will be addressed through the Dismissal Motion, which the Debtors will be required to formulate and file pursuant to the settlement and Term Sheet, in consultation with the Committee.

30. The Term Sheet and the procedures set forth therein are the result of the parties' extensive negotiations and cooperative efforts at reaching a resolution to these Cases that provides the maximum recovery available for creditors within the parameters of the Bankruptcy Code. Approving the Term Sheet and authorizing the distribution of the GUC Payment to general unsecured creditors as set forth therein will further the Bankruptcy Code's goal of efficient administration of the Debtors' estates and maximization of the Debtors' assets for the benefit of creditors. It is in the best interests of all creditors and should be approved.

## NOTICE

31. Notice of this Motion has been given by overnight delivery to (i) the U.S. Trustee; (ii) counsel for the Committee; (iii) counsel for the Debtors' pre- and post-petition secured lenders; (iv) counsel for the Stalking Horse Purchaser; and (v) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) approve the Term Sheet and the compromise represented thereby, including the GUC Payment and its designation for the benefit of general unsecured creditors; (iii) enter the proposed order attached hereto; and (iv) grant such other and further relief as is just and proper.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: April 27, 2010
Wilmington, Delaware

*/s/ Andrew R. Remming*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: 302-658-9200
Facsimile: 302-658-3989
Email: dabbott@mnat.com
          aremming@mnat.com

-and-

BRYAN CAVE LLP
Eric S. Prezant (admitted *pro hac vice*)
Leslie A. Bayles (admitted *pro hac vice*)
161 North Clark Street, Suite 4300
Chicago, IL 60601-3315
Telephone: 312-602-5000
Facsimile: 312-602-5050
Email: eric.prezant@bryancave.com
          leslie.bayles@bryancave.com

-and-

BRYAN CAVE LLP
Cullen K. Kuhn (admitted *pro hac vice*)
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102-2750
Telephone: 314-259-2000
Facsimile: 314-259-2020
Email: ckkuhn@bryancave.com

*Attorneys for the Debtors and
Debtors-in-Possession*