# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| INTERNATIONAL GARDEN | : | Case Number 10-13207 (KJC) |
| PRODUCTS INC., *et al.*, | : | |
| | : | Jointly Administered |
| Debtors. | : | **Hearing Date: 5/3/11 at 2:30 p.m.** |
| | : | **Objections Due: 5/3/11 at 2:30 p.m.** |

## UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF UNSECURED CREDITORS WITH RESPECT TO RESOLUTION OF DEBTORS' CASES (D.I. 380)

In support of her Objection to the Debtors' Motion for Entry of an Order Approving a Settlement with the Official Committee of Unsecured Creditors With Respect to Resolution of the Debtors' Cases (the "Motion"), Roberta A. DeAngelis, United States Trustee for Region 3 ("U.S. Trustee"), by undersigned counsel, avers as follows:

1. This Court has jurisdiction to hear this Objection.

2. Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3. In furtherance of her case supervisory responsibilities, as well as pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to raise and be heard on this Objection.

## FACTUAL BACKGROUND

4. The Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 4, 2010.

5. The U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") on October 21, 2010.

6. At the commencement of these jointly administered cases, the Debtors were indebted to Harris, N.A., as lender and Administrative Agent, and to other participating lenders (collectively, the "Prepetiton Lenders"), for almost $44 million pursuant to the terms of certain prepetition secured revolving and term credit facilities which encumbered substantially all of the Debtors' assets.

7. Upon the commencement of these cases, Harris, as agent, and certain participating lenders (the "Postpetition Lenders" and, collectively with the Prepetition Lenders, the "Lenders") and the Debtors entered into a priming senior secured, superpriority debtor-in-possession credit agreement, providing for up to $7.5 million of post-petition financing and granting the Lenders priming liens on substantially all of the Debtors' assets, excluding claims or causes of action under Chapter 5 of the Bankruptcy Code ("Bankruptcy Recoveries").[1] The Court granted interim approval of the post-petition financing on October 6, 2010.

8. Following Committee objections that were overruled and/or resolved, the Court approved the post-petition financing on a final basis by order dated November 10, 2010.

---

[1] The post-petition credit agreement also provides that the superpriority administrative claims granted to the Postpetition Lenders would not be payable out of Bankruptcy Recoveries.

9. Under the terms of the final DIP financing order the Committee or any other party in interest had until 60 days from the date of the final DIP financing order to assert any claims, causes of action or challenges against the Lenders ("Challenges"), after which time all of the Debtors' stipulations, waivers and releases regarding the Lenders' claims, liens and interests would be binding on all parties in interest, including any trustee or other estate representative. The Committee did not assert any Challenges during the investigation period, which expired on January 9, 2011.

10. On March 9, 2011, the Debtors moved for the approval of a key employee incentive plan "(KEIP") to aid in their efforts to market the Debtors' businesses. With any recovery to general unsecured creditors doubtful, the Committee objected to the proposed KEIP. The Committee also expressed concern that a sale of the Debtors' businesses would provide recovery only for the Lenders, reserving the right to object to any sale that did not provide a recovery for general unsecured creditors. The Committee subsequently withdrew its objection to the KEIP in contemplation of the settlement described in the Motion.

11. On April 8, 2011, the Debtors moved for the entry of an order approving bidding and auction procedures (the "Bidding Procedures Motion") for the sale of substantially all of their assets (including Chapter 5 avoidance actions held by the Debtors' estates) to IGP Acquisition LLC (the "stalking horse"), an affiliate of Gardens Alive, Inc.

12. The purchase price offered by the stalking horse will not pay the Lenders in full, and will not provide any recovery whatsoever for creditors holding unsecured priority claims or any subordinate class of claims or interests. However, the Bidding Procedures Motion indicated that the Committee had negotiated an agreement with the stalking horse that the purchase price

would include an additional $250,000 payment from the stalking horse "designated for the benefit of the Debtors' unsecured creditors if an agreement is reached with the Unsecured Creditors Committee to support the Court's approval of the Motion, including the Agreement, Bid Procedures and the sale process contemplated therein and to withdraw their objections to any other motions currently pending before the Court."

13. At the hearing on the Bidding Procedures Motion, the Debtors proposed bidding procedures different from those originally submitted with the Bidding Procedures Motion, explaining that the Committee had negotiated for the modified bidding procedures. The modified proposed bidding procedures indicate that the Debtors, the stalking horse and the Agent for the Lenders had agreed to increase the payment to the general unsecured creditors (the "GUC Payment") to $300,000, and that to be considered a Qualified Bid, any competing bid must also include a GUC Payment of $300,000. The modified proposed bidding procedures do not provide for payment of unsecured priority claims.

14. Counsel for the U.S. Trustee objected that the proposed bidding procedures as modified, requiring a provision for a GUC Payment as a qualification to participate in the bidding, would make an institution of distributing estate assets contrary to the detailed scheme of distribution that Congress expressly mandated in the Bankruptcy Code. However, the parties and the Court deferred the issue to a later hearing by adding the phrase "unless otherwise ordered by the Court" to the section of the proposed bidding procedures requiring competing bidders to offer a GUC Payment.

15. On April 27, 2011, the Debtors filed the instant Motion, seeking approval of a "settlement" with the Committee. The Motion does not describe the factual and/or legal basis of

any claim or controversy being compromised; instead, it only describes the provisions of a term sheet detailing a plan for distribution of proceeds from the asset sale for the benefit of general unsecured creditors and the terms of dismissal of these cases. Among other things,

  (a) Upon closing of the sale, the Lenders will permit and direct the purchaser to pay $300,000 of the sale proceeds (the "GUC Payment") directly into a segregated account for the sole benefit of general unsecured creditors, as a carve out from the proceeds of the Lenders' collateral; neither the Debtors nor their estates would have any interest in the GUC Payment.

  (b) The asset purchaser must agree that it will not pursue or initiate any Chapter 5 avoidance actions purchased as part of the sale, nor transfer its rights and interests in such actions to any third parties.[2]

  (c) The Lenders will waive and release any potential deficiency claim they have beyond the proceeds they receive from the asset sale, and not receive any portion of the GUC Payment.

  (d) The Debtors will pay all "budgeted, allowed administrative expense claims and all fees payable pursuant to 28 U.S.C. § 1930 that accrue prior to dismissal of the

---

[2] Inclusion of Chapter 5 avoidance actions in the assets to be sold immunizes certain general unsecured creditors against avoidance actions in the event theses cases are converted to Chapter 7. An assignee may not pursue avoidance actions for its own benefit; assignment effectively extinguishes avoidance claims. The Debtors' Statements of Financial Affairs disclose that during the 90 day and one year periods preceding their Chapter 11 filings, the Debtors made non-insider payments of almost $5 million and insider payments in excess of $650,000, respectively. Some of those payments may be avoidable and may represent substantial value to the estate.

Debtors' cases, including specifically the KEIP payments and all estimated claims against the Debtors pursuant to 11 U.S.C. § 503(b)(9).[3]

  (e)  After closing of the asset sale and deposit of the GUC payment as designated by the Committee, the Debtors will move for a "structured dismissal" of these jointly administered cases, filing a motion that will "contemplate the distribution of the GUC Payment to general unsecured creditors by the Committee or its counsel on a *pro rata* basis." The Debtors will submit with their motion to dismiss a proposed form of order setting forth the amounts of claims to be allowed; creditors will have an opportunity to object to the allowance of their claims at the amounts set forth in the motion, and the Committee will have standing to object to the amount listed for any particular claim, and to approve the resolution thereof, in connection with the dismissal motion.

  (f)  Upon dismissal of these cases, the Committee will cause the GUC Payment to be distributed to holders of general unsecured claims in accordance with the schedule attached to the dismissal motion, or as otherwise ordered by the Court.

16. Although the Debtors, the Lenders and the Committee have negotiated for payment of most (but not necessarily all) administrative claims, and for a payment for the benefit of creditors holding general unsecured claims, they have made no provision for the payment of unsecured priority claims, which are senior in right of payment to general unsecured claims.

---

[3] The Debtors represent that they are not aware of any unpaid administrative claims other than those that are provided for in the budget or otherwise being assumed by the asset purchaser. However, the term sheet does not address whether or how administrative expense claims that were not included in the budget will be paid.

17.     The Debtors' Schedules E collectively disclose at least $70,000 of non-contingent, liquidated and undisputed tax claims, together with claims held by a large number of licensing, regulatory and taxing authorities, all of which are scheduled in "unknown" amounts and declared to be contingent, unliquidated and disputed. Because the claims bar date in this case has not yet occurred (the general and governmental claims bar date is May 16, 2011), the actual amount of unsecured priority claims cannot be determined before the hearing on the Motion.

**GROUNDS FOR RELIEF**

**A. The Settlement Violates the Bankruptcy Code's Distribution Priority Scheme.**

18.     11 U.S.C. § 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). In considering a proposed sale under 11 U.S.C. § 363(b)(1), this Court "is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986). The "good faith" finding requirement ". . . ensures that section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11 and, as such, it mirrors the requirement of section 1129 that the bankruptcy court independently scrutinize the debtor's reorganization plan and make a finding that it 'has been proposed in good faith and not by any means forbidden by law.'" *Id.* at 150 (internal citations omitted). If the bankruptcy court is unable to make the "good faith" finding, it must determine whether the purchaser paid "value" for the assets. *See id.* at 151. If the purchaser did not pay "value," the sale should be disapproved. *See id.*

19.     The settlement described in the Motion is premised upon the misguided argument that the Committee is entitled to sell out an actual or potential sale objection for a cash payment

7

to general unsecured creditors. The Committee's right under the Bankruptcy Code to challenge a proposed sale under 11 U.S.C. § 363(b) is not the Committee's personal property and, accordingly, such a right may not be liquidated for a cash payment. Rather, the Committee's right to challenge a sale under section 363(b) inures to the benefit of the Debtors' estates and, as such, are essentially analogous to estate property (if such rights are not, in fact, estate property). Therefore, it is presumptively unreasonable for the Committee's constituency – general unsecured creditors – to receive a cash payment ahead of creditors whose claims are senior in right, in exchange for the settlement of rights that belong to, and are exercised for the benefit of, the Debtors' estates.

20. Granting the relief requested in the Motion opens the door to unwieldy, costly sale processes where each and every party in interest, regardless of whether it is out of the money – indeed, especially when it is out of the money -- is entitled to exact its price for silence. Landlords, equity security holders, and others may step forward and demand to be paid not to object to the sale.

21. In *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996), the United States Court of Appeals for the Third Circuit identified four criteria that this Court should consider in evaluating a proposed settlement: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." The *Martin* criteria are "designed to achieve the objective of having the trustee or debtor in possession act in the best interests of the estate." *In re Nationwide Sports Distribs., Inc.*, 227 B.R. 455, 460 (Bankr. E.D. Pa. 1998) (citation omitted). The trustee or debtor in possession

bears the burden of persuasion to prove that the settlement is in the estate's best interests. *See id.* (citations omitted).

22. In considering the fourth *Martin* factor – the "paramount interest of the creditors" – courts in the Third Circuit have taken the practical approach of (i) identifying the parties affected by the proposed settlement and (ii) assessing what effect the settlement has on their interests. *See In re Louise's, Inc.*, 211 B.R. 790, 801 (D. Del. 1997) (rejecting proposed compromise under Rule 9019 as a "disguised" plan of reorganization); *In re Key3Media Group, Inc.*, 336 B.R. 87, 98 (Bankr. Del. 2005) (noting the position of secured creditors with regard to compromise of estate claims subject to liens); *see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002) (noting that, on remand, bankruptcy court should consider proposed settlement's impact on equity security holders, given that unsecured creditors were paid in full). In fulfilling its gatekeeping role under *Martin*, this Court is obligated to reject settlements which favor one creditor constituency at the expense of another creditor group. *See Tindall v. Mavrode (In re Mavrode)*, 205 B.R. 716, 721 (Bankr. D.N.J. 1997) ("A proposed settlement will necessarily fail where one creditor benefits at the other creditors' expense"). If "the rights of others who are not party to the settlement are unduly prejudiced," this Court should reject the settlement, as "'no one [should be] set apart for unfair treatment.'" *See In re Medical Asset Management, Inc.*, 249 B.R. 659, 663 (Bankr. W.D. Pa. 2000) (citation omitted).

23. Unless approval of the settlement is expressly conditioned upon payment of creditors senior in priority to general unsecured creditors, the proposed settlement is unreasonable because the proposed GUC Payment for the exclusive benefit of general unsecured creditors falls outside of the range of possible remedies if the Committee were to successfully

9

litigate objections to the sale and/or claims and causes of action against non-Debtor parties. If the Committee challenged, among other things, the exercise of the Debtors' business judgment in pursuing a sale, the adequacy of the purchase price, and/or the purchaser's good faith, and if this Court were persuaded by the Committee's position, one of two results would be likely to occur: this Court would deny the sale motion, or the purchaser would increase the purchase price payable to the Debtors' estates. Either way, if the Committee contested the sale and prevailed, it would not be able to obtain a cash payment for the exclusive benefit of general unsecured creditors unless the purchase price were dramatically increased.

24. "Equality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. Internal Revenue Service*, 496 U.S. 53, 58 (1990). The Bankruptcy Code sets forth in numerous, interlocking sections a comprehensive scheme establishing the order in which claims against a debtor are to be paid in virtually all bankruptcy cases. *See* 11 U.S.C. §§ 503, 506, 507, 510, 547, 726.

    (a)    Section 506 governs the extent to which a claim is secured. 11 U.S.C. § 506.

    (b)    Section 507 specifies ten types of claims entitled to receive special priority among unsecured claims, as well as the order in which those claims are to be paid. Priority claims include, among others, certain administrative expenses, certain claims of trade creditors who delivered goods in the 20 days before entry of the order for relief, and certain tax claims. 11 U.S.C. § 507.

    (c)    Section 503 details the types of expenses that can be paid as administrative expenses, such as a Chapter 7 trustee's compensation, actual and necessary costs of

preserving the debtor's estate, and fees owed to attorneys and accountants retained by the debtor and unsecured creditors committees to the extent allowed under section 330. 11 U.S.C. §§ 503, 330.

(d) Section 510 specifies the circumstances under which certain claims may be subordinated to others. 11 U.S.C. § 510.

(e) Section 547 permits certain payments by the debtor that prefer one creditor over others to be voided and the funds returned to the estate for distribution in accordance with the Code's priority scheme. 11 U.S.C. § 547.[4]

25. Here, the Debtors seek authority to make a payment to the Committee that ignores the statutory priority scheme, attempting to justify it as a "settlement" that is somehow in the best interest of the estate, even though such a payment could not be made in a Chapter 11 plan without the consent of senior classes of creditors, and would not be made in a Chapter 7 case. There is no equitable or legal basis for disregarding the Code's priority scheme here simply because the GUC Payment will be made in the context of a "structured dismissal" rather than in a Chapter 11 plan.

26. The Supreme Court has rejected attempts to alter the statutory priorities set forth in the Code, finding such actions usurp the legislative function. *See, e.g., United States v. Noland*, 517 U.S. 535 (1996). *Accord Adventure Resources, Inc. v. Holland*, 137 F.3d 786, 796-797 (4th Cir. 1998); *Air Pilots Ass'n v. Shugrue (In re Ionosphere Clubs, Inc.)*, 22 F.3d 403, 408

---

[4] The preference rule "prevents debtors from depleting the estate to pay favored creditors with assets that otherwise would have been apportioned among creditors according to the [Code's priority scheme];" its purpose is to foster equality of distribution among the creditors of an insolvent debtor. *In re Pillowtex, Inc.*, 304 F.3d 246, 252 (3d Cir. 2002).

(2d Cir. 1994). *See also* 4 Alan N. Resnick & Henry J. Sommer Collier on Bankruptcy ¶ 507.02[3] (16th ed. 2010) (court may not substitute its judgment for Congress's by exercising its discretion in a way that impacts the priority in which claims are paid from the estate).

27. Other circuit courts have rejected attempts by parties to enter into settlements in Chapter 11 that circumvent the statutory priority scheme. The Fifth Circuit reversed the district court's approval of a pre-plan settlement of litigation involving the debtor and a junior unsecured creditor in *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, (5th Cir. 1984).

    (a) Senior unsecured creditors argued that the settlement could jeopardize their priority position by depleting estate assets. *Id.* at 298.

    (b) The Fifth Circuit held that "a bankruptcy court abuses its discretion in approving a settlement with a junior creditor unless the court concludes that priority of payment will be respected." *Id.*

    (c) The Court rejected the notion that the Bankruptcy Code's comprehensive priority scheme was only implicated in Chapter 11 plans, explaining:

> As soon as a debtor files a petition for relief, fair and equitable settlement of creditors' claims becomes a goal of the proceedings. The goal does not suddenly appear during the process of approving a plan of compromise. *Id.*

28. Applying similar logic, the Second Circuit vacated a bankruptcy court's approval of a preplan settlement that distributed estate assets directly to the official committee of unsecured creditors instead of distributing them pursuant to the Code's priority rules. *Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 464 (2d Cir. 2007). The *Iridium* court held that whether a pre-plan settlement complies with the

Bankruptcy Code's distribution scheme is the most important, and often the dispositive factor in determining whether the settlement is "fair and equitable." *Id.* at 464.

29. In this case, the Debtors, the Lenders and the Committee seek to circumvent the Code's priority scheme by causing a distribution to be made to out-of-the-money general unsecured creditors through a settlement agreement. That attempt, like those rejected by the Second and Fifth Circuits, cannot be approved.

30. Although the First Circuit reached a different result in *Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305 (1st Cir. 1993) based on the distinctive facts of that case, its reasoning is consistent with *AWECO* and *Iridium*, which held that the Code's priority scheme applies to a Chapter 11 settlement as well as to a plan. 984 F.2d 1305.

   (a) In *SPM*, a secured creditor and the unsecured creditors' committee entered into an agreement under which the secured creditor and the general unsecured creditors would share whatever proceeds they received through reorganization or liquidation according to a prescribed formula. *Id.* at 1308. The bankruptcy court found that term violated the Code's priority scheme and ordered the funds intended for the unsecured creditors to be paid to the estate instead. *Id.* at 1309.

   (b) Although the First Circuit reversed, it did not hold that the settlement was not subject to the Code's priority scheme. The court held, rather, that once the estate funds were distributed to the creditors in accordance with the Code's rules and priorities, the funds were no longer estate property and could be used or shared by the creditors

without regard to the Bankruptcy Code's requirements.[5] *Id.* at 1313. Simply put, once the funds are no longer estate property, the Bankruptcy Code does not control their distribution. *But see In re Armstrong World Indus., Inc.*, 432 F.3d 507, 514 (3d Cir. 2005) (emphasizing narrow scope of *SPM's* holding and rejecting concept that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive.); *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79 (same).

31. Here, the sale proceeds proposed to be used to make the GUC Payment would be property of the estate rather than of the Lenders. Proceeds received from the sale of a Debtors' assets are estate property, even when those assets are a lender's collateral. *See Woodlawn Auto Workers, F.C.U.*, 757 F.2d 512, 515 (2d Cir. 1985) (conversion in form of property of estate does not change its character as estate property). Such proceeds would not be the Lenders' property unless and until distributed to the Lenders.

    (a) Even upon distribution of the sale proceeds to the Lenders, the Lenders are not necessarily free to do whatever they wish with such funds.

    (b) Regardless of whether the Lenders are free to do as they wish with the sale proceeds once they are distributed to the Lenders, this Court should decline to play any role whatsoever regarding the distribution of such funds to anyone other than the Lenders, as such a role would be beyond the Court's subject matter jurisdiction, as discussed below.

32. Prior decisions in the Third Circuit establish that the Bankruptcy Code's comprehensive priority scheme is not limited to plan confirmation in Chapter 11 cases. If the

---

[5] The U.S. Trustee takes no position at this time whether this holding was correct.

GUC Payment provision were included in a Chapter 11 plan, there can be little doubt that the Third Circuit would find it violates the Code's priority scheme. Although the Third Circuit has not yet addressed the precise issue on appeal, its decisions in *Armstrong* and other cases strongly suggest that the Third Circuit would reach the same result here.

33. In *Armstrong*, the Chapter 11 debtor filed a reorganization plan that proposed to distribute warrants to the debtor's equity holders even though all of the unsecured creditors' claims would not be paid in full. 432 F.3d at 509. The district court denied confirmation because the plan contemplated the transfer of warrants to a junior class–equity holders–even though more senior classes of unsecured creditors would not be paid in full. *Id.* at 510-11. The Third Circuit affirmed, noting that "[a]llowing this particular type of transfer would encourage parties to impermissibly sidestep the carefully crafted strictures of the Bankruptcy Code, and would undermine Congress's intention . . . ." 432 F.3d at 514. The Third Circuit further rejected the idea that equitable considerations or time constraints could justify a different result. *Id.* at 517, 518. *Accord In re DBSD N. Am., supra.*, 634 F.3d at 100-101 (reversing the bankruptcy court's confirmation of a reorganization plan that proposed to give the existing shareholder shares and warrants in the reorganized entity without full payment of the general unsecured creditors claims).[6]

---

[6] The Second Circuit rejected the bankruptcy court's characterization of the shares and warrants as a "gift" from the holders of the second lien debt as well as its reasoning that such "gifting" was permissible when it comes from secured lenders, there is no doubt about their status, understandable reasons exist for the gift, no ulterior motives are involved, and the complaining creditor would not have gotten more in the absence of the gift. *See* 634 F.3d at 87 (explaining bankruptcy court's reasoning). The Second Circuit recognized that "[g]ifting may be a powerful tool in accelerating an efficient and non-adversarial . . . chapter 11 proceeding," but concluded that "Congress was well aware of both its benefits and disadvantages when it codified the [absolute priority] rule in the Bankruptcy Code." *Id.* at 100.

15

34. Further, the Third Circuit has addressed the standards for approving Chapter 11 settlements and held that settlements in Chapter 11, like plans and other aspects of reorganization must be fair and equitable. *In re Nutraquest*, 434 F.3d at 645 (citing *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). Under that standard, the court must consider whether the settlement is fair to all creditors regardless of whether anyone objects. *Id.* at 645. In *Nutraquest*, a creditor alleged that the settlement could not be approved because it prevented the creditor from asserting claims for contribution against the debtor. In affirming the settlement, the court was careful to explain that the disparate treatment alleged by the complaining creditor was not due to the terms of the settlement. *Id.* at 646.

35. The Third Circuit has also addressed the Code's priority scheme in the context of an asset sale in Chapter 11 and the need to remain faithful to that scheme. *In re Trans World Airlines, Inc.*, 322 F.3d 283, 291 (3d Cir. 2003). In *TWA*, the court affirmed a bankruptcy court's interpretation of section 363(f) authorizing the sale of estate property free and clear of other interests based in large measure on its consistency with the Code's priority scheme. The court reasoned that "[t]o allow the claimants [who held low priority general unsecured claims] to assert successor liability claims against [the purchaser] while limiting other creditors' recourse to the proceeds of the asset sale would be inconsistent with the Bankruptcy Code's priority scheme." *Id.* at 292.

36. Other circuit courts also plainly regard consistency with the Code as the prism through which all conduct should be viewed in Chapter 11. For example, the Eighth Circuit in an *en banc* decision that was affirmed by the Supreme Court held that section 506(c) did not

16

grant standing to a creditor to surcharge the collateral of a secured creditor. *In re Hen House Interstate, Inc.*, 177 F.3d 719 (8th Cir. 1999), *aff'd*, 530 U.S. 1 (2000). In reaching its decision, the court concluded that creditor standing "would undermine the carefully crafted equality-of-distribution scheme fundamental to the operation of the Bankruptcy Code." *Id.* at 723-724.

37. These cases establish beyond doubt that the Code's comprehensive priority scheme applies throughout a Chapter 11 case–not just in the context of a reorganization plan.

38. Policy considerations also favor adherence to Congress's comprehensive priority scheme as expressed in the Bankruptcy Code. Bankruptcy is a zero-sum proposition. In most cases, estate assets are insufficient to pay all creditors in full. Every recovery by one claimant therefore comes at the expense of another. Congress decided the order in which different types of claimants should be paid. By codifying its policy choices, Congress sought to ensure that those specific priorities would be applied uniformly in bankruptcy cases, so that individual bankruptcy judges would not be required to make such choices. Congress's prerogative to legislate distribution priorities should be respected, not ignored.

39. Moreover, application of the priority scheme expressed in the Bankruptcy Code makes cases easier to administer and more certain. Creditors know in what order they are entitled to be paid and can more accurately predict the amount, if any, they will receive. Parties will neither need to litigate cases like this one nor fear that bankruptcy courts will decide payment priorities on an *ad hoc* basis in the context of agreements between other parties. In short, applying the Bankruptcy Code as written by Congress makes bankruptcy cases more predictable. It ensures that creditors do not lose faith in the bankruptcy system because they

believe that bankruptcy courts can deny them their statutorily-mandated payment priority on a case by case basis.

**B.     This Court Lacks Subject Matter Jurisdiction to Approve Any Scheme for Distribution of the GUC Payment to General Unsecured Creditors.**

40.     If, as the Debtors assert, the funds earmarked for the GUC Payment will not be property of the Debtors' estates under Section 541[7] of the Bankruptcy Code, this Court does not have subject matter jurisdiction to approve any scheme for distribution of the GUC Payment to the general unsecured creditors.

41.     To the extent there are assets *in the estate* sufficient to allow the payment of a dividend on account of general unsecured claims, the allowance or disallowance of such claims would be a core matter under 28 U.S.C. § 157(b)(2)(B), within the Court's subject matter jurisdiction.

42.     However, the allowance or disallowance of claims that are not claims against the estate but are instead solely claims of creditors *inter se* and payable out of non-estate assets, *i.e.*, the GUC Payment, is a non-core matter.

(a)     The Court may exercise jurisdiction over non-core matters only if they are "related" to the bankruptcy case.

(b)     The usual test of whether a proceeding is "related" to a bankruptcy case is whether "the outcome of that proceeding could conceivably have any effect on the estate

---

[7] This is an assertion with which the U.S. Trustee vehemently disagrees, notwithstanding the recitation in the term sheet that the Debtors and their estates will have no interest in such funds.

18

being administered in bankruptcy." *In re Hall's Motor Transit Co.*, 889 F.2d 520, 522 (3d Cir. 1989), *quoting Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984).

43. If there are insufficient assets in the Debtors' estate to pay a dividend on general unsecured claims, then the outcome of determining the claims of general unsecured creditors *inter se* could not conceivably have any effect on the estate. Thus, any proceeding to allow or disallow such claims, or even to establish a structure for the allowance and/or payment of such claims, is neither a core matter nor a non-core related matter. As in *Hall's Motor Transit, supra*, if the GUC Payment is not an asset of the Debtors' estates, decisions regarding its allocation, use or disposition will not affect the estates. Thus, consideration of unsecured creditors' claims against the GUC Payment, or of a structure for the allowance and/or payment on account of their claims out of the GUC Payment, would fall beyond the Court's subject matter jurisdiction.

44. The term sheet which is the subject of the Motion asserts that the GUC Payment is not property of the Debtors' estates.

45. No provision of the Bankruptcy Code can confer subject matter jurisdiction where it does not exist, nor can such jurisdiction be created by agreement of the parties or even by judicial fiat.

46. Because the relief requested in the Motion requires the Court to become entangled in matters for which it lacks subject matter jurisdiction, the Court cannot grant such relief. Thus, the Court should deny the Motion in its entirety.

WHEREFORE the U.S. Trustee requests that this Court deny the Motion.

Respectfully submitted,

**ROBERTA A. DeANGELIS**
**UNITED STATES TRUSTEE**

Dated: May 3, 2011     **BY:**   /s/ Mark S. Kenney
                        Mark S. Kenney
                        Trial Attorney
                        Office of the United States Trustee
                        J. Caleb Boggs Federal Building
                        844 King Street, Suite 2207, Lockbox 35
                        Wilmington, DE 19801
                        (302) 573-6491
                        (302) 573-6497 (Fax)